## UNITED STATES COURT OF INTERNATIONAL TRADE

### BEFORE: THE HONORABLE TIMOTHY M. REIF, JUDGE

| | |
|---|---|
| HARDWARE RESOURCES, INC., )<br><br>Plaintiff, )<br><br>v. )<br><br>UNITED STATES, )<br><br>Defendant, )<br><br>and )<br><br>COALITION OF AMERICAN MILLWORK )<br>PRODUCERS, )<br><br>Defendant-Intervenor. ) | Ct. No. 23-00150 |

### ORDER

Upon consideration of the Motion for Judgment on the Agency Record of Plaintiff Hardware Resources, Inc., and all other pertinent papers, it is hereby:

ORDERED that Plaintiff's Motion is granted; and it is further

ORDERED that the scope ruling determination by the U.S. Department of Commerce ("Commerce") in a decision memorandum from Henry Wolfe to James Maeder, Final Scope Ruling on the Antidumping and Countervailing Duty Orders on Wood Mouldings and Millwork Products from the People's Republic of China: Request by Hardware Resources, Inc., A-570-117, bar code 4411647-01 (Aug. 2, 2023) (Public Version) (P.R. 25), is remanded to Commerce to reconsider and revise its scope ruling finding that Hardware Resources' edge-glued boards are covered by the scope of the antidumping and countervailing duty orders on wood mouldings and millwork products from the People's Republic of China.

Dated: _____ , 2024
      New York, New York                           _____
                                                            Hon. Timothy M. Reif, Judge

## UNITED STATES COURT OF INTERNATIONAL TRADE

## BEFORE: THE HONORABLE TIMOTHY M. REIF, JUDGE

|  |  |
|---|---|
| HARDWARE RESOURCES, INC., | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| UNITED STATES, | ) |
| | ) |
| Defendant, | )   Ct. No. 23-00150 |
| | ) |
| and | ) |
| | ) |
| COALITION OF AMERICAN MILLWORK | ) |
| PRODUCERS, | ) |
| | ) |
| Defendant-Intervenor. | ) |
| | ) |

## RULE 56.2 MOTION FOR JUDGMENT ON THE AGENCY RECORD OF PLAINTIFF HARDWARE RESOURCES, INC.

Pursuant to Rule 56.2 of the Rules of the U.S. Court of International Trade, Plaintiff Hardware Resources, Inc. hereby moves for judgment on the agency record.  Hardware Resources challenges the final scope ruling determination issued by the U.S. Department of Commerce ("Commerce") on August 2, 2023 finding that Hardware Resources' edge-glued boards are subject to the antidumping and countervailing duty orders on wood mouldings and millwork products from the People's Republic of China.

Hardware Resources seeks judgment on the agency record because Commerce's determinations were unsupported by substantial evidence on the record and not in accordance with law.  For the reasons elaborated in the accompanying brief in support of this Motion, Hardware Resources respectfully requests that this Court grant judgment on the agency record including, but not limited to, the following relief:

1. Finding that Commerce's determination that Hardware Resources' edge-glued boards are "moulding and millwork products" is unsupported by substantial evidence and otherwise not in accordance with law.

2. Finding that Commerce's determination that Hardware Resources' edge-glued boards are "continuously shaped wood, finger-jointed, and edge-glued mouldings or millwork blanks" is unsupported by substantial evidence and otherwise not in accordance with law.

3. Finding that Hardware Resources' edge-glued boards are not within the scope of the antidumping and countervailing duty orders on wood mouldings and millwork products from the People's Republic of China.

4. Ordering Commerce to reconsider and revise its scope ruling consistent with this Court's opinion and findings.

WHEREFORE, for the reasons described in this Motion and the accompanying brief in support, Hardware Resources respectfully requests that this Court enter judgment in its favor. A proposed order is attached for the Court's consideration.

Respectfully Submitted,

Dated: January 26, 2023

/s/ Jill A. Cramer
Jeffrey S. Grimson
Kristin H. Mowry
Jill A. Cramer
Bryan P. Cenko
Evan P. Drake
Mowry & Grimson, PLLC
5335 Wisconsin Ave., NW, Suite 810
Washington, DC 20015
202.688.3610
trade@mowrygrimson.com
*Counsel to Hardware Resources, Inc.*

2

**UNITED STATES COURT OF INTERNATIONAL TRADE**

**BEFORE: THE HONORABLE TIMOTHY M. REIF, JUDGE**

| | |
|---|---|
| **HARDWARE RESOURCES, INC.,** | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| **v.** | ) |
| | ) |
| **UNITED STATES,** | ) |
| | ) **Ct. No. 23-00150** |
| **Defendant,** | ) **PUBLIC VERSION** |
| | ) |
| **and** | ) |
| | ) |
| **COALITION OF AMERICAN MILLWORK** | ) |
| **PRODUCERS,** | ) |
| | ) |
| **Defendant-Intervenor.** | ) |
| | ) |

**BRIEF IN SUPPORT OF RULE 56.2 MOTION FOR JUDGMENT ON THE AGENCY RECORD OF PLAINTIFF HARDWARE RESOURCES, INC.**

Jeffrey S. Grimson
Kristin H. Mowry
Jill A. Cramer
Bryan P. Cenko
Evan P. Drake
Mowry & Grimson, PLLC
5335 Wisconsin Ave., NW, Suite 810
Washington, DC 20015
202.688.3610
trade@mowrygrimson.com
*Counsel to Hardware Resources, Inc.*

January 26, 2024

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................. ii

ADMINISTRATIVE DETERMINATION TO BE REVIEWED ...................................... 1

ISSUE OF LAW PRESENTED .......................................................................................... 1

STATEMENT OF FACTS ................................................................................................... 2

SUMMARY OF ARGUMENT .......................................................................................... 10

STANDARD OF REVIEW ................................................................................................ 12

ARGUMENT ...................................................................................................................... 13

I. Commerce's Determination that Edge-Glued Boards Are "Moulding and Millwork Products" Was Unreasonable Under the Plain Language of the Scope and Commerce Improperly Applied the (k)(1) and (k)(2) Factors .................................................. 13

A. The Plain Language of the Orders Is Dispositive That the Edge-Glued Boards Are Outside the Scope ........................................................................................................................ 15

B. The (k)(1) Factors Establish That Hardware Resources' Edge-glued Boards Are Not Subject to the Scope ..................................................................................................... 20

   1. Commerce's Finding That Hardware Resources' Edge-Glued Boards Are "Wood Mouldings and Millwork Products" Was Not Supported by Substantial Evidence ......... 21

   2. Commerce's Finding That Hardware Resources' Edge-Glued Boards Are Continuously Shaped or Finger-jointed or Edge-glued Moulding or Millwork Blanks Was Not Supported by Substantial Evidence ........................................................................ 30

C. Commerce Should Have Applied the 19 C.F.R. § 351.225(k)(2) Factors ........................................................................................................................ 34

   1. The Edge-Glued Boards Do Not Share the Same Physical Characteristics as In-Scope WMMP .............................................................................................................. 34

   2. The Expectations of the Ultimate Users of Hardware Resources' Edge-Glued Boards Are Different Than the Expectation of In-Scope WMMP Users ..................................... 35

   3. The Edge-Glued Boards Have Different Ultimate Uses Than In-Scope WMMP ......... 36

   4. The Edge-Glued Boards Are Not Sold in the Same Channels of Trade as In-Scope WMMP .............................................................................................................. 37

   5. The Edge-Glued Boards Are Advertised and Displayed in a Different Manner Than In-Scope WMMP ........................................................................................................ 38

II. Conclusion ...................................................................................................................... 39

# TABLE OF AUTHORITIES

**Statutes**

19 U.S.C. § 1516a ............................................................................................. 12

19 U.S.C. § 1671a ............................................................................................. 19

19 U.S.C. § 1673a ............................................................................................. 19

**Regulations**

19 C.F.R. § 351.225 ................................................ 6, 1, 5, 7, 9, 13, 14, 15, 16, 27, 33, 34

**Cases**

Algoma Steel Corp. v. United States, 865 F.2d 240 (Fed. Cir. 1989) .......................................... 17

Arcelormittal Stainless Belg. N.V. v. United States, 694 F.3d 82 (Fed. Cir. 2012) ..................... 12

Consol. Edison Co. v. NLRB, 305 U.S. 197 (1938) ....................................................... 12

Duferco Steel, Inc. v. United States, 296 F.3d 1087 (Fed. Cir. 2002) ............................. 15, 17, 19

Huaiyin Foreign Trade Corp. v. United States, 332 F.3d 1369 (Fed. Cir. 2003) .................. 12, 21

Kaptan Demir Celik Endustrisi Ve Ticaret A.S. v. United States, 46 CIT __, 592 F. Supp. 3d 1332 (2022) ......................................................................................... 17

King Supply Co., LLC v. United States, 674 F.3d 1343 (Fed. Cir. 2012) ............................ 22, 23

Kisor v. McDonough, 995 F.3d 1347 (Fed. Cir. 2021) ................................................... 31

Magnum Magnetics Corp. v. United States, 47 CIT __, 657 F. Supp. 3d 1387 (2023) ......... 13, 17

Marx v. Gen. Revenue Corp., 568 U.S. 371 (2013) ................................................... 18, 31

Meridian Prods., LLC v. United States, 851 F.3d 1375 (Fed. Cir. 2017) ....... 12, 13, 14, 15, 16, 17

Mid Continent Nail Corp. v. United States, 725 F.3d 1295 (Fed. Cir. 2013) ............................. 17

Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29 (1983) ................... 12

Nippon Steel Corp. v. United States, 458 F.3d 1345 (Fed. Cir. 2006) .................................. 12, 34

Oregon Steel Mills, Inc. v. United States, 862 F.2d 1541 (Fed. Cir. 1988) ............................. 20

<u>Sango Int'l, L.P. v. United States</u>, 484 F.3d 1371 (Fed. Cir. 2007)................................................ 34

<u>SKF USA Inc. v. United States</u>, 263 F.3d 1369 (Fed. Cir. 2001).................................................. 30

<u>SMA Surfaces, Inc. v. United States</u>, 47 CIT __, 617 F. Supp. 3d 1263 (2023) ................... 12, 13

<u>Smith Corona Corp. v. United States</u>, 915 F.2d 683 (Fed Cir. 1990)........................................... 18

<u>Universal Camera Corp. v. NLRB</u>, 340 U.S. 474 (1951) ............................................................. 12

<u>Walgreen Co. v. United States</u>, 620 F.3d 1350 (Fed. Cir. 2010).................................................. 13

**Other Authorities**

<u>Regulations to Improve Administration and Enforcement of Antidumping and Countervailing Duty Laws</u>, 86 Fed. Reg. 52,300 (Dep't of Commerce Sept. 20, 2021) ............................ 13, 16

