## UNITED STATES COURT OF INTERNATIONAL TRADE

## BEFORE: THE HONORABLE JOSEPH A. LAROSKI, JR., JUDGE

| | |
|---|---|
| HARDWARE RESOURCES, INC., | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| UNITED STATES, | ) |
| | ) |
| Defendant, | ) Ct. No. 23-00150 |
| | ) |
| and | ) |
| | ) |
| COALITION OF AMERICAN MILLWORK PRODUCERS, | ) |
| | ) |
| Defendant-Intervenor. | ) |
| | ) |

**REPLY BRIEF OF PLAINTIFF HARDWARE RESOURCES, INC. IN SUPPORT OF RULE 56.2 MOTION FOR JUDGMENT ON THE AGENCY RECORD**

Jill A. Cramer
Jeffrey S. Grimson
Bryan P. Cenko
Evan P. Drake
Mowry & Grimson, PLLC
5335 Wisconsin Ave., NW, Suite 810
Washington, DC 20015
202.688.3610
trade@mowrygrimson.com
*Counsel to Hardware Resources, Inc.*

Dated: June 24, 2024

## TABLE OF CONTENTS

Table of Authorities ................................................................................................ i

ARGUMENT ....................................................................................................... 1

**I.   Hardware Resources' Edge-Glued Boards Are Not Mouldings or Millwork Products Under the Plain Language of the Scope** ...................................................... 2

   **A.   Commerce Failed to Answer the Threshold Question of Whether an Article Is a "Moulding or Millwork Product" Under the Scope Language** ............................. 2

   **B.   King Supply Is Distinguishable and Does Not Govern This Case** ................ 5

   **C.   The United States and CAMP Mischaracterize Hardware Resources' Argument About UV Coating** ........................................................................................ 8

**II.   The (k)(1) Sources Confirm That Hardware Resources' Edge-Glued Boards Are Not Subject to the Scope** ............................................................................... 9

   **A.   The (k)(1) Sources Confirm That Hardware Resources' Boards Are Not "Mouldings or Millwork Products"** ..................................................................... 9

   **B.   Record Evidence Does Not Support Commerce's Finding That Hardware Resources' Boards Are Continuously Shaped, or Finger-jointed or Edge-glued Moulding or Millwork Blanks** ............................................................................. 15

**III.   The United States and CAMP Mischaracterize Hardware Resources' Argument About Industry Support** ..................................................................................... 20

**IV.   The United States and CAMP Fail to Rebut the Application of the (k)(2) Factors** .. 21

**Conclusion** ...................................................................................................... 21

# TABLE OF AUTHORITIES

## Regulations

19 C.F.R. § 351.225 ......................................................................................... 1, 2, 19

## Cases

Atkore Steel Components, Inc. v. United States, 42 CIT __, 313 F. Supp. 3d 1374  (2018) ....... 13

Burlington Truck Lines, Inc. v. United States, 371 U.S. 156 (1962) ...................................... 3, 18

Eckstrom Indus. v. United States, 254 F.3d 106 (Fed. Cir. 2001) .................................. 3

Huaiyin Foreign Trade Corp. v. United States, 322 F.3d 1369 (Fed. Cir. 2003) ........................ 19

King Supply Co., LLC v. United States, 674 F.3d 1343 (Fed. Cir. 2012)............... 5, 6, 7, 8, 9, 10

Kisor v. McDonough, 995 F.3d 1347 (Fed. Cir. 2021) ................................................ 18

Lamie v. U.S. Tr., 540 U.S. 526 (2004)........................................................................ 3

Marx v. Gen. Revenue Corp., 568 U.S. 371 (2013) .................................................. 18

Meridian Prods., LLC v. United States, 851 F.3d 1375 (Fed. Cir. 2017)....................................... 2

Nippon Steel Corp. v. United States, 458 F.3d 1345 (Fed. Cir. 2006) .................................. 10, 15

Star Pipe Prods. v. United States, 44 CIT __, 463 F. Supp. 3d 1366 (2020)........................ 11, 13

Star Pipe Prods. v. United States, 45 CIT __, 537 F. Supp. 3d 1362 (2021).............................. 11

Star Pipe Prods. v. United States, No. 17-00236, 2024 Ct. Intl. Trade LEXIS 26 (Mar. 6, 2024) ...................................................................................................................... 11

Star Pipe Products v. United States, 43 CIT __, 365 F. Supp. 3d 1277 (2019)..................... 11, 13

Stein Indus. Inc. v. United States, 43 CIT __, 365 F. Supp. 3d 1364 (2019) ............................... 7

Trade Associates Group v. United States, 38 CIT 131, 961 F. Supp. 2d 1306 (2014).............. 6, 7

Universal Camera Corp. v. NLRB, 340 U.S. 474 (1951) ...................................... 10, 19

## Other Authorities

Regulations to Improve Administration and Enforcement of Antidumping and Countervailing Duty Laws, 86 Fed. Reg. 52,300 (Dep't of Commerce Sept. 20, 2021).................................. 19

Wood Mouldings and Millwork Products From the People's Republic of China: Amended Final
    Antidumping Duty Determination and Antidumping Duty Order, 86 Fed. Reg. 9,486 (Feb. 16,
    2021)..........................................................................................................................................1

Wood Mouldings and Millwork Products From the People's Republic of China: Countervailing
    Duty Order, 86 Fed. Reg. 9,484 (Feb. 16, 2021) ......................................................................1

In accordance with Rules 56.2(c) and 81 of the Rules of the U.S. Court of International Trade, Plaintiff Hardware Resources, Inc. ("Hardware Resources") hereby replies to the response briefs of Defendant United States and Defendant-Intervenor Coalition of American Millwork Producers ("CAMP").  <u>See</u> Def.'s Resp. Pl.'s. Mot. J. Agency R. (Mar. 26, 2024), ECF No. 32 ("Def. Br."); Def.-Intervenor's Resp. Pl's. Mot. J. Agency R. (Apr. 26, 2024), ECF No. 34 ("CAMP Br.").

