A-570-117, C-570-118
Remand
Slip Op. 24-140
**Public Document**
E&C/OVIII:  HW

*Hardware Resources, Inc. v. United States*
**Court No. 23-00150, Slip. Op. 24-140 (CIT December 16, 2024)**
**Wood Mouldings and Millwork Products from the People's Republic of China**

**FINAL RESULTS OF REDETERMINATION
PURSUANT TO COURT REMAND**

## I.    SUMMARY

The U.S. Department of Commerce (Commerce) prepared these final results of

redetermination pursuant to the opinion and remand order of the U.S. Court of International

Trade (CIT or the Court) in *Hardware Resources, Inc. v. United States*.[1]  The final results

concern Commerce's scope ruling on edge-glued boards[2] imported by Hardware Resources, Inc.

(Hardware Resources), for the antidumping duty (AD) and countervailing duty (CVD) *Orders* on

wood mouldings and millwork products from the People's Republic of China (China).[3]

In its *Remand Order*, the Court held that the Final Scope Ruling is not in accordance with

law because Commerce failed to consider whether, as a threshold question, Hardware Resources'

edge-glued boards are wood mouldings and millwork products, which it was required to do

pursuant to the scope language.[4]  In accordance with the *Remand Order*, we have considered

whether Hardware Resources' edge-glued boards are "wood mouldings and millwork products"

---

[1] *See Hardware Resources, Inc. v. United States*, CIT No. 23-00150, Slip Op. 24-140 (CIT December 16, 2024) (*Remand Order*).
[2] *See* Memorandum, "Final Scope Ruling on the Antidumping and Countervailing Duty Orders on Wood Mouldings and Millwork Products from the People's Republic of China:  Request by Hardware Resources, Inc.," dated August 2, 2023 (Final Scope Ruling).
[3] *See Wood Mouldings and Millwork Products from the People's Republic of China:  Amended Final Antidumping Duty Determination and Antidumping Duty Order*, 86 FR 9486 (February 16, 2021) (*AD Order*); and *Wood Mouldings and Millwork Products from the People's Republic of China: Countervailing Duty Order*, 86 FR 9484 (February 16, 2021) (*CVD Order*) (collectively, the *Orders*).
[4] *See Remand Order* at 15-16 (citing 19 CFR 351.225(k)(1), that Commerce must give thorough and fair consideration to the "language of the scope.").

within the scope of the *Orders*. As set forth in detail below, on remand, we find that Hardware Resources' edge-glued boards are "wood mouldings and millwork products" within the meaning of the scope language in accordance with 19 CFR 351.225(k)(1). Accordingly, we continue to find that Hardware Resources' edge-glued boards are within the scope of the *Orders*.

## II.    SCOPE OF THE *ORDERS*[5]

The merchandise subject to the *Orders* consists of wood mouldings and millwork products that are made of wood (regardless of wood species), bamboo, laminated veneer lumber (LVL), or of wood and composite materials (where the composite materials make up less than 50 percent of the total merchandise), and which are continuously shaped wood or finger-jointed or edge-glued moulding or millwork blanks (whether or not resawn). The merchandise subject to the *Orders* can be continuously shaped along any of its edges, ends, or faces.

The percentage of composite materials contained in a wood moulding or millwork product is measured by length, except when the composite material is a coating or cladding. Wood mouldings and millwork products that are coated or clad, even along their entire length, with a composite material, but that are otherwise comprised of wood, LVL, or wood and composite materials (where the non-coating composite materials make up 50 percent or less of the total merchandise) are covered by the scope.

The merchandise subject to the *Orders* consists of wood, LVL, bamboo, or a combination of wood and composite materials that is continuously shaped throughout its length (with the exception of any endwork/dados), profiled wood having a repetitive design in relief, similar milled wood architectural accessories, such as rosettes and plinth blocks, and finger-jointed or edge-glued moulding or millwork blanks (whether or not resawn). The scope includes continuously shaped wood in the forms of dowels, building components such as interior paneling

---

[5] *See AD Order*, 86 FR at 9488; and *CVD Order*, 86 FR at 9485.

and jamb parts, and door components such as rails, stiles, interior and exterior door frames or jambs (including split, flat, stop applied, single- or double-rabbeted), frame or jamb kits, and packaged door frame trim or casing sets, whether or not the door components are imported as part of a door kit or set.

The covered products may be solid wood, laminated, finger-jointed, edge-glued, face-glued, or otherwise joined in the production or remanufacturing process and are covered by the scope whether imported raw, coated (*e.g.*, gesso, polymer, or plastic), primed, painted, stained, wrapped (paper or vinyl overlay), any combination of the aforementioned surface coatings, treated, or which incorporate rot-resistant elements (whether wood or composite). The covered products are covered by the scope whether or not any surface coating(s) or covers obscure the grain, textures, or markings of the wood, whether or not they are ready for use or require final machining (*e.g.*, endwork/dado, hinge/strike machining, weatherstrip or application thereof, mitre) or packaging.

All wood mouldings and millwork products are included within the scope even if they are trimmed; cut-to-size; notched; punched; drilled; or have undergone other forms of minor processing.

Subject merchandise also includes wood mouldings and millwork products that have been further processed in a third country, including but not limited to trimming, cutting, notching, punching, drilling, coating, or any other processing that would not otherwise remove the merchandise from the scope of the *Orders* if performed in the country of manufacture of the in-scope product.

Excluded from the scope of the *Orders* are countertop/butcherblocks imported as a full countertop/butcherblock panel, exterior fencing, exterior decking and exterior siding products (including solid wood siding, non-wood siding (*e.g.*, composite or cement), and shingles) that are not LVL or finger jointed; finished and unfinished doors; flooring; parts of stair steps (including

3

newel posts, balusters, easing, gooseneck, risers, treads, rail fittings and stair stringers); picture frame components three feet and under in individual lengths; and lumber whether solid, finger-jointed, or edge-glued.  To be excluded from the scope, finger-jointed or edge-glued lumber must have a nominal thickness of 1.5 inches or greater and a certification stamp from an American Lumber Standard Committee-certified grading agency.  The exclusion for lumber whether solid, finger-jointed, or edge-glued does not apply to screen/"surfaced on 4 sides" (S4S) and/or "surface 1 side, 2 edges" (SlS2E) stock (also called boards) that are finger-jointed and/or edge-glued, or to finger-jointed and/or edge-glued moulding or millwork blanks (whether or not resawn).  Accordingly, S4S and S1S2E stock/boards that are not finger-jointed or edge glued are excluded from the scope of the *Orders*.

Also excluded from the *AD Order* are all products covered by the scopes of the AD orders on:  (1) hardwood plywood from China,[6] (2) multilayered wood flooring from China,[7] (3) wooden cabinets and vanities from China,[8] and (4) wooden bedroom furniture from China.[9]

Also excluded from the *CVD Order* are all products covered by the scopes of the CVD orders on:  (1) hardwood plywood from China,[10] (2) multilayered wood flooring from China,[11] and (3) wooden cabinets and vanities from China.[12]

Imports of wood mouldings and millwork products are primarily entered under the following Harmonized Tariff Schedule of the United States (HTSUS) numbers:  4409.10.0500,

---

[6] *See Certain Hardwood Plywood Products from the People's Republic of China:  Amended Final Determination of Sales at Less Than Fair Value, and Antidumping Duty Order*, 83 FR 504 (January 4, 2018).
[7] *See Multilayered Wood Flooring from the People's Republic of China:  Amended Final Determination of Sales at Less Than Fair Value and Antidumping Duty Order*, 76 FR 76690 (December 8, 2011).
[8] *See Wooden Cabinets and Vanities and Components Thereof from the People's Republic of China:  Antidumping Duty Order*, 85 FR 22126 (April 21, 2020).
[9] *See Notice of Amended Final Determination of Sales at Less Than Fair Value and Antidumping Duty Order:  Wooden Bedroom Furniture from the People's Republic of China*, 70 FR 329 (January 4, 2005).
[10] *See Certain Hardwood Plywood Products from the People's Republic of China:  Countervailing Duty Order*, 83 FR 513 (January 4, 2018).
[11] *See Multilayered Wood Flooring from the People's Republic of China:  Countervailing Duty Order*, 76 FR 76693 (December 8, 2011).
[12] *See Wooden Cabinets and Vanities and Components Thereof from the People's Republic of China:  Countervailing Duty Order*, 85 FR 22134 (April 21, 2020).

4409.10.1020, 4409.10.1040, 4409.10.1060, 4409.10.1080, 4409.10.4010, 4409.10.4090,

4409.10.4500, 4409.10.5000, 4409.10.9020, 4409.10.9040, 4409.22.0590, 4409.22.1000,

4409.22.4000, 4409.22.5000, 4409.22.5020, 4409.22.5040, 4409.22.5060, 4409.22.5090,

4409.22.9000, 4409.22.9020, 4409.22.9030, 4409.22.9045, 4409.22.9060, 4409.22.9090,

4409.29.0665, 4409.29.1100, 4409.29.4100, 4409.29.5100, 4409.29.9100, 4412.99.5115,

4412.99.9500, 4418.91.9095, and 4421.91.9780.  Imports of wood mouldings and millwork

products may also enter under HTSUS numbers:  4409.10.6000, 4409.10.6500, 4409.22.6000,

4409.22.6500, 4409.29.6100, 4409.29.6600, 4412.41.0000, 4412.42.0000, 4412.49.0000,

4412.91.5115, 4412.92.5215, 4412.99.9700, 4418.20.4000, 4418.20.8030, 4418.20.8060,

4418.91.9195, 4418.99.9095, 4418.99.9195, 4421.91.9880, 4421.99.9780, and 4421.99.9880.

While the HTSUS subheadings are provided for convenience and customs purposes, the written

description of the scope of the *Orders* is dispositive.

## III.    BACKGROUND

On March 9, 2023, Commerce received a scope ruling application from Hardware

Resources, a U.S. importer of edge-glued boards from China.[13]  In its submission, Hardware

Resources requested that Commerce determine whether the edge-glued boards described therein

were outside the scope of the *Orders*.  On March 28, 2023, Commerce issued a supplemental

questionnaire to Hardware Resources,[14] to which Hardware Resources timely responded on April

3, 2023.[15]  On April 10, 2023, Commerce deemed the scope inquiry initiated.[16]  On May 10,

2023, the Coalition of American Millwork Producers (the petitioner) submitted comments and

factual information concerning Hardware Resources' scope ruling request.[17]  On May 31, 2023,

---

[13] *See* Hardware Resources' Letter, "Scope Ruling Application," dated March 9, 2023 (Scope Ruling Application).
[14] *See* Commerce's Letter, "Scope Inquiry Application Supplemental Questionnaire," dated March 28, 2023.
[15] *See* Hardware Resources' Letter, "Scope Inquiry Supplemental Questionnaire Response," dated April 3, 2023.
[16] *See* Memorandum, "Deemed Initiation of Scope Inquiry," dated April 10, 2023.
[17] *See* Petitioner's Letter, "Comments on Hardware Resources Scope Ruling Application," dated May 10, 2023.

Hardware Resources submitted comments and factual information rebutting the petitioner's submission.[18]  On August 2, 2023, Commerce issued its Final Scope Ruling.[19]

In the Final Scope Ruling, we determined that Hardware Resources' edge-glued boards are within the scope of the *Orders*.[20]  We found that, under a (k)(1) analysis, the edge-glued boards are covered by the scope of the *Orders* because they are "made of wood, continuously shaped wood, finger-jointed, and edge-glued mouldings or millwork blanks (whether or not resawn)."[21]  In addition to relying on information in the Scope Ruling Application and the *Orders*' scope language, we relied on information in the Petition[22] and supplemental responses[23] from the underlying investigations, information from previous scope decisions,[24] and information in the U.S. International Trade Commission (ITC) Report.[25]  Information from the investigations, previous scope rulings, and the ITC Report are (k)(1) sources.[26]  Because we found (k)(1) sources were dispositive with regard to whether Hardware Resources' edge-glued boards are included within the scope of the *Orders*, we found it unnecessary to further consider (k)(2) factors.[27]  However, to provide a complete explanation of our determination in response to the

---

[18] *See* Hardware Resources' Letter, "Rebuttal Comments," dated May 31, 2023.

[19] *See* Final Scope Ruling at 1; *see also Notice of Scope Rulings*, 88 FR 86320 (December 13, 2023).

[20] *See* Final Scope Ruling at 11.

[21] *Id.*

[22] *See* Final Scope Ruling at 8 (citing Memorandum, "Additional Information Placed on the Record," dated August 2, 2023 (Investigation Information Memorandum), at Exhibit I (Petitioner's Letter, "Petitions for the Imposition of Antidumping and Countervailing Duties pursuant to Section 701 and 731 of the Tariff Act of 1930, as Amended Volume I:  Common Issues and Injury Petition:  Wood Mouldings and Millwork Products from Brazil and the People's Republic of China," dated January 8, 2020 (Petition)).

[23] *See* Final Scope Ruling at 9 (citing Petitioner's Letter, "Wood Mouldings and Millwork Products from Brazil and the People's Republic of China:  Responses to First Supplemental Questions on General Issues Volume I of the Petition," dated January 15, 2020, at 5).

[24] *See* Final Scope Ruling at 9 (referencing Memorandum, "Final Scope Ruling on the Antidumping and Countervailing Duty Orders on Wood Mouldings and Millwork Products from the People's Republic of China:  Request by Loveday Lumber Company, Inc.," dated May 16, 2022).

[25] *See* Final Scope Ruling at 10 (referencing *Wood Mouldings and Millwork Products from China*, Inv Nos. 701-TA-636 and 731-TA-1470 (Final), USITC Pub. 5157 (February 2021) (ITC Report), at 8 (contained in Exhibit 5 of Hardware Resources' Scope Ruling Application)).

[26] *See* 19 CFR 351.225(k)(1).

[27] *See* 19 CFR 351.225(k)(2) (including, as (k)(2) factors, the product's physical characteristics; the ultimate purchasers' expectations; and the product's ultimate use, sales channels, and manner of advertisement and display).

arguments and information submitted by parties, we referenced certain (k)(2) factors in the Final Scope Ruling.

After Commerce issued its Final Scope Ruling, Hardware Resources challenged Commerce's scope ruling before the Court.

In its *Remand Order*, the Court held that Commerce ignored the threshold question of whether the product at issue is a wood moulding or millwork product.[28]  According to the Court, Commerce's scope ruling correctly noted that the scope description covers "items 'made of wood,' 'continuously shaped wood or finger jointed or edge-glued moulding or millwork blanks (whether or not resawn),' and 'the merchandise subject to th{e} investigation can be continuously shaped along any of its edges, ends, or faces.'"[29]  Yet, according to the Court, Commerce did not consider that, based on the first phrase of the scope, "{o}nly 'wood mouldings and millwork products *that*' are made of wood (or the other listed materials) and are 'continuously shaped or finger-jointed or edge-glued moulding or millwork blanks are subject to the *Orders*."[30]  The Court stated that the phrase "wood mouldings and millwork products that" must be given meaning in the context of the scope description, and, consequently, the Court held that Commerce must determine whether Hardware Resources' product is a wood moulding or millwork product.[31]  Accordingly, the Court ordered that Commerce reconsider its decision in light of the deficiencies the Court identified.[32]

---

[28] *See Remand Order* at 16.
[29] *Id*. at 13 (quoting the Final Scope Ruling at 8).
[30] *Id*.
[31] *Id*. at 13-14 and 16.
[32] *Id.* at 16 (stating that, because it ordered reconsideration, the Court did not reach Hardware Resources' claims regarding Commerce's determination with respect to an inherent end-use limitation contained in the scope description, Commerce's interpretation of the term "continuously shaped," or Commerce's consideration of various interpretive sources and factors under 19 CFR § 351.225(k)).

On February 18, 2025, we released our Draft Remand Results to interested parties.[33]  On February 26, 2025, Hardware Resources[34] and the petitioner[35] timely submitted comments on the Draft Remand Results.

## IV.     ANALYSIS OF HARDWARE RESOURCES' EDGE-GLUED BOARDS UNDER 19 CFR 351.225(K)(1)

We have reconsidered whether Hardware Resources' edge-glued boards are within the scope of the *Orders* in accordance with the Court's order and opinion.  As such, we considered the product description in Hardware Resources' Scope Ruling Application and supplemental responses, as well as the scope language of the *Orders* and the descriptions of merchandise contained in the investigations and previous determinations by Commerce.  Based on our analysis, in accordance with the Court's opinion and remand order, we find Hardware Resources' edge-glued boards are within the scope of the *Orders* under 19 CFR 351.225(k)(1), as detailed below.

### A.     Legal Framework

When a request for a scope ruling is filed, Commerce examines the scope language of the order{s} at issue and the description of the product contained in the scope ruling application.[36] Pursuant to Commerce's regulations, in determining whether a product is covered by the scope of an order, Commerce may make its determination on the basis of the scope language alone where such language is dispositive.[37]

Commerce may also take into account primary interpretive sources in determining a scope ruling, including the descriptions of the merchandise contained in the petition and

---

[33] *See* Commerce's Letter, "Draft Results of Redetermination Pursuant to Court Remand," issued February 18, 2025 (Draft Remand Results).
[34] *See* Hardware Resources' Letter, "Comments on Draft Redetermination," dated February 26, 2025 (Hardware Resources' Remand Comments).
[35] *See* Petitioner's Letter, "Comments on Draft Results of Redetermination Pursuant to Court Remand," dated February 26, 2025 (Petitioner's Remand Comments).
[36] *See Walgreen Co. v. United States*, 620 F.3d 1350, 1357 (Fed. Cir. 2010).
[37] *See* 19 CFR 351.225(k)(1).

investigation; previous or concurrent determinations by Commerce, including prior scope rulings, memoranda, or clarifications pertaining to the order at issue or other orders with same or similar language; and determinations of the ITC pertaining to the order at issue.[38]  Additionally, Commerce may consider secondary interpretive sources, such as any other determinations of Commerce or the ITC, Customs rulings or determinations, industry usage, dictionaries, and any other relevant record evidence, in determining a scope ruling.  However, to the extent that these secondary interpretive sources conflict with primarily interpretive sources under 19 CFR 351.225(k)(1)(i), the primary interpretive sources will normally control.[39]  If Commerce determines that these sources are determinative of the matter, it will issue a final scope ruling as to whether the merchandise is covered by the order or orders.[40]

Where the descriptions of the merchandise in the sources described in 19 CFR 351.225(k)(1) are not dispositive, Commerce will consider the five additional factors set forth at 19 CFR 351.225(k)(2)(i).  These factors are:  (A) the physical characteristics of the merchandise; (B) the expectations of the ultimate purchasers; (C) the ultimate use of the product; (D) the channels of trade in which the product is sold; and (E) the manner in which the product is advertised and displayed.  In the event of a conflict between these factors, the physical characteristics of the merchandise will normally be allotted greater weight than other factors.[41]

Commerce's scope rulings are made on a case-by-case basis, and may be applied on a producer-specific, exporter-specific, or importer-specific basis, or some combination thereof, or to all products from the same country with the same relevant physical characteristics as the

---

[38] *See* 19 CFR 351.225(k)(1)(i).
[39] *See* 19 CFR 351.225(k)(1)(ii).
[40] *See* 19 CFR 351.225(h).
[41] *See* 19 CFR 351.225(k)(2)(ii).

product at issue, on a country-wide basis, regardless of the producer, exporter, or importer of the products.[42]

### B.    Scope Analysis

For the reasons explained below, we continue to find that the description of the product in Hardware Resources' Scope Ruling Application and supplemental responses, the scope language of the *Orders*, and information from the investigations are dispositive as to whether Hardware Resources' product falls within the scope of the *Orders* in accordance with 19 CFR 351.225(k)(1).  Accordingly, for this redetermination, we find it unnecessary to consider the additional factors specified in 19 CFR 351.225(k)(2).

To begin, the language of the *Orders* states that subject merchandise consists of "wood mouldings and millwork products that" are "made of wood," "continuously shaped wood or finger-jointed or edge-glued moulding or millwork blanks (whether or not resawn),"[43] and "the merchandise subject to this investigation can be continuously shaped along any of its edges, ends, or faces."  Additionally, "{t}he covered products may be solid wood, laminated, finger-jointed, edge-glued, face-glued, or otherwise joined in the production or remanufacturing process and are covered by the scope whether imported raw, coated (*e.g.*, gesso, polymer, or plastic) {…} ."

In its remand order, the Court held that the opening phrase of the scope, "wood mouldings and millwork products that are" imposes an explicit requirement in determining if a product is subject merchandise.[44]  According to the Court, the phrase "wood mouldings and millwork products that" must be given meaning in the context of the scope description.[45]  The scope does not include a definition of "wood mouldings" or "millwork products."  However, in

---

[42] *See* 19 CFR 351.225(m)(1).
[43] *See Orders*.
[44] *See Remand Order* at 15-16.
[45] *Id.* at 13-14.

the Petition, the petitioner provided technical characteristics of wood mouldings and millwork products.[46]  Specifically, the petitioner stated that, "{w}ood moulding and millwork products are manufactured from softwood, hardwood, laminated veneer lumber, or some combination of wood and composite materials, and are woodwork or building materials that are produced in a mill or otherwise undergo remanufacturing."[47]  Additionally, in the Preliminary Scope Decision Memorandum from the underlying investigation, Commerce agreed with the petitioner that wood mouldings and millwork products are "clearly described as products that are manufactured from softwood, hardwood, laminated veneer lumber, or some combination of wood and composite materials, and are woodwork or building materials that are produced in a mill or otherwise undergo remanufacturing," and that the description was consistent with descriptions of wood mouldings and millwork products found in the "Petition, petition supplements, comments, and the U.S. International Trade (ITC) preliminary determination on wood mouldings and millwork products."[48]  Based on these interpretative sources from the investigation, we find that "wood mouldings and millwork products" means products that are manufactured from a type of wood or composite material and are woodwork or building materials that are produced in a mill or otherwise undergo remanufacturing.

In its Scope Ruling Application, Hardware Resources stated that its edge-glued boards are made of wood and that such wood undergoes remanufacturing into edge-glued boards.[49] That is, Hardware Resources stated that in order to manufacture its edge-glued boards, pieces of scrap wood are finger-jointed and edge-glued together into boards; and the boards are then planned, trimmed, coated, cut, lightly sanded, and scored using a straight saw along the board

---

[46] *See* Petition at 6.
[47] *Id.*
[48] *See Wood Mouldings and Millwork Products from the People's Republic of China:  Preliminary Affirmative Determination of Sales at Less Than Fair Value, Postponement of Final Determination, and Extension of Provisional Measures,* 85 FR 48669 (August 12, 2020) (*AD Investigation Preliminary Determination*), and accompanying Preliminary Scope Decision Memorandum (Preliminary Scope Decision Memorandum) at 8-9.
[49] *See* Scope Ruling Application at 9.

length.[50]  We find the steps of this manufacturing process as described by Hardware Resources in the Scope Ruling Application are demonstrative of a remanufacturing process of scrap wood to a completed woodwork or building material:  an edge-glued board.  As such, we find that Hardware Resources' edge-glued boards fall within the meaning of the scope language "wood mouldings and millwork products."

Hardware Resources' edge-glued boards, based on the description in the Scope Ruling Application, match the other characteristics of merchandise subject to the *Orders*, as they are made of wood, finger-jointed, and edge-glued.[51]  These physical characteristics are not in dispute.  The scope of the *Orders* also contains specific language stating that products "are covered by the scope whether imported raw, coated (*e.g.*, gesso, polymer, or plastic), primed, painted, stained, wrapped (paper or vinyl overlay), {or} any combination of the aforementioned surface coatings …"  Thus, a UV coating would not distinguish Hardware Resources' goods as out of scope, but rather, within the scope of the *Orders* given the other requirements are met.

Neither does the fact that Hardware Resources' product has a "1 mm mark ("score")" render the product out of scope.  As described by Hardware Resources, the "1 mm mark ("score")" is made "using a straight saw along the length of one side of the board," to act "as a guide" in further processing.[52]  The term "score" is not referenced in the scope of the *Orders* to describe continuously shaped moulding or millwork.  The scope does not include a definition of "continuously shaped wood."  However, the petitioner provided an excerpt of the U.S. Harmonized Tariff Schedule of the United States (HTSUS) in the underlying investigations which describes continuously shaped wood as wood that is "tongued, grooved, rebated, chamfered, V-jointed, beaded, molded, rounded or the like along any of its edges, ends or faces,

---

[50] *Id*. at 9 and Exhibit 1.
[51] *See* Scope Ruling Application at 4 and 5.
[52] *See* Scope Ruling Application at 7.

whether or not planed, sanded, or end jointed."[53]  Additionally, in comments regarding the intended scope of the *Orders* submitted during the underlying investigations, the petitioner stated that a product was continuously shaped where it was "smoothed/surfaced."[54]  Regarding the term "grooved," the petitioner described a groove as a "cut with, or parallel to the grain."[55]  Based on these sources, we find that "continuously shaped" includes "grooved" and nothing supports that the score on Hardware Resources' product differs in any material way from a groove, which, as explained above, is a type of continuous shaping.

In summary, we find that Hardware Resources' edge-glued boards are covered by the scope of the *Orders* because they are manufactured from a type of wood or composite material and are woodwork or building materials that are produced in a mill or otherwise undergo remanufacturing.  Therefore, they constitute "wood mouldings and millwork products" within the meaning of the scope terms based on an analysis of (k)(1) sources.  Additionally, Hardware Resources' edge-glued boards are made of wood, are continuously shaped, finger-jointed, and edge-glued.  Accordingly, we find that the description of the product contained in Hardware Resources' Scope Ruling Application and supplemental questionnaires is dispositive when considered in light of the sources identified in 19 CFR 351.225(k)(1) (in particular, the scope language of the *Orders* and other interpretive sources described above).  Therefore, it is not necessary to consider the additional factors specified in 19 CFR 351.225(k)(2).