Webster's Third New International Dictionary of the English Language Unabridged (1986)..... 14

<u>Wood Mouldings and Millwork Products from Brazil and China</u>, Conference Transcript (Jan. 29, 2020)......................................................................................................................................... 8

<u>Wood Mouldings and Millwork Products from China</u>, Inv. Nos. 701-TA-636 and 731-TA-1470 (Final), USITC Pub. No. 5157 (Feb. 2021).............................................. 8, 9, 20, 26, 27, 36, 37

<u>Wood Mouldings and Millwork Products From the People's Republic of China: Amended Final Antidumping Duty Determination and Antidumping Duty Order</u>, 86 Fed. Reg. 9,486 (Feb. 16, 2021)............................................................................................................ 3, 4, 16, 22, 23, 30

<u>Wood Mouldings and Millwork Products From the People's Republic of China: Countervailing Duty Order</u>, 86 Fed. Reg. 9,484 (Feb. 16, 2021) ............................................................ 3, 4, 16

In accordance with U.S. Court of International Trade Rule 56.2(c), Plaintiff Hardware Resources, Inc. hereby moves for judgment on the agency record.  The determination by the U.S. Department of Commerce ("Commerce") that Hardware Resources' edge-glued boards are within the scope of the antidumping ("AD") and countervailing duty ("CVD") orders on wood mouldings and millwork products ("WMMP") from the People's Republic of China was not supported by substantial evidence and was otherwise not in accordance with law.  The plain language of the scope, the factors set forth in 19 C.F.R. § 351.225(k)(1) (2023) and the 19 C.F.R. § 351.225(k)(2) factors establish that Commerce unreasonably found that Hardware Resources' edge-boards are within the scope of the AD/CVD Orders on WMMP (collectively "the Orders").  Hardware Resources' edge-glued boards are neither wood mouldings or millwork products nor continuously shaped wood or finger-jointed or edge-glued moulding or millwork blanks.

## ADMINISTRATIVE DETERMINATION TO BE REVIEWED

Pursuant to U.S. Court of International Trade Rule 56.2(c), Hardware Resources seeks review of the final scope ruling determination issued by Commerce on August 2, 2023 erroneously finding that Hardware Resources' edge-glued boards are within the scope of the Orders on WMMP from China.  See Mem. from Henry Wolfe to James Maeder re: Final Scope Ruling on the Antidumping and Countervailing Duty Orders on Wood Mouldings and Millwork Products from the People's Republic of China: Request by Hardware Resources, Inc., A-570-117, bar code 4411647-01 (Aug. 2, 2023) ("Scope Ruling") (P.R. 25).

## ISSUE OF LAW PRESENTED

**Whether Commerce's determination that Hardware Resources' edge-glued boards are "moulding and millwork products" and "continuously shaped wood, finger-jointed, and edge-glued mouldings or millwork blanks" and therefore subject to the Orders was supported by substantial evidence and otherwise in accordance with law.**

Commerce's determination that Hardware Resources' edge-glued boards are "moulding and millwork products" and "continuously shaped wood, finger-jointed, and edge-glued mouldings or millwork blanks" and therefore subject to the AD and CVD Orders on WMMP from China was unsupported by substantial evidence and otherwise not in accordance with law because no reasonable reading of the record evidence supported Commerce's determination that the edge-glued boards are subject to the Orders based on the plain scope language, the (k)(1) factors or the factors set forth in (k)(2).

## STATEMENT OF FACTS

On February 16, 2021, Commerce issued AD and CVD Orders on WMMP from China. The scope of the Orders is as follows:

> The merchandise subject to the Orders consists of wood mouldings and millwork products that are made of wood (regardless of wood species), bamboo, laminated veneer lumber (LVL), or of wood and composite materials (where the composite materials make up less than 50 percent of the total merchandise), and which are continuously shaped wood or finger-jointed or edge-glued moulding or millwork blanks (whether or not resawn). The merchandise subject to the Orders can be continuously shaped along any of its edges, ends, or faces.

> The percentage of composite materials contained in a wood moulding or millwork product is measured by length, except when the composite material is a coating or cladding. Wood mouldings and millwork products that are coated or clad, even along their entire length, with a composite material, but that are otherwise comprised of wood, LVL, or wood and composite materials (where the non-coating composite materials make up 50 percent or less of the total merchandise) are covered by the scope.

> The merchandise subject to the Orders consists of wood, LVL, bamboo, or a combination of wood and composite materials that is continuously shaped throughout its length (with the exception of any end-work/dados), profiled wood having a repetitive design in relief, similar milled wood architectural accessories, such as rosettes and plinth blocks, and finger-jointed or edge-glued moulding or millwork blanks (whether or not resawn). The scope includes continuously shaped wood in the forms of dowels, building components such as interior paneling and jamb parts, and door components such as rails, stiles, interior and exterior door frames or jambs (including split, flat, stop applied, single- or double-rabbeted), frame or jamb kits, and packaged door frame trim or casing sets, whether or not the door components are imported as part of a door kit or set.

The covered products may be solid wood, laminated, finger-jointed, edge-glued, face-glued, or otherwise joined in the production or remanufacturing process and are covered by the scope whether imported raw, coated (e.g., gesso, polymer, or plastic), primed, painted, stained, wrapped (paper or vinyl overlay), any combination of the aforementioned surface coatings, treated, or which incorporate rot-resistant elements (whether wood or composite). The covered products are covered by the scope whether or not any surface coating(s) or covers obscure the grain, textures, or markings of the wood, whether or not they are ready for use or require final machining (e.g., endwork/dado, hinge/strike machining, weatherstrip or application thereof, mitre) or packaging.

All wood mouldings and millwork products are included within the scope even if they are trimmed; cut-to-size; notched; punched; drilled; or have undergone other forms of minor processing.

Subject merchandise also includes wood mouldings and millwork products that have been further processed in a third country, including but not limited to trimming, cutting, notching, punching, drilling, coating, or any other processing that would not otherwise remove the merchandise from the scope of the Orders if performed in the country of manufacture of the in-scope product.

Excluded from the scope of the Orders are countertop/butcherblocks imported as a full countertop/butcherblock panel, exterior fencing, exterior decking and exterior siding products (including solid wood siding, non-wood siding (e.g., composite or cement), and shingles) that are not LVL or finger jointed; finished and unfinished doors; flooring; parts of stair steps (including newel posts, balusters, easing, gooseneck, risers, treads, rail fittings and stair stringers); picture frame components three feet and under in individual lengths; and lumber whether solid, finger-jointed, or edge-glued. To be excluded from the scope, finger-jointed or edge-glued lumber must have a nominal thickness of 1.5 inches or greater and a certification stamp from an American Lumber Standard Committee-certified grading agency. The exclusion for lumber whether solid, finger-jointed, or edge-glued does not apply to screen/"surfaced on 4 sides" (S4S) and/or "surface 1 side, 2 edges" (S1S2E) stock (also called boards) that are finger-jointed and/or edge-glued, or to finger-jointed and/or edge-glued moulding or millwork blanks (whether or not resawn). Accordingly, S4S and S1S2E stock/boards that are not finger-jointed or edge glued are excluded from the scope of the Orders.

Also excluded from the AD Order are all products covered by the scopes of the antidumping duty orders on: (1) hardwood plywood from the People's Republic of China, (2) multilayered wood flooring from the People's Republic of China, (3) wooden cabinets and vanities from the People's Republic of China, and (4) wooden bedroom furniture from the People's Republic of China.

Also excluded from the CVD Order are all products covered by the scopes of the countervailing duty orders on: (1) hardwood plywood from the People's Republic

of China, (2) multilayered wood flooring from the People's Republic of China, and (3) wooden cabinets and vanities from the People's Republic of China.

Imports of wood mouldings and millwork products are primarily entered under the following Harmonized Tariff Schedule of the United States (HTSUS) numbers: 4409.10.0500, 4409.10.1020, 4409.10.1040, 4409.10.1060, 4409.10.1080, 4409.10.4010, 4409.10.4090, 4409.10.4500, 4409.10.5000, 4409.10.9020, 4409.10.9040, 4409.22.0590, 4409.22.1000, 4409.22.4000, 4409.22.5000, 4409.22.5020, 4409.22.5040, 4409.22.5060, 4409.22.5090, 4409.22.9000, 4409.22.9020, 4409.22.9030, 4409.22.9045, 4409.22.9060, 4409.22.9090, 4409.29.0665, 4409.29.1100, 4409.29.4100, 4409.29.5100, 4409.29.9100, 4412.99.5115, 4412.99.9500, 4418.91.9095, and 4421.91.9780. Imports of wood mouldings and millwork products may also enter under HTSUS numbers: 4409.10.6000, 4409.10.6500, 4409.22.6000, 4409.22.6500, 4409.29.6100, 4409.29.6600, 4412.41.0000, 4412.42.0000, 4412.49.0000, 4412.91.5115, 4412.92.5215, 4412.99.9700, 4418.20.4000, 4418.20.8030, 4418.20.8060, 4418.91.9195, 4418.99.9095, 4418.99.9195, 4421.91.9880, 4421.99.9780, and 4421.99.9880. While the HTSUS subheadings are provided for convenience and customs purposes, the written description of the scope of the Orders is dispositive.

Scope Ruling at 2–4; see also Wood Mouldings and Millwork Products From the People's Republic of China: Amended Final Antidumping Duty Determination and Antidumping Duty Order, 86 Fed. Reg. 9,486 (Feb. 16, 2021) ("AD Order"); Wood Mouldings and Millwork Products From the People's Republic of China: Countervailing Duty Order, 86 Fed. Reg. 9,484, 9,485 (Feb. 16, 2021) ("CVD Order").

On March 9, 2023, Hardware Resources filed a Scope Ruling Application asking Commerce to determine that Hardware Resources' edge-glued boards imported from China are not covered by the scope of the Orders. See Letter on Behalf of Hardware Resources to Dep't of Commerce re: Scope Ruling Application (Mar. 9, 2023) (Public Version) ("Scope Ruling Application") (P.R. 1).[1] In its Scope Ruling Application, Hardware Resources described its merchandise as:

solid edge-glued boards made of white birch measuring 8-feet in length and 5/8-inches thick. The height of each board varies from 2.5 to 12 inches. The boards are

---

[1]  All references to the Scope Ruling Application are to the public version unless otherwise noted.

finger-jointed and edge-glued. A UV coating is applied to the boards except the bottom edge that is left uncoated/unfinished. The corners of the boards are lightly sanded to smooth the corners to 1/16 of an inch. The edge-glued boards are raw materials that will be further processed into cabinet parts upon importation to the United States.