## ARGUMENT

The ruling by the U.S. Department of Commerce ("Commerce") that Hardware Resources' edge-glued boards are "mouldings and millwork products" and "continuously shaped wood, finger-jointed, and edge-glued mouldings or millwork blanks" and therefore subject to the antidumping ("AD") and countervailing duty ("CVD") Orders on wood moulding and millwork products ("WMMP") from China (collectively "the Orders")[1] was unsupported by substantial evidence and otherwise not in accordance with law.  <u>See</u> Mem. from Henry Wolfe to James Maeder re: Final Scope Ruling on the Antidumping and Countervailing Duty Orders on Wood Mouldings and Millwork Products from the People's Republic of China: Request by Hardware Resources, Inc. at 1, 11 (Aug. 2, 2023) ("Scope Ruling") (P.R. 25).  The plain language of the scope of the Orders as well as the factors set forth in 19 C.F.R. § 351.225(k)(1) and (k)(2) (2023) establish that Hardware Resources' edge-glued boards are not within the scope.  The arguments by the United States and CAMP in their response briefs to the contrary are without merit and should be rejected.

---

[1]  <u>See</u> <u>Wood Mouldings and Millwork Products From the People's Republic of China: Amended Final Antidumping Duty Determination and Antidumping Duty Order</u>, 86 Fed. Reg. 9,486 (Feb. 16, 2021); <u>Wood Mouldings and Millwork Products From the People's Republic of China: Countervailing Duty Order</u>, 86 Fed. Reg. 9,484 (Feb. 16, 2021).

I.   **HARDWARE RESOURCES' EDGE-GLUED BOARDS ARE NOT MOULDINGS OR MILLWORK PRODUCTS UNDER THE PLAIN LANGUAGE OF THE SCOPE**

   A.  **Commerce Failed to Answer the Threshold Question of Whether an Article Is a "Moulding or Millwork Product" Under the Scope Language**

The arguments by the United States and CAMP that Commerce's Scope Ruling was supported by substantial evidence and in accordance with law under the plain language of the scope are unavailing.  It is uncontroverted that Commerce's scope analysis must begin with an examination of the scope language itself.  See 19 C.F.R. § 351.225(k); see also Meridian Prods., LLC v. United States, 851 F.3d 1375 (Fed. Cir. 2017).  The threshold parameter for determining whether products are within the scope of the Orders is whether they are "wood mouldings and millwork products."  Scope Ruling at 2-4 (P.R. 25).  Then, if, and only if, that initial requirement is met, the other limiting factors apply, i.e., items are subject to the scope if they satisfy the following criteria: (1) they are made of wood, bamboo, LVL or of wood and composite materials and (2) they are continuously shaped wood or finger-jointed or edge-glued moulding or millwork blanks.  See id.  Commerce was not permitted to skip over the first twelve words of the scope as it did in its Scope Ruling and focus only on the remainder of the opening sentence of the scope language that then sets the parameters of the types of wood mouldings and millwork products that are covered.

Neither the United States nor CAMP provides any reasonable justification for Commerce's failure to consider these key terms in the scope.  The United States argues that Commerce did not skip this primary step in its analysis but rather found that "the scope contains no clear end-use restrictions."  Def. Br. at 20 (citing Scope Ruling at 10 (P.R. 25)).  This response fails to grapple with the scope language itself, and Commerce's cursory dismissal of the actual scope language in the Scope Ruling was not supported by substantial evidence or in accordance with the law.  Whether an item is covered by the scope of the WMMP Orders is inherently based on the product's

end use as a wood moulding or millwork product.  As discussed in Hardware Resources' opening

brief, Commerce's failure to consider the words "wood mouldings and millwork products" in the

first sentence of the scope rendered these words superfluous in the scope language and thus

unsupported by substantial evidence.  See Pl.'s Br. Supp. R. 56.2 Mot. J. Agency R. at 18 (Jan. 26,

2024), ECF No. 30 (Public Version) ("Hardware Resources R. 56.2 Br.").  The United States fails

to meaningfully address this argument, stating that "wood mouldings and millwork products" is

an umbrella term defined by the remaining scope language.  Def. Br. at 21-22.  If, as the United

States suggests, the term "wood mouldings and millwork products" is merely an "umbrella term,"

id., then any product "made of wood . . . which {is} continuously shaped . . . or finger-jointed or

edge-glued" would be subject to the scope and there would have been no need to include the term

"wood mouldings and millwork products" in the scope description at all.  See id. at 9.  Commerce

may not lawfully interpret the scope in a manner that renders language in the first sentence of the

scope language to be surplusage.  See, e.g., Eckstrom Indus. v. United States, 254 F.3d 1068, 1073

(Fed. Cir. 2001) (rejecting a construction that rendered scope terms "mere surplusage").

        The United States argues that, to the extent that the phrase "wood mouldings and millwork

products" could be viewed as surplusage, "the preference for avoiding surplusage constructions is

not absolute."  Def. Br. at 22 n. 5 (citing Lamie v. U.S. Tr., 540 U.S. 526, 536 (2004)).  This

argument constitutes impermissible post-hoc rationalization that must be disregarded by this Court,

as this reasoning was not articulated by Commerce itself in its Scope Ruling.  See Burlington Truck

Lines, Inc. v. United States, 371 U.S. 156, 168-169 (1962) (holding that an agency's discretionary

order must be upheld "if at all, on the same basis articulated in the order by the agency itself").  In

addition, as discussed in Hardware Resources' opening brief and below, neither the plain language

nor the (k)(1) or (k)(2) factors support a reading of the scope that would render the term "wood mouldings and millwork products" to be unnecessary.