---

[53] *See* Investigation Information Memorandum at Exhibit I (Petition at Exhibit I-10).  As the scope language indicates, tariff codes are not dispositive or limiting with regard to what is covered by the scope.  Nonetheless, the definition from the tariff schedule provides some evidence of what might be considered "continuously shaped" wood.

[54] *See* Investigation Information Memorandum at Exhibit II (Petitioner's Letter, "Wood Mouldings and Millwork Products from Brazil and the People's Republic of China:  Additional Rebuttal Scope Comments," dated April 10, 2020, at 3 and 14).

[55] *See* Investigation Information Memorandum at Exhibit III (Petitioner's Letter, "Wood Mouldings and Millwork Products from Brazil and the People's Republic of China:  Responses to First Supplemental Questions on General Issues Volume I of the Petition," dated January 15, 2020, at 5).

## V.    INTERESTED PARTY COMMENTS ON DRAFT REMAND RESULTS

On February 18, 2025, we released our Draft Remand Results to interested parties.[56]  On February 26, 2025, Hardware Resources[57] and the petitioner[58] timely submitted comments on the Draft Remand Results.  We address the comments below.

**Comment 1:  New Scope Definition Unlawfully Expands the Scope**

*Hardware Resources Comments*

The following is a verbatim summary of arguments submitted by Hardware Resources.  For further details, *see* the Hardware Resources' Remand Comments at 4-7.

> The new definition of "wood moulding and millwork products" espoused for the first time in the Draft Remand Results unlawfully expands the scope and fails to meet the {CIT}'s mandate that the {Commerce} must give meaning to that term and "was not free to ignore this phrase in its scope analysis."[59] If "wood moulding or millwork products" means products that are "woodwork or building materials that are produced in a mill or otherwise undergo remanufacturing," that term really has no meaning at all. This new interpretation by Commerce continues to read the term wood "moulding and millwork products" out of the scope language by expanding it to include all woodwork that is made in a mill or remanufactured. Commerce's Draft Remand Results fail to consider all the relevant sources and instead focus almost exclusively on one statement that was later removed from the scope language.  Commerce must revise its remand redetermination to fully consider all record evidence, including information that contradicts the new information referenced by Commerce in its Draft Remand Results.  A full, fair consideration of the factors in 19 {CFR} 351.225(k)(1) establishes that Hardware Resources' edge-glued boards are not covered by the scope.

*Petitioner's Comments*

The following is a verbatim summary of arguments submitted by the petitioner.  For further details, *see* the Petitioner Remand Comments at 2-5.

> As it has in its draft remand analysis, {Commerce} should continue to find in its final remand determination that the edge-glued boards of {Hardware Resources} are wood moulding and millwork products and therefore are covered by the scope of the antidumping and countervailing duty orders on Wood Mouldings and Millwork Products from the People's Republic of China {*Orders*}.[60]  In its remand opinion, the CIT instructed {Commerce} to consider the threshold question of

---

[56] *See* Draft Remand Results.
[57] *See* Hardware Resources' Remand Comments.
[58] *See* Petitioner's Remand Comments.
[59] *See Remand Order* at 19.
[60] *See* Draft Remand Results at 10-14.

whether Hardware Resources' edge-glued boards are wood mouldings and millwork products such that they can be considered within the scope of the {Orders}.[61]  Relying on the language of the scope as well as the record of the underlying investigations, including information related to the physical specifications and manufacturing process of the merchandise in question, {Commerce} properly finds that Hardware Resources' edge-glued boards are wood moulding and millwork products and are appropriately covered by the {Orders}. {Commerce} should reach the same finding in its final remand determination.

**Commerce's Position:**

We disagree with Hardware Resources that Commerce's Draft Remand Results unlawfully expand the scope of the *Orders* and fail to satisfy the Court's *Remand Order*.  Rather, Commerce interpreted the scope language in accordance with the applicable scope regulations and the Court's *Remand Order*.  As such, in accordance with 19 CFR 351.225(k)(1), we continue to find that Hardware Resources' edge-glued boards fall within the scope of the *Orders*.

In its opinion, the Court held that Commerce ignored the threshold question of whether the product at issue is a wood moulding or millwork product, and that the scope phrase "wood mouldings and millwork products that" must be given meaning in context of the scope description.[62]  As described above in the "Scope Analysis" section, we addressed the threshold question by first interpreting the scope phrase "wood mouldings and millwork products" in the context of the scope description considering (k)(1) sources and then determining whether the product at issue falls within that interpretation.  Specifically, because the scope language does not include a definition of the scope phrase "wood mouldings and millwork products," Commerce has considered primary interpretative sources in accordance with 19 CFR 351.225(k)(1)(i), including descriptions of the merchandise by the petitioner in the petition and adopted by Commerce in its preliminary scope decision memorandum of the underlying

---

[61] *See Remand Order* at 13-14
[62] *Id.* at 15-16.

investigations upon its consideration of the petition, petition supplements, comments, and the ITC's preliminary determination.[63]

Importantly, Commerce's (k)(1) regulation provides that, "{i}n determining whether a product is covered by the scope of the order at issue, {Commerce} will consider the language of the scope and may make its determination on this basis alone if the language of the scope {…} is dispositive."[64] The regulation lists "primary interpretative sources," stating that "{t}he following primary interpretative sources *may* be taken into account under paragraph (k)(1) {…} *at the discretion of {Commerce.}*"[65] In addition, Commerce "may also consider secondary interpretative sources under paragraph (k)(1) {…} , such as any other determinations of {Commerce} or the {ITC} not identified above, Customs rulings or determinations, industry usage, dictionaries, and any other relevant record evidence."[66] In the event of a conflict between secondary interpretative sources and primary interpretative sources, "primary interpretative sources will normally govern."[67] Acknowledging much of this regulatory text, Hardware Resources states that Commerce "must revise its remand redetermination to fully consider *all* (k)(1) sources."[68] We disagree that the regulation requires Commerce to "fully consider all (k)(1) sources." We also disagree that Commerce failed "to consider all the relevant sources,"[69] and Hardware Resources fails to provide persuasive language from primary interpretative sources to support its claim or contradict the meaning Commerce gave to the scope phrase in accordance with the (k)(1) regulation, as detailed below.[70]

---

[63] *See* Draft Remand Results at 10-11; *see also* 19 CFR 351.225(k)(1)(i).
[64] *See* 19 CFR 351.225(k)(1).
[65] *See* 19 CFR 351.225(k)(1)(i) (emphasis added).
[66] *See* 19 CFR 351.225(k)(1)(ii).
[67] *Id*.
[68] *See* Hardware Resources' Remand Comments at 7 (emphasis added).
[69] *Id.* at 7.
[70] *Id*.

We further disagree with Hardware Resources that Commerce interpreted the scope phrase "so broadly as to read that term out of the scope entirely."[71]  As an initial matter, we agree that the language "woodwork or building materials that are produced in a mill or otherwise undergo remanufacturing" was removed from the scope by the petitioner in the early stages of the underlying investigation.[72]  To the extent that Hardware Resources suggests that the language was removed for a particular reason, it failed to cite to any information supporting such a proposition.  There are many reasons why a petitioner might revise proposed scope language in the early stages of an investigation.  For example, a petitioner could conceive that the language is unnecessary or redundant because it is already covered by the scope through other language.  Language might also be taken out to avoid issues of circumvention or evasion.[73]  Still, Commerce disagrees that giving meaning to the scope phrase "wood mouldings and millwork products" as "woodwork or building materials that are produced in a mill or otherwise undergo remanufacturing" reads "mouldings and millwork products" out of the scope entirely, as Hardware Resources claims.[74]  Indeed, the petitioner described that, "{w}ood moulding and millwork products are manufactured from softwood, hardwood, laminated veneer lumber, or some combination of wood and composite materials, and are woodwork or building materials that are produced in a mill or otherwise undergo remanufacturing."[75]

Similarly, we disagree with Hardware Resources that Commerce's interpretation could be read to include an "infinite universe of products."[76]  As the Court held, the scope phrase "wood

---

[71] *Id.* at 5.

[72] *See* Petition at 6; *see also AD Investigation Preliminary Determination,* 85 FR at Appendix I; and *generally,* Preliminary Scope Decision Memorandum at Attachment I.

[73] *See Certain New Pneumatic Off-The-Road Tires from the People's Republic of China:  Final Affirmative Determination of Sales at Less Than Fair Value and Partial Affirmative Determination of Critical Circumstances*, 73 FR 40485 (July 15, 2008) (*OTR Tires China*), and accompanying Issues and Decision Memorandum (IDM) at Comment 19; *see also Multilayered Wood Flooring from the People's Republic of China: Final Determination of Sales at Less Than Fair Value*, 76 FR 64318 (October 18, 2011) (*Wood Flooring China*), and accompanying IDM at Comment 12.A.

[74] *See* Hardware Resources Remand Comments at 5.

[75] *Id.*

[76] *Id.* at 6.

mouldings and millwork products" mandates a *threshold* question.  This threshold question constitutes the starting point of any inquiry to determine whether a product at issue is subject to the wood mouldings and millwork products *Orders*—it is not the *only* question to determine whether a product is covered by the *Orders*.  The relevant scope language here covers "wood mouldings and millwork products" (*i.e.*, "woodwork or building materials that are produced in a mill or otherwise undergo remanufacturing") "*that are*," "made of wood …, or of wood and composite materials …, and which are continuously shaped wood or finger-jointed or edge-glued moulding or millwork blanks (whether or not resawn)."  Contrary to Hardware Resources' claim, only products which meet the scope description are included.

As previously noted, Commerce examines the scope language of the orders at issue and the description of the product contained in the scope ruling application.[77]  Pursuant to Commerce's regulations, in determining whether a product is covered by the scope of an order, Commerce may make its determination on the basis of the scope language alone where such language is dispositive.[78]  Commerce's determination did not depart from this standard. Commerce continues to examine the scope language of the *Orders* in its entirety, and finds that the interpretation of the scope phrase "wood mouldings and millwork products," does not in any way invalidate the rest of the scope language of the *Orders*.  Commerce's analysis draws upon (k)(1) sources to determine the meaning of the scope phrase consistent with the Court's remand order, and the meaning was derived from the petitioner's description in the investigation and supported by (k)(1) sources.

---

[77] *See Walgreen Co. v. United States*, 620 F.3d 1350, 1357 (Fed. Cir. 2010).
[78] *See* 19 CFR 351.225(k)(1).

**Comment 2:   Draft Remand Results Ignore Statements by Petitioner and From the Investigation Phase**

*Hardware Resources' Comments*

The following is a verbatim summary of arguments submitted by Hardware Resources.  For further details, *see* the Hardware Resources' Remand Comments at 7-16.

> On remand, Commerce seeks to add back into the scope wording that was expressly removed from the scope language, and Commerce must review information from the investigation phase that undercuts its new definition.   In the original scope language set forth in the Petition, the opening sentence defined the scope as follows:
>
> > The merchandise subject to this investigation consists of wood mouldings and millwork products that are made of wood (regardless of wood species), laminated veneer lumber (LVL), or of wood and composite materials (where the composite materials make up less than 50 percent of the total merchandise), and which are **woodwork or building materials that are produced in a mill or otherwise undergo remanufacturing**.
>
> The bolded language was, however, removed from the scope and never reinserted. By deleting from the opening sentence of the scope the reference to "woodwork or building materials that are produced in a mill or otherwise undergo remanufacturing," the only reasonable interpretation is that the scope was not so broad as to cover any woodwork "produced in a mill or {that} otherwise undergo{es} remanufacturing."  Commerce may not now lawfully add back in that language through its overly broad new definition of "wood mouldings and millwork products" as it does in the Draft Remand Results.  Commerce is required to consider evidence on the record that may detract from its position and may not simply ignore such evidence.  Commerce selectively reads the record evidence and information that contradicts the new information referenced by Commerce in its Draft Remand Results to disregard the numerous examples from the Petition and investigation phase describing the product subject to the scope based on a narrow end use.

**Commerce's Position:**

Hardware Resources asserts that Commerce makes an "unsubstantiated leap" in interpreting "wood moulding and millwork products" to mean "woodwork or building materials that are produced in a mill or otherwise undergo remanufacturing."[79]  Hardware Resources further asserts that the petitioner's second supplemental questionnaire response from the underlying investigation undercuts Commerce's scope determination, and therefore, Commerce

---

[79] *Id*. at 10.

must consider it.[80]  We disagree that Commerce made an "unsubstantiated leap" in its interpretation. The petitioner described "wood moulding and millwork products" using the exact language Commerce relies on to interpret the scope phrase.  That the petitioner proposed a scope which included such language and, thereafter, submitted a second supplemental questionnaire response without the language demonstrates nothing more than the petitioner removed the language from the proposed scope.[81]

We agree that the language "woodwork or building materials that are produced in a mill or otherwise undergo remanufacturing" was removed from the proposed scope by the petitioner in the early stages of the underlying proceeding.[82]  To the extent that Hardware Resources suggests that the language at issue was removed from the proposed scope for a particular reason, it failed to cite to any information to support such a proposition, and Hardware Resources' citation to the U.S. Court of Appeals for the Federal Circuit (Federal Circuit) decision in *Fedmet Res. Corp.*, is unavailing.[83]  We disagree with Hardware Resources that the "only reasonable interpretation is that the scope was not so broad {…}."[84]  To the contrary, there are many reasons why proposed scope language is revised in an investigation.  For example, a petitioner could conceive that the language is unnecessary or redundant because it is already covered by the

---

[80] *See* Hardware Resources' Remand Comments at 10 (citing and attaching Petitioner's Letter, "Responses to Second Supplemental Questions on General Issues Volume I of the Petition," dated January 22, 2020); *id*. at 7-9 (asserting that Hardware Resources' submission to the record of petitioner's second supplemental questionnaire response from the underlying investigation should be considered by Commerce in rebuttal to Commerce's citation to the Preliminary Scope Decision Memorandum in the Draft Remand Results).  Commerce is attaching to these final results of remand redetermination the Preliminary Scope Decision Memorandum.
[81] *Id*. at 10-11 (citing Petitioner's Second Supplemental Questionnaire Response at 3).
[82] *See* Petition at 6; *see also AD Investigation Preliminary Determination,* 85 FR at Appendix I; and *generally,* Preliminary Scope Decision Memorandum.
[83] *Id.* at 12 (citing *Fedmet Resources Corporation v. United States*, 755 F.3d 912, 921 (Fed. Cir. 2014) (*Fedmet Res. Corp.*) ("whe{n} a petitioner is requested to clarify with a high degree of specificity the scope of its petition, its response is highly germane to a subsequent scope determination.  A petitioner has an obligation to be explicit and precise in its definition of the scope of the petition both prior and during the investigation.").
[84] *See* Hardware Resources Remand Comments at 12.

scope through other language.  Language might also be taken out to avoid issues of circumvention or evasion.[85]

Nevertheless, the language Commerce used to interpret "wood mouldings and millwork products" is from the petitioner's description, *i.e.*, "technical characteristics and use" section of the petition, which is unaltered from the original investigation.[86]  Indeed, the petitioner described that, "{w}ood moulding and millwork products are manufactured from softwood, hardwood, laminated veneer lumber, or some combination of wood and composite materials, and are woodwork or building materials that are produced in a mill or otherwise undergo remanufacturing."[87]  We agree with Hardware Resources that parties rely on the scope language to understand what products are and are not covered by the scope.[88]  However, scope language in of itself is not always dispositive, as demonstrated in Commerce's analysis drawing upon (k)(1) sources to clarify the definition of "wood mouldings and millwork products."  There is no indication on the record that the "wood mouldings and millwork products" technical description by the petitioner is incorrect.  In fact, information contained in the ITC Report further supports our interpretation, as in the product "Description and Applications," the ITC describes millwork as "*a general term referring to woodwork that is produced in a mill*; the universe of millwork products is extensive and diverse.  This broad category of products includes items like window and door frames, mouldings, and other dimension stock (worked wood products that are cut or shaped).  Millwork products typically are installed with screws, nails, or adhesives."[89]

Hardware Resources next argues that Commerce has again ignored record evidence that the definition of the scope is based on end-use.[90]  We disagree.  Notably, the petitioner's

---

[85] *See OTR Tires China* IDM at Comment 19; *see also Wood Flooring China* IDM at Comment 12.A.
[86] *See* Petition at 6.
[87] *Id.*
[88] *See* Hardware Resources Remand Comments at 12.
[89] *See* ITC Report at I-12 (emphasis added.)
[90] *See* Hardware Resources' Remand Comments at 14.

proposed scope with respect to the language at issue lacks any express mention of end use, as does the scope of the *Orders*.  Hardware Resources cites to multiple instances of end-uses mentioned in the petition.[91]  However, the language Hardware Resources cites to is the section of the petition titled "Technical Characteristics and Uses,"[92]  These end-use descriptions are examples of purposes for which the products within the scope could be used, and is a requirement under 19 CFR 351.202(b)(5) for all petition fillings.[93]  As such, we do not find it sufficient that such record evidence, which is required in every filed petition, is indicative of defining the scope on end use.  The Federal Circuit has observed that end-use restrictions "are disfavored because they can be difficult to enforce . . . because the physical characteristics of an imported product are more readily identifiable than the product's end use, which may be unclear at the time of importation."[94]  In fact, when an end-use requirement applies to a scope, Commerce must use express end-use terms in the language of the scope and the exclusionary language must leave no reasonable doubt that the products were intended to be out of scope.[95]  Lacking explicit end-use language or indication of the intent to include an end-use restriction in the scope, we disagree with Hardware Resources that the scope phrase "wood mouldings and millwork products" carries an implied end-use restriction.

Hardware Resources asserts that it is "illogical" to define wood mouldings or millwork products as woodwork produced in a mill or that "otherwise undergo{es} remanufacturing" but also define "moulding or millwork blanks" more narrowly as "boards fabricated by joining smaller pieces of wood together, which are later machined or moulded into a final profile."[96]  We

---

[91] *Id*. at 14-15.
[92] *See* Petition at 6 (emphasis added).
[93] *See* 19 CFR 351.202(b)(5).  A petition requesting the imposition of antidumping or countervailing duties must contain the following, to the extent reasonably available to the petitioner: A detailed description of the subject merchandise that defines the requested scope of the investigation, including the technical characteristics and uses of the merchandise and its current U.S. tariff classification number.
[94] *See King Supply Co. LLC v. United States*, 674 F.3d 1343, 1348 (Fed. Cir. 2012).
[95] *Id*.
[96] *See* Hardware Resources Comments at 15.

disagree. In this remand, Commerce provided a definition of "wood mouldings and millwork

products," whereas the definition Hardware Resources points to is a definition of a subset of

wood mouldings and millwork products specifically, "finger-jointed or edge-glued moulding or

millwork blanks." The exhibit from which this definition comes is a glossary of definitions for

specific covered products requested by Commerce from the petitioner.[97] Logically, the

definition of a single specific product covered by the scope would be more narrow than the larger

category of "wood moulding and millwork products."

**Comment 3:    Commerce Ignores Evidence From the ITC Determination That Undercuts Its Definition of the Scope**

*Hardware Resources Comments*

The following is a verbatim summary of arguments submitted by Hardware Resources. For further details, *see* the Hardware Resources' Remand Comments at 17-18.

> Commerce's Draft Remand Results also ignore the ample evidence from the {ITC} investigation phase, a primary source set forth in 19 {CFR} 351.225(k)(1)(i)(D), that undercuts its new definition of "wood moulding and millwork products." Taken as a whole, the record evidence from the ITC proceeding demonstrates that the universe of millwork products includes an entirely different class or kind of product than wood boards used for drawer sides. Commerce may not cherry pick certain language that supports its position, while ignoring the substantial evidence that contradicts it. Yet that is what Commerce did in its Draft Remand Results in ignoring the abundant evidence from the ITC proceeding that indicates that the definition of "wood moulding or millwork products" was based on end-use as products used mainly in residential and non-residential buildings for both interior and exterior applications and did not extend to edge-glued boards produced into drawer sides after importation.

**Commerce's Position:**

We disagree with Hardware Resources' view that Commerce ignored evidence from the

ITC determination.[98] As an initial matter, Commerce defines the scope of the merchandise

subject to an investigation with deference to the petitioner, and the ITC defines the domestic like

---

[97] *See* Investigation Information Memorandum at Exhibit III (Petitioner's Letter, "Wood Mouldings and Millwork Products from Brazil and the People's Republic of China: Responses to First Supplemental Questions on General Issues Volume I of the Petition," dated January 15, 2020, at EXHIBIT I-Supp-5).
[98] *See* Hardware Resources Comments at 17.

product.[99]  The role of the ITC is to make a determination as to material injury or threat of

material injury to the domestic industry.[100]  In general, the ITC uses Commerce's scope as the

basis for the product description to define the domestic like product for its injury analysis.[101]

With respect to the underlying investigation, in its report, the ITC confirmed, "we define a single

domestic like product consisting of all {wood mouldings and millwork products}, coextensive

with the scope of the investigations."[102]  In other words, the ITC defined domestic like product

consistent with the scope set forth by Commerce, which is based on the scope proposed by the

petitioner.

       The ITC Report contains language that supports our determination based upon product

description.  In the "Product Description" section of the ITC Report, in addition to the scope,

Wood Mouldings and Millwork Products are described as "lengths of wood molded into various

shapes, or profiles, for use in a wide variety of functional and decorative applications in

residential and non-residential construction," and the ITC Report further states that

"{d}epending on their profile and length, {wood mouldings and millwork products}may be used

as crown mouldings, interior and exterior door frames or jambs, astragals, base caps,

cornerguards, base shoes, brickmoulds, drip caps, and battens, among other applications."[103]

Thereafter, in another section, the ITC "provide{d} a broad outline of the possible products

classified as a millwork and mouldings," noting that it is "not feasible to discuss them all."[104]  It

is in this "broad outline of the possible products classified as a millwork and mouldings," that the

---

[99] *See e.g., Antidumping Duty Investigation of Certain Passenger Vehicle and Light Truck Tires from the People's Republic of China:  Final Determination of Sales at Less than Fair Value and Final Affirmative Determination of Critical Circumstances, in Part*, 80 FR 34893 (June 18, 2015) (*Truck Tires China*) and accompanying IDM at Comment 1; *see also Downhole Pipe & Equip. LP v. United States,* 887 F. Supp. 2d 1311, 1319  (CIT 2012), *aff'd* 776 F.3d 1369 (Fed. Cir. 2015).
[100] *See* section 731 of the Act.
[101] *See* ITC Report at 6-8.
[102] *Id.* at 12 and 6.
[103] *See* ITC Report at 8.
[104] *Id.* at I-12 n.20; *see also* Hardware Resources' Remand Comments at 17.

ITC observed, "{m}illwork is a general term referring to woodwork that is produced in a mill; the universe of millwork products is extensive and diverse."[105]  Hardware Resources asserts, and we agree, that the ITC also stated that, "{wood moulding and millwork products} are wood-constructed products used mainly in residential and non-residential buildings and can be used for both interior and exterior applications.  These products have both functional (*e.g.* door jamb) and decorative (*e.g.* mouldings) uses but are not structural (*e.g.* framing)," and "{t}his broad category of products includes items like window and door frames, mouldings, and other dimension stock (worked wood products that are cut or shaped).  Millwork products typically are installed with screws, nails, or adhesives."  In the same section, the ITC also elaborated on additional product descriptions, businesses and applications including specific products and end-uses.[106]  However, again, this discussion by the ITC was intended to "provide{} a broad outline of the possible products classified as a millwork and mouldings," and it was "not feasible to discuss all of the them."  We find that this information does not detract from our interpretation.

We emphasize that Commerce's practice is to avoid defining in-scope merchandise by end use, as end use is difficult to demonstrate at the time of importation and thus raises enforcement and circumvention issues.[107]  Although end use might inform the selection of which physical characteristics to include in the scope description, physical characteristics of merchandise are controlling.  The scope at issue contains no express end-use requirement, and, therefore, Commerce cannot read into the scope an end-use requirement on the basis of the ITC's

---

[105] *Id.*

[106] *Id.* at I-12 – I-13.

[107] *See King Supply Co. LLC v. United States*, 674 F.3d 1343, 1349 (Fed. Cir. 2012) ("{E}nd-use restrictions do not apply to AD orders unless the AD order at issue includes clear exclusionary language.  The requisite clear exclusionary language must leave no reasonable doubt that certain products were intended to be outside the scope of the AD order based solely on the end use of those products."); *Id.*, 674 F.3d at 1348 ("End-use restrictions in AD orders, while appropriately utilized in certain cases, are disfavored because they can be difficult to enforce.  This is because the physical characteristics of an imported product are more readily identifiable than the product's end use, which may be unclear at the time of importation.  Accordingly, when Commerce intends to impose end-use restrictions, Commerce consistently uses express terms such as 'only' or 'solely' to indicate restrictions on end uses for certain products." (citations omitted)).

non-exhaustive "outline of the possible products classified as millwork and mouldings," in its domestic industry injury determination.

Nevertheless, Hardware Resources' edge-glued boards would meet the additional product description criteria here. Edge-glued boards are lengths of wood molded into various shapes, that may be used for a variety of functions or applications.[108] Indeed, in the initial Scope Application public summary of the edge-glued boards, Hardware Resources stated that, "the edge-glued boards will be further processed into cabinet parts by Hardware Resources, though they could be used in other applications."[109] This is consistent with the statement in the ITC report highlighted by Hardware Resources that wood mouldings and millwork products are "wood-constructed products used mainly in residential and non-residential buildings … for both interior and exterior applications." As such, we find the ITC report does not detract from either our interpretation of the scope phrase "wood mouldings and millwork products" or our determination that Hardware Resources' edge-glued boards fall within the scope.