At the time of import into the United States, the boards have a small mark ("score") of approximately 1 mm that has been added by a straight saw along the length of the one side of the board that is of superior wood. This mark is later used by Hardware Resources (or its customer) to know which side of the board is to be used to place the groove that is added after import. The marking is removed when a groove is added after importation into the United States.

Id. at 4–5.

In its Scope Ruling Application, Hardware Resources further explained that, after importation into the United States, the edge-glued boards will be further processed into cabinet parts, specifically drawer sides, through post-importation processing including dovetailing and additional machine processing such as notching and drilling. Through this downstream processing in the United States after importation, the marking that exists on the boards at the time of importation is removed and a groove is added over top, with the marking directing where this groove is placed. See id. at 5–6. Hardware Resources also provided Commerce with photographs of its edge-glued boards. See id. at Exs. 1, 4. As it noted in its Scope Ruling Application, Hardware Resources had [████████████████████████████████

████████████████████████████████████████████████

████████████] and further processing of the boards into drawer parts in the United States after importation. See Letter on Behalf of Hardware Resources to Dep't of Commerce re: Scope Ruling Application at 10 (Mar. 9, 2023) (Business Proprietary Document) ("Confidential Scope Ruling Application") (C.R. 1).

In its Scope Ruling Application, Hardware Resources demonstrated that, based on the plain language of the scope, as well as the sources identified in 19 C.F.R. § 351.225(k)(1), the edge-

glued boards are not subject to the scope of the Orders because they are not wood mouldings or millwork products.  <u>See</u> Scope Ruling Application at 13–17.  Instead, unlike WMMP that are intended to be used as coverings for floors, walls, doors and in other areas in residential and non-residential construction, Hardware Resources demonstrated that the edge-glued boards are raw materials that are later produced into cabinet parts following processing after import into the United States.  <u>See id.</u> at 14.  Hardware Resources also established that the edge-glued boards are not in-scope wood mouldings or millwork blanks because the boards are not later machined or moulded into a final profile.  <u>See id.</u> at 16.  Hardware Resources also explained that its edge-glued boards are physically distinguishable from in-scope WMMP by virtue of the UV coating because mouldings and millwork products are generally not UV coated as they are intended to be stained or painted.  <u>See id.</u> at 18.  Further, the edge-glued boards are not in-scope merchandise because they are not finger-jointed or edge-glued wood mouldings or millwork blanks and are not continuously shaped.  <u>See id.</u>

As further support, Hardware Resources cited to a past scope ruling in which Commerce found that certain wood products are not considered wood mouldings or millwork blanks covered by the Orders where they "are not intended to be later manufactured into a moulding or piece of millwork, nor are {they} 'finger jointed or edge-glued.'"  <u>Id.</u> at 16 (citing <u>id.</u> at Ex. 10 (attaching Memorandum from Max Goldman to James Maeder re: Final Scope Ruling on the Antidumping and Countervailing Duty Orders on Wood Mouldings and Millwork Products from the People's Republic of China: Request by Loveday Lumber Company, Inc. (May 16, 2022) ("Loveday Scope Ruling"))).  In the Loveday Scope Ruling, Commerce also determined that Loveday Lumber's products are not continuously shaped, and were thus not covered  by the Orders, because they are

"produced using a straight saw, rather than a moulder or radial saw (i.e., equipment used to shape the wood)."  Id.

Hardware Resources also noted that, during the investigation phase, Petitioner described "finger jointed or edge glued moulding or millwork blanks" as "boards fabricated by joining smaller pieces of wood together, which are later machined or moulded into a final profile."  Scope Ruling Application at Ex. 9 (attaching Letter on Behalf of the Coalition of American Millwork Producers to Dep't of Commerce and Int'l Trade Comm'n re: Responses to First Supplemental Questions on General Issues Vol. I of the Petition at Ex. I-Supp-5, A-570-117, bar code 3932248-01 (Jan. 15, 2020) (Public Version) ("Pet'r Supp. QR")).  Hardware Resources further explained that the edge-glued boards are not in the scope of the Orders based on the 19 C.F.R. § 351.225(k)(2) sources because they have distinct physical characteristics, expectations of ultimate users, ultimate uses, channels of trade and manner in which they are advertised and displayed from WMMP.  See Scope Ruling Application at 17–22.  Hardware Resources provided additional information on its suppliers to Commerce in a supplemental questionnaire response.  See Letter on Behalf of Hardware Resources Inc. to Dep't of Commerce re: Scope Inquiry Supplemental Questionnaire Response, A-570-117, bar code 4361171-01 (Apr. 3, 2023) (Public Version) (P.R. 12).

Hardware Resources also placed on the record determinations by the International Trade Commission ("ITC") that further demonstrated that Hardware Resources' edge-glued boards are not properly considered WMMP.  See, e.g., Scope Ruling Application at 5, 14.  During its investigation, the ITC succinctly explained that "WMMP are lengths of wood molded into various shapes, or profiles, for use in a wide variety of functional and decorative applications in residential and non-residential construction" and "strips of materials used to cover transitions between surfaces (e.g., at the corners between walls and ceilings or at floor intersections), around openings

(e.g., windows and doors) or for decoration in the middle of walls (e.g., chair rails)."  Id. at Ex. 5

(P.R. 2) (attaching Wood Mouldings and Millwork Products from China, Inv. Nos. 701-TA-636

and 731-TA-1470 (Final), USITC Pub. No. 5157 at 8, I-13 (Feb. 2021) (Public Document) ("Final

ITC Report")); see also Letter on Behalf of Hardware Resources to Dep't of Commerce re:

Rebuttal Comments at 15 (May 31, 2023) (Public Version) (P.R. 20) ("Rebuttal Cmts.").  The ITC

then provided definitions for wood mouldings and for millwork products, making clear that there

was an end-use component to those definitions.  Specifically, the ITC defined wood mouldings as:

> a decorative element that is characterized by its placement, the material that it is
> made from, and its profile and level of ornamentation. They are strips of materials
> used to cover transitions between surfaces (e.g. at the corners between walls and
> ceilings or at floor intersections), around openings (e.g. windows and doors) or for
> decoration in the middle of walls (e.g. chair rails). Most homes feature at least door
> and window casings and baseboards, while others can have multiple applications.

Final ITC Report at I-13 (emphasis added).  The ITC elaborated that "there are four main moulding

categories — casing, crown, wall base (baseboard), and wall trim, depending on where it is

installed." Id. at I-14.  The ITC described millwork products as:

> a general term referring to woodwork that is produced in a mill; the universe of
> millwork products is extensive and diverse. This broad category of products
> includes items like window and door frames, mouldings, and other dimension stock
> (worked wood products that are cut or shaped). Millwork products typically are
> installed with screws, nails, or adhesives.

Id. at I-12.  The industry witnesses before the ITC also emphasized end-use, drawing a distinction

between "the moulding and millwork business" and other types of industries such as the "cabinet

manufacturers {and} furniture manufacturers." Rebuttal Cmts. at Ex. 1 (P.R. 20) (attaching Wood

Mouldings and Millwork Products from Brazil and China, Conference Transcript at 149 (P. Burke)

(Jan. 29, 2020) (Prelim.) ("ITC Conf. Tr.")).  Industry witnesses also confirmed that "{t}he

moulding and millwork that we sell is used for decorative purposes."  Id. at 118 (L. Ammons).

Petitioner's counsel specifically drew a distinction between "subject {WMMP imports} and a

separate case, the AD/CVD case on cabinets." Id. at 64 (T. Brightbill).  The ITC also explained that wood mouldings and millwork products are sold to construction companies and contractors, lumber, wholesalers, door manufacturers and home improvement retailers.  See Final ITC Report at I-8.

In response to Hardware Resources' Scope Ruling Application, Petitioner submitted comments arguing that the edge-glued boards are covered by the scope of the Orders, see Letter on Behalf of the Coalition of American Millwork Producers to Dep't of Commerce re: Comments on Hardware Resources' Scope Ruling Application (May 10, 2023) (Public Version) ("Pet'r Cmts.") (P.R. 15), and Hardware Resources submitted rebuttal comments to contest Petitioner's claims, see Rebuttal Cmts.

On August 2, 2023, Commerce issued its final determination on Hardware Resources' Scope Ruling Application.  Referencing "the sources identified in 19 C.F.R. § 351.225(k)(1)," Scope Ruling at 8, Commerce determined that Hardware Resources' edge-glued boards are covered by the Orders because they "match the physical characteristics of merchandise subject to the Orders, as they are made of wood, finger jointed, and edge glued." Id. at 9.  Commerce also found that the edge-glued boards are covered by the scope because "they are made of wood, continuously shaped wood, finger-jointed, and edge-glued mouldings or millwork blanks (whether or not resawn)" and there was "no clear end-use restriction" in the scope.  Id. at 9–11.  Commerce further determined that the 1 mm mark resulted in the boards being continuously shaped because the mark is considered a groove.  See id. at 8–9.  Although Commerce acknowledged that the term "score," was not referenced in the Orders, it found that "other primary sources all point to the score being within the scope." Id. at 9.  Commerce noted that the UV coating applied to the edge-glued boards was not significant for the purposes of its scope determination, because the Orders contain

9

"specific language stating that product{s} 'are covered by the scope whether imported raw, coated (e.g., gesso, polymer, or plastic), primed, painted, stained, wrapped (paper or vinyl overlay), {or} any combination of the aforementioned surface coatings.'" Id.

Commerce also suggested that the Loveday Scope Ruling was distinguishable because "although a similar straight saw is used, the saw is used to make a groove that creates a product that is indistinguishable from a millwork product at time of entry" and "there is no limitation to the type of tools that can be used to produce subject merchandise." Id. at 9. Commerce recognized that the ITC defined WMMP as "lengths of wood 'for use in a wide variety of functional and decorative applications in residential and non-residential construction' and 'strips of materials used to cover transitions between surfaces (e.g., at the corners between walls and ceilings or at floor intersections), around openings (e.g., windows and doors) or for decoration in the middle of walls (e.g., chair rails).'" Id. at 10. Nevertheless, Commerce disregarded the ITC's domestic like product description, which incorporated end use in addition to physical characteristics, on the grounds that the ITC does not define the scope and the scope does not have an end-use restriction. See id. Commerce also stated that while it could consider relevant determinations by Customs and Border Protection ("Customs"), it did not consider classification to be dispositive. See id. Commerce then declined to consider the (k)(2) factors, finding that the (k)(1) sources were dispositive. See id. at 11.

## SUMMARY OF ARGUMENT

Commerce's scope determination ignores the plain scope language in the Orders, which applies only to "wood mouldings or millwork products." By failing to consider whether Hardware Resources' edge-glued boards are considered "mouldings and millwork products" under the plain language of the scope, Commerce improperly applied the three-part scope analysis set forth in its own regulations and established by court precedent and a remand is warranted on that basis alone.