The United States and CAMP also attempt to appropriate Hardware Resources' argument, claiming it is Hardware Resources' interpretation that renders certain scope language to be superfluous.  See Def. Br. at 22; CAMP Br. at 8.  These arguments are meritless.  With regard to the United States' argument, there are many reasons specific exclusions are listed in the scope language.  For example, the listed exclusions may be products that simultaneously fall under two orders or arose as a result of comments filed by interested parties.  In all cases, the exclusions include products that were considered over the course of the investigation and for which Commerce made a specific determination.  Cf. Def. Br. at 18.  If a product is not contemplated during an investigation because it is an entirely different class or kind of product, there would be no need to list it among the exclusions.  No exclusion is needed for products not covered in the first place such as Hardware Resources' edge-glued boards.

There is also no merit to CAMP's argument that Hardware Resources' interpretation renders the remainder of the scope language superfluous.  First, Hardware Resources has never argued, as CAMP suggests, that "Commerce should have stopped its analysis . . . less than half a sentence into the scope language."  CAMP Br. at 8.  Rather, the point is that Commerce was not permitted to entirely skip over the reference to the "wood mouldings and millwork products" language.  The remainder of the scope language is not redundant.  Rather, the threshold question is whether the product qualifies as a "wood moulding and millwork product" that then meets the other additional qualifying language in the remainder of the scope.  See Hardware Resources R. 56.2 Br. at 16.  As described in Hardware Resources' opening brief, by failing to first start with whether Hardware Resources' edge-glued boards are "mouldings or millwork products,"

Commerce's Scope Ruling is unsupported by substantial evidence and not in accordance with law because Commerce improperly applied the scope analysis framework established in its own regulations and court precedent and a remand is warranted on that basis.

### B. __King Supply__ Is Distinguishable and Does Not Govern This Case

The United States' and CAMP's contentions that Commerce may not find a product to be excluded from the scope based on end-use absent "clear exclusionary language," Def. Resp. Br. at 16; CAMP Br. at 6-7, hinges on a flawed interpretation of King Supply Co., LLC v. United States, 674 F.3d 1343 (Fed. Cir. 2012). The United States (and CAMP by reference) appears to argue that Commerce reasonably ignored the inclusion of the terms "wood mouldings and millwork products" in the scope language under King Supply. King Supply has key distinguishing facts, and Commerce's reliance on that case to support its Scope Ruling is not supported by substantial evidence or in accordance with law.

In King Supply, the sole basis for exclusion of the product in question, a pipe fitting, was the end-use of the product. The party requesting the scope ruling acknowledged that its pipe fittings were "physically identical to those subject to the AD Order" but argued there was an end-use restriction written into the scope and thus its products were not properly considered subject merchandise. King Supply, 674 F.3d at 1347. By contrast, Hardware Resources disputes that its edge-glued boards are physically identical to in-scope mouldings or millwork products, and does not contend merely that they should be excluded solely because they are used as drawer sides. Rather, as discussed in its opening brief and Scope Ruling Application, Hardware Resources' boards are excluded from the scope because they have key physical differences. See Hardware Resources R. 56.2 Br. at 18. The United States and CAMP conflate "boards" with "mouldings or millwork products," and nothing in the plain language of the scope, or – as discussed below and in Hardware Resources' opening brief – in the (k)(1) or (k)(2) factors, suggests that Petitioner,

Commerce or the International Trade Commission ("ITC") contemplated that wood boards like those imported by Hardware Resources should be considered mouldings and millwork products.

The Federal Circuit in <u>King Supply</u> held that "end-use restrictions do not apply to AD orders <u>unless the AD order at issue</u> includes clear exclusionary language." <u>King Supply</u>, 674 F.3d at 1349 (emphasis added).    The Federal Circuit elaborated:

> Here, the *AD Order* specifies the physical characteristics of all pipe fittings covered by it, then states that the fittings "<u>are used</u>" in a certain exemplary context. This language is reasonably understood as exemplary and not absolute, despite the absence of more direct qualifiers that could have been included in the *AD Order* such as "for example" or "principally used," as the Trade Court would require. For example, some cups "are used" to hold liquids, but also "are used" to hold pencils. While these examples shed light on the functional capabilities of the cups, they do not necessarily preclude other uses for such cups.  <u>The phrase "are used" alone does not compel a reading of an exclusive end-use, and it does not render a reading of an exemplary use unreasonable or outside the scope of Commerce's broad authority to interpret its own AD orders</u>.

<u>Id.</u> (emphases added).  Using the example provided by the Court in <u>King Supply</u>, if there was an AD/CVD order on cups, some in-scope cups can be "used" to hold liquids, and they can also be "used" to hold pencils, and thus Commerce would not find an exclusive end-use without the express exclusionary terms.  Extending this example, if there was an AD/CVD order on "pencil holders," the product name itself would contain an inherent end-use or downstream application that Commerce would not be free to ignore.  Similarly, in the instant case, the term "wood mouldings and millwork products" has an inherent end-use that Commerce was not free to disregard.  <u>King Supply</u> did not address the scenario at issue in this case, i.e., how to interpret an AD/CVD order that has an implicit, inherent end use incorporated into the scope language.