**Comment 4:  Commerce Ignores the Loveday Scope Ruling in Expanding the Scope**

*Hardware Resources' Comments*

The following is a verbatim summary of arguments submitted by Hardware Resources. For further details, *see* the Hardware Resources' Remand Comments at 18-19.

> In concluding that the scope covers Hardware Resources' edge-glued boards in the Draft Remand Results, Commerce also ignores another (k)(1) source, the Loveday Scope Ruling. In its Draft Remand Results, Commerce fails to explain its departure from its determination in the Loveday Scope Ruling that an item is not covered by the scope of the orders where it is not intended to be later manufactured into a moulding or millwork product or how that conclusion is consistent with the new definition that expands the scope to cover any woodwork produced in a mill or that "otherwise undergo{es} remanufacturing."

---

[108] *See* ITC Report at 8.
[109] *See* Scope Ruling Application at 7.

**Commerce's Position:**

We disagree with Hardware Resources that Commerce's determination is inconsistent with the Loveday Lumber Scope Ruling.[110] First, we have determined that Hardware Resources' edge-glued boards fall within scope because they are wood moulding and millworks products which are made of wood, finger-jointed, edge-glued and continuously shaped.[111] As such, contrary to Hardware Resources' assertion, the Loveday Scope Ruling's discussion regarding blanks is not applicable here.[112]

Nevertheless, in response to Hardware Resources' claim, in the Loveday Scope Ruling, Commerce stated:

> we find that Loveday Lumber's LWS wood products are not "moulding or millwork blanks." In this regard, record evidence demonstrates that Loveday Lumber's LWS wood products are not intended to be later manufactured into a moulding or piece of millwork, nor are Loveday Lumber's LWS wood products "finger-jointed or edge-glued" as defined above.[113]

According to Commerce, regarding the phrase "finger-jointed or edge-glued moulding or millwork blanks," the petitioner had provided a glossary which defined "moulding or millwork blanks" as "{b}oards fabricated by joining smaller pieces of wood together, which are later machined or moulded into a final profile."[114] Commerce noted that the glossary also defined finger-jointing as a "method of joining wood pieces milled in the shape of fingers . . . " and edge-glued as "{b}oards fabricated by gluing two or more smaller pieces of wood together along their thinner edges."[115] Loveday Lumber had also placed a dictionary definition on the record

---

[110] *See* Hardware Resources' Comments at 18-19 (citing Scope Ruling Application at Exhibit 10, containing Memorandum, "Final Scope Ruling on the Antidumping and Countervailing Duty Orders on Wood Mouldings and Millwork Products from the People's Republic of China: Request by Loveday Lumber Company, Inc.," dated May 16, 2022 (Loveday Scope Ruling)).

[111] *See* Draft Remand Results at 13; *see also* Loveday Scope Ruling at 4 (describing that Loveday's LWS products are "not finger-jointed, edge-glued, or continuously shaped.").

[112] *See* Hardware Resources' Comments at 19.

[113] *See* Loveday Scope Ruling at 9.

[114] *Id.* (citing Investigation Information Memorandum, which includes Petitioner's Letter, "Responses to First Supplemental Questions on General Issues Volume I of the Petition," dated January 15, 2020, at Exhibit I-supp-5).

[115] *Id.*

defining a blank as "a piece of material prepared to be made into something (such as a key) by further operation."[116]  The information before Commerce regarding "moulding and millwork blanks" supported Commerce's conclusion in Loveday.  Our interpretation of "wood moulding and millwork products" is not inconsistent with Loveday as our review of the (k)(1) sources did not indicate that the scope phrase carries an express end-use restriction.

Second, we have not departed from the Loveday Scope Ruling in other respects.  In the Loveday Scope Ruling, Commerce found that products which are "rough sawn," using a straight saw and are "raw and unfinished" and do not "go through planing or other moulding-type manufacturing process," are not covered by the scope of the *Orders*.[117]  In the case of Hardware Resources' edge-glued boards, although a similar straight saw is used, the saw is used to make a groove along the length of one side of the boards.[118]  That is, the boards have a mark of approximately one mm added with a straight saw along the length of one side of the board.  As such, unlike Loveday Lumber's rough sawn and straight cut product,[119] Hardware Resources' edge-glued board is scored with a straight saw to create a fine detail along the length of the board.[120]  While the type of saw was relevant to the determination made in the Loveday Lumber Scope because of its integral impact on the finished product at issue in that scope ruling, there is no limitation to the type of tools that can be used to produce subject merchandise.  Additionally, unlike Loveday Lumber's products which are "rough and unfinished",[121] Hardware Resources' edge-glued boards are finger-jointed, edge-glued, planed, trimmed, sanded to smooth the corners, and have a UV coating applied, resulting in them not being "rough and unfinished."[122]  As such,

---

[116] *Id*. (citations omitted).
[117] *See* Scope Ruling Application at Exhibit 10 (citing, "Request by Loveday Lumber Company, Inc"  at 10).
[118] *Id.* at Exhibit 1.
[119] *See* Loveday Lumber Scope Ruling at 4, 7, and 9.
[120] *See* Scope Ruling Application at 4.
[121] *Id*. at 10.
[122] *Id.* at 4 and 9.

we find our redetermination of Hardware Resources' edge-glued boards is not contradictory to

our decision in Loveday Lumber.

**Comment 5:   Commerce Ignores Record Evidence in Determining That the Boards Are Continuously Shaped**

*Hardware Resources' Comments*

The following is a verbatim summary of arguments submitted by Hardware Resources.  For further details, *see* the Hardware Resources' Remand Comments at 20-23.

> In its Draft Remand Results, Commerce appears to conclude that Hardware Resources' edge-glued boards are also covered by the scope because they are continuously shaped wood.[123]  Commerce's determination that the 1 mm mark on Hardware Resources' boards constitutes a "groove" (and that the boards are therefore "continuously shaped"), is not grounded in a complete reading of the record evidence.[124]  The record does not support Commerce's conclusion that a mere 1 mm temporary marking is the same as a "groove."  In its discussion of continuous shaping in the Draft Remand Results, Commerce contends that "the petitioner described a groove as a 'cut with, or parallel to the grain."[125]  Commerce reads Petitioner's statement out of context.  Commerce also ignores record evidence that Hardware Resources provided showing that the 1 mm mark on its boards is a temporary guide, which, following importation, is then used to cut a groove.  The temporary and superficial nature of this marking makes it entirely distinct from a groove, a fact that Commerce must consider in its analysis.

**Commerce's Position:**

We continue to find that Hardware Resources' edge-glued boards are continuously

shaped.  Regarding the phrase "continuously shaped," the petition at Exhibit I-10 includes an

excerpt from the HTSUS defining continuously shaped wood as wood that is "tongued, grooved,

rebated, chamfered, V-jointed, beaded, molded, rounded or the like along any of its edges, ends

or faces, whether or not planed, sanded, or end jointed."[126]  Additionally, in comments regarding

the intended scope of the *Orders* submitted during the underlying investigations, the petitioner

---

[123] *See* Draft Remand Results at 12-13.
[124] *Id.*
[125] *Id.* at 13
[126] *See* Investigation Information Memorandum at Exhibit I (Petition at Exhibit I-10).  As the scope language indicates, tariff codes are not dispositive with regard to what is covered by the scope.  Nonetheless, the tariff schedule description is evidence of "continuously shaped" wood.

stated that a product was continuously shaped where it was "smoothed/surfaced."[127]  Regarding the term "grooved," the petitioner described a groove as a "cut with, or parallel to the grain."[128]

The record indicates that Hardware Resources' edge-glued boards are finger-jointed and edge-glued together into boards; and the boards are then planed, trimmed, coated with a UV coating, cut, and lightly sanded, and scored using a straight saw along the board length.[129]  Based on the record evidence, we found that the lengthwise scoring of the board constitutes continuous shaping by way of the lengthwise groove.[130]  Commerce's analysis of "grooved" in the Draft Remand Results derives from language in a section of the initial investigation about endwork/dados; it is not a technical specification for "groove."[131]  However, that language from that supplemental response is relevant to our analysis, as the description of "groove," whether or not under the category of a specific product, would not change depending on the context. Furthermore, in Hardware Resources' Scope Application, a classification ruling from U.S. Customer and Border Protection (CBP) described Hardware Resources' edge-glued boards as "white poplar edge-glued boards cut with a continuous groove along their length," and further described them as "continuously shaped throughout its length."[132]  Given the information before us, we continue to determine that the 1 mm cut or mark, as described by Hardware Resources, is different from "groove" in name only, rather than any physical characteristic.  Notwithstanding our interpretation of the word "groove" and Hardware Resources' 1 mm cut, Hardware Resources' edge-glued boards still constitute continuously shaped wood.  In the Scope Ruling

---

[127] *Id.* at Exhibit II (Petitioner's Letter, "Wood Mouldings and Millwork Products from Brazil and the People's Republic of China:  Additional Rebuttal Scope Comments," dated April 10, 2020, at 3 and 14).

[128] *Id.* at Exhibit III (Petitioner's Letter, "Wood Mouldings and Millwork Products from Brazil and the People's Republic of China:  Responses to First Supplemental Questions on General Issues Volume I of the Petition," dated January 15, 2020, at 5).

[129] *See* Scope Ruling Application at 9.

[130] *See* Draft Remand Results at 12.

[131] *See* Investigation Information Memorandum at Exhibit III (Petitioner's Letter, "Wood Mouldings and Millwork Products from Brazil and the People's Republic of China: Responses to First Supplemental Questions on General Issues Volume I of the Petition," dated January 15, 2020, at 5).

[132] *See* Scope Ruling Application at Exhibit 3a.

Application, Hardware Resources described its boards as "planed to 5/8 inches thick,"[133] and "sanded to smooth the corners to 1/16 of an inch."[134]  Both planing, a form of surfacing, and sanding to smooth corners" are characteristics which constitute "continuously shaping" based on (k)(1) sources, which indicate continuously shaped wood is wood that is "tongued, grooved, rebated, chamfered, V-jointed, beaded, molded, rounded or the like along any of its edges, ends or faces, whether or not planed, sanded, or end jointed." [135]

## VI.    FINAL RESULTS OF REDETERMINATION

For these final results of redetermination, we continue to find that Hardware Resources' edge-glued boards are within the scope of the *Orders*.  Upon a final and conclusive decision in this litigation, as appropriate, Commerce will issue appropriate instructions to CBP consistent with these final results of redetermination.

3/17/2025

X 

Signed by: CHRISTOPHER ABBOTT

Christopher Abbott
Deputy Assistant Secretary
 for Policy and Negotiations,
 performing the non-exclusive functions and duties
 of the Assistant Secretary for Enforcement and Compliance

---

[133] *Id.* at 9.
[134] *Id.* at 4, 7 and 9.
[135] *See* Investigation Information Memorandum at Exhibit I (Petition at Exhibit I-10).  As the scope language indicates, tariff codes are not dispositive or limiting with regard to what is covered by the scope.  Nonetheless, the tariff schedule description is evidence of "continuously shaped" wood; *see also* Investigation Information Memorandum at Exhibit II (Petitioner's Letter, "Wood Mouldings and Millwork Products from Brazil and the People's Republic of China:  Additional Rebuttal Scope Comments," dated April 10, 2020, at 3 and 14).

**Attachment I:  Preliminary Scope Decision Memorandum
(omitting preliminary scope memorandum attachments I-
IV (pages 58-300))**

Barcode:4012643-01 A-570-117 INV - Investigation

UNITED STATES DEPARTMENT OF COMMERCE
International Trade Administration
Washington, D.C. 20230

A-351-853; A-570-117;
C-570-118
Investigation
**Public Document**
E&C/OVIII: STL

August 5, 2020

| | |
|---|---|
| **MEMORANDUM TO:** | James Maeder<br>Deputy Assistant Secretary<br> for Antidumping and Countervailing Duty Operations |
| **FROM:** | Irene Darzenta Tzafolias<br>Director, Office VIII<br>Antidumping and Countervailing Duty Operations |
| **SUBJECT:** | Wood Mouldings and Millwork Products from Brazil and the People's Republic of China: Preliminary Scope Decision Memorandum |

---

## I.    SUMMARY

Based on our analysis of comments received from interested parties concerning the scope of the antidumping duty (AD) investigations of wood mouldings and millwork products (millwork products) from Brazil and the People's Republic of China (China) and the countervailing duty (CVD) investigation of wood mouldings and millwork products from China, we recommend that the Department of Commerce (Commerce) preliminarily revise the scope of the investigations to clarify that the following products are not subject to the scope of the investigations:

- Lumber (solid, edge-glued or fingered-jointed);
- Stair stringers;
- Countertop/butcherblocks; and,
- Unassembled wooden kitchen cabinets, unassembled wooden bedroom wardrobes, and unassembled wooden bathroom cabinets, including their wood moulding components, if they are covered under other AD/CVD orders.

We also recommend preliminarily revising the scope of the investigations to clarify that the following products are subject to the investigations:

- Screen/surfaced on four sides (S4S) and/or surface one side, two edges (S1S2E) stock/boards that are finger-jointed or edge-glued; and,
- Wood moulding door components which enter as part of unassembled door kits.



## II.    BACKGROUND

On January 8, 2020, Commerce received AD petitions concerning imports of millwork products from Brazil and China, and a CVD petition concerning imports of millwork products from China.[1]  The Petitions were filed in proper form by the Coalition of American Millwork Producers (the petitioner).[2]  Commerce initiated these investigations on January 28, 2020.[3]  The *Initiation Notices* define the scope of these investigations as follows:

> The merchandise subject to these investigations consists of wood mouldings and millwork products that are made of wood (regardless of wood species), bamboo, laminated veneer lumber (LVL), or of wood and composite materials (where the composite materials make up less than 50 percent of the total merchandise), and which are continuously shaped wood that undergoes additional manufacturing or finger-jointed or edge-glued moulding or millwork blanks (whether or not resawn).

> The percentage of composite materials contained in a wood moulding or millwork product is measured by length, except when the composite material is a coating or cladding.  Wood mouldings and millwork products that are coated or clad, even along their entire length, with a composite material, but that are otherwise comprised of wood, LVL, or wood and composite materials (where the non-coating composite materials make up 50 percent or less of the total merchandise) are covered by the scope.

> The merchandise subject to these investigations consists of wood, LVL, bamboo, or a combination of wood and composite materials that is continuously shaped throughout its length (with the exception of any endwork/dados), profiled wood having a repetitive design in relief, similar milled wood architectural accessories, such as rosettes and plinth blocks, and finger-jointed or edge-glued moulding or millwork blanks (whether or not resawn).  The scope includes continuously shaped wood in the forms of dowels, building components such as interior paneling and jamb parts, and door components such as rails and stiles.

---

[1] *See* Petitioner's Letter, "Wood Mouldings and Millwork Products from Brazil and the People's Republic of China:  Petitions for the Imposition of Antidumping and Countervailing Duties," dated January 8, 2020 (Petitions).

[2] The Coalition of American Millwork Producers is comprised of Bright Wood Corporation, Cascade Wood Products, Inc., Endura Products, Inc., Sierra Pacific Industries, Sunset Moulding, Woodgrain Millwork, Inc., and Yuba River Moulding.

[3] *Wood Mouldings and Millwork Products  from Brazil and the People's Republic of China:  Initiation of Less-Than-Fair-Value Investigations*, 85 FR 6502 (February 5, 2020); *see also Wood Mouldings and Millwork Products  from the People's Republic of China:  Initiation of Countervailing Duty Investigation*, (February 5, 2020) 85 FR 6513 (*Initiation Notices*)

2

The covered products may be solid wood, laminated, finger-jointed, edge-glued, face-glued, or otherwise joined in the production or remanufacturing process and are covered by the scope whether imported raw, coated (*e.g.*, gesso, polymer, or plastic), primed, painted, stained, wrapped (paper or vinyl overlay), any combination of the aforementioned surface coatings, treated, or which incorporate rot-resistant elements (whether wood or composite).  The covered products are covered by the scope whether or not any surface coating(s) or covers obscures the grain, textures, or markings of the wood, whether or not they are ready for use or require final machining (*e.g.*, endwork/dado, hinge/strike machining, weatherstrip or application thereof, mitre) or packaging.

All wood mouldings and millwork products are included within the scope even if they are trimmed; cut-to-size; notched; punched; drilled; or have undergone other forms of minor processing.

Subject merchandise also includes wood mouldings and millwork products that have been further processed in a third country, including but not limited to trimming, cutting, notching, punching, drilling, coating, or any other processing that would not otherwise remove the merchandise from the scope of the investigations if performed in the country of manufacture of the in-scope product.

Excluded from the scope of these investigations are exterior fencing, exterior decking and exterior siding products (including solid wood siding, non-wood siding (*e.g.*, composite or cement), and shingles) that are not LVL or finger jointed; finished and unfinished doors; flooring; parts of stair steps (including newel posts, balusters, easing, gooseneck, risers, treads and rail fittings); and picture frame components three feet and under in individual lengths.

Excluded from the scope of these investigations are all products covered by the scope of the antidumping and countervailing duty orders on *Hardwood Plywood from the People's Republic of China.  See Certain Hardwood Plywood Products from the People's Republic of China: Amended Final Determination of Sales at Less Than Fair Value, and Antidumping Duty Order, 83 FR 504 (January 4, 2018)*; *Certain Hardwood Plywood Products from the People's Republic of China: Countervailing Duty Order*, 83 FR 513 (January 4, 2018).

Excluded from the scope of these investigations are all products covered by the scope of the antidumping and countervailing duty orders on *Multilayered Wood Flooring from the People's Republic of China.  See Multilayered Wood Flooring from the People's Republic of China: Amended Final Determination of Sales at Less Than Fair Value and*

Filed By: Suzanne Lam, Filed Date: 8/6/20 12:33 PM, Submission Status: Approved

*Antidumping Duty Order*, 76 FR 76690 (December 8, 2011); *Multilayered Wood Flooring from the People's Republic of China: Countervailing Duty Order*, 76 FR 76693 (December 8, 2011).

Imports of wood mouldings and millwork products are primarily entered under the following Harmonized Tariff Schedule of the United States (HTSUS) numbers: 4409.10.4010, 4409.10.4090, 4409.10.4500, 4409.10.5000, 4409.22.4000, 4409.22.5000, 4409.29.4100, and 4409.29.5100. Imports of wood mouldings and millwork products may also enter under HTSUS numbers: 4409.10.6000, 4409.10.6500, 4409.22.6000, 4409.22.6500, 4409.29.6100, 4409.29.6600, 4418.99.9095 and 4421.99.9780. While the HTSUS subheadings are provided for convenience and customs purposes, the written description of the scope of these investigations is dispositive.

## III.    SCOPE COMMENTS

Regarding the scope as written above, in accordance with the *Preamble* to our regulations,[4] Commerce set aside a period of time for parties to raise issues regarding product coverage and, in the *Initiation Notices*, encouraged parties to submit comments. Commerce provides this specific comment period so that the petitioner may be made aware of any areas in which the scope is unintentionally over-inclusive, and, if appropriate, reconsider product coverage.[5]

Commerce received timely scope comments on the records of all the ongoing millwork products investigations from the companies listed below. The petitioner submitted timely rebuttal comments.[6]

1. Anji Golden Elephant Bamboo Wooden Industry Co., Ltd. (Anji Golden Elephant);[7]
2. Cali Bamboo, LLC (Cali Bamboo);[8]
3. Composite Technology International, Inc. (CTI);[9]
4. FD Sales Company LLC (FD Sales);[10]

---

[4] *See Antidumping Duties; Countervailing Duties; Final Rule,* 62 FR 27296, 27323 (May 19, 1997) (*Preamble*).

[5] *Id*., 62 FR at 27323.

[6] *See* Petitioner's Letter, "Rebuttal Scope Comments," dated March 13, 2020 (Petitioner Rebuttal Scope Comments).

[7] *See* Anji Golden Elephant's Letter, "Scope Comments," dated March 3, 2020 (Anji Golden Elephant Scope Comments).

[8] *See* Cali Bamboo's Letter, "Comments on Scope of Investigations," dated March 3, 2020 (Cali Bamboo and Lumber Liquidators Scope Comments).

[9] *See* CTI Letter, "Comments on the Scope of the Investigation," dated March 3, 2020 (CTI Scope Comments 1).

[10] *See* FD Sales Letter, "Scope Comments," dated March 3, 2020 (FD Sales Scope Comments).

4

5.  Fujian Nanping Yuanqiao Wood-Industry Co., Ltd. (Fujian Nanping);[11]
6.  International Wood Products, LLC (IWP);[12]
7.  Lanzhou Xinyoulian Industrial Co., Ltd. (Lanzhou Xinyoulian);[13]
8.  Lumber Liquidators Services, LLC (Lumber Liquidators);[14]
9.  Oppein Home Group Inc. (Oppein);[15]
10. Raoping HongRong Handicrafts Co., Ltd. (Raoping);[16]
11. Red Tide International LLC (Red Tide);[17]
12. Seaboard International Forest Products, LLC (Seaboard);[18]
13. Shandong Jiapeng Wood Co., Ltd. (Shandong Jiapeng);[19]
14. Shandong Jinluda International Trade Co., Ltd. (Shandong Jinluda);[20]
15. Shaxian Hengtong Wood Industry Co., Ltd (Shaxian Hengtong);[21]
16. Shaxian Shiyiwood., Ltd. (Shaxian Shiyiwood);[22]
17. Shenzhenshi Huanwei Woods Co., Ltd. (Shenzhenshi Huanwei);[23]
18. Sylvan Products, LLC (Sylvan Products);[24]
19. Weston Wood Solutions Inc. (Weston Wood);[25] and
20. Xuzhou Hexi Wood Co., Ltd (Xuzhou Hexi);[26]

On March 18, 2020, Sylvan Products submitted a request to file additional scope comments,[27] and Commerce allowed a second opportunity for interested parties to submit additional comments on the scope of these investigations.[28]  Commerce received

---

[11] *See* Xuzhou Hexi Wood Co., Ltd, Shaxian Hengtong Wood Industry Co., Ltd, Shaxian Shiyiwood., Ltd., and Fujian Nanping Yuanqiao Wood-Industry Co., Ltd.'s Letter, "Comments on Scope and Request that Commerce Find Two Distinct Products; Laminated Veneer Lumber," dated March 3, 2020 (Fujian Nanping, Shaxian Hengtong, Shaxian Shiyiwood, and Xuzhou Hexi Scope Comments).

[12] *See* IWP's Letter, "Scope Comments," dated April 2, 2020 (IWP Scope Comments).

[13] *See* Lanzhou Xinyoulian, "Comments on Scope and Request that Commerce Find Two Distinct Products: Wood Shutter Components," dated March 3, 2020 (Lanzhou Xinyoulian Scope Comments).

[14] *See* Cali Bamboo and Lumber Liquidators Scope Comments.

[15] *See* Oppein's Letter, "Scope Comments," dated March 3, 2020 (Oppein Scope Comments 1).

[16] *See* Roaping's Letter, "Comments on Scope of the Investigation," dated March 27, 2020 (Roaping Scope Comments).

[17] *See* Red Tide's Letter, "Scope Comments," dated April 30, 2020 (Red Tide S1S2E Scope Comments).

[18] *See* Seaboard's Letter, "Scope Comments," dated March 3 (Seaboard Scope Comments 1).

[19] *See* Shandong Jiapeng's Letter, "Scope Comments," dated March 5, 2020 (Shandong Jiapeng and Shandong Jinluda Scope Comments).

[20] *Id.*

[21] *See* Fujian Nanping, Shaxian Hengtong, Shaxian Shiyiwood, and Xuzhou Hexi Scope Comments.

[22] *Id.*

[23] *See* Shenzhenshi Huanwei's Letter, "Comments on Scope of the Investigation," dated March 3, 2020 (Shenzhenshi Huanwei Scope Comments).

[24] *See* Sylvan Products' Letter, "Scope Comments," dated March 18, 2020 (Sylvan Products Scope Comments).

[25] *See* Weston Wood's Letter, "Weston Wood Solutions Inc.'s Scope Comments," dated March 3, 2020 (Weston Wood Scope Comments).

[26] *See* Fujian Nanping, Shaxian Hengtong, Shaxian Shiyiwood, and Xuzhou Hexi Scope Comments.

[27] *See* Sylvan Products Scope Comments.

[28] *See* Memorandum, "Scope Comments and Rebuttal Comments Extension," dated March 20, 2020 (Additional Scope Comment Period).

5

additional scope comments from CTI, IWP, Oppein, Raoping and Seaboard.[29]  On April 10, 2020, Commerce received additional rebuttal comments from the petitioner, which contained new factual information regarding S1S2E boards.[30]  On April 27, 2020, Commerce allowed interested parties an opportunity to submit rebuttal comments specific to S1S2E boards,[31] and on April 30, 2020, Commerce received timely S1S2E board rebuttal comments from CTI, IWP, and Red Tide.[32]  Additionally, on June 11, 2020, Commerce sent out letters to the petitioner and Lanzhou Xinyoulian, requesting additional information on lumber and wood shutter components, respectively.[33]  On June 24, 2020, Commerce received timely lumber comments from the petitioner, and Lanzhou Xinyoulian did not respond to Commerce's request.[34]  On July 13, 2020, Commerce provided interested parties another opportunity to submit rebuttal comments to the petitioner's lumber comments,[35] and on July 16, 2020, Commerce received timely lumber rebuttal comments from CTI and IWP.[36]

## IV.    SCOPE ISSUES

Below is a complete list of the scope issues raised by interested parties:

**Issue 1:**  Whether the Scope is Overly Broad and Ambiguous
**Issue 2:**  Whether to Add Clarifying Language Regarding Out-of-Scope Products
**Issue 3:**  Whether to Exclude Bamboo Mouldings and Millwork Products
**Issue 4:**  Whether to Exclude LVL Mouldings and Millwork Products
**Issue 5:**  Whether to Exclude Polyvinyl Chloride Cladded Door Stiles
**Issue 6:**  Whether to Exclude CTI's SuperJambs® and Jamboo® Superframes
**Issue 7:**  Whether to Exclude Wood Shutter Components
**Issue 8:**  Whether to Exclude Finger-Jointed Siding Products

---

[29] *See* CTI's Letter, "CTI's Additional Comments on the Scope of the Investigation," dated April 2, 2020 (CTI Scope Comments 2); *see also* IWP Scope Comments; Oppein's Letter, "Additional Scope Comments," dated March 27, 2020 (Oppein Scope Comments 2); Roaping Scope Comments, and Seaboard's Letter, "Scope Comments," dated April 2, 2020 (Seaboard Scope Comments).