Hardware Resources' edge-glued boards are neither wood mouldings nor millwork products. If Commerce had properly made a determination based on the plain language of the scope, it would have been evident that the phrase "mouldings and millwork products" does not include wood boards imported to be further processed into drawer sides. Hardware Resources' edge-glued boards clearly stand apart from the in-scope products enumerated in the plain language of the Orders. Further, Commerce's determination that the 1 mm mark transforms an otherwise out-of-scope product into "continuously shaped wood, finger-jointed, and edge-glued mouldings or millwork blanks" improperly reads the plain language of the scope.

Even if it was proper for Commerce to have proceeded to the (k)(1) factors before applying the plain scope language contrary to its own regulations and Federal Circuit precedent, Commerce's determination was still unsupported by substantial evidence and not in accordance with law because an analysis of the (k)(1) factors, including the Petition, ITC determination, a past Commerce scope ruling, a past Customs ruling and other materials, demonstrates that Hardware Resources' edge-glued boards are not subject to the scope. Here, no "reasonable mind" could find that both the primary and secondary sources support Commerce's determination that the edge-glued boards are moulding or millwork products and continuously shaped or finger-jointed or edge-glued moulding or millwork blanks.

To the extent Commerce found that the scope or (k)(1) factors were not dispositive, it should have consulted the (k)(2) factors, which establish that Hardware Resources' edge-glued boards are not in-scope moulding and millwork products because they have distinct physical characteristics, expectations of ultimate users, ultimate uses, channels of trade and manner in which they are advertised and displayed from WMMP. The Court should, therefore, determine

that Commerce's finding was unsupported by substantial evidence and otherwise not in accordance with law.

## STANDARD OF REVIEW

Under the applicable standard of review, "{t}he Court shall hold unlawful any determination, finding or conclusion found . . . to be unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B)(i). Specifically, relevant to the legal issue here, whether a product is covered by the language of the scope is "a question of fact reviewed for substantial evidence." Meridian Prods., LLC v. United States, 851 F.3d 1375, 1382 (Fed. Cir. 2017). "{W}ether the unambiguous terms of a scope control the inquiry, or whether some ambiguity exists, is a question of law that {the court} review{s} de novo." Meridian, 851 F.3d at 1382; see also SMA Surfaces, Inc. v. United States, 47 CIT __, 617 F. Supp. 3d 1263, 1272 n.3 (2023) (citing Arcelormittal Stainless Belg. N.V. v. United States, 694 F.3d 82, 89–90 (Fed. Cir. 2012)).

Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Huaiyin Foreign Trade Corp. v. United States, 332 F.3d 1369, 1374 (Fed. Cir. 2003) (quoting Consol. Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)). Substantial evidence supporting an agency determination must be based on the whole record, and the Court shall take into account not only the information that supports the agency's decision but also "whatever in the record fairly detracts from its weight." Nippon Steel Corp. v. United States, 458 F.3d 1345, 1351 (Fed. Cir. 2006) (quoting Universal Camera Corp. v. NLRB, 340 U.S. 474, 477–78 (1951)). Although Commerce does not have to provide perfect explanations, the path of Commerce's decision must be reasonably discernable. See Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43 (1983).

12

**ARGUMENT**

I. **COMMERCE'S DETERMINATION THAT EDGE-GLUED BOARDS ARE "MOULDING AND MILLWORK PRODUCTS" WAS UNREASONABLE UNDER THE PLAIN LANGUAGE OF THE SCOPE AND COMMERCE IMPROPERLY APPLIED THE (K)(1) AND (K)(2) FACTORS**

It is well-established that Commerce's scope analysis involves three steps, the first of which is consideration of the scope language itself.  See Meridian, 851 F.3d at 1381–82.[2]  To determine whether a product falls within the scope of an AD/CVD order, Commerce must first "consider the language of the scope and may make its determination on this basis alone if the language of the scope, including the descriptions of merchandise expressly excluded from the scope, is dispositive."  19 C.F.R. § 351.225(k)(1) (emphasis added).  The Federal Circuit has confirmed that "Commerce's inquiry must begin with the order's scope to determine whether it contains an ambiguity and, thus, is susceptible to interpretation." Meridian, 851 F.3d at 1381 (emphasis added)); see also Walgreen Co. v. United States, 620 F.3d 1350, 1357 (Fed. Cir. 2010) (stating that the language of Commerce's final order is the "cornerstone in any scope determination").  "If the scope {language} is unambiguous, it governs."  Meridian, 851 F.3d at 1381, n. 7.  "The relevant scope terms are 'unambiguous' if they have 'a single or clearly defined or stated meaning.'"  Id. (quoting Unambiguous, Webster's Third New International Dictionary of the English Language Unabridged (1986)).

---

[2]  Commerce's 2021 amendments to 19 C.F.R. § 351.225(k) were Commerce's attempt to consolidate previous practices and incorporate the Federal Circuit's three-step framework outlined in Meridian Products.  See Regulations to Improve Administration and Enforcement of Antidumping and Countervailing Duty Laws, 86 Fed. Reg. 52,300 (Dep't of Commerce Sept. 20, 2021); see also SMA Surfaces, Inc. v. United States, 47 CIT __, 617 F. Supp. 3d 1263, 1272 n.2 (2023) ("In September 2021, Commerce promulgated a final rule that amended the text of 19 C.F.R. § 351.225(k)(1) to reflect the three-step inquiry that had been fashioned by the Federal Circuit's combining of case law and the prior code provisions"); Magnum Magnetics Corp. v. United States, 47 CIT __, 657 F. Supp. 3d 1387, 1394 (2023) ("Since the amendment of 19 C.F.R. § 351.225(k)(1), the U.S. Court of International Trade has interpreted Commerce's revised regulation to reflect the approach in Meridian Products").

If the scope language in the order itself is not dispositive, Commerce's regulations instruct Commerce to determine whether it can make a ruling based on the primary interpretive sources listed in 19 C.F.R. § 351.225(k)(1)(i). <u>See</u> 19 C.F.R. § 351.225(k)(1)(i) ("The following primary interpretive sources <u>may</u> be taken into account under paragraph (k)(1) introductory text of this section . . . .") (emphasis added); <u>see also</u> <u>Meridian</u>, 851. F.3d at 1382 ("Scope orders are interpreted with the aid of other sources as described by regulation").  These primary interpretative sources include:

> (A) The descriptions of the merchandise contained in the petition pertaining to the order at issue;
> (B) The descriptions of the merchandise contained in the initial investigation pertaining to the order at issue;
> (C) Previous or concurrent determinations of the Secretary, including prior scope rulings, memoranda, or clarifications pertaining to both the order at issue, as well as other orders with same or similar language as that of the order at issue; and
> (D) Determinations of the Commission pertaining to the order at issue, including reports issued pursuant to the Commission's initial investigation.

19 C.F.R. § 351.225(k)(1)(i) (A)–(D).  Commerce "may also consider secondary interpretive sources under paragraph (k)(1) introductory text of this section, such as any other determinations of the Secretary or the Commission not identified above, Customs rulings or determinations, industry usage, dictionaries, and any other relevant record evidence."  <u>Id.</u> § 351.225(k)(1)(ii).  To the extent that the primary interpretative sources conflict with the secondary interpretative sources, "the primary interpretative sources will normally govern in determining whether a product is covered by the scope of the order at issue."  <u>Id.</u>  "Although a party's description of merchandise in these sources may aid Commerce in making its determination, that description 'cannot substitute for language in the order itself' because '{i}t is the responsibility of {Commerce}, not those who {participated in} the proceedings, to determine the scope of the final orders.'"  <u>Meridian</u>, F.3d at 1382 (quoting <u>Duferco Steel, Inc. v. United States</u>, 296 F.3d 1087, 1097 (Fed. Cir. 2002)).

If the sources enumerated under section (k)(1) are not dispositive, Commerce will consider the factors under section 351.225(k)(2).  19 C.F.R. § 351.225(k)(2)(i)(A)–(E); see also Meridian, 851 F.3d at 1382.  These (k)(2) factors include: "(i) {t}he physical characteristics of the product; (ii) {t}he expectations of the ultimate purchasers; (iii) {t}he ultimate use of the product; (iv) {t}he channels of trade in which the product is sold; and (v) {t}he manner in which the product is advertised and displayed."  19 C.F.R. § 351.225(k)(2)(i)(A)–(E).  "In the event of a conflict between the factors under paragraph (k)(2)(i) of this section, paragraph (k)(2)(i)(A) will normally be allotted greater weight than the other factors."  Id. § 351.225(k)(2)(ii). "In conducting this analysis, it is well settled that Commerce has discretion in how to balance these factors."  Meridian, 851 F.3d at 1382 (internal citation omitted).

Here, the plain language of the Orders is dispositive and demonstrates that the edge-glued boards are out of scope.  Even if the language of the Orders is not dispositive, the (k)(1) factors establish that the edge-glued boards are not properly covered by the scope.  Finally, even if Commerce were to resort to the (k)(2) factors, it is evident that the edge-glued boards should not be considered subject merchandise.

### A. THE PLAIN LANGUAGE OF THE ORDERS IS DISPOSITIVE THAT THE EDGE-GLUED BOARDS ARE OUTSIDE THE SCOPE

Commerce improperly read the plain scope language in finding that Hardware Resources' edge-glued boards are subject to the AD/CVD Orders on WMMP from China.  The operative scope language of the Orders provides:

> The merchandise subject to this order consists of wood mouldings and millwork products that are made of wood (regardless of wood species), bamboo, laminated veneer lumber (LVL), or of wood and composite materials (where the composite materials make up less than 50 percent of the total merchandise), and which are continuously shaped wood or finger-jointed or edge-glued moulding or millwork blanks (whether or not resawn). The merchandise subject to this order can be continuously shaped along any of its edges, ends, or faces.

AD Order, 86 Fed. Reg. at 9,488 (emphasis added).[3]  The threshold parameter for determining whether a product is within the scope of the Orders, thus, is that they are "wood mouldings and millwork products."  Id.  Then if, and only if, that initial requirement is met, the other limiting factors apply, i.e., items are subject to the scope if they satisfy the following criteria: (1) they are made of wood, bamboo, LVL or of wood and composite materials and (2) they are continuously shaped wood or finger-jointed or edge-glued moulding or millwork blanks.  See id.

The Federal Circuit has made clear that "Commerce's inquiry must begin with the order's scope to determine whether it contains an ambiguity and, thus, is susceptible to interpretation." Meridian, 851 F.3d at 1381 (emphasis supplied).  Indeed, Commerce designed its 2021 amendments to 19 C.F.R. § 351.225(k) to incorporate the Federal Circuit's three-step framework outlined in Meridian and other Federal Circuit cases.  See Regulations to Improve Administration and Enforcement of Antidumping and Countervailing Duty Laws, 86 Fed. Reg. at 52,322–23.  It is plain, therefore, that Commerce's scope analysis must begin with an examination of the scope language itself.