The Court has recognized in multiple instances that <u>King Supply</u> is applicable only where, unlike the instant case, there is no dispute as to whether the product at issue is physically identical to in-scope merchandise.  For example, in <u>Trade Associates Group v. United States</u>, 38 CIT 131, 961 F. Supp. 2d 1306 (2014), the Court distinguished <u>King Supply</u> as prohibiting end-use as a

6

basis for exclusion from the scope only when the product at issue met the physical description in the scope and end-use is the sole basis of distinction between the product at issue and in-scope products. There, the Court explained,

> {T}he holding in <u>King Supply</u> sheds no light on the issue this case presents. . . . The plaintiff in <u>King Supply</u> conceded that its imported fittings "are identical to those subject" to the antidumping order but argued that these fittings were outside of the scope because they were not actually used to join sections of piping systems but instead were "for structural use in applications such as handrails, fencing, and guardrails." Commerce concluded that the scope language sentence was not an "end-use" provision but rather that it uses piping systems only as an example "where a permanent, welded connection is desired" and that "<u>the language 'are used' does not mean that the use identified is necessarily the exclusive use</u>." . . . The Court of Appeals determined that the "are used" language at issue in <u>King Supply</u> was not sufficiently clear to render unreasonable the Department's interpretation that the scope did not preclude other uses.

<u>Trade Assocs. Grp.</u>, 38 CIT at 146, 961 F. Supp. 2d at 1318-19 (emphases added) (citations omitted); <u>see also</u> <u>Stein Indus. Inc. v. United States</u>, 43 CIT __, 365 F. Supp. 3d 1364 (2019) (holding that Commerce failed to address the plaintiff's arguments relating to a product's physical characteristics and incorrectly relied on <u>King Supply</u>).

These cases demonstrate that the end-use restrictions created by <u>King Supply</u> apply only when (1) end-use is the sole basis of distinction and (2) the scope language has created ambiguity as to whether other uses are precluded. By contrast, in the instant case, there are key physical characteristics that distinguish Hardware Resources' boards from in-scope products. Further, the scope language in the instant case is not ambiguous. The term "wood mouldings and millwork products" incorporates an inherent threshold end-use for defining in-scope products.

Hardware Resources agrees that "this case is more straightforward than the scope language in <u>King Supply</u>," Def. Br. at 18, but not for the reason advanced by the United States. Unlike the scope language at issue in <u>King Supply</u>, the WMMP Orders do not contain "are used" or other qualifying language that creates an ambiguity as to whether the listed uses are exhaustive or merely

exemplary. Rather, the opening sentence of the WMMP scope <u>requires</u> that merchandise be a wood moulding or millwork product in order to be covered by the scope and then goes on to clarify what types of mouldings or millwork products are subject to the Orders based on physical characteristics. Unlike the scope language at issue in <u>King Supply</u> in which an ambiguity was created by the "are used" language, the terms "wood mouldings or millwork products" have, in themselves, an inherent meaning inextricably tied to the end-use of these products. Further, contrary to Commerce's suggestion that <u>King Supply</u> created a blanket rule against end-use restrictions in the scope, <u>see</u> Scope Ruling at 10, n. 58 (P.R. 25), in reality, the Federal Circuit noted in that case that end-use restrictions can be "appropriately utilized in certain cases" and are merely "disfavored" on the grounds that "physical characteristics of an imported product are more readily identifiable than the product's end use, which may be unclear at the time of importation." <u>King Supply</u>, 674 F.3d at 1348.

In short, <u>King Supply</u> does not support the lawfulness of Commerce's disregard of the threshold issue of whether the edge-glued boards are "wood mouldings or millwork product." The arguments of United States overstate the implications of that case and are unavailing.

### C. The United States and CAMP Mischaracterize Hardware Resources' Argument About UV Coating

Both the United States and CAMP mischaracterize Hardware Resources' arguments regarding UV coating. They argue that applying a coating does not remove a product from the scope because the scope language states that subject merchandise can be coated. <u>See</u> Def. Br. at 30; CAMP Br. at 9-10. That claim obfuscates the real point. Hardware Resources does not claim that UV coating alone takes the edge-glued boards outside the scope. Rather, the use of a UV coating demonstrates Hardware Resources' edge-glued boards are distinguishable from in-scope merchandise. Unlike other merchandise coated with materials that are included within the scope,

Hardware Resource's edge-glued boards cannot be used in decorative or functional applications listed in the Petition and other sources gathered during the investigation because they have a UV coating that prevents them for being further painted or stained in the manner of wood mouldings and millwork.  See Letter on Behalf of Hardware Resources to Dep't of Commerce re: Scope Ruling Application at 18 (Mar. 9, 2023) (Public Version) ("Scope Ruling Application") (P.R. 1). Commerce's failure to recognize that UV coating further demonstrates the way in which Hardware Resources' edge-glued boards are distinguishable from the merchandise covered by the scope., i.e., wood mouldings and millwork products, further rendered Commerce's determination unsupported by substantial evidence necessitating a remand to Commerce.

## II.  THE (K)(1) SOURCES CONFIRM THAT HARDWARE RESOURCES' EDGE-GLUED BOARDS ARE NOT SUBJECT TO THE SCOPE

### A. The (k)(1) Sources Confirm That Hardware Resources' Boards Are Not "Mouldings or Millwork Products"

Any ambiguity that might exist regarding whether edge-glued boards are in-scope "mouldings and millwork products" is resolved through consideration of the (k)(1) sources. Commerce failed to properly consider substantial record evidence from the Petition, the ITC investigation and a prior scope ruling that Hardware Resources' edge-glued boards are not "mouldings or millwork products" and for this reason Commerce's decision was unsupported by substantial evidence and a remand is warranted. See Hardware Resources R. 56.2 Br. at 23-30.

The United States and CAMP argue that Commerce reasonably ignored this overwhelming record evidence because it does not establish "the requisite 'clear exclusionary language,'" they claim was mandated by King Supply.  Def. Resp. at 22; CAMP Resp. at 8-9.  King Supply does not create a blanket rule that absolves Commerce of its responsibility to consider all evidence on the record, including the (k)(1) sources, that may detract from its conclusion.  See Nippon Steel

Corp. v. United States, 458 F.3d 1345, 1350-51 (Fed. Cir. 2006); see also Universal Camera Corp. v. NLRB, 340 U.S. 474, 488 (1951).