[30] *See* Petitioner's Letter, "Additional Rebuttal Scope Comments," dated April 10, 2020 (Petitioner Additional Rebuttal Scope Comments).

[31] *See* Memorandum, "Comment Period for Smooth 1 Side and 2 Edges (S1S2E) Boards," dated April 27, 2020.

[32] *See* CTI's Letter, "CTI's Scope Comments Regarding Smooth 1 Side and 2 Edges Boards," dated April 30, 2020 (CTI S1S2E Scope Comments); *see also* IWP's Letter, "IWP's Additional Scope Comments re S1S2E Lumber," dated April 30, 2020 (IWP S1S2E Scope Comments); and Red Tide S1S2E Scope Comments.

[33] *See* Commerce's Letter to the Petitioner, "Request for Additional Information Regarding the Scope of the Investigations," dated June 11, 2020; *see also* Commerce's Letter to Lanzhou Xinyoulian, "Request for Additional Information Regarding the Scope of the Investigations," dated June 11, 2020.

[34] *See* Petitioner Letter, "Response to Request for Additional Information on Scope Regarding Lumber," dated June 24, 2020 (Petitioner Lumber Definition).

[35] *See* Memorandum, "Rebuttal Comment Period," dated July 13, 2020.

[36] *See* CTI's Letter, "CTI's Rebuttal Scope Comments on Petitioner's Additional Scope Comments on Lumber," dated July 16, 2020 (CTI Lumber Comments); *see also* IWP's Letter, "IWP'S comments on new factual information re out of scope lumber," dated July 16, 2020 (IWP Lumber Comments) at 6.

6

**Issue 9:** Whether to Exclude Picture Frame Components with 90-Degree Rabbet
Groove or Overhang

**Issue 10:** Whether to Exclude Millwork Products that are Imported as Components in
Unassembled Wooden Kitchen Cabinets, Unassembled Wooden Bathroom
Cabinets, and Unassembled Wooden Bedroom Wardrobes

**Issue 11:** Whether to Exclude Millwork Products that are Imported as Components in
Unassembled Wooden Interior Door Set

**Issue 12:** Whether to Exclude Smooth 1 Side and 2 Edges (S1S2E) Boards and Clarify
the Exclusion for Lumber

## V.     DISCUSSION OF ISSUES

### Issue 1:  Whether the Scope is Overly Broad and Ambiguous

***FD Sales' and Seaboard's Comments***
- Commerce should provide coherent and consistent guidance and remove potential
ambiguities in the scope language.  The scope is overly broad and ambiguous
because it does not provide any clear definition for mouldings, millwork, or
additional manufacturing.[37]
- It is unclear whether additional manufacturing means products that undergo
additional manufacturing before or after importation into the United States.[38]
- Based on the language of the Petitions, the petitioner only intended to cover
millwork products that are used as covering for floors, walls, doors, and other
areas, primarily in residential and non-residential construction.[39]
- Commerce should clarify the intended meaning and provide relevant definitions
as to the intended purpose of the scope of these investigations.[40]

***The Petitioner's Comments***
- The scope of these investigations is clear and administrable.  It is a well-
established practice that "scope inclusions are written in broad terms and then
specific exclusions are carved out from the general terms."[41]
- As stated in *Novosteel SA v. United States*, "{a} petitioner need not circumscribe
the entire universe of articles that might possibly fall within the order it seeks, "
and "{Commerce} and the courts have roundly rejected… the proposition that a
petition must expressly and specifically identify all the products covered by the
order at issue."[42]
- A description of millwork products that are subject to the scope of these
investigations can be found in the scope language and in the Petitions and petition

---

[37] *See* FD Sales Scope Comments at 3; *see also* Seaboard Scope Comments 1 at 3-4.
[38] *See* FD Sales Scope Comments at 3; *see also* Seaboard Scope Comments 1 at 4.
[39] *See* Petitions at 14.
[40] *See* FD Sales Scope Comments at 4; *see also* Seaboard Scope Comments 1 at 5.
[41] *See* Petitioner Rebuttal Scope Comments at 2-3 (citing *Power Train Components, Inc. v. United States,*
911 F. Supp. 2d 1338, 1343 (CIT 2013)).
[42] *Id.* at 3 (citing *Novosteel SA v. United States,* 284 F.3d 1261, 1270 (Fed. Cir. 2002)).

7

supplements.  These descriptions provide a clear roadmap of in-scope products and out-of-scope products.[43]

**Commerce's Position:**  Commerce agrees with the petitioner and preliminarily finds that the scope is not overly broad.  Scope language, by nature, is a general description of subject merchandise.[44]  Furthermore, the records of these investigations include detailed descriptions of in-scope wood mouldings and millwork products provided by the petitioner in the Petitions and the petition supplements.[45]  For example, to further identify in-scope wood mouldings and millwork products, the petitioner provided several glossaries of wood mouldings and millwork products in the petition supplements.[46]  Additionally, in the Petitions, wood mouldings and millwork products are clearly described as products that are manufactured from softwood, hardwood, laminated veneer lumber, or some combination of wood and composite materials, and are woodwork or building materials that are produced in a mill or otherwise undergo remanufacturing.[47]

To further clarify the scope, the petitioner also revised its initial proposed scope language to define in-scope wood mouldings and millwork products as products which are continuously shaped wood that undergoes additional manufacturing, finger-jointed or edge-glued.[48]  Furthermore, Commerce extended the scope comment period multiple times and provided interested parties several opportunities to submit scope comments to ensure that the record of these investigations included a comprehensive description of in-scope and out-of-scope products.[49]  Accordingly, Commerce finds that the records of these investigations contain numerous descriptions and examples of in-scope and out-of-scope products, and that the plain language of the scope defines subject merchandise as "wood mouldings and millwork products that are made of wood, bamboo, laminated veneer lumber (LVL), or of wood composite materials (where the composite materials make up less than 50 percent of the total merchandise), and which are continuously shaped wood that undergoes additional manufacturing, or finger-jointed or edge-flued." This description is consistent with the descriptions of millwork products found in the Petitions, petition supplements, comments, and the U.S. International Trade

---

[43] *Id.*

[44] *See* 19 CFR 351.225(a) ("Issues arise as to whether a particular product is included within the scope of an antidumping or countervailing duty order or a suspended investigation.  Such issues can arise *because the descriptions of subject merchandise* contained in the Department's determinations *must be written in general terms.*); *see also Duferco Steel, Inc. v. United States*, 296 F.3d 1087, 1096 (Fed. Cir. 2002).

[45] *See* Petitioner's Letter, "Responses to First Supplemental Questions on General Issues Volume I of the Petition," dated January 15, 2020 (First Petition Supplement) at Exhibit 2-7, and 12-13; *see also* Petitioner's Letter, "Responses to Second Supplemental Questions on General Issues Volume I of the Petition," dated January 22, 2020 (Second Petition Supplement) at 1-7.

[46] *See* First Petition Supplement at Exhibit I-Supp-2, I-Supp-3, and I-Supp-5.

[47] *See* the Petitions at 6.

[48] *See* Second Petition Supplement at 3-4.

[49] *See* Memorandum, "Extension of Deadline for Comments on Scope and Product Characteristics," dated February 13, 2020 (First Scope Extension); *see also* Additional Scope Comment Period; and Memorandum, "Scope Comments and Rebuttal Comments Extension," dated March 27, 2020 (Additional Scope Comment Period Extension)

8

Barcode:4012643-01 A-570-117 INV - Investigation    -

Commission's (ITC) preliminary determination on wood mouldings and millwork products from Brazil and China.[50]  In other words, there is ample evidence on the records of these investigations that the products covered by the scope are those which the petitioner intended to cover.

However, as a result of comments provided by interested parties on the scope language, we find the phrase "that undergoes additional manufacturing" with respect to the inclusion of continuously shaped wood could be subject to two interpretations:  (1) additional manufacturing occurring before importation to the United States; and (2) additional manufacturing occurring after importation to the United States.  Commerce suggested that the petitioner add this language to the scope of these investigations during the petition phase;[51] however, Commerce now recognizes, based on the comments received, that this phrase may cause confusion.  Therefore, we are preliminarily removing it from the scope of these investigations.  Based on the information on the records of the investigations, it is apparent that the petitioner intended to cover continuously shaped wood, regardless of whether it undergoes additional manufacturing before or after importation into the United States.  For example, IWP requests that Commerce find its S1S2E boards are out-of-scope in part because its S1S2E boards do not undergo additional manufacturing and are imported as a finished product.[52]  The petitioner opposes this exclusion because, as expressed in the Petitions, the petitioner intended to cover S1S2E boards as described by IWP.[53]  Additionally, the following scope language already covers the issue of additional manufacturing in clarifying that merchandise is covered regardless of whether it undergoes additional manufacturing before or after importation into the United States:

> The covered products may be solid wood, laminated, finger-jointed, edge-glued, face-glued, or otherwise joined in the production or remanufacturing process and are covered by the scope whether imported raw, coated (*e.g.*, gesso, polymer, or plastic), primed, painted, stained, wrapped (paper or vinyl overlay), any combination of the aforementioned surface coatings, treated, or which incorporate rot-resistant elements (whether wood or composite).  The covered products are covered by the scope whether or not any surface coating(s) or covers obscures the grain, textures, or markings of the wood, whether or not they are ready for use or require final machining (*e.g.*, endwork/dado, hinge/strike machining, weatherstrip or application thereof, mitre) or packaging.

---

[50] *See Wood Mouldings and Millwork Products from Brazil and China*, Investigation Nos. 701-TA-636 and 731-TA-1469-1470 (Preliminary), Publication 5030 (March 2020) (ITC Preliminary Report) at 10; *see also* Attachment IV.
[51] *See* Second Petition Supplement at 3; *see also* Memorandum, "Phone Call with Counsel to the Petitioner," dated January 22, 2020 (Commerce requested that the petitioner revise  the first paragraph of the scope to, "The merchandise subject to this investigation consists of wood mouldings and millwork products … and which are continuously shaped wood that undergoes additional manufacturing.").
[52] *See* IWP Scope Comments at 2 and 8.
[53] *See* Petitioner Additional Rebuttal Scope Comments at 3 (citing Second Petition Supplement at 3).

9

All wood mouldings and millwork products are included within the scope even if they are trimmed; cut-to-size; notched; punched; drilled; or have undergone other forms of minor processing.

Commerce has the authority to clarify the scope of an investigation, or modify the proposed scope to make it administrable, enforceable, or to prevent potential evasion.[54] Further, it is our normal practice to provide ample deference to the petitioner with respect to products for which it seeks relief in an investigation.[55]  Here, evidence on the record demonstrates that the scope language reflects the product coverage intended by the petitioner in the Petitions.  However, to provide greater clarity in the scope, and because doing so does not undermine the petitioner's intent, we are removing the phrase "that undergoes additional manufacturing" from the scope of these investigations.  Accordingly, we preliminarily recommend modifying the scope, as defined in the *Initiation Notices*, by removing the phrase "that undergoes additional manufacturing" from the first paragraph of the scope of the investigations.

## Issue 2:  Whether to Add Clarifying Language Regarding Out-of-Scope Products

Interested Parties claim that the scope requires clarification for products that are not millwork products.  Interested parties request Commerce to clarify that the following products are excluded from the scope of these investigations:

1.  <u>Wooden Panels, Wall Mosaics and Wooden Countertops</u>

### *FD Sales' Comments*
- FD Sales, an importer of wooden paneling and countertops, requests that Commerce clarify and confirm that wooden panels, wall mosaics and wooden countertops are excluded from the scope of the investigations.[56]
- Wooden panels and wall mosaics do not undergo additional manufacturing, and are not finger-jointed, edge-glued, or continuously shaped.[57]
- Wooden panels consist of wood pieces or a single wood veneer layer that are individually glued directly on to a wood backing.[58]
- Wall mosaics are not rigid panels and are made of rectangular pieces of wood in varying widths, lengths, and thickness that are individually directly glued to a

---

[54] *See AMS Associates, Inc. v. United States*, 881 F. Supp. 2d 1374, 1380 (CIT 2012).
[55] *See, e.g., Certain Softwood Lumber Products from Canada:  Final Affirmative Countervailing Duty Determination, and Final Negative Determination of Critical Circumstances*, 82 FR 51814 (November 8, 2017  ), and accompanying Issues and Decisions Memorandum (IDM) at Comment 90 ("While {Commerce} possesses the authority to determine the scope of an investigation, {Commerce's} standard practice is to provide ample deference to the petitioner with respect to the definition of the product(s) for which it seeks relief during the investigation phase of an AD or CVD proceeding."); *Notice of Final Determination of Sales at Less Than Fair Value:  Large Residential Washers from the Republic of Korea*, 77 FR 75988 (November 26, 2012), and accompanying IDM at Comment 1.
[56] *See* FD Sales Scope Comments at 1-2.
[57] *Id.* at 7 and 11.
[58] *Id.* at 5.

10

mesh backing.  The mesh backing is flexible and different from rigid wooden backings.[59]

- Wooden countertops are long wood panels made from individual strips of lumber that are finger-jointed and edge-glued.  Wooden countertops are sold as "butcherblock" countertop panels used as a functional top surface for kitchen cabinets, kitchen furniture, and workbenches.  Although FD Sales' wooden countertops are finger-jointed and edge-glued, these countertops are not used in building construction, do not undergo additional manufacturing, do not consist of continuously shaped wood and are not a decorative strip that has a curved or projecting surface.  The edges of the butcherblock countertop are straight with 90-degree corners that are not beveled or otherwise subjected to working by a shaping machine.  They are the result of the process of ripping, finger-jointing and edge-gluing long strips into a countertop.[60]

### Shenzhenshi Huanwei's Comments

- Shenzhenshi Huanwei, an exporter of wall panels and countertops/butcherblocks, requests that Commerce clarify and confirm that its wall panels and countertops/butcherblocks are excluded from the scope of these investigations.[61]
- Wooden wall panels are assembled and glued onto the substrate back board panel manually, and its wood countertops/butcherblocks are assembled wood blocks that are hand sanded and polished.[62]
- The dimensions of its countertops/butcher blocks differ significantly from millwork products and provides an example of its countertop/butcher block that measures 8 feet by 6 feet length, 25 inches or 36 inches in width and 1.5 inches in thickness.[63]
- Commerce should add exclusionary language to the scope of these investigations to make it clear that these products are out-of-scope products.[64]

### The Petitioner's Comments

- The petitioner agrees that wooden wall panels and wall mosaics are not subject to the scope of these investigations, so long as these products are not finger-jointed, edge-glued or continuously shaped, do not undergo additional manufacturing, and are already glued onto the relevant backing material at the time of importation.[65]
- The petitioner also agrees that wooden countertop/butcherblock panels, which are imported as a full countertop panel in dimensions such as those identified by Shenzhenshi Huanwei and serve as the functional top surface on kitchen cabinets, are not intended to fall within the scope of these investigations.[66]

---

[59] *Id.* at 6
[60] *Id.* at 7-8.
[61] *See* Shenzhenshi Huanwei Scope Comments at 2.
[62] *Id.*
[63] *Id.* at 10-11.
[64] *Id.* at 13.
[65] *See* Petitioner Rebuttal Scope Comments at 20.
[66] *Id* at 21.

11

- Shenzhenshi Huanwei did not propose any exclusionary scope language, and the petitioner believes the scope language is clear; and therefore, no revision is necessary.[67]

2.  <u>Carpet Grippers</u>

***Shandong Jinluda and Shandong Jiapeng's Comments***
- Shandong Jinluda and Shandong Jiapeng, Chinese exporters of carpet grippers (also known as carpet tack strips, tackles strips, smooth edge and floor edge), request that Commerce confirm that their carpet grippers are excluded from the scope of these investigations.[68]
- A carpet gripper is a thin piece of plywood strip that is pre-studded with dozens of pins and nails and is used exclusively for the installation of carpets.[69]
- Carpet grippers are not produced in a mill and they are not finger-jointed, edge-glued or continuously shaped.[70]

***The Petitioner's Comments***
- The petitioner agrees, based on this physical description of the merchandise, as well as the photographs submitted, that Shandong Jinluda and Shandong Jiapeng's carpet grippers are excluded from the scope of these investigations. Carpet grippers are not moulded or produced in a mill and they are not shaped, finger-jointed or edge-glued.  Carpet grippers are merely thin strips of plywood pre-studded with pins and nails.[71]
- The petitioner believes the scope language is clear and no exclusionary language is needed for carpet grippers.[72]

3.  <u>Stair Stringers</u>

***Weston Wood's Comments***
- Weston Wood requests that Commerce modify the scope to exclude stair stringers from the scope of these investigations, because the plain language of the scope excludes "parts of stair steps."[73]
- Stair stringers or stringer boards, are boards that are found on each side of a flight of stairs.  Stair stringers are cut into a zig-zag pattern and serve as structural support for the treads and risers of the stair's steps.[74]
- The scope of the investigations states:  "Excluded from the scope of these investigations are … parts of stair steps (including newel posts, balusters, easing,

---

[67] *Id.*
[68] *See* Shandong Jiapeng and Shandong Jinluda Scope Comments at 1.
[69] *Id.* at 2-3.
[70] *Id.*
[71] *Id.*
[72] *Id.*
[73] *See* Weston Wood Scope Comments at 1.
[74] *Id.* at 2.

12

gooseneck, risers, treads and rail fittings)…" The parts of the stair steps identified in the scope provide support and connect steps, which is similar to the purpose of stair stringers. Additionally, the physical characteristics of stair stringers are similar to risers and treads that are expressly excluded from the scope of these investigations.

### The Petitioner's Comments
- The petitioner agrees, based on Weston Wood's description of stair stringers, that stair stringers are excluded from the scope of these investigations.[75]
- Stair stringers, as described by Weston Wood, are part of the scope exclusion for "parts of steps." However, millwork products that are designed to be attached to stair stringers for a decorative purposes and that otherwise fit the physical description in the scope language are in-scope merchandise.[76]
- The petitioner does not oppose the following minor modification to the scope language to clarify that stair stringers fall within the scope's "parts of stair steps" exclusion: "Excluded from the scope of this investigation are … parts of stair steps (including newel posts, balusters, easing, gooseneck, risers, treads, rail fittings and **stair stringers**)."[77]

## 4. Lengthwise Sawn Wood Bracing, Blocking, and Temporary Structural Forming

### Sylvan Products' Comments
- Sylvan Products, an importer of lengthwise sawn (LWS) wood bracing, blocking, and temporary structural forming components (LWS wood products), requests Commerce confirm that its LWS wood products are excluded from the scope of these investigations.[78]
- LWS wood products are described as "wood bracing, blocking, and temporary structural concrete forming products, such as rectangular, square, triangular cant strips and exterior skewback with or without chamfered edges, and trapezoidal reveal and rustification, used as components in the steel and wooden concrete form systems for the creation of concrete structures."[79] Additionally, LWS wood products are generally of low quality and are typically discarded as soon as the construction project is completed.[80]
- The scope should be revised to define "moulding and millwork products" as products that are used as "a covering for floors, walls, doors, and other areas, primarily in residential and non-residential construction, and for decorative, exposed applications for permanent or semi-permanent architectural applications in transition areas in close proximity to other moulding, millwork, and cabinetry,

---

[75] *See* Petitioner Rebuttal Scope Comments at 24.
[76] *Id.*
[77] *Id.*
[78] *See* Sylvan Products Scope Comments at 1 and 4.
[79] *Id.* at 3.
[80] *Id.* at 14.

13

such as transition strips or mouldings for cabinets, doors, windows, and decorative room trim."

***The Petitioner's Comments***
- The petitioner agrees, based on Sylvan Products' description of LWS wood products, that LWS wood products are excluded from the scope of these investigations.[81]
- The petitioner disagrees with Sylvan Products' proposed revision of the scope because the language relies on end-use to define subject merchandise, which is contrary to Commerce's practice.[82]

5. <u>Unprocessed Laminated Veneer Lumber Panels</u>

***CTI's Comments***
- CTI, a U.S. importer of subject merchandise, requests that Commerce clarify that unprocessed laminated veneer lumber (LVL) panels exported to the United States for further processing are excluded from the scope of these investigations.[83]
- Unprocessed LVL panels have not undergone additional processing and are not continuously shaped at the time of importation into the United States.  LVL panels typically possess a width of over 600 mm, a thickness of 9-52 mm, and a length of 1250-6096 mm.[84]
- The following paragraph creates uncertainty into whether LVL panels are subject to the scope of the investigations:

> Subject merchandise also includes wood mouldings and millwork products that have been further processed in a third country, including but not limited to trimming, cutting, notching, punching, drilling, coating, or any other processing that would not otherwise remove the merchandise from the scope of the investigations if performed in the country of manufacture of the in-scope product.

- Trimming, cutting, notching, punching, drilling, coating, and other processing are exactly how unprocessed LVL panels are converted into mouldings and millwork after importation into the United States.[85]

---

[81] *See* Petitioner Additional Rebuttal Scope Comments at 14.
[82] *Id.* at 6 (citing *Certain Steel Wheels from the People's Republic of China:  Final Affirmative Countervailing Duty Determination, Final Affirmative Critical Circumstances Determination*, 77 FR 17017 (March 23, 2012), and accompanying IDM at 82; *see also Circular Welded Carbon Quality Steel Pipe from the People's Republic of China:  Final Affirmative Countervailing Duty Determination and Final Affirmative Determination of Critical Circumstances*, 73 FR 31970 (June 5, 2008), and accompanying IDM at 8).
[83] *See* CTI Scope Comments 2 at 1.
[84] *Id.* at 6.
[85] *Id.* at 7.

14

- The scope language is unclear and causes uncertainty into whether unprocessed LVL panels are subject merchandise, and CTI proposes the following revision to the scope language to clarify that unprocessed LVL panels are excluded from the scope of these investigations:  "Excluded from the scope of these investigations are … unprocessed LVL panels with a minimum width of 600 millimeters (mm), a thickness from 9 mm to 52 mm, and a length from 1250 mm to 6096 mm."[86]

***The Petitioner's Comments***
- The petitioner agrees, unprocessed LVL panels are not subject to the scope of these investigations.
- The scope language CTI claims causes uncertainty is intended for the prevention of circumvention of the scope through alterations to Brazilian and Chinese mouldings and millwork products in third countries, which are then exported to the United States.  This language does not cover raw LVL panels imported into the United States, which may be subsequently manufactured into LVL mouldings and millwork products in the United States.
- The petitioner disagrees with CTI's proposed scope language, because it is unnecessary and would cause confusion.

**Commerce Position:**  Commerce preliminarily finds, based on the intent of the petitioner, as expressed in the Petitions, and the additional comments received, that the above stated products (carpet grippers, stair stringers, LWS wood products, unprocessed LVL panels, wooden panels, wall mosaics and wooden countertops/butcherblocks), as described by interested parties, are not subject to the scope of these investigations.  Commerce also agrees with the petitioner that the scope language is clear and requires no exclusionary language for wooden panels, wall mosaics, carpet grippers, LWS wood products, and unprocessed LVL panels.  However, Commerce is preliminarily revising the scope of these investigations to include express exclusions for stair stringers and countertops/butcherblocks.

In determining whether to modify the scope of an investigation, Commerce defers to the intent of the petitioner in exercising that authority to fulfill its statutory mandate to provide, where appropriate, the relief requested by the petitioning industry.[87]  As stated above, Commerce generally exercises its authority for establishing the scope of a proceeding in a manner that reflects the intent of the petitioner,[88] in order to establish a scope that will be effective to remedy the dumping or countervailable subsidies determined to exist during an investigation.[89]  Consequently, "absent an overarching

---

[86] *Id.*
[87] *See, e.g.*, *Hydrofluorocarbon Blends and Components Thereof from the People's Republic of China: Final Determination of Sales at Less Than Fair Value and Final Affirmative Determination of Critical Circumstances*, 81 FR 42314 (June 29, 2016), and accompanying IDM at Comment 2; and *Certain Steel Nails from the People's Republic of China:  Final Determination of Sales at Less Than Fair Value and Partial Affirmative Determination of Critical Circumstances*, 73 FR 33977, 33979 (June 16, 2008).
[88] *See AMS Associates, Inc.*, 881 F. Supp. 2d at 1380.
[89] *See Mitsubishi Electric Corporation v. United States*, 898 F.2d 1577, 1583 (Fed. Cir. 1990).

15

reason to modify the scope in the Petitions, {Commerce} accepts {the scope}" as written.[90]

The plain language of the scope of these investigations clearly states:

> {T}he merchandise subject to these investigations consists of wood mouldings and millwork products that are made of wood … which are continuously shaped wood that undergoes additional manufacturing or finger-jointed or edge-glued moulding or millwork blanks (whether or not resawn).