Commerce's scope determination was not supported by substantial evidence and was otherwise not in accordance with law because Commerce erroneously found that the plain language of the scope covered the edge-glued boards with only a cursory discussion.  See Scope Ruling at 8.  Although Commerce acknowledges that the first step of its analysis in a scope inquiry should be to determine whether the language of the scope is dispositive, it appears to have skipped this step and proceeded directly to the (k)(1) factors.  See id.  Commerce stated that "{t}he scope language does not include a definition of 'continuously shaped wood' or what constitutes 'grooved,'" but omitted any discussion of the meaning of the operative phrase "mouldings and

---

[3]  The countervailing duty order has identical language.  See CVD Order, 86 Fed. Reg. 9,484.

millwork products" in the scope language of the Orders.  See id. at 8.  By failing to consider whether Hardware Resources' edge-glued boards are considered "mouldings and millwork products" under the plain language of the scope, Commerce improperly applied the three-part scope analysis set forth in its own regulations and established by court precedent and a remand is warranted on that basis alone.[4]

Even if this Court determines that a remand is not warranted for Commerce's failure to apply the plain language of the scope, Commerce's Scope Ruling was nonetheless unsupported by substantial evidence because Hardware Resources' edge-glued boards are neither wood mouldings nor millwork products.  The scope of an AD/CVD duty order may not be read contrary to its literal language.  See Mid Continent Nail Corp. v. United States, 725 F.3d 1295, 1301–02 (Fed. Cir. 2013); see also Maclean Power, LLC v. United States, 43 CIT __, 359 F. Supp. 3d 1367, 1370–71 (2019).  Nor may Commerce expand the scope beyond its literal terms.  See Duferco Steel, 296 F.3d at 1097 ("{A}lthough the scope of a final order may be clarified, it cannot be changed in a way contrary to its terms.") (quoting Smith Corona Corp. v. United States, 915 F.2d 683, 686 (Fed Cir. 1990)).  If Commerce had properly made a determination based on the plain language of the scope, it would have been evident that the phrase "mouldings and millwork products" does not

---

[4] Although a recent decision of the Court recently held that "Commerce had the discretion to consider the (k)(1) sources when determining whether the scope language plainly spoke to the inclusion or exclusion of {a company's} product, without first characterizing the existence of ambiguity as a condition precedent," that holding is not binding here for several reasons.  See Magnum Magnetics, 47 CIT __, 657 F. Supp. 33d at 1394.  First, the decision by another judge in this Court in Magnum Magnetics is not binding legal precedent.  See, e.g., Kaptan Demir Celik Endustrisi Ve Ticaret A.S. v. United States, 46 CIT __, 592 F. Supp. 3d 1332, 1337 n.1 (2022) ("Of course, the decisions of other trial courts are not binding") (citing Algoma Steel Corp. v. United States, 865 F.2d 240, 243 (Fed. Cir. 1989)).  Further, the holding in Magnum Magnetics conflicts with the Federal Circuit's holding in Meridian as implemented by Commerce's own regulations.  Magnum Magnetics, 47 CIT __, 657 F. Supp. 33d at 1394.

include wood boards imported to be further processed into drawer sides. Wood boards manufactured into drawer sides are plainly not mouldings or millwork for the same reason that cabinet parts, furniture parts, and lumber are not mouldings or millwork, i.e., they are physically distinct products created by different processes for different purposes. Commerce's failure to first consider the plain language reading of the scope violates the canon of surplusage by rendering the entire operative phrase "mouldings and millwork products" superfluous. See, e.g., Marx v. Gen. Revenue Corp., 568 U.S. 371, 392 (2013) ("Under this 'most basic of interpretative canons, . . . {a} statute should be construed so that effect is  given to all of its provisions, so that no part will be inoperative  or superfluous, void or insignificant'") (citation omitted).

Adopting Commerce's reading would result in the following reading of the scope:

The merchandise subject to this order consists of wood ~~mouldings and millwork products~~ that are made of wood (regardless of wood species), bamboo, laminated veneer lumber (LVL), or of wood and composite materials (where the composite materials make up less than 50 percent of the total merchandise), and which are continuously shaped wood or finger-jointed or edge-glued ~~moulding or millwork blanks~~ (whether or not resawn). The merchandise subject to this order can be continuously shaped along any of its edges, ends, or faces.

If any piece of wood shaped along its length or finger-jointed or edge-glued falls under the scope of the Orders, as Commerce found, then "mouldings and millwork products" has no meaning in the scope language and any wood product that was continuously shaped or finger-jointed or edge-glued would be covered, regardless of whether it was or was not a moulding or millwork product. Such an outcome would be nonsensical. See id. at 393 ("the canon against superfluity surely counsels against an interpretation that renders the entire provision at issue superfluous"). A plain language reading of the entire scope – without omitting "mouldings and millwork products," as Commerce does – shows that the scope is dispositive and applies only to mouldings and millwork products, not wood boards later manufactured into drawer parts. Commerce's determination leads to an unlawful expansion of the scope. See Duferco Steel, 296 F.3d at 1097.

18

Further, the scope language is demonstrably only intended to encompass products that are "continuously shaped" or "finger-jointed or edge-glued mouldings or millwork blanks." As noted, in their imported condition, the edge-glued boards do not have a groove or other continuous shaping. Nothing in the scope language indicates that a mere mark or score is considered "continuous shaping." When imported, the boards only bear a mark on one side of the board that signifies the placement of where the groove should be added after importation to the United States. See Scope Ruling Application at 20. The record also showed, as discussed above, that the edge-glued boards are not finger-jointed or edge-glued moulding or millwork blanks because they are used in downstream cabinet making, not as moulding or millwork. Thus, the second threshold parameter for determining whether an article is in scope is also absent.

Commerce's finding that Hardware Resources' products fall within the scope of the AD/CVD Orders on WMMP also raises serious concerns about the legality of Commerce's industry support determination during the investigation phase. Commerce considers a petition to be properly filed on behalf of the industry if:

> (i) the domestic producers or workers who support the petition account for at least 25 percent of the total production of the domestic like product, and
> (ii) the domestic producers or workers who support the petition account for more than 50 percent of the production of the domestic like product produced by that portion of the industry expressing support for or opposition to the petition.

19 U.S.C. §§ 1671a(c)(4), 1673a(c)(4).

Industry support is an "essential element of an affirmative determination" and "underlies the merits of the order {with} lack of industry support provid{ing} a ground for its revocation." Oregon Steel Mills, Inc. v. United States, 862 F.2d 1541, 1545 (Fed. Cir. 1988). Applying Commerce's reading of the scope language means that any wood board is covered by the Orders, thereby leading to an unlawful expansion of the scope of the Orders to cover a wide range of

unrelated wood products such as boards for furniture, pallets, coffins, wine barrels, ladders and birdfeeders.  Because these products were not considered within the scope of the investigation, domestic producers of these products were not included in any industry support determination by Commerce or in the ITC's injury investigation. The ITC defined the domestic like product to include "all WMMP, coextensive with the scope of the investigations."  Final ITC Report at 24. There was no indication that the industry included all downstream producers of wooden cabinet components or the myriad other industries that import wood products for further manufacture, the inevitable result based on Commerce's Scope Ruling.  Unlawfully expanding the scope to cover not wood mouldings and millwork products but any kind of wood boards, raises serious concerns about the legality of Commerce's and the ITC's antidumping determinations, including whether Petitioner met the threshold of industry support necessary for Commerce to initiate the WMMP investigation.

In sum, Commerce's finding that Hardware Resources' edge-glued boards fell within the plain language of the scope of the AD/CVD Orders on WMMP from China was not supported by substantial evidence or otherwise in accordance with law because the plain language of the scope does not cover Hardware Resources' edge-glued boards that are neither wood mouldings or millwork products nor continuously shaped, finger-jointed or edge-glued moulding or millwork blanks.

## B.  THE (K)(1) FACTORS ESTABLISH THAT HARDWARE RESOURCES' EDGE-GLUED BOARDS ARE NOT SUBJECT TO THE SCOPE

Even if it was proper for Commerce to have proceeded to the (k)(1) factors before applying the plain scope language contrary to its own regulations and Federal Circuit precedent, Commerce's determination was still unsupported by substantial evidence and contrary to law under the (k)(1) factors.  Here, no "reasonable mind" could find that both the primary and

secondary sources support Commerce's determination that the edge-glued boards are moulding or millwork products and continuously shaped or finger-jointed or edge-glued moulding or millwork blanks.  See Huaiyin, 332 F.3d at 1374.

   1. **Commerce's Finding That Hardware Resources' Edge-Glued Boards Are "Wood Mouldings and Millwork Products" Was Not Supported by Substantial Evidence**

Commerce's finding that Hardware Resources' edge-glued boards are wood mouldings or millwork products was not supported by substantial evidence because Hardware Resources' edge-glued boards are raw materials that are further processed into drawer parts after importation and not mouldings or millwork.  See Scope Ruling Application at 6, Exs. 1, 4.   In its brief mention of Hardware Resources' arguments relating to the critical threshold question of whether the edge-glued boards are moulding or millwork products buried at the end of its analysis, Commerce stated that "{w}e find that additional arguments made by Hardware resources related to the intended end use of the product (e.g., being further manufacturing into cabinets) are inconsequential.  In this regard, Commerce's practice is not to make scope inclusion or exclusion decisions based on end use requirements absent clear scope language indicating otherwise."  Scope Ruling at 10.  Here, Commerce improperly disregarded the plain statements from the Petition that whether a product is in the scope is indeed based on end use.  Namely, in the Petition, Petitioner stated that "in-scope WMMP share the same general physical characteristics, including shape and materials.  All WMMP are constructed from similar wood inputs and are intended to be used as a covering for floors, walls, doors, and other areas, primarily in residential and non-residential construction." Scope Ruling Application at 14 (emphasis added) (attaching Letter on Behalf of the Coalition of American Millwork Producers to Dep't of Commerce and Int'l Trade Comm'n re: Petitions for the Imposition of Antidumping and Countervailing Duties at 14 (Jan. 7, 2020) (Public Version)

("Petition")).  Thus, according to the Petition, "intent" and "use" are key factors in determining what is and is not WMMP.  Commerce cannot reasonably hide behind a statement that it simply does not consider end-use where Petitioner itself relied on the end use of the product in defining in-scope merchandise.