The United States cursorily dismisses evidence in the Petition, Petitioner's questionnaire responses during Commerce's investigation, the ITC Report and key witness testimony on the basis of the alleged limitation in King Supply on conducting an end-use analysis of scope language. See Def. Br. at 22-23. Nothing in King Supply or other authority cited by the United States or CAMP suggests that Commerce is absolved of its responsibility to evaluate evidence concerning usage in the (k)(1) sources that may be contrary to its interpretation of the scope. Indeed, the Federal Circuit in King Supply considered the (k)(1) sources and found that these sources supported Commerce's determination that there was no end-use restriction in the plain language of the scope. King Supply, 674 F.3d at 1350. Among other things, the Court found that the ITC "expressly noted the use of the subject pipe fittings in a variety of contexts, including structural applications for which King alleges its pipe fittings are used . . . clearly indicating that the ITC did not consider piping systems as the sole end-use for the subject pipe fittings." Id. In contrast to King Supply, the (k)(1) sources in this case overwhelmingly support a finding that the products subject to the WMMP Orders have an inherent end-use that does not encompass Hardware Resources' edge-glued boards.

Contrary to the suggestion by the United States that King Supply supports Commerce's disregard of the (k)(1) sources cited by Hardware Resources in its Scope Ruling Application, Def. Br. at 22-23, the Court has previously remanded scope determinations in which Commerce has failed to contend with evidence of distinct end-uses in the (k)(1) sources. For example, in the Star Pipe litigation, the Court issued multiple remands to Commerce for its failure to properly consider record evidence in the (k)(1) sources, including evidence in these sources related to usage that

detracted from Commerce's conclusion that the products at issue were in-scope. In Star Pipe Products v. United States, 43 CIT __, 365 F. Supp. 3d 1277 (2019) ("Star Pipe I"), the Court remanded Commerce's scope ruling finding that flanges were in the scope of the antidumping order on non-malleable cast iron pipe fittings from China because Commerce failed to address, among other things, evidence in the petition that flanges were not used in the industries discussed in the petition. See id., 43 CIT at __, 365 F. Supp. 3d at 1282 ("The petition… also stated that virtually all subject fittings are used in fire protection systems and steam heat conveyance systems whereas Star Pipe's flanges 'are for the water and wastewater industries and are not generally used in fire protection systems or steam heat conveyance systems.'" (citing the scope ruling request and underlying petition)). The Court also held that Commerce selectively read the ITC report and failed to meaningfully address evidence in that report that suggested that "pipe fittings subject to the Order are those used in pipe fitting applications" while there was evidence on the record in the scope proceeding that Star Pipe's ductile iron flanges were "not suitable for, and are not approved for, use in pipe fitting applications." Id., 43 CIT at __, 365 F. Supp. 3d at 1283 (emphases added). That case then led to several additional remands after Commerce continued to selectively read the ITC report to overlook language on end use and the Court found that Commerce had failed to properly take into account the (k)(1) sources. See, e.g., Star Pipe Prods. v. United States, 44 CIT __, 463 F. Supp. 3d 1366 (2020); see also Star Pipe Prods. v. United States, 45 CIT __, 537 F. Supp. 3d 1362, 1376 (2021); Star Pipe Prods. v. United States, No. 17-00236, 2024 Ct. Intl. Trade LEXIS 26 (Mar. 6, 2024). What is clear from the Star Pipe litigation is that Commerce must consider all evidence in the (k)(1) sources, including evidence relating to usage. Commerce may not ignore evidence that does not support its ultimate conclusion, as it did in this case.

The United States' and CAMP's remaining arguments regarding evidence in (k)(1) sources are similarly unpersuasive. The United States, as did Commerce below, unreasonably disregards the numerous places in the Petition in which the Petitioner defined the subject merchandise by reference to end use. See Def. Br. at 23; see also Hardware Resources R. 56.2 Br. at 23-24 (discussing abundant examples in the administrative record where Petitioner discusses end use as the basis for explaining what is meant by "mouldings or millwork products"). Ignoring the ample evidence that contradicts its position, the United States focuses on one sentence in the Final ITC Report that states that "'{m}illwork is a general term referring to woodwork that is produced in a mill; the universe of millwork products is extensive and diverse.'" Def. Br. at 23 (citing Wood Mouldings and Millwork Products from China, Inv. Nos. 701-TA-636 and 731-TA-1470 (Final), USITC Pub. No. 5157 at I-12 (Int'l Trade Comm. Feb. 2021) (Public Document) ("Final ITC Report") (attached to Scope Ruling Application at Ex. 5 (P.R. 2)). The United States argues that this is proof that the term "mouldings and millwork" has no inherent meaning. See Def. Br. at 23. The United States takes this sentence out of context. The entire passage reads as follows:

> WMMP are wood-constructed products used mainly in residential and non-residential buildings and can be used for both interior and exterior applications. These products have both functional (e.g. door jamb) and decorative (e.g. mouldings) uses but are not structural (e.g. framing). Millwork is a general term referring to woodwork that is produced in a mill; the universe of millwork products is extensive and diverse. This broad category of products includes items like window and door frames, mouldings, and other dimension stock (worked wood products that are cut or shaped). Millwork products typically are installed with screws, nails, or adhesives.

Final ITC Report at I-12 (P.R. 2) (emphases added).