The petitioner has stated that wooden panels, wall mosaics, carpet grippers, and LWS wood products are not intended to be covered by the scope of these investigations, so long as they are not millwork products made of wood that is continuously shaped, finger-jointed, edge-glued or undergo additional manufacturing.  Furthermore, as explained above in the discussion for Issue 1, we preliminarily find that a product undergoing additional manufacturing alone does not exclude it from the scope of these investigations.  Accordingly, Commerce does not find it appropriate to amend the scope, as defined in the *Initiation Notices*, with exclusionary language for wooden panels, wall mosaics, carpet grippers, and LWS wood products, because these products are not covered by the current language of the scope, unless they are also millwork products made of wood that is continuously shaped, finger-jointed, or edge-glued, in which case they are properly included in the scope of the investigations.

Additionally, there are deficiencies in CTI's and Sylvan Products' proposed exclusions. Sylvan Products requests that Commerce modify the scope language to define "moulding and millwork products" as "moulding and millwork products as products that are used as a covering for floors, walls, doors, and other areas, primarily in residential and non-residential construction, and for decorative, exposed applications …"  However, the proposed modification relies on end-use to define subject merchandise and Commerce's preference is to not define the scope of an investigation based on end-use, preferring instead to define subject merchandise by the physical characteristics of the included and excluded products.  In *Off-The-Road Tires from China*, Commerce stated that,

> {a} scope based upon end-use application … raises administrative problems for {Commerce}.  In certain instances, the actual end-use of merchandise may be unknown to the producers or exporters investigated by {Commerce}.  Any certifications or assertions made by the exporter/producer about the end-use of particular sales would be difficult, if not impossible, to verify.  As a result, {Commerce's} analysis would

---

[90] *See, e.g., Circular Welded Austenitic Stainless Pressure Pipe from the People's Republic of China: Preliminary Determination of Sales at Less Than Fair Value and Postponement of Final Determination*, 73 FR 51788, 51789 (September 5, 2008), unchanged in *Circular Welded Austenitic Stainless Pressure Pipe from the People's Republic of China:  Final Determination of Sales at Less Than Fair Value*, 74 FR 4913 (January 28, 2009).

16

depend on a generally unverifiable supposition about the end-use of individual sales and would be subject to manipulation.[91]

Furthermore, it is unclear how Sylvan Products would have U.S. Customs and Border Protection (CBP) determine at the border whether an item's end-use causes it to be subject to the scope of these investigations. Accordingly, in keeping with our practice and preference to define the scope based on physical characteristics of the product (and not the ultimate end-use), we do not find it appropriate to amend the scope, as defined in the *Initiation Notices*, with Sylvan Products' proposed scope language.

For unprocessed LVL panels, the petitioner has made it clear that it did not intend to cover unprocessed LVL panels. CTI claims the following scope language, as written, causes uncertainty into whether unprocessed LVL panels are in-scope products:

> Subject merchandise also includes wood mouldings and millwork products that have been further processed in a third country, including but not limited to trimming, cutting, notching, punching, drilling, coating, or any other processing that would not otherwise remove the merchandise from the scope of the investigations if performed in the country of manufacture of the in-scope product.

CTI argues that trimming, cutting, notching, punching, drilling, coating, or any other processing is exactly how unprocessed LVL panels are converted into millwork products after importation into the United States. However, CTI's request to exclude unprocessed LVL panels based on width, thickness, and length is unnecessary and could cause undue confusion. While Commerce has the authority to clarify the scope of an investigation, or modify the proposed scope to make it administrable, enforceable, or to prevent potential evasion, it generally seeks to exercise that authority in a manner that reflects the intent of the petitioner.[92] The petitioner has made it clear in the Petitions and scope comments that the scope language is intended to prevent circumvention of the scope, and is not intended to cover unprocessed LVL panels. Additionally, in modifying a scope, Commerce must ensure that the revised scope would be administrable by CBP and is not susceptible to circumvention.[93] CTI's proposed scope language for unprocessed LVL panels injects uncertainty and could exclude products for which the petitioner is seeking relief. Accordingly, in keeping with our practice to provide ample deference to the petitioner

---

[91] See *Certain New Pneumatic Off-The-Road Tires from the People's Republic of China: Final Affirmative Determination of Sales at Less Than Fair Value and Partial Affirmative Determination of Critical Circumstances*, 73 FR 40485 (July 15, 2008), and accompanying IDM at Comment 19; *see also Multilayered Wood Flooring from the People's Republic of China: Final Determination of Sales at Less Than Fair Value*, 76 FR 64318 (October 18, 2011), and accompanying IDM at Comment 12.A.

[92] See *AMS Associates, Inc.*, 881 F. Supp. 2d at 1380.

[93] See *Antidumping Duty Investigation of Certain Passenger Vehicle and Light Truck Tires from the People's Republic of China: Final Determination of Sales at Less Than Fair Value and Affirmative Determination of Critical Circumstances, in Part*, 80 FR 34893 (June 18, 2015), and accompanying IDM at Comment 1.

17

and in order to prevent circumvention, we find it inappropriate to amend the scope, as defined in the *Initiation Notices*, with CTI's proposed scope language.

In establishing the scope of an investigation, Commerce strives to craft a scope that both includes the specific products for which the petitioner requested relief, and excludes those products which may fall within the general scope definition, but for which the petitioner does not seek relief.[94]  Accordingly, Commerce is preliminarily revising the scope to affirmatively exclude stair stringers and countertop/butcherblocks.  The original scope language explicitly excludes parts of stairs steps, stating "{e}xcluded from the scope of these investigations are ... parts of stair steps (including newel posts, balusters, easing, gooseneck, risers, treads, and rail fittings)."  The petitioner does not oppose adding stair stringers to the listed parts of stair steps excluded from the scope, and to further clarify the scope, Commerce is preliminarily revising the scope of these investigations to exclude stair stringers.

For countertop/butcherblocks, the petitioner argues that the scope language is clear in that it does not include countertop/butcherblocks; however, wooden countertops have common characteristics with in-scope products in that they are finger-jointed, edge-glued, and sanded smooth.  The lack of an explicit exclusion may make it difficult for CBP to differentiate wooden countertops/butcherblocks from other finger-jointed, edge-glued, and continuously shaped in-scope products.  Accordingly, to further clarify the scope, Commerce is preliminarily revising the scope, as defined in the *Initiation Notices*, to explicitly exclude countertop/butcherblocks.

**Issue 3:  Whether to Exclude Bamboo Mouldings and Millwork Products**

***Anji Golden Elephant's Comments***
- Anji Golden Elephant, a foreign exporter of subject merchandise, requests that Commerce clarify that bamboo mouldings and millwork are excluded from the scope of these investigations because the scope is unintentionally over inclusive. Commerce should narrow the scope by removing all references to bamboo.[95]
- Bamboo millwork products do not compete with the domestic millwork products industry, were not included in the initial petition scope and are a separate class or kind than in-scope products.[96]
- Bamboo is not a type of wood, it is a "hardy grass," and therefore, products made of bamboo are not a type of "wood" moulding.  Commerce's inclusion of

---

[94] *See Initiation of Antidumping Duty Investigations:  Spring Table Grapes from Chile and Mexico*, 66 FR 26832-33 (May 15, 2001) (*Spring Table Grapes from Chile and Mexico*), (holding that the domestic industry is in the best position to identify the imports that they compete against and believe to be unfairly traded); *see also Certain Softwood Lumber Products from Canada:  Final Affirmative Countervailing Duty Determination, and Final Negative Determination of Critical Circumstances*, 82 FR 51814 (November 8, 2017) (*Softwood Lumber from Canada*), and accompanying IDM at 234.
[95] *See* Anji Golden Elephant Comments at 1-2 and 17.
[96] *Id.* at 2.

18

"bamboo" in various places in the scope creates inconsistencies and contradictions that can leads to future enforcement problems.[97]

- Chapter 44 of the HTSUS, which covers wood and articles of wood, provides specific headings for bamboo products. In doing this, the HTSUS views bamboo differently from conventional wood products.[98]
- The petitioner never intended to cover bamboo millwork products because the petitioner did not incorporate bamboo-specific HTSUS codes in the scope.[99]
- The petitioner failed to explain the contradiction between the HTSUS classification and the scientific classification of bamboo. The petitioner did not provide any documentary support that would allow Commerce and interested parties to understand what is covered by the addition of "bamboo" to the scope.[100]
- The Petitions and petition supplements do not provide any information or analysis establishing that the domestic millwork product industry competes with is injured by bamboo millwork products.[101]
- Because the initial scope excluded bamboo and the petitioner does not compete with bamboo products, the petitioner was required to amend the Petitions to include bamboo products, but failed to follow the proper procedure to amend its proposed scope.[102]
- Commerce should revise the scope to explicitly exclude bamboo mouldings and millwork products.[103]

### Cali Bamboo and Lumber Liquidators

- Cali Bamboo and Lumber Liquidators are U.S. importers of bamboo mouldings, and request Commerce exclude millwork products made entirely of bamboo.[104]
- Bamboo is a grass and products made from 100 percent bamboo are manufactured differently than millwork products. Mouldings made from 100 percent bamboo are formed from laminated bamboo strips that are constructed from the protective layer around the bamboo plant.[105]
- Bamboo is significantly stronger and harder than typical wood products with Janka hardness ratings as high as 5,574. Hardwood flooring alternatives only have a Janka Hardness rating as high as 3,684.[106]
- Commerce revised the scope of the multilayered wood flooring AD and CVD orders to exclude bamboo.[107] From a customer's viewpoint, wood mouldings and

---

[97] *Id.* at 4.
[98] *Id.* at 6.
[99] *Id.* at 6 and 8.
[100] *Id*.
[101] *Id.* at 7.
[102] *Id.* at 11.
[103] *Id.* at 15-16.
[104] *See* Cali Bamboo and Lumber Liquidators Scope Comments at 2.
[105] *Id.* at 4-5.
[106] *Id.* at 6.
[107] *Id.* (citing *Multilayered Wood Flooring from the People s Republic of China: Amended Antidumping and Countervailing Duty Orders*, 77 FR 5484 (February 3, 2012)).

flooring are corresponding products (, *i.e.*, a customer would not mix wood moulding with bamboo flooring).

- Commerce also excluded products made of 100 percent of bamboo in the scope of *Certain Hardwood Plywood from China*, "{t}he scope of the investigation excludes the following items …(6) products made entirely from bamboo and adhesives (also known as 'solid bamboo')."[108]

### The Petitioner's Comments

- The petitioner disagrees with the exclusion of bamboo mouldings and millwork products from the scope of the investigations. The petitioner intended to include bamboo millwork products in the scope and stated in its petition supplement, "{m}ouldings and millwork products made of bamboo are covered by the scope."[109]
- The fact that bamboo is actually a type of grass rather than a type of wood is irrelevant. Bamboo is commonly understood to be a wood-like product. The U.S. HTSUS classifies certain products under Chapter 44, which covers "wood and articles of wood," notes that any reference to "wood" in the heading of Chapter 44, applies to "bamboo and other materials of woody nature."[110]
- Lumber Liquidators' website markets "bamboo" as a type of wood species on its website, alongside all of its other mouldings and millwork products.[111]
- Commerce should not define bamboo products to be a separate class or kind of merchandise, because respondents did not satisfy the requirements outlined in the five *Diversified Products* Criteria, use to distinguish products that are outside the scope of the petitioner's requested relief.[112]

**Commerce Position:**  Commerce preliminarily finds, based on the intent of the petitioner, as expressed in the Petitions, and the comments received, that bamboo millwork products are subject to the scope of these investigations. Additionally, the plain language of the scope explicitly covers bamboo millwork products:  "{T}he merchandise subject to these investigations consists of wood mouldings and millwork products that are made of wood (regardless of wood species), bamboo,…"

As noted above, while Commerce has the authority to clarify the scope of an investigation, or modify the proposed scope to make it administrable, enforceable, or to prevent potential circumvention, it generally seeks to exercise that authority in a manner that reflects the intent of the petitioner.[113]  Anji Golden Elephant argues that the petitioner did not intend to cover bamboo millwork products; however, the petitioner

---

[108] *Id.* at 6-7 (citing *Certain Hardwood Plywood Products from the People s Republic of China:  Amended Final Determination of Sales at Less Than Fair Value, and Antidumping Duty Order,* 83 FR 504 (January 4, 2018) (*Certain Hardwood Plywood Products from China*).

[109] *See* Petitioner Rebuttal Scope Comments at 10 (citing Petition Second Supplement at 3).

[110] *Id.* at 11.

[111] *Id.* at 13 and at Exhibit 1.

[112] *Id* at 12 (citing *Certain Softwood Lumber Products from Canada,* 67 FR 15539 (April 2, 2002), and accompanying IDM at Comment 52.

[113] *See AMS Associates, Inc.*, 881 F. Supp. 2d at 1380.

20

clearly identified bamboo millwork products as subject merchandise in its proposed scope language.[114]  Cali Bamboo and Lumber Liquidators argue that millwork products made entirely of bamboo should be excluded from the scope of these investigations because they are manufactured differently than wood millwork products, and are significantly stronger than wood millwork products.  However, the petitioner opposes this claim, reporting that bamboo is commonly understood to be a wood-like product, and it defined bamboo millwork products as a wood moulding and millwork product in the scope of these investigations.[115]  Although Commerce has the authority to define the scope of an investigation, that authority cannot be used to deprive the petitioner of relief with respect to products the petitioner intended to be included in the investigation.

Anji Golden Elephant argues that the petitioner's member companies as a whole do not produce millwork products, and are consequently not injured by bamboo millwork product producers.  However, the statute does not require that the petitioner produce every type of product that is encompassed by the scope of the investigation.[116]  In other words, while the petitioner is required to produce (or represent those that produce) the domestic like product, it need not produce every permutation or model of the subject merchandise.[117]  Additionally, the petitioner states:

> LVL wood mouldings and millwork products, like other wood mouldings and millwork products {, *i.e.*, bamboo}, compete directly with domestically produced wood mouldings and millwork products, take sales from U.S. producers through unfair pricing, and injure the domestic industry.  In other words, domestic and subject import wood mouldings and millwork products are interchangeable and compete head-to-head regardless of whether they are produced from LVL **or other materials identified in the scope language**.[118]

Therefore, because wood millwork products are interchangeable with bamboo millwork products, U.S. producers of millwork products compete directly with imported millwork products made of bamboo.

---

[114] *See* Second Petition Supplement at 3.

[115] *See* Petitioner Rebuttal Scope Comments at 11.

[116] *See Light-Walled Rectangular Pipe and Tube from Mexico:  Notice of Preliminary Determination of Sales at Less Than Fair Value and Postponement of Final Determination*, 69 FR 19400, 19402 (April 13, 2004), unchanged in *Light-Walled Rectangular Pipe and Tube from Mexico:  Notice of Final Determination of Sales at Less Than Fair Value*, 69 FR 53677 (September 2, 2004), and accompanying IDM at Comment 5; *Notice of Final Determination of Sales at Less Than Fair Value:  Circular Seamless Stainless Steel Hollow Products from Japan*, 65 FR 42985 (July 12, 2000), and accompanying IDM at Comment 1; and *Notice of Preliminary Determination of Sales at Less Than Fair Value, Postponement of Final Determination, and Affirmative Preliminary Determination of Critical Circumstances in Part:  Prestressed Concrete Steel Wire Strand  from Mexico*, 68 FR 42378 (July 17, 2003)

[117] *See Notice of Final Determination of Sales at Less Than Fair Value:  Circular Seamless Stainless Steel Hollow Products from Japan*, 65 FR 42985 (July 12, 2000), and accompanying IDM at Comment 1; *see also Notice of Final Determination of Sales at Less Than Fair Value:  Large Residential Washers from the Republic of Korea*, 77 FR 75988 (December 26, 2012), and accompanying IDM at Comment 2.

[118] *See* Petitioner Rebuttal Scope Comments at 6 (emphasis added).

21

Anji Golden Elephant, Cali Bamboo and Lumber Liquidators raise concerns regarding the HTSUS codes in the scope of the investigations. The HTSUS classifications on the records of these investigations refer to millwork products made of wood. Nothing on the record of these investigations suggests that either the petitioner or Commerce intended to exclude bamboo millwork products. Additionally, the scope expressly indicates that references to tariff schedule numbers are not dispositive or limiting with regard to what is covered by the scope. The written description of the subject merchandise is dispositive and bamboo millwork products are explicitly identified in the scope language. Furthermore, as stated by the petitioner, the HTSUS classifies certain bamboo products under Chapter 44, which covers, "wood and articles of wood; wood charcoal." The HTSUS further notes that any reference to "wood" in a heading of Chapter 44 applies to "bamboo and other materials of a woody nature." Therefore there is no basis for excluding bamboo millwork products based on the HTSUS codes identified in the scope of these investigations.

Anji Golden Elephant also claims that bamboo millwork products are a separate class or kind of product than wood millwork products. In deciding whether a product included in the scope of a proceeding falls within a separate class or kind of merchandise, Commerce looks for clear dividing lines through the application of the five *Diversified Products* criteria, which may distinguish the product in question from other products for which the petitioner have requested relief.[119] The *Diversified Products* criteria are: (1) physical characteristics; (2) customer expectations; (3) ultimate use; (4) channels of trade; and (5) advertising and display.[120] However, Anji Golden Elephant only minimally addresses the physical differences between bamboo and wood, reporting that bamboo is a "hardy grass" with "different growth patterns, rooting structure, flowering patters, competitive characteristics, fertility and longevity," than wood.[121] Cali Bamboo and Lumber Liquidators also argue that bamboo is physically different than wood because bamboo is a type of grass rather than wood. Because Anji Golden Elephant did not provide sufficient information for Commerce to evaluate the *Diversified Product* criteria, and for the reasons discussed above, we preliminarily find no basis to amend the scope as defined in the *Initiation Notices* with respect to bamboo millwork products.

**Issue 4: Whether to Exclude LVL Mouldings and Millwork Products**

***Xuzhou Hexi, Shaxian Hengtong, Shaxian Shiyiwood, and Fujian Nanping's Comments***

- Commerce should exclude LVL millwork products from the scope of these investigations, because LVL is a separate and distinct product from in-scope merchandise.[122]

---

[119] *See Notice of Final Determination of Sales at Less Than Fair Value: Certain Softwood Lumber Products from Canada*, 67 FR 15539 (April 2, 2002), and accompanying IDM at Comment 52.
[120] *Id.*
[121] *See* Anji Golden Elephant Scope Comment at 15.
[122] *See* Fujian Nanping, Shaxian Hengtong, Shaxian Shiyiwood, and Xuzhou Hexi Scope Comments at 1.

22

- LVL is a sheet of manufactured material made of veneers produced with raw wood, through rotary cutting or slicing *via* such processes as drying, gluing, assembly along the grain (or primarily along the grain) and hot pressing.[123]
- LVL is three times stronger than solid wood sawn timber, and can be used for a wide range of applications, including building formwork components, building beams, carriage plate, furniture, floor, wood keel for room decoration, packaging materials.[124]
- LVL and solid millwork products are not interchangeable.  LVL is mainly used for small-sized lines such as door stile, 1/4 round moulding, shoe moulding, door stop, *etc.*....[125]  Wood mouldings are used in home decoration, while LVL door stiles and similar articles are used as door accessories.[126]
- LVL falls into the ASTM D5456 standard, which demonstrates that it is different from solid or other wood millwork products.[127]
- The petitioner does not produce or sell LVL products.  Additionally, certain types of LVL are under the protection of utility patents entitled to one Chinese producer and exporter; and as a result, the petitioner does not produce certain LVL products.[128]
- If Commerce should find that LVL millwork products are within the scope of the investigations, Commerce should find them to be separate and distinct from other millwork products, and assign separate rates to each.  These products do not compete with each other, are produced from different processes, and are sold at different price points.[129]

### CTI's Comments

- LVL is a different class or kind of merchandise, and request Commerce excluded LVL millwork products from the scope of these investigations.[130]
- Commerce excluded LVL in *Hardwood Plywood from the People's Republic of China*, because it was distinguishable from plywood by its parallel grain orientation, waterproof adhesive, extreme hardness and modulus of elasticity of 1,500,000 per square inch or higher.[131]
- LVL differs from millwork products and LVL customers view LVL as a different product because it is stronger, straighter and more uniform than conventional millwork products.[132]
- The petitioner does not produce LVL.  LVL has a different manufacturing process than millwork products, and is often made from smaller species of wood like

---

[123] *Id.* at 2.
[124] *Id.*
[125] *Id.*
[126] *Id.* at 5-6.
[127] *Id.* at 6 and Exhibit 3.
[128] *Id.* at 7, Exhibit 4 and Exhibit 5.
[129] *Id.* at 7.
[130] *See* CTI Scope Comments 1 at 2 and 6.
[131] *Id.* at 7.
[132] *Id.* at 8.

23

- poplar or eucalyptus, while conventional millwork products are made from pine.[133]
- LVL also has a different ultimate end-use than millwork products, because LVL is often used as door components and it must meet stringent standards and independent testing required by door manufacturers.[134]

## 1) LVL Door Stiles and End Rails

### CTI's Comments

- If Commerce does not exclude LVL from the scope of these investigations, it should at least exclude LVL door stiles profiled for steel doors. LVL steel door stiles are composed only of LVL and are uniquely profiled to be used in making steel doors. To the best of CTI's knowledge, the petitioner does not make LVL steel door stiles.[135]
- The scope indicates that LVL steel door stiles are outside the scope of these investigations because it references wooden door stiles, not LVL doors stiles: "{T}he scope includes continuously shaped wood in the forms of dowels, building components such as interior paneling and jamb parts, and door components such as rails and stiles."[136]
- The scope should be revised to provide an express exclusion for LVL door stiles: "{E}xcluded from the scope of these investigations are … LVL door stiles profiled for steel doors."[137]

### Weston Wood's Comments

- Commerce should exclude LVL door stiles and end rails from the scope of the investigations, because including these products would unreasonably expand the scope of the investigations to include products not produced by the petitioner.[138]
- The exclusion for LVL products that are at least partially made from composite materials like PVC is defined ambiguously, "where the composite materials make up less than 50 percent of the total merchandise." The petitioner intended to measure the composite material by length, except when the composite material is coated or cladding. No guidance is provided in the scope as to the thickness of the composite material that would warrant exclusion when it extends more than 50 percent of the length of the board.[139]
- Commerce should exclude from the scope of these investigations LVL door stiles and rails, with or without a composite material on the entire length of one surface having a maximum width of 44 mm, thickness from 28 mm to 128 mm, maximum length of 2423 mm; minimum composite thickness (if used) of 10

---

[133] *Id.* at 7-8 (citing Petitions at 4).
[134] *Id.* at 9.
[135] *Id.* at 9-10.
[136] *Id.* at 10.
[137] *Id.*
[138] *See* Weston Wood Scope Comments at 5 and Exhibit 5.
[139] *Id.* at 6-7.

24

    mm, water boiling point exterior adhesive, modulus of elasticity of 1,300,000 pounds per square inch or higher, and a top layer machined with one or more profile channels throughout.[140]

- At minimum, Commerce should modify the language of the scope to exclude millwork products with composite materials running more than 50 percent of the length of the merchandise regardless of whether the composite materials are coated or cladding.[141]

### *Xuzhou Hexi, Shaxian Hengtong, Shaxian Shiyiwood, and Fujian Nanping's Comments*

- LVL door stiles, a primary LVL product, are small door accessories and make up a very small part of the overall cost of door production and the resultant market sales price. The LVL component also comes in at a competitive price and improves the market competitiveness of the U.S. door producers.[142]

## 2) LVL Broom Handles, Mop Handles, Rack Handles, and Brush Blocks

### *CTI's Comments*

- CTI requests that broom handles, mop handles, rake handles, and brush blocks made from LVL should be excluded from the scope of these investigations.[143]
- Broom, mop and rake handles are long, cylindrical articles made from LVL. The top end of the handle is sanded and domed. The bottom end of the handle is typically tapered, wood threaded, or metal threaded.[144]
- Brush blocks are rectangular blocks made from LVL. In the middle of the brush blocks are holes that match the bottom end of the LVL handles, such that the LVL handles can be secured to the brush block.[145]
- Broom, mop and rake handles, and brush blocks were not intended to be included within the scope. According to the Petitions, subject wood mouldings and millwork products are used "primarily in residential and non-residential construction," and broom, mop and rake handles, and brush blocks are used as parts for producing manual cleaning tools.[146]
- Broom, mop and rake handles are not continuously shaped throughout their length, as required by the plain language of the scope. One end is sanded and domed. The bottom end is end-worked either by tapering, wood threading or metal threading.[147]

---

[140] *Id.* at 7.
[141] *Id.* at 7-8.
[142] *See* Fujian Nanping, Shaxian Hengtong, Shaxian Shiyiwood, and Xuzhou Hexi Scope Comments at 6.
[143] *See* CTI Scope Comments 2 at 2 and 7.
[144] *Id.* at 7.
[145] *Id.*
[146] *Id.* at 8 (citing the Petitions at 6).
[147] *Id.*

25

- The scope requires that subject merchandise be made from wood.  However, certain of the handles are made not only of wood, but have metal threading on the bottom end, which is not a wood material or a composite material for that matter.[148]
- To the best of CTI's knowledge, the petitioner does not manufacture broom handles, mop handles, rake handles, and brush blocks.
- CTI proposes the following language be added to the scope of these investigations:  "Excluded from the scope of these investigations are … laminated veneer lumber (LVL) broom, mop, and rake handles that are (i) sanded and domed on one end, and ii) either tapered, wood threaded, or metal threaded on the other end; LVL brush blocks with holes in the middle suitable for attaching a broom, mop, or rake handle; …"[149]

3)  LVL Closet Rods

***CTI's Comments***
- Closet rods made from LVL should be excluded from the scope of these investigations.[150]
- LVL closet rods are long, cylindrical articles made from LVL. Closet rods were not intended to be included within the scope because they are not used in construction, they are used as a closet organizing tool.[151]
- LVL closet rods stay stronger and straighter than domestic closet rods made of solid wood, and to the best of CTI's knowledge, LVL closet rods are not produced in the United States.[152]
- CTI proposes the following language be added to the scope of these investigations:  "Excluded from the scope of these investigations are … laminated veneer lumber (LVL) closet rods; …"[153]

***The Petitioner's Comments***
- The petitioner opposes the exclusion of LVL mouldings and millwork products as proposed by CTI and Weston Wood Products.  The petitioner intended to cover LVL mouldings and millwork products, including LVL door stiles and end rails. The plain language of the scope and the Petitions clearly demonstrate the petitioner's intent to cover these products.[154]
- LVL wood mouldings and millwork products compete directly with domestically produced wood mouldings and millwork products, and are interchangeable products, whether produced from LVL or other materials identified in the scope.