In characterizing Hardware Resources' arguments related to end-use as "inconsequential," Commerce cited the Federal Circuit's holding in King Supply Co., LLC v. United States, 674 F.3d 1343 (Fed. Cir. 2012).  That case is distinguishable.  In King Supply, the party requesting the scope ruling acknowledged that its imported pipe fittings were "physically identical to those subject to the AD Order" but argued there was an end-use restriction written into the scope and thus its products were not properly considered subject merchandise.  Id. at 1347.  Contrary to Commerce's suggestion in a footnote to the Hardware Resources Scope Ruling that King Supply has a blanket rule against end-use restrictions in the scope, in reality, the Federal Circuit noted that end-use restrictions can be "appropriately utilized in certain cases" and are merely "disfavored" on the grounds that "physical characteristics of an imported product are more readily identifiable than the product's end use, which may be unclear at the time of importation."  Id. at 1348.  The reason for disfavoring per the Court's reasoning in King Supply is thus to prefer the "physical characteristics."

In the WMMP case, as discussed above, the first threshold criteria of the scope is that a product be a "wood moulding {or} millwork product."  Unlike physical characteristics that were plainly stated in the opening sentence of the pipe fittings AD order, see id. at 1345–46,[5] in the WMMP case, the opening sentence first requires that merchandise be a moulding or millwork

---

[5]  "The leading paragraph in the 'product description' section of the Petition identified products subject to the investigation in terms of their physical characteristics ('carbon steel buttweld fittings having an inside diameter of less than 360 millimeters,' and satisfying certain American Society for Testing and Materials ('ASTM') and American National Standards Institute ('ANSI') industry standards for materials and dimensions)."  King Supply, 674 F.3d at 1345–46.

product and only then goes on to clarify what types of moulding or millwork products are subject to the Orders based on physical characteristics. The definition of "wood mouldings {or} millwork products" is inherently end-use based. Thus, this case is distinguishable from the AD order underlying <u>King Supply</u> where the scope contained physical characteristics in its opening sentence to define what a pipe fitting was. <u>See id.</u> ("Here, the AD Order specifies the physical characteristics of all pipe fittings covered by it, then states that the fittings 'are used' in a certain exemplary context"). <u>King Supply</u> does not, therefore, support Commerce's refusal to consider whether a product was actually wood moulding or millwork (an inherently use-based criteria) before finding it in scope. Once end-use is properly considered, the only reasonable reading of the record was that Hardware Resources' edge-glued boards are not covered by the Orders because they are used as drawer sides and not as wood mouldings or millwork.

### i.   The Descriptions of the Merchandise Contained in the Petition Establish That Edge-Glued Boards Are Not Moulding or Millwork Products

The language of the Petition and its supplements further establish that edge-glued boards are not the type of products subject to the scope because they are not wood moulding or millwork products. From the very outset of the initial investigation of WMMP, Petitioner defined in-scope merchandise using an end-use criteria. Specifically, Petitioner stated that that "in-scope WMMP share the same general physical characteristics, including shape and materials. All WMMP are constructed from similar wood inputs and are <u>intended to be used as a covering for floors, walls, doors, and other areas, primarily in residential and non-residential construction</u>." Petition at 14 (emphasis added). Further, the Petition provided the following examples of these residential and non-residential construction uses for in-scope merchandise including:

> These uses include as crown mouldings, which are used where wall and ceiling meet to cover large angles, and cove mouldings, which have a concave profile and are used at corners, including as a ceiling cornice. Wood mouldings and millwork products are also used as interior and exterior door frames or jambs, and as astragals,

which are attached to one of a pair of doors to keep the other from swinging through the opening and also can serve a decorative purpose. Wood mouldings and millwork products also include base caps, which are installed flush against the wall and the top of a baseboard, and corner guards, which are used to protect corners or cover ragged edges where wall coverings and painted surfaces meet at an outside corner. Additional uses, among others, include as base shoes, which are applied where base moulding meets the floor to protect the base from damage and/or to conceal uneven lines or cracks where the base meets the floor; as brickmoulds, which are used as an exterior door and window casing to provide a surface for brick or other siding to butt against; as drip caps, which are applied over exterior window and door frames to keep water from seeping under the siding and to direct water away from window glass; and as battens, which are used to conceal the line where two parallel boards or panels meet.

Id. at 6–7.  The Petition itself, thus, included an end-use definition in crafting the scope language.

In clarifying its proposed scope language before Commerce during the investigation phase, Petitioner doubled down on the parameters for the types of products covered, consistently explaining that wood mouldings and millwork were products that are "used" or have a "purpose" of general building construction.  For instance, Petitioner explained that "{w}ood mouldings and millwork products have a variety of overlapping uses.  For example, both crown mouldings and bed mouldings are used where wall and ceiling meet, whereas base mouldings serve a similar purpose, but where wall and floor meet."  Pet'r Supp. QR at 12.  Further, Petitioner asserted that:

customers and producers generally perceive all types of wood mouldings and millwork products to be a single category of merchandise . . . {,} including baseboards, door/window trim (casing), shoe and quarter rounds . . . dowels, crown and chair moulding, window and door trim, and rosettes . . . {and} mull posts and door frames.

Id. at 13–14.  In addition to these end-use descriptions, Petitioner described "finger jointed or edge glued moulding or millwork blanks" as "boards fabricated by joining smaller pieces of wood together, which are later machined or moulded into a final profile."  Pet'r Supp. QR at Ex. I-Supp-5.  Thus, Petitioner embedded references to end use throughout the Petition and its supplements.

24

Further, Hardware Resources' edge-glued boards are distinguishable from in-scope merchandise because they have a UV coating.  See Scope Ruling Application at 18; see also Petition at 8 (stating that "the moulded pieces may be coated by painting priming, lamination, or wrapping with vinyl, veneer, or paper").  Commerce unreasonably determined that the UV coating "squarely {places Hardware Resources' edge-glued boards} within the scope of the orders."  Scope Ruling at 9.  Commerce's conclusion on this issue once again ignores important end-use distinctions.  Unlike other merchandise coated with materials that are included within the scope of the AD/CVD Orders on WMMP, Hardware Resource's edge-glued boards cannot be used in decorative or functional applications listed in the Petition and other sources gathered during the investigation because they have a UV coating that prevents them for being further painted or stained in the way that wood mouldings and millwork are.  See Scope Ruling Application at 18.

In sum, by providing a consistent description of the products covered by the scope, Petitioner was clearly limiting the scope of the case to a specific category of merchandise, i.e., wood for use in functional and decorative applications in residential and non-residential construction. These types of statements are precisely the kind that Commerce must considered under the (k)(1) factors.  It was improper for Commerce to have blatantly ignored this language by merely disregarding it as "inconsequential."  Throughout the investigation phase, Petitioner made numerous statements establishing that in-scope moulding or millwork products were those that were used in certain enumerated downstream ways.  Drawer sides for cabinets were not listed as one of these downstream uses.  It was thus unreasonable and unsupported by substantial evidence for Commerce to have concluded that edge-glued boards imported to be manufactured into drawer sides for cabinets – not mouldings or millwork – are subject to the Orders.

ii.     **The ITC's Determinations Further Establish That Edge-Glued Boards Are Not Covered by the Orders**

Commerce also improperly disregarded the significant information gleaned during the ITC investigation that demonstrated that wood moulding and millwork products have specific characteristics and end-uses that are wholly distinguishable from Hardware Resources' edge-glued boards.  During its investigation, the ITC succinctly explained that "WMMP are lengths of wood molded into various shapes, or profiles, for use in a wide variety of functional and decorative applications in residential and non-residential construction" and "strips of materials used to cover transitions between surfaces (e.g., at the corners between walls and ceilings or at floor intersections), around openings (e.g., windows and doors) or for decoration in the middle of walls (e.g., chair rails)."  Final ITC Report at 8, I-13.  The ITC then provided definitions for wood mouldings and for millwork products, making clear that there was an end-use component to those definitions.  Specifically, the ITC defined wood mouldings as:

> a decorative element that is characterized by its placement, the material that it is made from, and its profile and level of ornamentation. They are strips of materials used to cover transitions between surfaces (e.g. at the corners between walls and ceilings or at floor intersections), around openings (e.g. windows and doors) or for decoration in the middle of walls (e.g. chair rails). Most homes feature at least door and window casings and baseboards, while others can have multiple applications.

Id. at I-13 (emphasis added).  The ITC elaborated that "there are four main moulding categories — casing, crown, wall base (baseboard), and wall trim, depending on where it is installed."  Id. at I-14.  The ITC described millwork products as:

> a general term referring to woodwork that is produced in a mill; the universe of millwork products is extensive and diverse. This broad category of products includes items like window and door frames, mouldings, and other dimension stock (worked wood products that are cut or shaped). Millwork products typically are installed with screws, nails, or adhesives.

Id. at I-12.  The industry witnesses before the ITC also emphasized end-use, drawing a distinction between "the moulding and millwork business" and other types of industries such as the "cabinet

manufacturers {and} furniture manufacturers." ITC Conference Tr. at 149 (P. Burke). Industry witnesses also confirmed that "{t}he moulding and millwork that we sell is used for decorative purposes." Id. at 118 (L. Ammons). Petitioner's counsel specifically drew a distinction between "subject {WMMP imports} and a separate case, the AD/CVD case on cabinets." Id. at 64 (T. Brightbill). In short, there were numerous determinations and indications during the ITC phase demonstrating that wood mouldings and millwork were "for use in a wide variety of functional and decorative applications in residential and non-residential construction" and "strips of materials used to cover transitions between surfaces (e.g., at the corners between walls and ceilings or at floor intersections), around openings (e.g., windows and doors) or for decoration in the middle of walls (e.g., chair rails)." Final ITC Report at I-13. These descriptions did not remotely suggest that wood boards used to make cabinet drawer sides after importation are considered WMMP.

In its Scope Ruling, Commerce improperly disregarded the ITC's description of wood mouldings and millwork on the grounds that "the goal of the ITC in defining the product subject to the scope differs from that of Commerce." Scope Ruling at 10. This finding, however, ignores the regulations that expressly provide that Commerce should consider "determinations" of the {ITC} . . . including reports issued pursuant to the Commission's initial investigation." 19 C.F.R. § 351.225(k)(1)(i)(D). By failing to contend with the ITC's determination and those of industry witnesses at the ITC conference establishing that the definition of WMMP is inherently based on where and how the product is used, Commerce misapplied its own regulations directing it to consider determinations of the ITC.