Taken as a whole, and placing the sentence cited by the United States in context, this excerpt from the Final ITC Report demonstrates that the universe of millwork products includes an entirely different class or kind of product than wood boards used for drawer sides. As the Court

noted in Star Pipe, Commerce may not cherry pick certain language that supports its position, while ignoring the substantial evidence that contradicts it.  See Star Pipe I, 43 CIT at __, 365 F. Supp. 3d 1286 ("{Commerce} did not consider the petition, and its analysis of the ITC Report was so selective and cursory as to ignore a substantial amount of information relevant to the scope question presented in this case.  Commerce must correct these deficiencies in responding to this Opinion and Order.").  As recognized in Star Pipe I, consideration of (k)(1) sources importantly "reduces the risk that antidumping duties will be imposed absent an affirmative ITC injury or threat finding."  Star Pipe I, 43 CIT at __, 365 F. Supp. 3d at 1285-86 (citing Atkore Steel Components, Inc. v. United States, 42 CIT __, __, 313 F. Supp. 3d 1374, 1381-82 (2018)).

There is also no support for the United States' argument that evidence in the Final ITC Report can be ignored because the goal of the ITC "is to determine whether injury has occurred, not to redefine the scope of an Order."  Def. Br. at 24.  The evidence in the Final ITC Report is not intended to "redefine" the Orders but to ensure that Commerce does not "inadvertently impose antidumping duties on a 'class or kind of foreign merchandise'" for which the ITC has not made an injury finding.  See Atkore, 42 CIT at __, 313 F. Supp. 3d at 1381.  In its Scope Ruling, Commerce erroneously dismissed the ITC's discussion of end uses on the basis that the ITC makes a separate inquiry regarding injury.  See Scope Ruling at 10 (P.R. 25).  But Commerce could make such a claim in all scope cases and precedent makes clear that Commerce is not permitted to ignore the ITC's findings on end-use.  See, e.g., Star Pipe I, 43 CIT at __, 365 F. Supp. 3d at 1285-86.  Commerce may not reasonably disregard the findings in the Final ITC Report in favor of a selective reading of the information both in that report and elsewhere in the record.

The United States and CAMP also unconvincingly downplay the importance of the Loveday Scope Ruling.  In its Scope Ruling Application, Hardware Resources noted that

Commerce had previously found a product to be out of scope where it was "not intended to be later manufactured into a moulding or piece of millwork." Scope Ruling Application at 16 (P.R. 1) (emphasis added) (citing Mem. from Max Goldman to James Maeder re: Final Scope Ruling on the Antidumping and Countervailing Duty Orders on Wood Mouldings and Millwork Products from the People's Republic of China: Request by Loveday Lumber Company, Inc. (May 16, 2022) (Public Document) ("Loveday Scope Ruling") (attached to Scope Ruling Application at Ex. 10) (P.R. 3)). Neither the United States nor CAMP provides any reasonable justification supporting Commerce's decision to ignore this key finding concerning the inherent end use in the definition of WMMP. CAMP argues that Commerce did not find Loveday Lumber's merchandise to be excluded "simply because" it was not intended to be later manufactured into a moulding or millwork product but rather based its decision on additional factors. CAMP Br. at 10. The United States similarly argues that the Loveday Scope Ruling can be distinguished because the merchandise was "not continuously shaped" and did not undergo "planning or other moulding-type manufacturing processes" and Loveday Lumber's lengthwise-sawn products were not "finger-jointed or edge-glued." Def. Br. at 25.

The United States and CAMP ignore a key finding in the Loveday Scope Ruling that unequivocally affirms that intended use of the product governs whether that product is subject to the WMMP Orders. There, Commerce noted as "an initial matter" that "Loveday Lumber's LWS wood products are not 'moulding or millwork blanks'" because "record evidence demonstrates that Loveday Lumber's LWS wood products are not intended to be later manufactured into a moulding or piece of millwork." Loveday Scope Ruling at 9 (P.R. 3). Thus, how Loveday Lumber intended to use its products formed the primary reason for Commerce's scope decision. While there were additional factors supporting its decision in the Loveday Scope Ruling, Commerce was

14

not free to ignore this key consideration in evaluating Hardware Resources' edge-glued boards. See Nippon Steel Corp., 458 F.3d at 1351. In addition, as discussed in Hardware Resources' opening brief and below, Hardware Resources' boards are not continuously shaped. See Hardware Resources R. 56.2 Br. at 30-34. Commerce's failure to apply the same reasoning to Hardware Resources' product that it did in the Loveday Scope Ruling rendered its determination unsupported by substantial evidence and contrary to law. The United States and CAMP fail to provide any reasonable support for Commerce's departure from its determination in the Loveday Scope Ruling that an item is not covered by the scope of the WMMP case where it is not intended to be later manufactured into a moulding or millwork product. Commerce's disavowal of the reasoning in the Loveday Scope Ruling was yet another reason its Scope Ruling as to Hardware Resources' product was unsupported by substantial evidence and not in accordance with law.

### B. Record Evidence Does Not Support Commerce's Finding That Hardware Resources' Boards Are Continuously Shaped, or Finger-jointed or Edge-glued Moulding or Millwork Blanks

As discussed in Hardware Resources opening brief, the (k)(1) sources demonstrate that Hardware Resources' edge-glued boards are not continuously shaped and that its boards are not finger-jointed or edge-glued moulding or millwork blanks. See Hardware Resources R. 56.2 Br. at 30-34. Commerce's determination to the contrary in its Scope Ruling is unsupported by substantial record evidence, and neither the United States nor CAMP is able to justify Commerce's conclusion on this issue.

In its Scope Ruling, Commerce provided no basis in the record for its finding that Hardware Resources' products are mouldings or millwork blanks, despite evidence on the record that Petitioner described "finger jointed or edge glued moulding or millwork blanks" as "boards fabricated by joining smaller pieces of wood together, which are later machined or moulded into a final profile." Letter on Behalf of the Coalition of American Millwork Producers to Dep't of

Commerce and Int'l Trade Comm'n re: Responses to First Supplemental Questions on General Issues Vol. I of the Petition at Ex. I-Supp-5 (Jan. 15, 2020) (emphasis added) (attached to Scope Ruling Application Ex. 10) (P.R. 3)). Hardware Resources' boards are not later machined or moulded into a final profile, a fact that Commerce entirely ignored. As discussed above, Commerce also ignored its previous finding in the Loveday Scope Ruling that Loveday's products were not "mouldings or millwork blanks" because Loveday's products were "not intended to be later manufactured into a moulding or piece of millwork." Loveday Scope Ruling at 9 (P.R. 3).