---

[148] *Id.*
[149] *Id.* at 2 and 9.
[150] *Id.*
[151] *Id.*
[152] *Id.*
[153] *Id.*
[154] *See* Petitioner Rebuttal Scope Comments at 4.

26

- Weston Wood's claim that no petitioning company manufactures LVL is false. Bright Wood Corporation and Cascade makes LVL millwork products as well as LVL products with composite materials.[155]

- Excluding LVL millwork products would cause a major loophole in the scope language.  For example, excluding LVL door stiles could permit parties to apply think layers of LVL to otherwise finger-jointed wood door stiles that can lead to circumvention issues.[156]

- The ITC found in its preliminary determination that the differences between LVL and other millwork products were not sufficient to demarcate a clear dividing line separating LVL millwork products from finger-jointed millwork products.[157]

- LVL broom handles, rack handles, mop handles and brush blocks are covered by the scope of these investigations.  The scope specifically "includes continuously shaped wood in the form of dowels."  This includes cylindrical articles and products that have been end worked.[158]

- The scope clearly states that millwork products are included within the scope even if they are "trimmed; cut-to-size; notched; punched; drilled; or have undergone other forms of minor processing," (, *i.e.*, sanding).  LVL brush blocks cannot be excluded on the basis of containing two threaded holes in the center.[159]

- LVL broom handles, mop handles, rake handles, and brush blocks have the same physical characteristics as other in-scope millwork products, and there is therefore no way to distinguish broom, mop and rake handles from other in-scope millwork products.[160]

- The petitioner intended to cover closet rods and the initial scope explicitly covered closet rods.[161]  At the request of Commerce, the petitioner removed the non-exhaustive list of millwork products from the initial scope.  This does not mean that the petitioner intended to remove these products from the scope of these investigations.[162]

- Additionally, the scope language continues to make clear that "continuously shaped wood in the forms of dowels" (*i.e.*, cylindrical articles like closet rods) are covered by the scope," regardless how strong or straight it is.[163]

- CTI's end-use arguments would not allow for proper identification of the products upon importation.  Commerce "prefers to define the scope of physical characteristics because reliance on an end-use application often results in ambiguity with respect to product coverage at the time merchandise enters the

---

[155] *Id.* at 6.
[156] *Id.* at 6-7.
[157] *Id.* at 8.
[158] *See* Petitioner Additional Rebuttal Scope Comments at 9-10.
[159] *Id.* at 10-11.
[160] *Id.*
[161] *Id.* at 11 (citing First Petition Supplement at 9).
[162] *Id*.
[163] *Id.* at 9-10.

27

country, which is when CBP must determine whether the importer has properly classified the merchandise as subject or non-subject merchandise."[164]

**Commerce Position:**  Commerce preliminarily finds that LVL millwork products, including LVL door stiles, end rails, broom handles, mop handles, rake handles, closet rods and brush blocks, are subject to the scope of these investigations, based on the intent of the petitioner, as expressed in the Petitions.

As noted above, while Commerce has the authority to clarify the scope of an investigation, or modify the proposed scope to make it administrable, enforceable, or to prevent potential evasion, it generally seeks to exercise that authority in a manner that reflects the intent of the petitioner.[165]  CTI states that LVL has distinct characteristics, and the petitioner does not produce LVL products.[166]  However, as stated above, the statute does not require that the petitioner produce (or represent those that produce) every type of product that is encompassed by the scope of the investigation.[167]  Additionally, the plain language of the scope explicitly covers LVL millwork products:  "The merchandise subject to these investigations consists of wood mouldings and millwork products that are made of wood (regardless of wood species), bamboo, *laminated veneer lumber (LVL)*…" (emphasis added).  In the Petition the petitioner describes millwork products as, "{w}ood moulding and millwork products are manufactured from softwood, hardwood, *laminated veneer lumber*, or some combination of wood and composite materials, and are woodwork or building materials that are produced in a mill or otherwise undergo remanufacturing."[168]  The petitioner also stated that it intended to cover LVL millwork products, because LVL millwork products are interchangeable with the wood millwork products produced by the petitioner; and therefore are in direct competition with domestic wood millwork products.[169]  To further establish its intent, the petitioner provided millwork product glossaries that include LVL products.[170]

---

[164] *Id.* at 10 (citing *Certain Steel Wheels from the People's Republic of China:  Final Affirmative Countervailing Duty Determination, Final Affirmative Critical Circumstances Determination*, 77 FR 17017 (March 23, 2012  ), and accompanying IDM  at 82; *see also Circular Welded Carbon Quality Steel Pipe from the People's Republic of China:  Final Affirmative Countervailing Duty Determination and Final Affirmative Determination of Critical Circumstances*, 73 FR 31970 (June 5, 2008) at 8).

[165] *See AMS Associates, Inc.*, 881 F. Supp. 2d at 1380.

[166] *See* CTI Scope Comments 1 at 7.

[167] *See Light-Walled Rectangular Pipe and Tube from Mexico:  Notice of Preliminary Determination of Sales at Less Than Fair Value and Postponement of Final Determination*, 69 FR 19400, 19402 (April 13, 2004), unchanged in *Light-Walled Rectangular Pipe and Tube from Mexico:  Notice of Final Determination of Sales at Less Than Fair Value*, 69 FR 53677 (September 2, 2004), and accompanying IDM at Comment 5; *Notice of Final Determination of Sales at Less Than Fair Value:  Circular Seamless Stainless Steel Hollow Products from Japan*, 65 FR 42985 (July 12, 2000), and accompanying IDM at Comment 1; and *Notice of Preliminary Determination of Sales at Less Than Fair Value, Postponement of Final Determination, and Affirmative Preliminary Determination of Critical Circumstances in Part: Prestressed Concrete Steel Wire Strand  from Mexico*, 68 FR 42378 (July 17, 2003).

[168] *See* the Petitions at 6 (emphasis added).

[169] *See* Petitioner Rebuttal Scope Comments at 6.

[170] *See* Petitions First Supplement at Exhibit I-Supp-2 and Exhibit I-Supp-5.

28

Barcode:4012643-01 A-570-117 INV - Investigation  -

CTI claims that LVL is a different class or kind of merchandise than in-scope products. However, as noted by the petitioner, the ITC found in its preliminary determination that the differences between LVL and other wood millwork products were not, "sufficient to demarcate a clear dividing line separating LVL {wood mouldings and millwork products} from finger-jointed {wood moulding and millwork products}."[171]  Section 771(25) of the Tariff Act of 1930, as amended, defines "subject merchandise" as "the class or kind of merchandise that is within the scope of an investigation" or other proceeding covered by the statute.  As stated above, Commerce bases its determination of whether the merchandise, as described in the scope of a proceeding, constitutes a single class or kind of merchandise on an evaluation of the *Diversified Products* criteria; these criteria look to differences in:  (1) the general physical characteristics of the merchandise; 2) the expectations of the ultimate purchaser; 3) the ultimate use of the merchandise; 4) the channels of trade in which the merchandise moves; and 5) the manner in which the product is advertised or displayed.

With regard to the physical characteristics, the ITC found that LVL and other wood mouldings and millwork products "are both made of wood fiber molded or carved into the same shapes and dimensions."[172]  The ITC also noted that LVL millwork products are made from thin veneers of wood glued together, while other millwork products are made from finger-jointed lumber or solid lumber.[173]  These properties enable LVL millwork products to have greater stability and resistance to damage, however, the ITC notes that finger-jointed millwork products have been certified for use in high velocity hurricane zones, which would require performance similar to that of LVL millwork products.[174]

With regard to customer expectations, the ITC again found substantial similarities between LVL and other millwork products:  "{C}ustomers view LVL {wood mouldings and millwork products} and finger-jointed {wood mouldings and millwork products} as similar insofar as both come in some of the same shapes, can be used in some of the same applications, particularly in door frames and jambs, and are sold through the same channels of distribution."[175]  Additionally, the ITC preliminarily found that the record indicates that customers perceive LVL millwork products and finger-jointed wood millwork products as suitable for the same end-uses.[176]

With regard to ultimate use, the ITC noted that "LVL {wood mouldings and millwork products} are typically used in structural applications such as interior and exterior wood door frames and jambs and window components, which are also leading applications for finger-jointed {wood mouldings and millwork products}."[177]  Additionally, the ITC

---

[171] *See* ITC Preliminary Report at 14.
[172] *Id.* at 11.
[173] *Id.* at 11.
[174] *Id.*
[175] *Id.* at 12.
[176] *Id.* at 13.
[177] *Id.* at 11.

29

Filed By: Suzanne Lam, Filed Date: 8/6/20 12:33 PM, Submission Status: Approved

"view{ed} these two products as part of a continuum of {wood mouldings and millwork products}…"[178]

On channels of trade, the ITC found that both LVL and other wood mouldings and millwork products "are sold through the same channels of distribution, including to distributors, retailers, and end-users. Both LVL {wood mouldings and millwork products} and finger-jointed {wood mouldings and millwork products} destined for use in door frames and jambs are sold to door manufacturers."[179] While the ITC did not make findings specific to advertising and display, the fact that LVL and other wood mouldings and millwork products are sold through the same channels of distribution indicates that they would be advertised and displayed similarly. Additionally, the record does not indicate that LVL millwork products are separately advertised to the end-user.

Therefore, in analyzing the *Diversified Products* criteria, taken together, we agree with the ITC's finding that there is no basis for determining that LVL millwork products are a separate class or kind of merchandise from wood mouldings and millwork products. Consequently, "absent an overarching reason to modify the scope in the Petitions, {Commerce} accepts {the scope}" as written, [180] with regard to LVL wood mouldings and millwork products.

For LVL door stiles and end rails, the scope includes door components such as rails and stiles, "{t}he scope includes … door components such as rails, stiles." The fact that the door stiles and end rails are made from LVL does not exclude them from the scope of these investigations, because, as stated above, the scope explicitly covers LVL millwork products. Additionally, Commerce must ensure that the scope is administrable by CBP and is not susceptible to circumvention, and, as noted by the petitioner, an exclusion for LVL door stiles could create the potential for circumvention, because parties could apply thin layers of LVL to otherwise finger-jointed wood door stiles.

For LVL broom handles, mop handles, rake handles and closet rods, the scope covers dowels, which are cylindrically shaped millwork products, "{t}he scope includes continuously shaped wood in the forms of dowels …" Additionally, the scope states that millwork products are included in the scope even if they are "trimmed; cut-to-size; notched; punched; drilled; or have undergone other forms of minor processing." Therefore, LVL broom/mop/rake handles and brush blocks are subject to the scope of these investigations, regardless of their threaded ends and/or holes. As stated above, in modifying a scope, Commerce must ensure that the revised scope is administrable by

---

[178] *Id.* at 14.
[179] *Id.* at 12.
[180] *See, e.g., Circular Welded Austenitic Stainless Pressure Pipe from the People's Republic of China: Preliminary Determination of Sales at Less Than Fair Value and Postponement of Final Determination*, 73 FR 51788, 51789 (September 5, 2008), unchanged in *Circular Welded Austenitic Stainless Pressure Pipe from the People's Republic of China: Final Determination of Sales at Less Than Fair Value*, 74 FR 4913 (January 28, 2009).

30

CBP and that it is not susceptible to circumvention.[181]  LVL broom handles, mop handles, rake handles, closet rods and brush blocks have the same physical characteristics as in-scope millwork products, and Commerce's practice is to not grant exclusions based on end-use.  Consequently, Commerce finds that excluding LVL broom handles, mop handles, rake handles, closet rods and brush blocks would exclude products for which the petitioner seeks relief.

Accordingly, we preliminarily find no basis to amend the scope as defined in the *Initiation Notices* with respect to LVL mouldings and millwork products, including LVL door stiles, end rails, broom handles, mop handles, rake handles, closet rods, or brush blocks.

### Issue 5:  Whether to Exclude Polyvinyl Chloride Cladded Door Stiles

#### *CTI's Comments*

- Commerce should exclude polyvinyl chloride (PVC) cladded door stiles because they are composed of LVL and extruded PVC covering the LVL. PVC-cladded door stiles are made of wood and a non-composite material.[182]
- The petitioner erred in defining composite material to include thermoplastic material with or without a foaming agent, which would incorporate purely thermoplastic material such as PVC.[183]
- The Window and Door Manufacturers Association (WDMA) provides the following description of composite:  "A composite whose ingredients include cellulosic elements.  These cellulosic elements can appear in the form of, but are not limited to:  distinct fibers, fiber bundles, particles, wafers, flakes, strands and veneers.  These elements may be bonded together with naturally occurring or synthetic polymers."  The WDMA's definition of composite does not include purely thermoplastic materials such as PVC.[184]
- The scope fails to provide any guidance as to the unit of measure for determining the percentage of composite-cladded materials.  For example, the scope does not indicate if the composite-cladded products be measured in terms of thickness, weight, or some other unit of measure.  Additionally, the scope is not administrable because it provides no instruction as to how to measure the percentage of composite-cladding or composite-coating materials.[185]
- The scope includes continuously shaped wood in the form of door components such as rails and stiles.  Unlike the language in the other sections of the scope, which expressly lists wood, bamboo, LVL or wood and composite materials, this

---

[181] *See Antidumping Duty Investigation of Certain Passenger Vehicle and Light Truck Tires from the People's Republic of China:  Final Determination of Sales at Less Than Fair Value and Affirmative Determination of Critical Circumstances, in Part*, 80 FR 34893 (June 18, 2015), and accompanying IDM at Comment 1.
[182] *See* CTI Scope Comments 1 at 2.
[183] *Id.* at 4.
[184] *Id.* at 4.
[185] *Id.* at 5.

Filed By: Suzanne Lam, Filed Date: 8/6/20 12:33 PM, Submission Status: Approved

specific reference is limited to wood.  If the petitioner intended to cover wood and composite door stiles, the petitioner would have explicitly included it in the plain language of the scope.[186]

- PVC-cladded door stiles should be added to the "Excluded from the scope of these investigations" paragraph in the scope of these investigations.[187]

### The Petitioner's Comments

- The petitioner opposes the exclusion of PVC-cladded door stiles in the scope of these investigations, because CTI's door stiles are composed of LVL and PVC. As stated above, LVL is in-scope merchandise and the plain language of the scope also identifies door stiles as in-scope merchandise.[188]
- The scope includes in-scope products that are coated or clad, even along their entire length, with a composite material, when they are otherwise comprised of wood, LVL or wood and composite materials (where the non-coating composite materials make up 50 percent or less of the total merchandise).[189]
- In response to Commerce's petition supplemental questionnaire, the petitioner provided a definition of "composite material."  CTI acknowledges that this definition includes PVC.[190]
- CTI misunderstands the scope language and there is no need to determine the percentage of composite-cladded materials.  The plain language of the scope states:  "The percentage of composite materials contained in a wood moulding or millwork product is measured by length, except when the composite material is a coating or cladding."  Therefore, when composite material is a coating or cladding, and the product otherwise meets the scope definition, the product is covered, regardless of the length, thickness, or weight of the coating and/or cladding.[191]

**Commerce Position:**  Commerce preliminarily finds that PVC cladded door stiles, are subject to the scope of these investigations, based on the intent of the petitioner, as expressed in the Petitions.  The plain language of the scope explicitly covers door stiles and millwork products made of LVL or wood and composite materials:  "{T}he merchandise subject to these investigations consists of wood mouldings and millwork products that are made of … wood and composite materials (where the composite materials make up less than 50 percent of the total merchandise)…"  Further, the scope expressly states that "{t}he percentage of composite materials contained in a wood moulding or millwork product is measured by length, except when the composite material is a coating or cladding."

---

[186] *Id.* at 5-6.
[187] *Id.* at 6.
[188] *See* Petitioner Rebuttal Scope Comments at 15-16
[189] *Id.* at 16; *see also* the second paragraph of the scope of these investigations at Attachment I, II, and III.
[190] *Id.* at 16.
[191] *Id.* at 16-17.

Filed By: Suzanne Lam, Filed Date: 8/6/20 12:33 PM, Submission Status: Approved

As noted above, while Commerce has the authority to clarify the scope of an investigation, or modify the proposed scope to make it administrable, enforceable, or to prevent potential evasion, it generally seeks to exercise that authority in a manner that reflects the intent of the petitioner.[192]  Accordingly, to further clarify the scope and identify the petitioner's intent, Commerce requested the petitioner provided a definition for composite materials.  The petitioner provided the following language, which CTI and the petitioner agree includes PVC:

> Composite materials regarding wood mouldings and millwork products are defined as a thermoplastic material with or without a foaming agent, or a combination of a thermoplastic material and a non-plastic material.  The non-plastic material may be cellulosic (such as wood fibers) or non-cellulosic (such as talc or calcium).  Most commonly used in the millwork industry are thermoplastic resins and materials whose ingredients include cellulosic elements.  A composite can also be comprised of a thermoplastic material with a filler other than cellulosic elements (*i.e.*, talc, calcium carbonate, or other).[193]

In establishing the scope of an investigation, Commerce strives to craft a scope that both includes the specific products for which the petitioner requested relief, and excludes those products which may fall within the general scope definition, but for which the petitioner does not seek relief.[194]  Therefore, taken together, the plain language of the scope and the intent of the petitioner clearly demonstrate that PVC cladded door stiles are subject to the scope of these investigations.  Accordingly, we preliminarily find no basis to amend the scope as defined in the *Initiation Notices* with respect to PVC cladded door stiles.

### Issue 6:  Whether to Exclude CTI's SuperJambs® and Jamboo® Superframes

*CTI's Comments*
- Commerce should exclude certain patented and trademarked, extruded gesso-coated door jambs (SuperJambs® and Jamboo® Superframes), because extruded gesso-coated door jambs are ready to paint products consisting of separate pieces of wood married together and coated as one by extruding a gesso coating over the wood through a cast steel die.[195]
- Extruded gesso door jambs are highly-engineered products that have structural and dimensional strength and stability, whereas domestic door jambs are finger-jointed pieces of wood with a thin coat of paint.  Extruded gesso door jambs

---

[192] *See AMS Associates, Inc.*, 881 F. Supp. 2d at 1380.
[193] *See* First Petition Supplement at 2.
[194] *See, e.g.*, *Spring Table Grapes from Chile and Mexico*, 66 FR at 26832-33 (holding that the domestic industry is in the best position to identify the imports that they compete against and believe to be unfairly traded); *Softwood Lumber from Canada*, and accompanying IDM at 234.
[195] *See* CTI Scope Comments at 2 and 10-11.

33

receive a thick gesso coating that makes the door jamb uniformly smooth, free of seams, nail holes, or cracks.[196]

- CTI's SuperJambs® doorstop is made from medium density fiberboard (MDF), which the petitioner has acknowledged is not within the scope of these investigations.[197]

- Jamboo® Superframes are also an engineered product, made from Chinese cedar that is finger-jointed to bamboo at its base.

- Extruded gesso door jambs are installed differently than domestic door jambs. Domestic door jambs require the surface to be sanded, applying caulk to the seam between the door stop and jamb, and priming the jamb. Extruded gesso door jambs are ready-to-paint products where priming and caulking is not required.[198]

- CTI's extruded gesso door jambs, SuperJambs® and Jamboo® Superframes, are CTI patented products and are sold in the United States as registered trademarks. The scope in *Certain Lined Paper Products from China, Indonesia and India*, expressly excludes from the scope a list of trademarked products.[199]

- CTI proposes excluding its SuperJambs® and Jamboo® Superframes with the following language: "Excluded from the scope of these investigations are … SuperJambs® and Jamboo® Superframes, which are engineered wood products that are extruded gesso-coated and are ready-to-paint, as imported."[200]

### The Petitioner's Comments

- The petitioner opposes the exclusion of CTI's SuperJambs® and Jamboo® Superframes and CTI's proposed scope language, because CTI's SuperJambs® and Jamboo® Superframes are door jambs, which are expressly included in the scope of these investigations.[201]

- CTI's Jamboo® Superframes are in-scope products because they are finger-jointed, made from bamboo, and are gesso-coated.[202]

- CTI claims that its SuperJambs® consists of highly engineered wood substrates and wood materials, including MDF. However, CTI does not specify what proportion of the product is comprised of MDF, and its brochure indicates that its SuperJambs® are substantially produced from "solid wood engineered substrate" with a small "MDF stop attached." SuperJambs® are also gesso coated, which is expressly included in the scope of these investigations.[203]

---

[196] *Id.* at 11.
[197] *Id.*
[198] *Id.* at 12.
[199] *Id.* at 12 (citing *Notice of Amended Final Determination of Sales at Less Than Fair Value: Certain Lined Paper Products from the People's Republic of China; Notice of Antidumping Duty Orders: Certain Lined Paper Products from India, Indonesia and the People's Republic of China; and Notice of Countervailing Duty Orders: Certain Lined Paper Products from India and Indonesia*, 71 FR 56949 (September 28, 2006) (expressly excluding from the scope a list of trademarked products).
[200] *Id.* at 13.
[201] *See* Petitioner Rebuttal Scope Comments at 17.
[202] *Id.* at 17-18.
[203] *Id.* at 18.

Filed By: Suzanne Lam, Filed Date: 8/6/20 12:33 PM, Submission Status: Approved

- CTI only cites one case where Commerce excluded trademarked products from the scope of the investigations. However, the order cited produces no explanation for excluded trademarked products and no discussion of how the trademarked products differ from other in-scope products. Additionally, the petitioner in the cited case proposed the trademark scope exclusions, and it was not Commerce's decision to exclude based on trademarked products.[204]

**Commerce Position:** Commerce preliminarily finds that CTI's SuperJambs® and Jamboo® Superframes are subject to the scope of these investigations, based on the intent of the petitioner, as expressed in the Petitions. The plain language of the scope explicitly covers door jambs: "{T}he scope includes continuously shaped wood in the forms of dowels, building components such as interior paneling and jamb parts, and door components such as rails and stiles."

As noted above, while Commerce has the authority to clarify the scope of an investigation, or modify the proposed scope to make it administrable, enforceable, or to prevent potential evasion, it generally seeks to exercise that authority in a manner that reflects the intent of the petitioner.[205] Although the petitioner stated that it did not intend to cover MDF,[206] CTI did not provide the details on how or to what extent MDF is included in its SuperJambs®. Additionally, CTI identifies previous investigations where Commerce expressly excluded from the scope certain unique products that are trademarked.[207] However, in those previous investigations the petitioner intended to exclude the trademarked products.[208] For CTI's SuperJambs® and Jamboo® Superframes, the petitioner has stated in the Petitions and in rebuttal comments, that it intends to cover door jambs, such as CTI's SuperJambs® and Jamboo® Superframes;[209] therefore, excluding these trademarked products would be contrary to the petitioner's intent. Accordingly, we preliminarily find no basis to amend the scope as defined in the *Initiation Notices* with respect to CTI's SuperJambs® and Jamboo® Superframes.

### Issue 7:  Whether to Exclude Wood Shutter Components

***Lanzhou Xinyoulian's Comments***
- Commerce should exclude wood shutter components from the scope of these investigations, because wood shutter components are primarily used in the

---

[204] *Id.* at 18-19.
[205] *See AMS Associates, Inc.*, 881 F. Supp. 2d at 1380.
[206] *See* ITC Preliminary Report at 8.
[207] *See* CTI Scope Comments at 12 (citing *Certain Lined Paper Products from the People's Republic of China; Certain Lined Paper Products from India, Indonesia and the People's Republic of China; and Certain Lined Paper Products from India and Indonesia,* 71 FR 56,949 (September 28, 2006)).
[208] *See Initiation of Antidumping Duty Investigations:  Certain Lined Paper Products from India, Indonesia, and the People's Republic of China,* 70 FR 58374 (October 6, 2005).
[209] *See* Petitioner Rebuttal Scope Comments at 17-20; *see also* the Petitions at 4-5; and Petition First Supplement at 4-5, 11-12 and Exhibit I-Supp-2.