Once end-use is properly considered, the record demonstrates that Hardware Resources' edge-glued boards are not wood mouldings or millwork products used in the types of applications recognized during the ITC's phase of the investigation. See Scope Ruling Application at 4. Unlike

wood mouldings and millwork products, Hardware Resources' edge-glued boards are not used to produce mouldings or millwork products and are not moulding or millwork blanks. Specifically, as discussed, the edge-glued boards are not for functional and decorative applications in residential and non-residential construction like in-scope mouldings or millwork products.  <u>See id.</u>  The edge-glued boards are also not standard wood mouldings because they are not worked to a pattern having the same profile in cross section throughout their length.  <u>See id.</u> The edge-glued boards are not strips of materials that are used to cover transitions between surfaces, around openings, or for decoration in the middle of walls.  <u>See id.</u>  Instead, the edge-glued boards are raw materials that are further processed by Hardware Resources into drawer parts, i.e., drawer sides for cabinets after importation into the United States.  <u>See id.</u> at 4-6, Ex. 4; <u>see also</u> Rebuttal Cmts at 4-9. Commerce's failure to consider the ITC determinations on the end-uses of WMMP further rendered its decision unsupported by substantial evidence and contrary to law.

### iii.  Previous Scope Ruling Shows That Hardware Resources' Edge-Glued Boards Are Not Mouldings or Millwork Products

Commerce's own prior determination in the course of the WMMP case further establishes that Hardware Resources' edge-glued boards are not covered by the scope.  Consistent with Petitioner's own description of in-scope merchandise where it characterized "finger jointed or edge glued moulding or millwork blanks" as "boards fabricated by joining smaller pieces of wood together, <u>which are later machined or moulded into a final profile</u>,"  Pet'r Supp. QR at Ex. I-Supp-5 (emphasis added), in a prior scope ruling, Commerce itself determined that certain wood products are not considered to be moulding or millwork blanks where they "are not intended to be later manufactured into a moulding or piece of millwork."  Loveday Scope Ruling at 9.

In the Loveday Scope Ruling, Commerce concluded that Loveday Lumber's wood products were not covered by the scope of the AD/CVD Orders because they are not continuously

shaped wood or finger-jointed or edge-glued mouldings or millwork blanks.  Id. at 9.  Specifically, Commerce found that Loveday's products were not considered mouldings or millwork blanks because "record evidence demonstrates" that they "are not intended to be later manufactured into a moulding or piece of millwork, nor are {they} 'finger jointed or edge-glued.'"  Id.  Thus, at the time of Hardware Resources' Scope Ruling, Commerce had already determined that products that are not mouldings or millwork blanks are not subject to the AD/CVD Orders.

Commerce ignored the key findings in Loveday Scope Ruling in its Scope Ruling on Hardware Resources' edge-glued boards.   Instead, as described above, Commerce merely concluded that the "arguments made by Hardware {R}esources related to the intended end use of the product (e.g., being further manufacturing into cabinets) are inconsequential."  Scope Ruling at 10.  Commerce cannot, however, lawfully find in its Loveday Scope Ruling that an end-use descriptor, i.e., whether the merchandise was "intended to be later manufactured into a moulding or piece of millwork," was determinative, while rejecting such an end-use characteristic here as being "inconsequential."  Id.  Here, as discussed above, consistent with the Loveday Scope Ruling, Hardware Resources' edge-glued boards fall outside of the scope of the AD/CVD Orders on WMMP because they are not intended to be later manufactured into a moulding or piece of millwork.  By failing to reach a conclusion consistent with its prior ruling for Loveday where the key question was whether the product was "intended to be later manufactured into a moulding or piece of millwork," Commerce's determination that Hardware Resources' edge-glued boards are subject to the Orders on WMMP was not supported by substantial evidence and otherwise not in accordance with law.  See id.  Further, Commerce acted arbitrarily by treating Hardware Resources' edge-glued boards differently from its Loveday Lumber scope ruling.  See SKF USA Inc. v. United States, 263 F.3d 1369, 1382 (Fed. Cir. 2001) ("{I}t is well-established that 'an agency action is

arbitrary when the agency offers insufficient reasons for treating similar situations differently'" (citation omitted)).

> **2.  Commerce's Finding That Hardware Resources' Edge-Glued Boards Are Continuously Shaped or Finger-jointed or Edge-glued Moulding or Millwork Blanks Was Not Supported by Substantial Evidence**

Not only did Commerce improperly find that Hardware Resources' products are "wood mouldings or millwork" products but it also compounded its error by concluding that Hardware Resources' edge-glued boards are "continuously shaped or finger-jointed or edge-glued moulding or millwork blanks." Scope Ruling at 11.  Commerce gave no reason whatsoever for its conclusion that Hardware Resources' edge-glued boards were "moulding or millwork blanks."  Further, Commerce apparently determined that a "1 mm mark ('score')" was continuous shaping, concluding without any factual support whatsoever that "there is no evidence that the score differs in any material way from a groove, which is a type of continuous shaping."  Id. at 9.  As noted, to fall within the scope of the Orders, a moulding or millwork product (which the edge-glued boards are not) must also be "continuously shaped wood" or "finger-jointed or edge-glued moulding or millwork blanks."  AD Order, 86 Fed. Reg. at 9,488.  An analysis of the (k)(1) factors demonstrates that the 1 mm mark or score in Hardware Resources' edge-glued boards is not properly considered a groove or otherwise considered continuous shaping and the boards are not moulding or millwork blanks.

The Petition included an excerpt from the Harmonized Tariff Schedule of the United States ("HTSUS") (a source considered under (k)(1)), providing that continuously shaped wood means wood that is "tongued, grooved, rebated, chamfered, V-jointed, beaded, molded, rounded or the like along any of its edges, ends or faces, whether or not planed, sanded, or end-jointed."  Scope Ruling Application at 15 & Ex. 7 (Petition at Ex. I-10) (P.R. 2).   Petitioner further described a

"groove" as a "cut with, or parallel to the grain."  Pet'r SQR at 5.  Additional U.S. Note 1 to Chapter 44 of the HTSUS defines standard wood mouldings (also spelled as "moldings") as "wood moldings worked to a pattern and having the same profile in cross section throughout their length." Additional U.S. Notes 1(a) to Chapter 44, HTSUS (attached as Scope Ruling Application at Ex. 6 (P.R. 1)).  Nowhere in these definitions is "score" or "mark" mentioned as a type of continuous shaping.  The only logical conclusion, one that Commerce failed to reach, is that Petitioner could have included the terms "marked" or "scored" in this list, but did not do so.  The inclusion of so many specific examples of shaping, without any reference whatsoever to "marked" or "scored" are absent, suggests in line with the well-known canon of *expressio unius est exclusio alterius* that temporarily-marked boards were never intended to be included together with the other examples. See, e.g., Kisor v. McDonough, 995 F.3d 1347, 1349 (Fed. Cir. 2021) ("the expression of one thing implies the exclusion of others"); see also Marx v. Gen. Revenue Corp., 568 U.S. 371, 392 (2013). Nothing in the Petition, therefore, suggests that scoring constitutes a type of continuous shaping. Nor did anything in the Petition suggest boards imported to be manufactured into cabinet drawer parts after importation are subject to the scope as moulding or millwork blanks.

Hardware Resources' edge-glued boards are not reasonably regarded as continuously shaped because the boards do not undergo the types of processing described in the tariff schedule that would render the boards as continuously shaped or as described by Petitioners as a "cut with, or parallel to the grain." Scope Ruling Application at 15.  As noted, in the condition that they are imported, the edge-glued boards do not have a groove but bear a shallow, 1 mm mark on one side of the board that signifies the placement of where the groove should be added after importation to the United States.  See id.  Despite this record evidence and its acknowledgement that the term "score" is not a term used in the scope, Commerce determined that the 1 mm equates to continuous

NONCONFIDENTIAL DOCUMENT
CONFIDENTIAL INFORMATION REMOVED

shaping.  See Scope Ruling at 8–9.  Commerce further stated, without any legal or factual support, that "in the case of Hardware Resources edge-glued planks, although a similar straight saw is used, the saw is used to make a groove that creates a product that is indistinguishable from a millwork product at time of entry."  Id. at 9.  The evidence placed on the record by Hardware Resources demonstrated that the boards do not have a groove or other shaping referenced in the scope and were made using a type of saw distinct from those used in moulding and millwork.  Indeed, Hardware Resources explained to Commerce that it had [ █████████████████████████ ██████████████████████████████████████████████ ████████████████████████████ ].  Confidential Scope Ruling Application at 10. What would be the point of [ ████████████████████████████████ ] continuously shaped?  Further, there was no factual evidence to the contrary on the record.

Moreover, Commerce once again ignored a key principle from the Loveday Scope Ruling in which Commerce found that Loveday's products are not continuously shaped and not moulding or millwork blanks because they are "produced using a straight saw, rather than a moulder or radial saw (i.e., equipment used to shape the wood)" and "are not intended to be later manufactured into a moulding or piece of millwork."  Loveday Scope Ruling at 9.  Like Loveday's product, Hardware Resources' edge-glued boards are produced using a straight saw and not a moulder or radial saw. See Scope Ruling Application at 7, 15–16 (explaining that the mark is added "using a straight saw along the length of one side of the board that is of superior wood" (emphasis added)); see also id. at Ex. 8 (showing picture of a straight saw).  "The marking has no function other than as a visual guide for where a groove will be added after importation."  Id. at 7.  In its Scope Ruling, Commerce acknowledged that Hardware Resources' edge-glued boards are produced using a "straight saw," but it nonetheless found that "the saw issued to make a groove that creates a product that is

indistinguishable from a millwork product at the time of entry." Scope Ruling at 9. Neither logic nor a reasonable reading of the record supports Commerce's conclusion. Commerce has established via the Loveday Scope Ruling that wood products cut with a straight saw rather than moulder or radial saw and that are not "later manufactured into a moulding or piece of millwork" are not subject merchandise, and its failure to follow its own past scope ruling rendered its decision unsupported by substantial evidence and contrary to law.

Finally, a past Customs ruling demonstrates that Hardware Resources' edge-glued boards are not continuously shaped. Customs had determined that a wood board is not continuously shaped if it is only planed and eased. See Rebuttal Cmts. at 17, Ex. 4 (attaching Customs Ruling No. N326074 (June 8, 2022)). Although Hardware Resources discussed this Customs ruling on the record, Commerce entirely ignored this issue in its Scope Ruling. See Scope Ruling at 10, n. 62 (explaining only that Commerce is not bound to follow Customs decisions and not whether it is proper to consider the interpretation of meanings of terms such as "continuous shaping"). Although Commerce is not bound by Customs decisions, they nonetheless represent persuasive secondary interpretative sources regarding the meaning of continuous shaping. See 19 C.F.R. § 351.225(k)(1)(ii). Because Hardware Resources' edge-glued boards are merely planed and eased (along with the mark), they are not continuously shaped as Customs has defined that term. See Customs Ruling N326074. Customs' definition is consistent with the other primary (k)(1) factors, i.e., the Petition and Commerce's past Loveday Scope Ruling. See 19 C.F.R. § 351.225(k)(1)(ii) (explaining that the primary interpretative sources govern over the secondary interpretative sources). Commerce's disregard of a Customs ruling without any analysis was not supported by substantial evidence because Commerce failed to properly apply its own interpretative factors set forth in (k)(1) and to take into account "whatever in the record fairly detracts from {the} weight"

of its determination that Hardware Resources' edge-glued boards fall within the scope of the AD/CVD Orders on WMMP.  Nippon Steel, 458 F.3d at 1351.