Commerce's determination that the 1 mm mark on Hardware Resources' boards constitutes a "groove" (and the boards are therefore "continuously shaped"), is also unsubstantiated, for the reasons discussed in Hardware Resources' opening brief. Neither the United States nor CAMP points to any discussion in Commerce's Scope Ruling or in the record evidence that supports Commerce's conclusion that a mere 1 mm temporary marking is the same as a "groove." Cf. Def. Br. at 26-30. The United States cites to an excerpt of the U.S. Harmonized Tariff Schedule in the Petition defining "continuously shaped" to include wood that is "grooved" and to comments from CAMP based on a supplemental Petition that "a product was 'grooved' when 'cut with, or parallel to the grain.'" Id. at 26-27 (citing Scope Ruling at 8-9 (P.R. 25) and Letter on Behalf of the Coalition of American Millwork Producers to Dep't of Commerce and Int'l Trade Comm'n re: Responses to First Supplemental Questions on General Issues Vol. I of the Petition at Ex. I-Supp-5 (Jan. 15, 2020) (Public Version) ("Pet'r Supp. QR") (attached to Scope Ruling Application at Ex. 9) (P.R. 2)). Notably, the reference to the alleged meaning of groove from the Petitioner is actually to a discussion of what is meant by "endwork/dado" wherein Petitioner contrasted a dado that is cut "across, or perpendicular to, the grain" with a groove which was "cut with, or parallel to the grain." Pet'r Supp. QR at 5 (P.R. 2); see also Scope Ruling at 9 & n. 52 (P.R. 25). The

16

United States argues that substantial evidence supports Commerce's conclusion that a 1 mm marking or score is the same as a groove, but then does not actually point to any evidence on the record in the instant scope proceeding supporting its conclusion.  See Def. Br. at 27.  Such evidence does not exist.  It is also notable that the United States relies on statements by Petitioner as to the meaning of groove in the record from the underlying investigation as persuasive but ignores that very same record evidence when it comes to Petitioner's numerous references in the administrative record to end use defining what is a "moulding or millwork product."  See Hardware Resources R. 56.2 Br. at 23-24.

CAMP also incorrectly argues that Hardware Resources does not provide any record evidence to support its position that its boards are not continuously shaped.  See CAMP Br. at 6. CAMP, like Commerce below, ignores record evidence that Hardware Resources provided showing that the 1 mm mark on its boards is a temporary guide, which, following importation, is then used to cut a groove.  See Scope Ruling Application at 15 (P.R. 2).  The temporary and superficial nature of this marking makes it entirely distinct from a groove, a fact that Commerce should have considered in its analysis.  The fact that CAMP states that Petitioner intended to cover such items, CAMP Br. at 7, n. 2, does nothing to support with substantial evidence Commerce's analysis in its Scope Ruling.

As also discussed in Hardware Resources' opening brief, the Petition and other (k)(1) sources do not list superficial and temporary "scores" or "marks" (or any equivalent terminology) as a type of continuous shaping.  Petitioner could have included these terms in its description of "continuous shaping," but did not do so.  The United States claims that this argument "elevates form over substance," Def. Br. at 28, but nonetheless does not address the fact that the inclusion of so many specific examples of shaping, without any reference whatsoever to "marked" or "scored"

17

demonstrates that a temporarily-marked board (as opposed to a permanently cut "groove") was never intended to be included with the other examples of continuous shaping.  See, e.g., Kisor v. McDonough, 995 F.3d 1347, 1349 (Fed. Cir. 2021) ("the expression of one thing implies the exclusion of others"); see also Marx v. Gen. Revenue Corp., 568 U.S. 371, 392 (2013) ("the *expressio unius, exclusio alterius* canon . . . instructs that when Congress includes one possibility in a statute, it excludes another by implication").

The United States and CAMP also repeat Commerce's argument that the Loveday Scope Ruling is not applicable to Hardware Resources' product because, unlike the "rough sawn" and "raw and unfinished" product in the Loveday Scope Ruling, Hardware Resources' merchandise is "lightly sanded" on the corners and has a 1 mm score along the length of one side.  Def. Br. at 28. Citing the Scope Ruling, the United States argues that, even though Hardware Resources uses a straight saw as did Loveday (rather than a rotary shaping/milling blade), this saw makes a "groove" that "creates a product that is indistinguishable from a millwork product at the time of entry."  Id. (citing Scope Ruling at 9 (P.R. 25)).  As discussed above, Commerce failed to acknowledge its finding in the Loveday Scope Ruling that a determining factor for whether a product is in scope is whether it is "intended to be later manufactured into a moulding or piece of millwork."  Loveday Scope Ruling at 9 (P.R. 3).

In the Scope Ruling, Commerce also entirely failed to address a past U.S. Customs and Border Protection Ruling that found that a wood board is not continuously shaped if it is only planed and eased (as were the edge-glued boards here).  See Hardware Resources R. 56.2 Br. at 33.  Because Commerce failed to address this argument, the United States' and CAMP's arguments in response constitute impermissible post-hoc rationalization.  See Burlington Truck Lines, 371 U.S. at 168.  In any case, there is no merit to the United States' and CAMP's arguments on this

point.  They simply repeat their conclusory position that the 1 mm mark on Hardware Resources'

boards is equivalent to a groove, which, as discussed above, has no basis in the record.  They also

argue that Customs rulings are a "secondary (k)(1) source" and that primary (k)(1) sources

normally govern to the extent that there is a conflict.  See Def. Br. at 29, n. 7; see also CAMP Br.

at 5.  As discussed above, however, both the primary (k)(1) sources and the Customs ruling support

Hardware Resources' position. Moreover, although Commerce may not be bound to follow a

Customs decision, Customs decisions are at least "beneficial" and "informative" given that

Commerce itself promulgated a regulation indicating that it may consider Customs rulings in

making scope decisions.   See 19 C.F.R. § 351.225(k)(1)(ii);  Regulations to Improve

Administration and Enforcement of Antidumping and Countervailing Duty Laws, 86 Fed. Reg.