35

production of wood shutters, and are a separate and distinct product from in-scope merchandise.[210]

- Wood shutter components are sold to shutter manufacturers in the United States, who assemble these components into window shutters/shutter doors.[211]
- Wood shutter components are typically made from basswood, poplar and paulownia, while millwork products are made from solid woods like pine and fir.[212]
- Wood shutter components are painted on all four-sides, and millwork products are usually painted on three sides.[213]
- Wood shutter components and millwork products are classified under different HTSUS codes. Wood shutter components are predominantly classified under HTSUS of 442199.3000, which states, "Consisting of wooden frames in the center of which are fixed louver boards or slats, with or without their hardware."[214]
- The petitioner primarily does not produce or sell wood shutter components, and wood shutter components do not compete with millwork products.[215]

***The Petitioner's Comments***

- The petitioner acknowledges that it initially did not intend to cover window blind components such as shutter slates; however, Lanzhou Xinyoulian's request reveals that components of shutter slats are subject to the scope of these investigations, and there is no practical way to distinguish wood shutter components from other in-scope products.[216]
- Wood shutter components are versatile products and can be interchangeable with in-scope products, which are also made from basswood, poplar and paulownia.[217]
- The production process for wood shutter components is extremely similar to the production of millwork products. Like millwork products, the production of wood shutter components starts with lumber that is cut, finger-jointed to the appropriate length and bonded together, sent through a moulding machine for formation into the appropriate shape, primed, and painted. Therefore, there is no meaningful or identifiable physical characteristics to distinguish these wood shutter components from other millwork products.[218]
- Domestic producers who manufacture wood shutter components are being injured by unfairly traded wood shutter components from Brazil and China. Menzner Hardwoods, a company listed as a supporter in the Petitions, produces wood

---

[210] *See* Lanzhou Xinyoulian Scope Comments at 1-2.
[211] *Id.* at 3.
[212] *Id.* at 2.
[213] *Id.*
[214] *Id.* at 5.
[215] *Id.*
[216] *See* Petitioner Rebuttal Scope Comments at 13-14.
[217] *Id.* at 14.
[218] *Id.*

36

shutter components, and other U.S. producers such as Powell Valley Millwork also produce wood shutter components.[219]

- Lanzhou Xinyoulian provides no information to support its claim that wood shutter components are a different class or kind of merchandise, and Commerce has minimal factual information on the record to find these products to be a separate class or kind of merchandise from in-scope products.[220]

**Commerce Position:**  Commerce preliminarily finds that wood shutter components, as described by Lanzhou Xinyoulian, are included in the scope of these investigations.  In modifying a scope, Commerce must ensure that the revised scope would be administrable by CBP and is not susceptible to circumvention.[221]  Wood shutter components are very similar to millwork products.  Both products have similar production processes, physical characteristics, and are interchangeable.  Therefore, excluding wood shutter components could exclude products for which the petitioner seeks relief.

To ensure the scope accurately reflects the products for which the petitioner seeks relief, Commerce provided Lanzhou Xinyoulian an opportunity to distinguish its wood shutter components from in-scope products.[222]  However, Lanzhou Xinyoulian did not respond to the additional opportunity to provide comment, and thus the record lacks information demonstrating that wood shutter components are distinct from in-scope merchandise.  Accordingly, the record does not support Lanzhou Xinyoulian's claim that wood shutter components are distinguishable and a separate class or kind of merchandise from in-scope products.

Additionally, Lanzhou Xinyoulian's concern regarding the HTSUS codes in the scope of the investigations is unwarranted.  The HTSUS classifications on the records of these investigations refer to the possibility that certain millwork products are subject to these investigations and do not encompass every type of product that is subject to the scope of these investigations.  The scope expressly indicates that references to tariff schedule numbers are not dispositive or limiting with regard to what is covered by the scope.  The written description of the subject merchandise is dispositive.  Therefore there is no basis for excluding wood shutter components based on the HTSUS codes identified in the scope of these investigations.

Furthermore, the petitioner details compelling concerns regarding the interchangeability between wood shutter components and in-scope products.  It is therefore reasonable to conclude that excluding wood shutter components could cause injury to domestic wood mouldings and millwork products producers.  As noted above, it is our standard practice

---

[219] *Id.* at 14-15; *see also* the Petitions at Exhibit I-3 and Exhibit I-5.
[220] *Id.* at 15.
[221] *See Antidumping Duty Investigation of Certain Passenger Vehicle and Light Truck Tires from the People's Republic of China:  Final Determination of Sales at Less Than Fair Value and Affirmative Determination of Critical Circumstances, in Part*, 80 FR 34893 (June 18, 2015), and accompanying IDM at Comment 1.
[222] *See* Commerce's Letter, "Request for Additional Information Regarding the Scope of the Investigations," dated June 11, 2020.

to provide ample deference to the petitioner with respect to products for which it seeks relief in these investigations. Based on the information on the record, modifying the scope to exclude wood shutter components would exclude products for which the petitioner is seeking relief. Therefore, in accordance with our preference to provide ample deference to the petitioner, and because the record lacks information demonstrating that wood shutter components are distinct from in-scope merchandise, we preliminarily find no basis to amend the scope as defined in the *Initiation Notices* with respect to wood shutter components.

### Issue 8: Whether to Exclude Finger-Jointed Siding Products

***Seaboard's Comments***

- Seaboard, an importer of exterior wood beveled siding, requests that Commerce find its exterior wood beveled siding is outside the scope of these investigations.[223]
- Exterior siding is a material (such as boards or metal or plastic pieces) forming the exposed surface of outside walls of frame buildings. Wood siding can be applied to the interior or exterior of a house or building, and is typically made from pine, spruce, fir, cedar, and redwood.[224]
- Exterior wood bevel siding is not continuously shaped and the scope explicitly excludes exterior siding.[225]
- Seaboard's exterior wood siding does not compete with the petitioner's products because the petitioner does not produce exterior wood siding.[226]
- Exterior wood bevel siding is made from stock paulownia lumber, which may be finger-jointed, and has been ripped into rectangular planks. The rectangular planks are then vertically resawn or bandsawn to create the beveled shape. The long edges of the exterior wood siding are the product of a rip saw and are not continuously shaped. The term "bevel" refers to wood that is cut with sharp edges that are not perpendicular to the top of the wood/material.[227]
- Exterior wood bevel siding is not a millwork product, because it is not a decorative strip that has curved or projecting surface and not a custom woodworking in a finished building. Exterior wood siding has no decorative function for a house or building as it is used as an exterior wall covering.[228]

***The Petitioner's Comments***

- The petitioner opposes the exclusion of Seaboard's exterior wood bevel siding products. Seaboard's exterior siding products are finger-jointed and the scope only excludes exterior siding products that are not finger-jointed.

---

[223] *See* Seaboard Comments at 1-2.
[224] *Id.* at 2-3.
[225] *Id.* at 7.
[226] *Id.* at 8.
[227] *Id.* at 7.
[228] *Id.* at 8.

38

**Commerce Position:**  Commerce preliminarily finds that finger-jointed exterior siding, as described by Seaboard, is included in the scope of these investigations.  The plain language of the scope covers finger-jointed exterior siding products:

> Excluded from the scope of this investigation are exterior fencing, exterior decking and exterior siding products (including solid wood siding, non-wood siding (*e.g.*, composite or cement), and shingles) **that are not LVL or finger-jointed** {emphasis added}…

As stated above, while Commerce has the authority to clarify the scope of an investigation, or modify the proposed scope to make it administrable, enforceable, or to prevent potential evasion, it generally seeks to exercise that authority in a manner that reflects the intent of the petitioner.[229]  With the above language the petitioner intended to exclude from the scope of the investigations non-finger-jointed exterior siding products. Additionally, the plain language of the scope identifies examples of non-finger-jointed exterior products (*i.e.*, solid wood siding, non-wood siding, and shingles) which are excluded from the scope of the investigations.  The products which Seaboard is requesting to be excluded from the scope "may be finger jointed."  Therefore, exterior wood bevel siding that is not finger jointed is already expressly excluded from the scope.  The corollary to this exclusionary language is that exterior wood bevel siding which is finger jointed falls into the category of products that the petitioner intended to cover. Accordingly, we preliminarily find no basis to amend the scope as defined in the *Initiation Notices* with respect to wood bevel siding products.

**Issue 9:  Whether to Exclude Picture Frame Components with 90-Degree Rabbet Groove or Overhang**

*Raoping's Comments*

- Raoping, a producer and exporter of wooden picture frames, requests that Commerce modify the scope language to exclude picture frame components.[230]
- The scope excludes picture frame components three feet and under in individual lengths.  This language is unrealistically restrictive based on length, and a 90-degree rabbet groove is a more appropriate physical characteristic upon which to distinguish picture frames from in-scope products.[231]
- The petitioner has recognized that picture frames are different from millwork products and that picture frames are not the primary focus of the scope of these investigations and could cause confusion.[232]
- Picture frames are intricate, ornate and significantly more expensive than millwork products.  Picture frames have detailed designs and carvings on their surfaces and have much more surface finishing.[233]  Picture frames serve as

---

[229] *See AMS Associates, Inc.*, 881 F. Supp. 2d at 1380.
[230] *See* Raoping Comments at 2.
[231] *Id.* at 4.
[232] *Id.* at 5 and Exhibit 1.
[233] *Id.* at 7.

Filed By: Suzanne Lam, Filed Date: 8/6/20 12:33 PM, Submission Status: Approved

decorative borders for artwork and are not part of the finished trim installed when a house is purchased.[234]

- Picture frames are not interchangeable with millwork products. Mouldings are mainly used for trimming edges, floor bases, and crowns in a linear fashion. Picture frame components are designed with a rabbet groove of 90 degrees so that they can connect together, lock and fix the artwork and backing of the picture frame.[235]

- A rabbet is an area of overhang, or "lip," that the print or artwork sits in when mounted into the picture frame. A rabbet width of ¼ inch is standard on most frames and constitutes the difference between the frame's viewable area and size. Because the overhang caused by the rabbet groove, picture frame components cannot be applied flush against the wall, floor base or door, which is crucially important for wood mouldings.[236]

- A 90-degree rabbet groove is present in all picture frame components regardless of length. Accordingly, regardless of length, picture frame components can be differentiated from in-scope millwork products, by their 90-degree rabbet groove.[237]

- The scope should be revised as follows by removing "three feet and under individual lengths" requirement and replacing it with 90-degree rabbet groove: "Excluded from the scope of these investigations are … picture frame components with a 90-degree rabbet groove or overhang."[238]

***The Petitioner's Comments***

- The petitioner opposes excluding picture frame components based on their 90-degree rabbet groove or overhang. All picture moulding profiles, which are specifically included in the scope, have 90-degree grooves, adding this language would exclude products the petitioner intended to cover.[239]

- The petitioner member companies produce these wood mouldings and millwork products, and their exclusion would be contrary to the petitioner's clearly established intent.[240]

**Commerce Position:** Commerce preliminarily finds that certain picture frame components with a 90-degree rabbet groove or overhang are included in the scope of these investigations, based on the intent of the petitioner, as expressed in the Petitions. The plain language of the scope excludes "picture frame components three feet and under in individual lengths;" and therefore, clearly covers picture frame components, whether or not rabbet grooved, as long as they are greater than three feet.

---

[234] *Id.* at 6.
[235] *Id.*
[236] *Id.* at 7.
[237] *Id.*
[238] *Id.* at 8.
[239] *See* Petitioner Rebuttal Scope Comments at 17.
[240] *Id.*

40

As stated above, while Commerce has the authority to clarify the scope of an investigation, or modify the proposed scope to make it administrable, enforceable, or to prevent potential evasion, it generally seeks to exercise that authority in a manner that reflects the intent of the petitioner.[241]  Excluding picture frame components with a 90-degree rabbet groove or overhang would necessarily also exclude millwork products for which the petitioner seeks relief, because all picture moulding profiles, some of which are in-scope products, have 90-degree rabbet grooves.  In establishing the scope of an investigation, Commerce strives to craft a scope that both includes the specific products for which the petitioner requested relief, and excludes those products which may fall within the general scope definition, but for which the petitioner does not seek relief.[242]  Accordingly, Commerce finds that the current exclusion for picture frame components under three feet serves to cover millwork products for which the petitioner seeks relief, while excluding products that may fall within the general scope definition, but which the petitioner does intend to be covered by the scope of the investigations.  Therefore, we preliminarily find no basis to amend the scope as defined in the *Initiation Notices* with respect to picture frame components with a 90-degree rabbet groove or overhang.

### Issue 10:  Whether to Exclude Millwork Products that are Imported as Components in Unassembled Wooden Kitchen Cabinets, Unassembled Wooden Bathroom Cabinets, and Unassembled Wooden Bedroom Wardrobes

***Oppein's Comments***

- Oppein, a Chinese producer of cabinets and home furnishings, requests that Commerce confirm that the following products are outside the scope of the investigations on wood mouldings and millwork products from Brazil and China:[243]

  o Unassembled wooden kitchen and bathroom cabinets, including wood mouldings, whereby all cabinet parts and hardware are imported together as a complete article, are covered by the scope of the *Wooden Cabinets and Vanities and Components from China Orders*.[244]

  o Unassembled wooden bedroom wardrobes, including wood mouldings, whereby all cabinet parts and hardware are imported together as a complete article, is covered by the scope of *Wooden Bedroom Furniture from China Order*.[245]

---

[241] *See AMS Associates, Inc.*, 881 F. Supp. 2d at 1380.

[242] *See, e.g.*, *Spring Table Grapes from Chile and Mexico*, 66 FR at 26832-33 (holding that the domestic industry is in the best position to identify the imports that they compete against and believe to be unfairly traded); *Softwood Lumber from Canada*, and accompanying IDM at 234.

[243] *See* Oppein Scope Comments at 1.

[244] *Id.* at 2-3 (citing *Wooden Cabinets and Vanities and Components Thereof from the People's Republic of China:  Antidumping Duty Order*, 85 FR 22126 (April 21, 2020) (*AD Wooden Cabinets and Vanities Order*); *see also Wooden Cabinets and Vanities and Components Thereof from the People's Republic of China:  Countervailing Duty Order*, 85 FR 22134 (April 21, 2020) (*CVD Wooden Cabinets and Vanities Order*) (collectively, *Wooden Cabinets and Vanities from China Orders*)).

[245] *Id.* at 2-3 (citing *Notice of Amended Final Determination of Sales at Less Than Fair Value and Antidumping Duty Order:  Wooden Bedroom Furniture from the People's Republic of China*, 70 FR 329 (January 4, 2005) (*Wooden Bedroom Furniture from China Order*)).

41

- Upon importation into the United States, Oppein did not declare with CBP its wood mouldings for the cabinets separately from its unassembled cabinet imports, but included all components, including wood mouldings, as part of each complete cabinet assembly.  The scope of the *Wooden Cabinets and Vanities and Components from China Order* excludes "solid wooden accessories including corbels and rosettes, which serve the primary purpose of decoration and personalization," if they are "entered separate from a wooden cabinet or vanity."[246]

- A specific article imported into the United States cannot be covered by the scope of two distinct antidumping orders and two countervailing duty orders simultaneously.[247]

### *The Petitioner's Comments*

- The petitioner agrees that unassembled wooden kitchen cabinets and bathroom vanities from China, imported with all cabinet or vanity parts and hardware; unassembled wooden bedroom wardrobes, including wood mouldings, whereby all cabinet parts and hardware are imported together as a complete article; and wooden bedroom wardrobes, including wood mouldings, whereby all cabinet parts and hardware are imported together as a complete article, are covered by the scope of the *Wooden Cabinets and Vanities and Components from China Orders* and *Wooden Bedroom Furniture from China*, respectively.[248]

- There are no pending AD/CVD investigations on wood cabinets and vanities from Brazil; therefore, millwork products from Brazil whether or not imported together with other parts of a cabinet or vanity, are subject to the scope of the AD investigation for wood mouldings and millwork products from Brazil.[249]

- There is no CVD order on wooden bedroom furniture from China; therefore, millwork products imported from China, whether or not imported together with other parts of a bedroom wardrobe or other bedroom furniture, are subject to the scope of the CVD investigation for wood mouldings and millwork products from China.[250]

- There is no AD order on wooden bedroom furniture from Brazil; therefore millwork products imported from Brazil, whether or not imported together with other parts of a bedroom wardrobe or other bedroom furniture, are subject to the scope of the AD investigation for millwork products from Brazil.[251]

- Oppein's unassembled wooden bedroom wardrobes, where all parts of the wardrobe – including wood mouldings – are imported together as a complete article, fall under the scope of AD order on W*ooden Bedroom Furniture from China*.  Therefore the petitioner does not oppose the addition of express exclusion

---

[246] *Id.* at 4 (citing *Wooden Cabinets and Vanities and Components from China Orders*).
[247] *Id.* at 5.
[248] *See* Petitioner Rebuttal Scope Comments at 25 (citing *Wooden Cabinets and Vanities and Components from China Orders*; and *Wooden Bedroom Furniture from China Order*.
[249] *Id.*
[250] *Id.* at 26.
[251] *Id.* at 25-26.

language for products covered by the scope of the AD order on *Wooden Bedroom Furniture from China*.[252]

**Commerce Position:** Commerce preliminarily finds that unassembled wooden kitchen cabinets and bathroom vanities from China, imported with all cabinet or vanity parts and hardware; unassembled wooden bedroom wardrobes, including wood mouldings, whereby all cabinet parts and hardware are imported together as a complete article; and wooden bedroom wardrobes, including wood mouldings, whereby all cabinet parts and hardware are imported together as a complete article, are covered by the scope of the *Wooden Cabinets and Vanities from China Orders*[253] and the AD order on *Wooden Bedroom Furniture from China*,[254] respectively.

Additionally, if a product is covered under another order, it is not subject to the scope of these investigations. However, if there is no existing order, the products are covered under the scope of these investigations. For Brazil, because there is no existing order on wooden cabinets and vanities or wooden bedroom furniture, the millwork products imported from Brazil, whether or not imported together with other cabinet and vanity parts or with other bedroom furniture parts, are subject to the scope of the AD investigation on millwork products from Brazil. For China, because there is no existing CVD order on wooden bedroom furniture, the millwork products imported from China, whether or not imported together with other bedroom furniture parts, are subject to the scope of the CVD investigation on millwork products from China. Accordingly, we are preliminarily amending the scope as defined in the *Initiation Notices* to add exclusionary language for products that are covered by existing AD/CVD orders.

For the scope of the China CVD investigation, we are preliminarily amending the scope as defined in the *Initiation Notices* by adding the following language:

> Excluded from the scope of this investigation are all products covered by the scope of the antidumping and countervailing duty orders on *Wooden Cabinets and Vanities from the People's Republic of China*. *See Wooden Cabinets and Vanities and Components Thereof from the People's Republic of China*: *Countervailing Duty Order*, 85 FR 22134 (April 21, 2020).

---

[252] *Id.* at 26.
[253] *See Wooden Cabinets and Vanities from China Orders* (citing the scope: "Subject merchandise includes all unassembled, assembled and/or "ready to assemble" (RTA) wooden cabinets and vanities, also commonly known as flat packs … RTA wooden cabinets and vanities are defined as cabinets or vanities packaged so that at the time of importation they may include: (1) Wooden components required to assemble a cabinet or vanity (including drawer faces and doors); and (2) parts (*e.g.*, screws, washers, dowels, nails, handles, knobs, adhesive glues) required to assemble a cabinet or vanity.").
[254] *See Wooden Bedroom Furniture from China Order* (citing the scope: "The subject merchandise is made substantially of wood products, including both solid wood and also engineered wood products made from wood particles, fibers, or other wooden materials such as plywood, oriented strand board, particle board, and fiberboard, with or without wood veneers, wood overlays, or laminates, with or without non-wood components or trim such as metal, marble, leather, glass, plastic, or other resins, and whether or not assembled, completed, or finished.").

43

For the scope of the China AD investigation, we preliminarily recommend amending the scope as defined in the *Initiation Notices* by adding the following language:

> Excluded from the scope of this investigation are all products covered by the scope of the antidumping and countervailing duty orders on *Wooden Cabinets and Vanities from the People's Republic of China*. *See Wooden Cabinets and Vanities and Components Thereof from the People's Republic of China*: *Antidumping Duty Order*, 85 FR 22126 (April 21, 2020).

> Excluded from the scope of this investigation are all products covered by the scope of the antidumping duty order on *Wooden Bedroom Furniture from the People's Republic of China*. *See Notice of Amended Final Determination of Sales at Less Than Fair Value and Antidumping Duty Order*: *Wooden Bedroom Furniture from the People's Republic of China*, 70 FR 329 (January 4, 2005).

### Issue 11:  Whether to Exclude Millwork Products that are Imported as Components in Unassembled Wooden Interior Door Set

***Oppein's Comments***

- Commerce should confirm that wood mouldings imported as a set of unassembled wooden door, including all door parts and hardware, are excluded of the scope of these investigation.[255]
- The scope language is dispositive and excludes wood mouldings imported in wooden interior door sets, "{e}xcluded from the scope of these investigations are … finished and unfinished doors."[256]
- It is clear that the scope of these investigations covers "door components such as rails and stiles" when door rails and stiles are imported by themselves, but excludes door rails and stiles that are part of a finished or unfinished door. "Finished doors" refer to assembled doors consisting of a door frame, door core/panel, and essential hardware.[257]
- "Unfinished doors" refer to unassembled door sets including door components such as rails and stiles.[258]
- Unassembled but complete door sets should be classified under HTSUS 4418.20.8060doors and their frames and thresholds.[259]
- The General Rule of Interpretation 2(a) of the HTSUS governs the classification of unassembled items:

---

[255] *See* Oppein Scope Comments 1 at 5; *see also* Oppein Scope Comments 2 at 2.
[256] *See* Oppein Scope Comments 2 at 2-3.
[257] *Id.* at 3.
[258] *Id.*
[259] *Id.*

44

2.  (a) Any reference in a heading to an article shall be taken to include a reference to that article incomplete or unfinished, provided that, as entered, the incomplete or unfinished article has the essential character of the complete or finished article.  It shall also include a reference to that article complete or finished (or falling to be classified as complete or finished by virtue of this rule), entered unassembled or disassembled.[260]

### The Petitioner's Comments

- The petitioner opposes Oppein's request to exclude millwork products imported together with unassembled but complete sets of wooden interior doors from the scope of these investigations.[261]
- All millwork door components were indented to be covered, regardless of whether they are imported at the same time as other parts of a door or as part of a set.[262]
- The plain language of the scope includes "jamb parts," and "door components such as rails and stiles."[263]
- The physical descriptions in the scope language, and not the HTSUS numbers referenced therein, are dispositive.  However, noting that such categories also contain subject merchandise, the petitioner requests Commerce add HTSUS subheadings 4418.20.4000, 4418.20.8030 and 4418.20.8060 to the scope of these investigations.[264]

**Commerce Position:**  Commerce preliminarily finds that door components, whether imported alone or with an unassembled wooden door set, are included in the scope of these investigations, based on the intent of the petitioner, as expressed in the Petitions, and comments received.  Additionally, the plain language of the scope explicitly covers door components, "{t}he scope includes … door components such as rails and stiles," and there is no language in the scope that excludes door components imported with a wooden door set.

As stated above, while Commerce has the authority to clarify the scope of an investigation, or modify the proposed scope to make it administrable, enforceable, or to prevent potential evasion, it generally seeks to exercise that authority in a manner that reflects the intent of the petitioner.[265]  Excluding millwork door components that are imported together with unassembled doors, is contrary to the petitioner's intent and could exclude millwork products for which the petitioner seeks relief.  The petitioner stated in the Petitions that it intended to cover door components, "{w}ood mouldings and millwork products are also used as interior and exterior door frames or jambs, and as astragals, which are attached to one of a pair of doors …"[266]  Additionally, to further

---

[260] *Id.*
[261] *See* Petitioner Rebuttal Scope Comments at 27; *see also* Petitioner Additional Scope Comments at 7.
[262] *Id.*
[263] *See* Petitioner Additional Scope Comments at 7.
[264] *Id.* at 8.
[265] *See AMS Associates, Inc.*, 881 F. Supp. 2d at 1380.
[266] *See* the Petitions at 4.

45

Barcode:4012643-01 A-570-117 INV - Investigation  -

define subject merchandise, the petitioner provided a glossary detailing millwork door components that are subject to the scope of these investigations.[267]

In modifying a scope, Commerce must ensure that the scope is administrable by CBP and is not susceptible to circumvention, and an exclusion for millwork door components that are imported together with unassembled doors could create the potential for circumvention, because parties could potentially import multiple millwork door components with unassembled door sets to evade any antidumping and/or countervailing duty orders.  Although the scope expressly excludes finished and unfinished doors, it also expressly includes millwork door components, and the petitioner made clear in their rebuttal comments that millwork door components that are imported together with wooden door sets are subject to the scope of these investigations.  However, to further clarify the scope and ensure that the scope is administrable by CBP, Commerce is preliminarily adding the following language to the scope, as defined in the *Initiation Notices*, with respect millwork door components imported as part of a door kit or set: "{t}he merchandise subject to these investigations … interior and exterior door frames or jambs (including split, flat, stop applied, single- or double-rabbeted), frame or jamb kits, and packaged door frame trim or casing sets, whether or not the door components are imported as part of a door kit or set."  To further clarify the scope of these investigations and to ensure coverage of the millwork door components for which the petitioner is seeking relief, Commerce is also preliminarily amending the scope as defined in the *Initiation Notices*, to include the HTSUS subheadings 4418.20.4000, 4418.20.8030 and 4418.20.8060.

### Issue 12:  Whether to Exclude S1S2E Boards and Clarify the Exclusion for Lumber

#### *Red Tide's Comments*
- Red Tide (DBA Wood Brokerage International), an importer of lumber and S1S2E boards, requests Commerce clarify that specific non-millable S1S2E boards are excluded from the scope of these investigations.[268]
- Red Tide's Rustic Knotty Pine Panels (RKP Panels) have a rustic look and are a type of utility pane that are not produced in the United States.[269]
- RKP Panels typically are imported in the following thickness, width and length: 21/32 inches x 12-16 inches x 36-96 inches.[270]
- RKP Panels consist of edge-glued strips of solid lumber.  Sometimes they are finger-jointed but this is not required, because the presence of knots in the panels is acceptable to, if not desired by, the end-user.  Additionally, the defects may be filled by putty.[271]
- RKP panels are sold for woodworking projects, such as shelving or bird-houses, at big box stores.  They are sometimes sold as "utility" boards or "utility panels."

---

[267] *See* Petition First Supplement at Exhibit I-Supp-2.
[268] *See* Ride Tide's Scope Comments at 1-2.
[269] *Id.* at 2.
[270] *Id.* at 4.
[271] *Id.* at 5.