In short, applying the (k)(1) factors, it is evident that Commerce's determination that Hardware Resources' products fall within the scope of the AD/CVD Orders on WMMP was also unsupported by substantial evidence and not in accordance with law because the only reasonable reading of the record was that Hardware Resources' edge-glued boards are not continuously shaped and are not finger-jointed or edge-glued mouldings or millwork blanks.

### C. COMMERCE SHOULD HAVE APPLIED THE 19 C.F.R. § 351.225(K)(2) FACTORS

Although Commerce did not need to consider the (k)(2) factors because, as shown above, the plain language of the scope and (k)(1) factors alone are determinative in establishing that Hardware Resources' edge-glued boards are not subject to the Orders, to the extent Commerce misapplied the plain language of the scope and (k)(1) factors and, instead, the Court regards the scope and (k)(1) factors as ambiguous or not dipositive, an analysis of the (k)(2) factors further confirms that Hardware Resources' edge-glued boards are not covered by the scope of the AD/CVD Orders.  See Sango Int'l, L.P. v. United States, 484 F.3d 1371, 1379 (Fed. Cir. 2007) (to be dispositive, (k)(1) sources "must be 'controlling' of the scope inquiry in the sense that they definitively answer the scope question"); 19 C.F.R. § 351.225(k)(2).

### 1. The Edge-Glued Boards Do Not Share the Same Physical Characteristics as In-Scope WMMP

Hardware Resources submitted evidence on the record demonstrating that the edge-glued boards do not share the same physical characteristics as in-scope WMMP because, unlike mouldings and millwork products, the edge-glued boards are scored with a straight saw and do not have decorative profiles on their face.  See Scope Ruling Application at Ex. 1, 4.  As explained above, the edge-glued boards at the time of importation bear a shallow mark of approximately 1

mm added to signify where a groove will be added upon importation.  In-scope wood mouldings and millwork products would not have a shallow mark like Hardware Resources' edge-glued boards because in-scope wood mouldings and millwork products are intended to be used either as decorative or functional applications in constructions and not as cabinet parts.  <u>See, e.g.</u>, Pet'r SQR at Ex. I-Supp-5.  Further, the edge-glued boards are UV coated whereas mouldings and millwork products are generally not coated with UV as they are intended to be stained or painted.  <u>See</u> Petition at 8 (stating that "the moulded pieces may be coated by painting, priming, lamination, or wrapping with vinyl, veneer, or paper").  This UV coating is a critical distinguishing factor in the physical characteristics of Hardware Resources' boards versus in-scope WMMP.  In short, the record demonstrated that Hardware Resources' edge-glued boards do not have the same physical characteristics as in-scope WMMP.

### 2. The Expectations of the Ultimate Users of Hardware Resources' Edge-Glued Boards Are Different Than the Expectation of In-Scope WMMP Users

Record evidence also shows that the expectations of ultimate users of Hardware Resources' edge-glued boards are different from the expectations of ultimate users of in-scope merchandise.  <u>See</u> Scope Ruling Application at Ex. 7, 9.  As described in the Petition, purchasers of wood mouldings and millwork products would expect to use wood mouldings and millwork products primarily in residential and non-residential construction to adorn walls and other structural parts of a building.  <u>See</u> Petition at 6; Final ITC Report at 8.  By contrast, Hardware Resources purchases the edge-glued boards as raw materials with the expectation that they will be further processed into and used as drawer parts.  Hardware Resources' own customers will then purchase the finished drawer sides or assembled drawer boxes manufactured by Hardware Resources or its customers in the United States.  The ultimate users of WMMP have wholly distinct expectations.  Here too the

record demonstrates that ultimate users do not have the same expectations for Hardware Resources' edge-glued boards as they do for in-scope WMMP.

### 3. The Edge-Glued Boards Have Different Ultimate Uses Than In-Scope WMMP

The record evidence further demonstrated that Hardware Resources' edge-glued boards have different uses than in-scope merchandise. See Scope Ruling Application at Ex. 7, 9. As explained in the Petition, wood mouldings and millwork products are used in exterior and interior applications in residential and non-residential construction:

> These uses include as crown mouldings, which are used where wall and ceiling meet to cover large angles, and cove mouldings, which have a concave profile and are used at corners, including as a ceiling cornice. Wood mouldings and millwork products are also used as interior and exterior door frames or jambs, and as astragals, which are attached to one of a pair of doors to keep the other from swinging through the opening and also can serve a decorative purpose. Wood mouldings and millwork products also include base caps, which are installed flush against the wall and the top of a baseboard, and corner guards, which are used to protect corners or cover ragged edges where wall coverings and painted surfaces meet at an outside corner. Additional uses, among others, include as base shoes, which are applied where base moulding meets the floor to protect the base from damage and/or to conceal uneven lines or cracks where the base meets the floor; as brickmoulds, which are used as an exterior door and window casing to provide a surface for brick or other siding to butt against; as drip caps, which are applied over exterior window and door frames to keep water from seeping under the siding and to direct water away from window glass; and as battens, which are used to conceal the line where two parallel boards or panels meet.

Petition at 6–7. Hardware Resources' edge-glued boards are not used in the types of applications described in the Petition. Unlike in-scope WMMP, Hardware Resources' edge-glued boards are not used to produce mouldings or millwork products and not moulding or millwork blanks. Specifically, as discussed, the edge-glued boards are not for functional and decorative applications in residential and non-residential construction like in-scope mouldings or millwork products. Instead, the edge-glued boards are raw materials that are further processed by Hardware Resources into drawer parts, i.e., drawer sides after importation into the United States. See Scope Ruling

Application at 7.  Further, as noted, the edge-glued boards are UV coated whereas mouldings and millwork products are generally not UV coated as they are intended to be stained or painted.  See id. at 4–9, 18–20.  This UV coating is a critical differentiating factor in that the UV coating makes the boards unsuitable or incapable of being stained or painted. The UV coating disqualifies the use of Hardware Resources' edge-glued boards from being used as millwork or mouldings.  Because Hardware Resources' edge-glued boards bear a mark to signify where a groove will be added after importation, they are also not suitable for use as in the foregoing applications named in the Petition.  Instead, they are used to make drawer parts following significant processing after importation.  The ultimate uses of Hardware Resources' edge-glued boards and in-scope WMMP are clearly different.

### 4.   The Edge-Glued Boards Are Not Sold in the Same Channels of Trade as In-Scope WMMP

The record evidence establishes that Hardware Resources' edge-glued boards are not sold in the same channels of trade as in-scope merchandise.  See Scope Ruling Application at Ex. 1, 4.  Wood mouldings and millwork products are sold through distributors, retail, or direct to end users, see id. at 14, as well as to construction companies and contractors, lumber wholesalers, door manufacturers and home improvement retailers.  See Final ITC Report at 8–9.  By contrast, Hardware Resources internally processes the edge-glued boards in the United States including adding a groove, dovetailing and other further processing to produce cabinet drawer parts.  See Scope Ruling Application at 21.  For some boards, Hardware Resources sells to customers who themselves produce cabinet drawer parts.  Further processing by Hardware Resources in the United States includes dovetailing as well as additional machine processing such as notching and drilling.  See id.  The edge-glued boards, in the condition as imported, are not sold through downstream customers such as distributors or retailers because the boards are intended to be further processed

by Hardware Resources or its customer into cabinet drawer parts.  Notably, unlike in-scope mouldings or millwork blanks that are sold in the channels of trade described by Petitioner and intended to be further manufactured into mouldings or millwork products, the edge-glued boards, are only sold directly to Hardware Resources for further production into cabinet drawer parts or, to Hardware Resources' own customers, who are themselves producers of cabinet drawers.

### 5. The Edge-Glued Boards Are Advertised and Displayed in a Different Manner Than In-Scope WMMP

Further, the unrebutted record evidence showed that Hardware Resources' edge-glued boards are advertised and displayed in a different manner than in-scope WMMP.  See Pet'r SQR at 13–14.  Petitioner described advertising and display of wood mouldings and millwork products as follows:

> Major retailers like Home Depot advertise various types of subject merchandise, including baseboards, door/window trim (casing), shoe and quarter rounds, and "general purpose" moulding (which includes items like S4S boards), all under the broader category of "Moulding & Millwork" products. Similarly, Lowe's website advertises dowels, crown and chair moulding, window and door trim, and rosettes under a single "Moulding and Millwork" grouping. Major domestic producers like Sierra Pacific Industries also list various types of the domestic like product, including finger-jointed mouldings, mull posts and door frames, on a single product offerings webpage for under "Mouldings & Millwork."

Id.  Unlike in-scope merchandise, Hardware Resources does not advertise or display the edge-glued boards in the condition that they are imported.  Indeed, because the edge-glued boards are not generally sold to downstream customers, they are not advertised or displayed through any channel of trade other than the quantity sold to other cabinet producers.  In-scope merchandise therefore has a different manner of advertising and display than Hardware Resources' boards.  In sum, it is evident applying the (k)(2) criteria that Hardware Resources' edge-glued boards are not within the scope based on the analysis under the (k)(2) factors as explained above.

## II.   CONCLUSION

For the foregoing reasons, the Court should grant Hardware Resources' Motion for Judgment on the Agency Record because Commerce's Scope Ruling was unsupported by substantial evidence on the record and not in accordance with law.

Respectfully submitted,


/s/ Jill A. Cramer
Jeffrey S. Grimson
Kristin H. Mowry
Jill A. Cramer
Bryan P. Cenko
Evan P. Drake
Mowry & Grimson, PLLC
5335 Wisconsin Ave., NW, Suite 810
Washington, DC 20015
202.688.3610 (ph)
trade@mowrygrimson.com
*Counsel to Hardware Resources, Inc.*

## CERTIFICATE OF COMPLIANCE

As required by Paragraph 2 of the Standard Chambers Procedures of the Court of International Trade, I, Jill A. Cramer, hereby certify that this brief complies with the word limitations set forth in Paragraph 2(B) of the Standard Chamber Procedures. Excluding the table of contents, table of authorities, signature block and any certificates of counsel, the word count for this brief is 13,369 words. This brief thus complies with the Standard Chambers Procedures, which permits briefs of 14,000 words or fewer.

January 26, 2024

/s/ Jill A. Cramer
Jill A. Cramer
Mowry & Grimson, PLLC
5335 Wisconsin Avenue, NW, Suite 810
Washington, DC 20015
202-688-3610 (ph)
202-595-8968 (fax)
*Counsel to Plaintiff*