52,300, 52,314 (Dep't of Commerce Sept. 20, 2021).  Indeed, Commerce's own Scope Ruling

Application requires that a requesting party submit "copies of any Customs rulings relevant to the

tariff classification."  Scope Ruling Application at 8 (P.R. 1).  Furthermore, Commerce is required

to at least consider evidence on the record that may detract from its position, and may not simply

ignore such evidence.  See Universal Camera Corp., 340 U.S. at 488.

Finally, the United States contends that Hardware Resources' argument that Commerce

lacked factual support for its determination "attempts to flip the appropriate standard of review."

Def. Br. at 29.  This argument is meritless.  Commerce's decisions must be supported by substantial

record evidence, which was entirely lacking in this instance.  See Huaiyin Foreign Trade Corp. v.

United States, 322 F.3d 1369, 1374 (Fed. Cir. 2003).  Contrary to the United States' suggestion

that Hardware Resources did not provide evidence showing that a "score" is materially different

than a "groove," Hardware Resources provided record evidence that its score was merely a shallow

1 mm temporary marking that was intended to be used as a guide for a groove that would be cut

into the boards following importation.  <u>See</u> Scope Ruling Application at 4-5, 7, 15 & Ex. 1 (P.R. 1).  The groove-cutting operation was done in the United States by American workers, a fact that Commerce's definition would simply disregard.  The temporary and superficial nature of the score, made with a straight saw, makes it entirely distinct from a "groove" that cuts and shapes a board. Commerce failed to provide adequate evidence or legal support for its conclusion that the mark on Hardware Resources' edge-glued boards constitutes continuous shaping and nothing in the response briefs of United States or CAMP resuscitate the lawfulness of that conclusion.

## III.  THE UNITED STATES AND CAMP MISCHARACTERIZE HARDWARE RESOURCES' ARGUMENT ABOUT INDUSTRY SUPPORT

The United States and CAMP also mischaracterize Hardware Resources' arguments regarding industry support.  <u>See</u> Def. Br. at 33; <u>see also</u> CAMP Br. at 11.  Hardware Resources is not claiming that the Court should revisit the industry support calculation.  Rather, the reading advanced by Commerce in its Scope Ruling is clearly contrary to the scope language that it used to undertake the industry support calculation.  There was no indication that the industry included all downstream producers of wooden cabinet components or the myriad other industries that import wood products for further manufacture, the inevitable result based on Commerce's Scope Ruling. Unlawfully expanding the scope to cover not only wood mouldings and millwork products but any kind of wood boards negates the industry support calculation – yet additional evidence that edge-glued boards for cabinet production were not intended to be included in the scope.[2]

---

[2]  If the scope covered wood boards imported for manufacture into cabinetry, then the domestic cabinet component industry would have been included in the industry support calculation. There is indeed a separate industry for wood cabinet manufacturers as acknowledged by the fact that an entirely separate AD/CVD case was brought on that product.  <u>See, e.g.</u>, Scope Ruling at 3 (noting exclusion for wooden cabinets and vanities).

**IV.    THE UNITED STATES AND CAMP FAIL TO REBUT THE APPLICATION OF THE (K)(2) FACTORS**

The United States and CAMP also fail to rebut substantial record evidence showing that the (k)(2) factors demonstrate that Hardware Resources' edge-glued boards are not subject to the Orders on WMMP.  Although the plain language of the scope and the (k)(1) sources unequivocally demonstrate that its boards are excluded from the scope, if the Court determines that these sources are not dispositive, the Court should issue a remand requiring Commerce to consider the (k)(2) factors.  See Hardware Resources R. 56.2 Br. at 34-38.

## CONCLUSION

For the foregoing reasons, the Court should grant Hardware Resources' Motion for Judgment on the Agency Record because Commerce's Scope Ruling was unsupported by substantial evidence on the record and not in accordance with law.

Respectfully submitted,

/s/ Jill A. Cramer
Jeffrey S. Grimson
Jill A. Cramer
Bryan P. Cenko
Evan P. Drake*
Mowry & Grimson, PLLC
5335 Wisconsin Ave., NW, Suite 810
Washington, DC 20015
202.688.3610 (ph)
trade@mowrygrimson.com
*Counsel to Hardware Resources, Inc.*

*\*Admitted to New York bar; Practice supervised by members of the D.C. bar and limited to federal international trade matters pursuant to D.C. Bar Rule 49(c)(2)*

## CERTIFICATE OF COMPLIANCE

As required by Paragraph 2 of the Standard Chambers Procedures of the Court of International Trade, I, Jill A. Cramer, hereby certify that this brief complies with the word limitations set forth in Paragraph 2(B) of the Standard Chamber Procedures. Excluding the table of contents, table of authorities, signature block and any certificates of counsel, the word count for this brief is 6,987 words. This brief thus complies with the Standard Chambers Procedures, which permits briefs of 7,000 words or fewer.

/s/ Jill A. Cramer
Jill A. Cramer
Mowry & Grimson, PLLC
5335 Wisconsin Avenue, NW, Suite 810
Washington, DC 20015
202-688-3610 (ph)
202-595-8968 (fax)
*Counsel to Hardware Resources, Inc.*

Dated: June 24, 2024