Filed By: Suzanne Lam, Filed Date: 8/6/20 12:33 PM, Submission Status: Approved

On Home Depot's website, similar boards are not included in the moulding/millwork category, instead, they are listed as "common boards."[272]

- RKP panels are classified under HTSUS 4421.99.9400 which includes "edge glued lumber" (other than bamboo).  While not dispositive of the scope question, it is noteworthy that this HTSUS code is not mentioned in the scope or by the petitioner.[273]

- RKP panels are not a millwork product.  Nor are they finger-jointed or edge-glued moulding or millwork blanks, because the presence of knots and defects prevents them from serving as a blank to enter the "back end" of the production of moulding and millwork products.[274]

### CTI's Comments

- Commerce should revise the scope to clarify that S1S2E boards are excluded of the scope of these investigations, because S1S2E boards are:  (1) not continuously shaped throughout their length as required by the plain language of the scope, and (2) are out-of-scope lumber.  [275]

- The petitioner confirms that lumber is excluded from the scope of these investigations, and the petitioner improperly identifies S1S2E boards as lumber.[276]

- Commerce recently placed on the record of *Certain Softwood Lumber Products from Canada* the standard lumber grading rules by the National Lumber Grades Authority approved by the American Lumber Standard Committee.  The American Lumber Standard Committee is a United States based non-profit organization comprised of manufacturers, distributors, users, and consumers of lumber.  The American Lumber Standard Committee membership is also appointed by the Secretary of Commerce.  In this publication, the National Lumber Grades Authority referred to S1S2E boards as "dressed (surface) lumber" which is:

    > {l}umber that has been dressed by a planing machine (for purposes of attaining smoothness of surface and uniformity of size) on one side (S1S), two sides (S2S), one edge (S1E), two edges (S2E), or a combination of sides and edges – S1S1E, S1S2E, S2S1E or S4S.[277]

- The American Lumber Standard Committee published a January 2020 version of the American Softwood Lumber Standard, which also categorizes S1S2E as dressed (surfaced) lumber.  The petitioner's claim that S1S2E is not lumber directly contradicts Commerce's published standards on lumber, which includes S1S2E boards.[278]

---

[272] *Id.*
[273] *Id.* at 6.
[274] *Id.* at 8.
[275] *See* CTI Scope Comments 2 at 2.
[276] *Id.* at 3.
[277] *Id.* at 3-4.
[278] *Id.* at 4.

47

Barcode:4012643-01 A-570-117 INV - Investigation  -

- The American Softwood Lumber Standards, which are developed under procedures published by Commerce and administered by the National Institute of Standards and Technology (NIST), references S1S2E as "dressed surface lumber," which is further defined as lumber that has been surfaced by a machine.[279]
- The NIST standard defines boards as, "{l}umber of less than nominal 2-inch thickness and of nominal 2-inch or greater width.  Lumber of less than nominal 2-inch thickness and of less than nominal 6-inch width is designated as strips or boards."[280]
- The petition and the current language of the scope do not provide any parameters for lumber.  The petitioner's vague and undefined terms such as "mere lumber," present significant concerns regarding the administrability of the scope.[281]
- The petitioner claims that lumber (which is derived from planing a log) is outside the scope, while arguing that lumber that has been planed is "continuously shaped" and within the scope.  This claim is irreconcilable and again presents significant concerns regarding the administrability of the scope.[282]
- The petitioner's attempt to keep certain types of lumber as in-scope while allowing other types of lumber to remain out-of-scope serves as a strong indicator of future administrability issues.[283]
- S1S2E boards are not covered by the plain language of the scope.  S1S2E lumber is not continuously shaped wood that has undergone additional manufacturing, as required by the scope.  S1S2E is merely a finger-jointed and edge-glued type of lumber.  This confusion justifies Commerce to clarify that S1S2E boards are expressly excluded from the scope.[284]
- The petitioner's additional comments on lumber fail to provide an adequate definition of lumber that is administrable.  The petitioner claims that structural lumber has a thickness of 1.5 inches and says that structural lumber "tends to be" thicker than blanks.  The petitioner uses the same language for its finger-joint description, claiming that finger-jointed structural lumber "typically" has a longer finger joint than S4S. Accordingly, the petitioner's thickness and finger joint exclusion is not a consistent or reliable determinative factor.[285]
- The petitioner's grading stamp proposal only applies to structural lumber.  The definition of lumber encompasses many other types, including "appearance" lumber, which is not stamped.[286]

---

[279] *See* CTI S1S2E Scope Comments at 3.
[280] *Id.* at 4 and Exhibit B at 12.
[281] *Id.* at 4.
[282] *Id.* at 4-5.
[283] *Id.* at 5.
[284] *Id.*
[285] *See* CTI Lumber Comments at 3.
[286] *Id.*

48

- The American Softwood Lumber Standard provides numerous other categories of lumber, including, but not limited to rough lumber, worked lumber, patterned lumber, and dressed (surfaced) lumber.[287]
- The petitioner draws a distinction between boards, which is lumber, and other types of lumber. This distinction is inconsistent with the American Softwood Lumber Standard. This is also inconsistent with CBP's historical understanding that boards, including S4S boards, are a type of lumber.[288]

### IWP's Comments

- Commerce should clarify that IWP's Forest Trim exterior trim/fascia boards, referred to in the industry as S1S2E boards, are excluded of the scope of these investigations. IWP's S1S2E boards are not continuously shaped and are made of Cypress a wood that is native to China, not the United States, and is generally more expensive than domestic S1S2E boards. [289]
- IWP's S1S2E boards are finger-jointed and edge-glued, primed and imported as a finished product. IWP's S1S2E boards do not undergo additional manufacturing nor are they blanks. [290]
- The HTSUS code 4409 provides the following definition of "continuously shaped":

    Wood (including strips and friezes for parquet flooring, not assembled) continuously shaped (tongued, grooved, rebated, chamfered, V-jointed, beaded, molded, rounded or the like) along any of its edges, ends or faces, whether or not planed, sanded or end-jointed.[291]

    This language indicates that HTSUS identifies planing as a distinct process from continuous shaping;[292] therefore solely smoothing a surface does not constitute continuous shaping.
- IWP's S1S2E boards are not imported under HTSUS code 4409, because they are not continuously shaped. IWP's S1S2E boards are not "tongued, grooved, rebated, chamfered, V-jointed, beaded, molded, rounded or the like." IWP's S1SE boards are imported under HTSUS code 4407:

    Wood sawn or chipped lengthwise, sliced or peeled, whether or not planed, sanded or end-jointed, of a thickness exceeding 6 mm.[293]
- HTSUS code 4407 was excluded from the scope of these investigations, and not used to select mandatory respondents.[294]

---

[287] *Id.* at 5.
[288] *Id.*
[289] *See* IWP Scope Comments at 2-3.
[290] *Id* at 2.
[291] *Id.* at 7-8.
[292] *See* IWP S1S2E Scope Comments at 4.
[293] *Id.* at 9.
[294] *Id.* at 15.

49

- The petitioner defines moulding or millwork blanks as, "{Boards}… which are later machined or moulded into a final profile." IWP's S1S2E boards are imported as finished products; they are finger-jointed, edge-glued, and primed.[295]
- The petitioner did not intend to cover S1S2E boards, because it did not identify or describe S1S2E boards in the scope of these investigations. While the petitioner initially proposed the inclusion of S1S2E boards that are finger-jointed and/or coated with any surface coating in the initial scope, the petitioner removed this language from scope as defined in the *Initiation Notices*.[296]
- IWP's S1S2E boards are not interchangeable with in-scope products, because they are used for structural purposes. IWP's S1S2E boards binds roof eaves, and overhangs, giving them lateral rigidity, and keeps the roof's lower line together and prevent sagging and separation.[297]
- The *Diversified Products* criteria do not support finding that S1S2E boards are subject to the scope of these investigations.
  - (1) Physical Characteristics: IWP's S1S2E wood boards are smooth on one side and on two edges, whereas subject merchandise is "continuously shaped wood," typically with a continuous or repeating moulded, decorative pattern or groove(s). Millwork products are primarily aesthetic and IWP's S1S2E boards are structural. Additionally IWP's S1S2E boards have different sizes, tolerances, and moisture content.
  - (2) Ultimate Purchasers: IWP's S1S2E board purchasers expect it provide structural support. Millwork product purchases expect a decorative appearance and more accurate size and tolerance references.
  - (3) Channels of Trade: In-scope products are typically marketed and displayed separate from S1S2E boards. For example, Sierra Pacific's website contains an entire list of offered moulding and millwork, all of which is continuously shaped wood for interior use. In-scope products are typically directed to different types of subcontractors than the IWP's S1S2E boards, as different types of tools, nails and glues are used for installation.
  - (4) Ultimate Use: IWP's S1S2E boards are used for various structural functions, and must be capable of weathering the outside elements while maintaining their structural integrity. In-scope products allow for tight and aesthetically pleasing fits in corners and around doors.[298]
- The scope, as written, requires clarification. The scope states:
  {E}xcluded from the scope of these investigations are exterior fencing, exterior decking and exterior siding products (including solid wood siding, non-wood siding (*e.g.*, composite or cement), and shingles) that are not LVL or finger-jointed …

---

[295] *Id.* at 12 (citing Second Petition Supplement at Exhibit 14).
[296] *Id.* at 11-13.
[297] *Id.* at 13-14.
[298] *Id.* at 17-19.

This language implies that all exterior products that are LVL or finger-jointed are included within the scope, as well as all exterior products not otherwise expressly excluded.[299]

- Commerce should modify the scope as follows:

  Excluded from the scope of these investigations are:  S1S2E boards; to the extent otherwise covered by the scope language herein, exterior fencing, exterior decking and exterior siding products (including solid wood siding, non-wood siding (*e.g.*, composite or cement), and shingles) if they are not LVL or finger-jointed; finished and unfinished doors …[300]

- The American Softwood Lumber Standard defines "lumber" as "a manufactured product derived from a log through sawing or planing" and "dressed lumber" as "Lumber that has been surfaced by a machine (to attain smoothness of surface and uniformity of size)…"[301]  However, the petitioner argues that the planing and smoothing characteristics of out-of-scope lumber represents continuously shaped wood.[302]

- The American Softwood Lumber Standard further defines dressed lumber as, "Lumber that has been surfaced by a machine (to attain smoothness of surface and uniformity of size) on one side (S1S), two sides (S2S), one edge (S1E), two edges (S2E), or a combination of sides and edges (S1S1E, S1S2E, S2S1E, S4S). Lumber surfaced S1E, S2E, S1S, S2S, S1S1E, S1S2E, S2S1E, S4S is classified as dressed (surfaced) lumber in the surfaced width or thickness."[303]

- The petitioner cannot reasonably contend that all of the above specified lumber, that is planed on one side or edge, is continuously shaped and is subject to the scope of these investigations, while simultaneously covering lumber, whether solid, finger-jointed, or edge-glued."[304]

- S1S2E boards are flat on both sides and edges and not continuously shaped, and lumber with flat sides and edges, is not continuously shaped.  The petitioner acknowledges this:

  There is no requirement in the scope language that in-scope products be continuously shaped along their entire length on every side.  In fact, any such requirement would, absurdly and unintentionally, remove a substantial portion of wood mouldings from the scope.  Many flat back mouldings have one side that will be attached to a wall and thus are not shaped on one side.[305]

---

[299] *Id.* at 19-20.
[300] *Id.* at 20.
[301] *See* IWP S1S2E Scope Comments at 2.
[302] *Id.* at 9.
[303] *Id.* at 9-10.
[304] *Id.* at 10 (citing Petitioner Rebuttal Scope Comments at 15).
[305] *Id.* (citing Petitioner Rebuttal Scope Comments at 3).

51

- The Western Wood Products Association, which is certified by the American Lumber Standard Committee as a rules writing agency[306] groups lumber into three categories:
  1) Framing or Structural Lumber, which is graded for strength
  2) Appearance Lumber, which is not graded for strength
  3) Industrial or Factory Lumber, which is generally graded to specific end-uses or for remanufacturing and recovery purposes.[307]

  The WWPA includes specifications and physical descriptions for "Dressed (surfaced) Lumber" for framing lumber, appearance lumber, and industrial lumber.  WWPA expressly includes S1S2E and S4S boards in its detailed description of appearance lumber.[308]

- The WWPA provides standard sizes of various forms of lumber including boards which typically have a 1 inch nominal thickness.[309]  Additionally the WWPA specifies that appearance lumber has a minimum thickness ranging from 1 inch to 1.5 inches.[310]

### The Petitioner's Comments

- The petitioner opposes the requests to exclude S1S2E boards from the scope of these investigations.[311]
- The petitioner has stated, "{m}ouldings and millwork product blanks and … S1S2E boards are covered by the scope when they are finger-jointed or edge-glued."[312]  Therefore, IWP's S1S2E boards when they are finger-jointed or edge-glued are subject to the scope of these investigations.[313]
- S1S2E boards are continuously shaped because they are smooth surfaced which constitutes shaping.[314]
- There is no requirement in the scope language that in-scope products need to be continuously shaped along their entire length on every side.[315]
- The initial scope proposed in the petition included a non-exhaustive list of types of mouldings and millwork products, which listed S4S and S1S2E boards as subject merchandise.  In response to Commerce's request, the petitioner removed the illustrative list of mouldings and millwork products in its entirety, and replaced it with a general physical description of the covered merchandise.[316]

---

[306] *See* IWP Lumber Comments at 6.
[307] *Id.* at 7 and Exhibit 2 at 4.
[308] *Id.* at 8.
[309] *Id.* at 8 and Exhibit 2 at 20.
[310] *Id.* at 8 and Exhibit 2 at 19.
[311] *See* Petitioner Rebuttal Scope Comments at 27; *see also* Petitioner Additional Rebuttal Scope Comments at 7.
[312] *Id.* at 3 (citing Second Petition Supplement at 3).
[313] *Id.* at 3.
[314] *Id*.
[315] *Id*.
[316] *Id.* at 4 (citing Second Petition Supplement at 3-4).

52

- All millwork products, including S1S2E boards, are subject the scope of these investigations, regardless of their wood species. Differences in prices and warranty are not relevant to the analysis of in-scope merchandise.[317]
- S1S2E boards are not lumber. The petitioner explained at length in a petition supplement the differences between the two products. These identifiable differences include thicknesses, and the length and appearance of the joint.[318]
- While the National Lumber Grades Authority issues standards for S1S2E boards, it also issues standards for products like exterior patio decking and ladder rails, products that, like S1S2E boards, are not mere lumber.[319]
- The National Lumber Grades Authority of Canada, whose rules are approved by the American Lumber Standard Committee, defines lumber as,

> {a} manufactured product derived from a log in a sawmill or planing mill, which when rough shall have been sawed, edged, and trimmed at least to the extent of showing saw marks or other marks made in the conversion of logs to lumber on the four longitudinal surfaces of each piece for its overall length, and which has not been further manufactured other than by cross-cutting, ripping, resawing, joining crosswise and/or endwise in a flat plane surfacing with or without end matching and working.[320]

- In its investigation of *Softwood Lumber from Canada*, the ITC has similarly defined lumber as, "a product derived from a log by lengthwise sawing which, in its original sawed condition, has at least two approximately parallel longitudinal-sawed surfaces, and which may be rough, dressed, or worked."[321]
- Solid lumber is lumber which has not been, for example, ripped and re-joined. Out-of-scope solid lumber is easily distinguished from in-scope S4S/S1S2E stock or boards and mouldings and millwork product blanks, all of which must be finger-jointed or edge-glued in order to be subject to the scope.[322]
- Lumber is also out-of-scope when it is finger-jointed or edge-glued, which can be known as structural or dimension lumber.[323] Structural lumber, because of its use in structural applications, tends to be thicker than blanks or S4S/S1S2E boards, with structural lumber having a thickness of 1.5 inches or greater.[324]
- Finger-jointed or edge-glued structural lumber is also stamped with a stamp issued by an American Lumber Standard Committee – Certified Grading Bureau

---

[317] *See* Petitioner's Additional Rebuttal Comments at 5.

[318] *Id.*

[319] *Id.* at 6.

[320] *See* Petitioner Lumber Definition at 2 and at Exhibit 1.

[321] *Id.* at 3 and Exhibit 3 (citing *Softwood Lumber Products from Canada*, Investigation Nos. 701-TA-566 and 731-TA-1342, (Final), Publication 4749 (December 2017) at 1-17).

[322] *Id.* at 3.

[323] *Id*.

[324] *Id.* at 3 and Exhibit 3 (citing Second Petition Supplement at Exhibit I-Supp2- l; *see also Softwood Lumber Products from Canada*, Investigation Nos. 701-TA-566 and 731-TA-1342, Final, Publication 4749 (December 2017) at 1-17)

53

to demonstrate that it adheres to a variety of specified manufacturing standards, including strength and quality testing.[325]

- Finger-jointed millwork products like blanks and S4S/S1S2E boards typically have a finger joint that is only ¼ inch or ½ inch long, while the finger joint in structural lumber is longer.  Structural lumber also allows for a gap in the finger joint – either a "tip gap" between the tip of a finger in the joint area and the base of the matching profile for that finger, or a "finger joint offset" between the surfaces of the lumber in either lateral or vertical direction.[326]  Finger-jointed boards and blanks, because of their decorative uses, do not allow for such a gap in the finger joint.[327]

**Commerce Position:**  Commerce preliminarily finds that S1S2E boards/lumber are included in the scope of these investigations.  As stated above, in establishing the scope of an investigation, Commerce strives to craft a scope that both includes the specific products for which the petitioner requested relief, and excludes those products which may fall within the general scope definition, but for which the petitioner does not seek relief.[328]  The record demonstrates that an exclusion for S1SE boards/lumber would result in excluding millwork products for which the petitioner seeks relief from these investigations.  However, after reviewing the numerous comments received by interested parties on the definitions of lumber and S1S2E boards, Commerce recognizes that the record of these investigations lacked clarity on the differences between lumber, which is expressly excluded from scope of these investigations, and S1S2E boards/lumber, which the petitioner intends to cover within the scope of these investigations.  Consequently, Commerce provided interested parties multiple opportunities to submit comments and factual information regarding S1S2E boards/lumber and lumber to ensure that the record of these investigations provided a comprehensive description of lumber and S1S2E boards/lumber.  While interested parties have argued that S1S2E boards should be excluded from the scope of these investigations because the boards are a type of lumber, it is Commerce's standard practice to provide ample deference to the petitioner with respect to products for which it seeks relief in these investigations.

Based on the comments and industry standards placed on the record by interested parties, Commerce recognizes that the industry views S1S2E boards as a type of lumber.[329]  However, the mere fact that S1S2E boards are a type of lumber does not mean that they cannot be covered by the scope of these investigations.  Furthermore, we do not find IWP's *Diversified Products* analysis supports a conclusion that S1S2E boards are an out-

---

[325] *Id.* at 3 and Exhibit 5.

[326] *Id.* at 4 and Exhibit 7.

[327] *Id.* at 4.

[328] *See, e.g.*, *Spring Table Grapes from Chile and Mexico*, 66 FR at 26832-33 (holding that the domestic industry is in the best position to identify the imports that they compete against and believe to be unfairly traded); *see also Softwood Lumber from Canada*, and accompanying IDM at 234.

[329] *See* IWP Lumber Comments at 7-8, Exhibit 1 (citing American Softwood Lumber Standard (January 2020)), and Exhibit 2 (citing Western Wood Products Association Western Lumber Product Use Manual); *see also* CTI S1S2E Scope Comments at 3 and Exhibit B (citing American Softwood Lumber Standard (January 2020)).

54

of-scope product, because IWP's analysis does not include tangible physical characteristics that would distinguish S1S2E boards from other in-scope products, in a way that is administrable by CBP.  For example, IWP reports that S1S2E wood boards are smooth on one side and on two edges, whereas subject merchandise is "continuously shaped wood."  Requiring CBP to differentiate out-of-scope products based on degrees of "smoothness" is impractical.  Additionally, the petitioner clearly intended to cover boards and blanks regardless of whether they are continuously shaped on one or all edges, ends or faces.[330]  This description is consistent with the continuously shaped definition listed under HTSUS code 4409:

> Wood (including strips and friezes for parquet flooring, not assembled) continuously shaped (tongued, grooved, rebated, chamfered, V-jointed, beaded, molded, rounded or the like) **along any of its edges, ends or faces,** whether or not planed, sanded or end-jointed.[331]

Accordingly, Commerce is preliminarily adding the following language to the scope to clarify that boards and blanks can be continuously shaped along any of its edges, ends or faces:  "{t}he merchandise subject to these investigations can be continuously shaped along any of its edges, ends, or faces."

Red Tide and IWP also raise concerns regarding the HTSUS codes in the scope of these investigations; however, the scope expressly indicates that references to tariff schedule numbers are not dispositive or limiting with regard to what is covered by the scope.  Furthermore, nothing on the record of these investigations suggests that either the petitioner or Commerce intended to exclude S1S2E boards.  In fact, the petitioner provided a definition and glossary that identified and described S1S2E and S4S boards as in-scope products.[332]  Therefore there is no basis for excluding S1S2E boards based on the HTSUS codes identified in the scope of these investigations.

All parties, including the petitioner, have had opportunities to provide Commerce with proposed language which may help clarify the scope.  In its comments, the petitioner reported the following three identifiable and administrable differences between in-scope S1S2E boards and out-of-scope lumber:  (1) finger-jointed or edge-glued structural lumber is also stamped with a stamp issued by an American Lumber Standard Committee-certified grading bureau; (2) finger-jointed or edge-glued structural lumber is typically 1.5 inches or greater; and (3) finger-jointed millwork products like blanks and S4S/S1S2E boards typically have a finger joint that is only ¼ inch or ½ inch long.  It is clear from the record of these investigations that the petitioner did not intend to cover

---

[330] *See* Petition First Supplement at Exhibit I-Supp-5; *see also* Petition Second Supplement at 1-3 and Petitioner Additional Rebuttal Scope Comments at 3 (stating,"{s}mooth/surface one side ("S1S") boards are smoothed/surfaced, which constitutes shaping … There is no requirement in the scope language that in-scope products be continuously shaped along their entire length on every side … Like other mouldings, S1S2E boards are continuously shaped products and, as such, are classified under the scope language as wood mouldings and millwork products.").
[331] *See* the Petitions at Exhibit I-10; *see also* IWP Scope Comments at 7-8.
[332] *See* Petition First Supplement at Exhibit I-Supp-5; *see also* Petition Second Supplement at 1-3.

55

lumber generally; however, the petitioner also made it clear that it intended to cover S1S2E boards, specifically.  Accordingly, to ensure that the scope is administrable by CBP, [333] Commerce is preliminarily clarifying the scope by identifying S1S2E boards as a type of lumber included in the scope of these investigations and identifying certain physical characteristics that distinguish S1S2E boards from out-of-scope lumber.  Specifically, Commerce is preliminarily revising the scope as defined in the *Initiation Notices* with the following language:

> Excluded from the scope of these investigations are … lumber whether solid, finger-jointed, or edge-glued.  To be excluded from the scope, finger-jointed or edge-glued lumber must have a nominal thickness greater than 1.5 inches and a certification stamp from the American Lumber Standard Committee-Certified Grading Bureau.  The exclusion for lumber whether solid, finger-jointed, or edge-glued does not apply to screen/"surfaced on 4 sides" (S4S) and/or "surface 1 side, 2 edges" (SlS2E) stock (also called boards) that are finger jointed, edge-glued mouldings, or millwork blanks (whether or not resawn).

## VI. PUBLIC COMMENT

Commerce summarized the comments and made preliminary determinations with respect to the scope exclusion requests in this memorandum.  Interested parties may comment on Commerce's preliminary scope determinations.  Scope briefs or other comments on Commerce's preliminary scope determinations may be submitted to the Assistant Secretary for Enforcement and Compliance.  Any submission must follow the general filing requirements provided in 19 CFR 351.303.  Note that Commerce has modified certain of its requirements for serving documents containing business proprietary information until further notice.[334]  These scope briefs and scope rebuttal briefs are separate from the regular case and rebuttal briefs concerning the preliminary determinations of these investigations.  Scope briefs may be submitted no later than 30 days after the publication of the preliminary determinations of the AD investigations of millwork products from Brazil and China in the *Federal Register*.  Scope rebuttal briefs (which are limited to issues raised in the scope briefs) may be submitted no later than seven days after the deadline for the scope briefs.  These deadlines apply to the AD and CVD millwork products investigations.  For all scope briefs and rebuttals thereto, parties must file identical documents simultaneously on the records of all the ongoing AD and CVD millwork products investigations.  No new factual information or business proprietary information may be included in either scope briefs or rebuttal scope briefs.

---

[333] *See Antidumping Duty Investigation of Certain Passenger Vehicle and Light Truck Tires from the People's Republic of China:  Final Determination of Sales at Less Than Fair Value and Affirmative Determination of Critical Circumstances, in Part*, 80 FR 34893 (June 18, 2015), and accompanying IDM at Comment 1.

[334] *See Temporary Rule Modifying AD/CVD Service Requirements Due to COVID-19; Extension of Effective Period*, 85 FR 41363 (July 10, 2020).

Filed By: Suzanne Lam, Filed Date: 8/6/20 12:33 PM, Submission Status: Approved

**Recommendation**

We recommend that Commerce adopt the positions, as outlined above, concerning the scope of the AD and CVD investigations of wood mouldings and millwork products from Brazil and China.  The revised scope, based on the recommendations in this memorandum, is contained in the Attachments.

☒                    ☐
_____        _____
Agree                Disagree

                            8/5/2020

X  _James Maeder_____

    Signed by: JAMES MAEDER

_____
James Maeder
Deputy Assistant Secretary
for Antidumping and Countervailing Duty Operations

57