## UNITED STATES COURT OF INTERNATIONAL TRADE

## BEFORE: THE HONORABLE JOSEPH A. LAROSKI, JR., JUDGE

| | |
|---|---|
| HARDWARE RESOURCES, INC., | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| UNITED STATES, | ) |
| | ) |
| Defendant, | ) Ct. No. 23-00150 |
| | ) |
| and | ) |
| | ) |
| COALITION OF AMERICAN MILLWORK PRODUCERS, | ) |
| | ) |
| Defendant-Intervenor. | ) |
| | ) |

## PLAINTIFF HARDWARE RESOURCES, INC.'S COMMENTS IN OPPOSITION TO THE FINAL RESULTS OF REDETERMINATION

Jill A. Cramer
Jeffrey S. Grimson
Kavita Mohan
Mowry & Grimson, PLLC
5335 Wisconsin Ave., NW, Suite 810
Washington, DC 20015
202.688.3610
jac@mowrygrimson.com
*Counsel to Hardware Resources, Inc.*

Dated: April 30, 2025

## TABLE OF CONTENTS

INTRODUCTION ........................................................................................................... 1

STANDARD OF REVIEW ............................................................................................ 2

ARGUMENT ................................................................................................................. 2

I.   COMMERCE'S NEW SCOPE DEFINITION UNLAWFULLY EXPANDED THE SCOPE AND IS
UNSUPPORTED BY SUBSTANTIAL RECORD EVIDENCE ............................................. 2

   A.   Commerce's New Definition of "Wood Mouldings and Millwork Products"
   Unlawfully Expanded the Scope ........................................................................ 3

   B.   Commerce May Not Lawfully Expand the Scope Based on Language That Was
   Expressly Removed ............................................................................................ 7

II.   COMMERCE IGNORED EVIDENCE FROM THE ITC DETERMINATION THAT UNDERCUTS
ITS RESULT .................................................................................................................. 17

III.   COMMERCE IGNORED THE LOVEDAY SCOPE RULING IN EXPANDING THE SCOPE ....... 21

IV.   COMMERCE IGNORED RECORD EVIDENCE IN DETERMINING THAT HARDWARE
RESOURCES' BOARDS ARE CONTINUOUSLY SHAPED ............................................... 25

CONCLUSION ............................................................................................................. 30

# TABLE OF AUTHORITIES

## Cases

A.L. Patterson, Inc. v. United States, 585 Fed. App'x 778 (Fed. Cir. 2014) ................................ 19

AG der Dillinger Huttenwerke v. United States, 28 CIT 94, 310 F. Supp. 2d 1347 (2004) ........... 2

Columbia Forest Prods. v. United States, __ CIT __, 399 F. Supp. 3d 1283 (2019) .................... 10

Duferco Steel, Inc. v. United States, 296 F.3d 1087 (Fed. Cir. 2002) ..................................... 5, 11

Fedmet Res. Corp. v. United States, 755 F.3d 912 (Fed. Cir. 2014) ........................................... 10

Gerald Metals, Inc. v. United States, 132 F.3d 716 (Fed. Cir. 1997) ............................................. 6

Habas Sinai Ve Tibbi Gazlar Istihsal Endustrisi A.S. v. United States, 33 CIT 695, 625 F. Supp. 2d 1339 (2009) ..................................................................................................................... 25

Hardware Res., Inc. v. United States, __ CIT __, 744 F. Supp. 3d 1358 (2024) ................. passim

King Supply Co., LLC v. United States, 674 F.3d 1343 (Fed. Cir. 2012) ............................... 15, 16

Maclean Power, L.L.C. v. United States, __ CIT __, 359 F. Supp. 3d 1367 (2019) .................... 5

NMB Sing. Ltd. v. United States, 28 CIT 1252, F. Supp. 2d 1327 (2004) .................................... 2

Peer Bearing Company-Changshan v. United States, 38 CIT 823, 986 F. Supp. 2d 1389 (2014) . 5

Star Pipe Prods. v. United States, __ CIT __, 365 F. Supp. 3d 1277 (2019) ................... 7, 12, 17

Star Pipe Prods. v. United States, __ CIT __, 463 F. Supp. 3d 1366 (2020) .............................. 24

Stein Indus. Inc. v. United States, 43 CIT __, 365 F. Supp. 3d 1364 (2019) ............................. 16

Trade Assoc. Grp. v. United States, 38 CIT 131, 961 F. Supp. 2d 1306 (2014) ........................ 16

Trendium Pool Prods. v. United States, __ CIT__, 399 F. Supp. 3d 1335 (2019) ................. 7, 19

Universal Camera Corp. v. NLRB, 340 U.S. 474, 488 (1951) ............................................. 6-7, 12

Vandewater Int'l Inc. v. United States, 130 F.4th 981 (Fed. Cir. 2025) ...................................... 30

Vietnam Finewood Co. v. United States, __ CIT __, 633 F. Supp. 3d 1243 (2023) ................... 10

## Statutes

19 U.S.C. § 1516a ......................................................................................................................... 2

## Regulations

19 C.F.R. § 351.225(k)(1) ............................................................................................................ 17

19 C.F.R. § 351.225(k)(1)(i) .......................................................................................................... 6

19 C.F.R. § 351.225(k)(2) ............................................................................................................ 30

**Other Authorities**

<u>Wood Mouldings and Millwork Products From the People's Republic of China: Amended Final Antidumping Duty Determination and Antidumping Duty Order</u>, 86 Fed. Reg. 9,486 (Dep't of Commerce Feb. 16, 2021) ........................................................................................................... 9

<u>Wood Mouldings and Millwork Products From the People's Republic of China: Countervailing Duty Order</u>, 86 Fed. Reg. 9,484 (Dep't of Commerce Feb. 16, 2021) ...................................... 9

<u>Wood Mouldings and Millwork Products from the People's Republic of China: Preliminary Affirmative Determination of Sales at Less Than Fair Value, Postponement of Final Determination, and Extension of Provisional Measures</u>, 85 Fed. Reg. 48,669 (Dep't of Commerce Aug. 12, 2020) ....................................................................................................... 8, 9

## INTRODUCTION

In accordance with Rule 56.2(h) of the Rules of the U.S. Court of International Trade, Plaintiff Hardware Resources, Inc. ("Hardware Resources") submits these comments in response to the Final Results of Redetermination Pursuant to Court Remand filed by the Department of Commerce ("Commerce") on March 17, 2025.  See Final Results of Redetermination Pursuant to Ct. Remand (Mar. 17, 2025) (Public Document), ECF No. 53-1 ("Remand Results").

In its original scope decision, Commerce found that Hardware Resources' edge-glued boards were within the scope of the antidumping ("AD") and countervailing duty ("CVD") orders (collectively, the "Orders") on wood mouldings and millwork products from China.  See Mem. from Henry Wolfe to James Maeder re: Final Scope Ruling on the Antidumping and Countervailing Duty Orders on Wood Mouldings and Millwork Products from the People's Republic of China: Req. by Hardware Resources, Inc. at 1, 11 (Dep't of Commerce Aug. 2, 2023) ("Scope Ruling") (P.R. 25).[1]  This Court held in its opinion remanding this case that Commerce "ignored the threshold question of whether the product at issue is a wood moulding or millwork product" and that "Commerce must reconsider its decision in light of the deficiencies the Court has identified."  Hardware Res., Inc. v. United States, __ CIT __, __, 744 F. Supp. 3d 1358, 1366 (2024).  In its Remand Results, Commerce continued to find that Hardware Resources' edge-glued boards are within the scope of the Orders.  Commerce unlawfully redefined the scope based on a selective reading of the record, simultaneously expanding the scope in a manner that rendered the term "wood mouldings and millwork products" meaningless, while also ignoring substantial record information from Commerce's original investigation, the International Trade Commission

---

[1]  References to the original scope proceeding administrative record are designated as P.R. (public record) or C.R. (confidential record).  References to the record documents from the remand proceeding are referenced as Rem. P.R.  All citations in this brief are to a public document or version unless otherwise noted.

("ITC") investigation and Commerce's own scope rulings that contradict its new interpretation. Commerce failed to address the deficiencies identified by the Court and engaged in a selective reading of record evidence, and the Court should find that the Remand Results are unsupported by substantial evidence and not in accordance with law and issue a second remand.

## STANDARD OF REVIEW

The Court reviews remand determinations for compliance with its remand order.  See <u>NMB Sing. Ltd. v. United States</u>, 28 CIT 1252, 1259-60, 341 F. Supp. 2d 1327, 1333-34 (2004).  Any factual findings on remand must be supported by substantial evidence, and the agency's legal determinations must be in accordance with law.  <u>See</u> 19 U.S.C. § 1516a(b)(1)(B); <u>see also, e.g.</u>, <u>AG der Dillinger Huttenwerke v. United States</u>, 28 CIT 94, 106, 310 F. Supp. 2d 1347, 1358 (2004).

## ARGUMENT

## I.    COMMERCE'S NEW SCOPE DEFINITION UNLAWFULLY EXPANDED THE SCOPE AND IS UNSUPPORTED BY SUBSTANTIAL RECORD EVIDENCE

In its Remand Results, Commerce adopted a new definition of "wood mouldings and millwork products" that unlawfully expands the scope and relies on wording that was ultimately removed from the final scope language.  The Court expressly directed Commerce to determine on remand whether Hardware Resources' edge-glued boards are "wood mouldings or millwork products."  <u>Hardware Res.</u>, __ CIT at __, 744 F. Supp. 3d at 1366.  The Court found that Commerce's scope ruling

> ignores the initial requirement set forth in the first phrase of {the opening} paragraph {of the scope}.  Only "wood mouldings and millwork products that" are made of wood (or the other listed materials) and are "continuously shaped or finger-jointed or edge-glued moulding or millwork blanks" are subject to the Orders.  The phrase "wood mouldings and millwork products that" must be given meaning in the context of the scope description.

Id., __ CIT at __, 744 F. Supp. 3d at 1365 (internal citations omitted).  By failing to give a meaningful definition of the term "wood mouldings and millwork products that" in the context of the scope description, Commerce failed to comply with the Court's remand order.

### A. Commerce's New Definition of "Wood Mouldings and Millwork Products" Unlawfully Expanded the Scope

In its Remand Results, Commerce noted that "{t}he scope does not include a definition of 'wood mouldings' or 'millwork products'" and then explained that "in the Petition,… the petitioner stated that, '{w}ood moulding and millwork products are manufactured from softwood, hardwood, laminated veneer lumber, or some combination of wood and composite materials, and are woodwork or building materials that are produced in a mill or otherwise undergo remanufacturing.'"  Remand Results at 10-11 (citing Letter on Behalf of the Coalition of American Millwork Producers to Dep't of Commerce and Int'l Trade Comm'n re: Petitions for the Imposition of Antidumping and Countervailing Duties at 6 (Jan. 8, 2020) (Public Version)) (excerpts attached to Letter on Behalf of Hardware Resources to Dep't of Commerce re: Scope Ruling Application at Ex. 7 (Mar. 9, 2023) (Public Version) ("Scope Ruling Application") (P.R. 2)).  Commerce used this reference to define "wood mouldings and millwork products" as "products that are manufactured from a type of wood or composite material and are woodwork or building materials that are produced in a mill or otherwise undergo remanufacturing."  Id. at 11. Based on this definition, Commerce found Hardware Resources' edge-glued boards to be in-scope "wood mouldings or millwork products" because the manufacturing processes described by Hardware Resources "are demonstrative of a remanufacturing process of scrap wood to a completed woodwork or building material: an edge-glued board" and "{a}s such, we find that Hardware Resources' edge-glued boards fall within the meaning of the scope language 'wood mouldings and millwork products.'"  Id. at 12.

Commerce's new definition does not comply with the Court's remand decision.  The Court required Commerce to give "meaning in the context of the scope description" to the term "wood mouldings and millwork products."  Hardware Res., __ CIT at __, 744 F. Supp. 3d at 1365.   As Hardware Resources raised in its comments on the Draft Remand released by Commerce, the definition used by Commerce based on its selective reading of the record that "wood moulding or millwork products" are "woodwork or building materials that are produced in a mill or otherwise undergo remanufacturing," however, is so broad that it essentially reads that term out of the scope entirely.   Specifically, "{t}he terms 'woodwork' and 'remanufacturing' are not defined" by Commerce.  Letter on Behalf of Hardware Resources to Dep't of Commerce re: Cmts. on Draft Redetermination at 5 (Feb. 26, 2025) (Public Version) ("Draft Remand Cmts.") (Rem. P.R. 2). Lacking any definition, those terms appear to cover any product made of wood that is processed after importation, an infinite universe of products.  Id. at 5-6.  This definition is overly broad and cannot be sustained.  While in-scope "wood mouldings and millwork products" may be a subset of all "woodwork or building materials that are produced in a mill or otherwise undergo remanufacturing," the reverse is not true – all such products are not "wood mouldings and millwork products."  To depict this pictorially,



The Court has held in numerous cases that although Commerce may interpret the scope after an order is in effect, it may not expand it.  See, e.g., Peer Bearing Company-Changshan v. United States, 38 CIT 823, 830, 986 F. Supp. 2d 1389, 1397 (2014) ("Commerce may not place merchandise within the scope of an order if the scope language may not reasonably be interpreted to include that merchandise.") (citing Duferco Steel, Inc. v. United States, 296 F.3d 1087, 1089 (Fed. Cir. 2002)); see also Maclean Power, L.L.C. v. United States, __ CIT __, __, 359 F. Supp. 3d 1367, 1371 (2019) (citing Duferco, 296 F.3d at 1089) ("{O}rders may be interpreted as including subject merchandise only if they contain language that specifically includes the subject merchandise or may be reasonably interpreted to include it.").  By defining "wood mouldings and millwork products" as "woodwork or building materials that are produced in a mill or otherwise undergo remanufacturing," Commerce unlawfully enlarged the scope language to cover an entirely new, and seemingly infinite, universe of products.

In response to comments by Hardware Resources, Draft Remand Cmts. at 4-7 (Rem. P.R. 2), Commerce disagreed that its interpretation could be read to include an infinite universe of products, but it provides no support for its conclusion.  See Remand Results at 17.  Rather, Commerce decided that "wood mouldings and millwork products" is a "threshold question," that is further qualified by the words that follow "that are," "made of wood…, or of wood and composite materials…, and which are continuously shaped wood or finger-jointed or edge-glued moulding or millwork blanks (whether or not resawn)."  Id. at 18.  Commerce's determination seems to be an admission that its selective definition of "wood mouldings and millwork products" renders those terms meaningless because Commerce's primary analytical focus in interpreting the scope is on the words that follow.  Although Commerce correctly recognized that the term "wood mouldings and millwork products" is "the starting point of any inquiry" to determine whether a

5

product at issue is subject to the Orders, see id., the definition of "wood mouldings and millwork products" cannot reasonably defined to encompass what would effectively amount to all wood products.  Essentially, adopting Commerce's expanded definition, the scope would mean the following:

> The merchandise subject to this order consists of wood ~~mouldings and millwork~~ products that are made of wood (regardless of wood species), bamboo, laminated veneer lumber (LVL), or of wood and composite materials (where the composite materials make up less than 50 percent of the total merchandise), and which are continuously shaped wood or finger-jointed or edge-glued ~~moulding or millwork~~ ~~blanks~~ (whether or not resawn).  The merchandise subject to this order can be continuously shaped along any of its edges, ends, or faces.

This result is precisely what the Court found to be problematic in Commerce's original Scope Ruling.  As the Court noted, "{t}he phrase 'wood mouldings and millwork products that' must be given meaning in the context of the scope description," Hardware Res., __ CIT at __, 744 F. Supp. 3d at 1365, and that meaning cannot be one that is so broad it obviates the need for the phrase itself.

Commerce provided no other meaningful response in its Remand Results to Hardware Resources' arguments relating to its unlawful expansion of the scope.  Commerce instead concluded that its new definition is in accordance with the primary interpretative sources in 19 C.F.R. § 351.225(k)(1)(i), and that its consideration of these sources is at its own discretion.  See Remand Results at 16 ("We disagree that the regulation requires Commerce to 'fully consider all (k)(1) sources.'").  Commerce's regulations do not, however, permit it to cherry pick from among the record evidence in support of a pre-determined conclusion.  Indeed, such an interpretation of its regulations contravenes the substantial evidence standard, which requires that Commerce "must take into account whatever in the record fairly detracts from its weight."  Gerald Metals, Inc. v. United States, 132 F.3d 716, 720 (Fed. Cir. 1997) (quoting Universal Camera Corp. v. NLRB, 340

U.S. 474, 488 (1951)); see also Star Pipe Prods. v. United States, __ CIT __, __, 365 F. Supp. 3d 1277, 1279 (2019) ("Star Pipe I") ("Commerce may not disregard record evidence that detracts from its intended conclusion."); Trendium Pool Prods. v. United States, __ CIT__, __, 399 F. Supp. 3d 1335, 1339 (2019) (explaining that a scope determination "'requires an examination of the record as a whole, taking into account both the evidence that justifies and detracts from an agency's opinion.' Even when merchandise is facially covered by the literal language of the order, it may still be outside the scope 'if the order can reasonably be interpreted so as to exclude it.'" (citations omitted)).

As discussed below, Commerce may not lawfully ignore record evidence from Commerce's investigation, the ITC and prior scope rulings, as it has done here, while relying on language from the Petition that was subsequently removed from the scope. Commerce's failure to consider the entire record and its overly broad definition of "wood mouldings and millwork products" rendered its decision unsupported by substantial evidence and not in accordance with law.

## B. Commerce May Not Lawfully Expand the Scope Based on Language That Was Expressly Removed

Commerce's conclusion that the term "wood moulding or millwork products" means "products that are manufactured from a type of wood or composite material and are woodwork or building materials that are produced in a mill or otherwise undergo remanufacturing," expands the scope by adding back into the scope language wording that was expressly removed during Commerce's initial investigation. Remand Results at 11, 17. Commerce provided the following explanation in support of its new definition:

> in the Petition, the petitioner provided technical characteristics of wood mouldings and millwork products. Specifically, the petitioner stated that, "{w}ood moulding and millwork products are manufactured from softwood, hardwood, laminated

7

> veneer lumber, or some combination of wood and composite materials, and are
> woodwork or building materials that are produced in a mill or otherwise undergo
> remanufacturing."

Id. at 11-12 (citing Petition at 6 (excerpts attached to Scope Ruling Application at Ex. 7 (P.R. 2)).

It further notes that in the Preliminary Scope Decision Memorandum from the investigation,

Commerce "agreed with the petitioner that wood mouldings and millwork products are 'clearly

described as products that are manufactured from softwood, hardwood, laminated veneer lumber,

or some combination of wood and composite materials, and are woodwork or building materials

that are produced in a mill or otherwise undergo remanufacturing.'"   Id. at 11 (citing Wood

Mouldings and Millwork Products from the People's Republic of China: Preliminary Affirmative

Determination of Sales at Less Than Fair Value, Postponement of Final Determination, and

Extension of Provisional Measures, 85 Fed. Reg. 48,669 (Dep't of Commerce Aug. 12, 2020)

("Prelim. AD Determination"); Mem. from Irene Darzenta Tzafolias to James Maeder re: Prelim.

Scope Decision Mem. at 8-9 (Aug. 5, 2020) (attached to Remand Results as Attach. I)).  Relying

on this definition, Commerce then determined that because Hardware Resources' edge-glued

boards are "made of wood and that such wood undergoes remanufacturing," they "fall within the

meaning of the scope language 'wood mouldings and millwork products.'"   Id. at 12.

Significantly, the language selected by Commerce as a definition for "wood mouldings and

millwork products" was expressly removed from the final scope language during Commerce's

original investigation.  In the original scope language set forth in the Petition, the opening sentence

described the scope as follows:

> The merchandise subject to this investigation consists of wood mouldings and
> millwork products that are made of wood (regardless of wood species), laminated
> veneer lumber (LVL), or of wood and composite materials (where the composite
> materials make up less than 50 percent of the total merchandise), and which are
> woodwork or building materials that are produced in a mill or otherwise undergo
> remanufacturing.

Petition at 4 (emphasis added) (attached to Scope Ruling Application at Ex. 7) (P.R. 2)). The underlined language was, however, deleted from the scope and never reinserted. Specifically, prior to initiation, the Petitioner eliminated this language in its response to Commerce's pre-initiation questions, revising the opening sentence of the scope to read:

> The merchandise subject to this investigation consists of wood mouldings and millwork products that are made of wood (regardless of wood species), bamboo, laminated veneer lumber (LVL), or of wood and composite materials (where the composite materials make up less than 50 percent of the total merchandise), and which are continuously shaped wood that undergoes additional manufacturing or finger-jointed or edge-glued moulding or millwork blanks (whether or not resawn).

Letter on Behalf of Pet'r to Dep't of Commerce and Int'l Trade Comm'n re: Resp. to Second Supp. Questions on General Issues Vol. I of the Petion at 3, 5-6 (Jan. 22, 2020) (Public Version) (attached to Draft Remand Cmts. at Ex. 1 (Rem. P.R. 2-5)). The preliminary determination also omitted the reference to "woodwork or building materials that are produced in a mill or otherwise undergo remanufacturing" and further changed the scope language to eliminate the phrase "that undergoes additional manufacturing" from the opening sentence. Prelim. AD Determination, 85 Fed. Reg. at 48,672; see also Wood Mouldings and Millwork Products From the People's Republic of China: Amended Final Antidumping Duty Determination and Antidumping Duty Order, 86 Fed. Reg. 9,486, 9,488 (Dep't of Commerce Feb. 16, 2021); Wood Mouldings and Millwork Products From the People's Republic of China: Countervailing Duty Order, 86 Fed. Reg. 9,484, 9,485 (Dep't of Commerce Feb. 16, 2021).

By removing from the opening sentence of the scope the reference to "woodwork or building materials that are produced in a mill or otherwise undergo remanufacturing," the only reasonable interpretation is that the scope was not so broad as to cover any woodwork "produced in a mill or {that} otherwise undergo{es} remanufacturing." Cf. Draft Remand Cmts. at 2 (Rem. P.R. 2). As the Federal Circuit has held,

> where a petitioner is requested to clarify with a high degree of specificity the scope of its petition, its response is highly germane to a subsequent scope determination. A petitioner has an obligation to be explicit and precise in its definition of the scope of the petition both prior and during the investigation.

Fedmet Res. Corp. v. United States, 755 F.3d 912, 921 (Fed. Cir. 2014). Parties rely on the scope language to understand what products are and are not covered by the scope. Commerce may not now lawfully add back in that language through its overly broad new definition of "wood mouldings and millwork products" as it does in the Remand Results. See generally Columbia Forest Prods. v. United States, __ CIT __, __, 399 F. Supp. 3d 1283, 1291-94 (2019) (declining to expand the scope to cover a product that was considered but not ultimately added to the scope language); Vietnam Finewood Co. v. United States, __ CIT __, __, 633 F. Supp. 3d 1243, 1257-259 (2023) (declining to uphold Commerce's scope definition when it selectively included language that was ultimately deleted from the scope language).

The Court should reject Commerce's revised scope decision that relies on language excised from the Petition. Commerce acknowledged that the language it relied on was removed from the proposed scope by the Petitioner in the early stages of the proceeding. See Remand Results at 17, 20. Commerce then concluded, however, that Hardware Resources provided no support for its assertion that the language must have been removed because the scope was not so broad as to encompass virtually all wood products. Id. at 20. Commerce states that "there are many reasons why proposed scope language is revised in an investigation" and then provided examples of some reasons why this may happen. Id. at 20-21. The reasons cited by Commerce are entirely speculative and have no basis in the record. Commerce may not lawfully elevate speculation over record evidence to define a key term in the scope. See Vietnam Finewood, __ CIT at __, 633 F. Supp. 3d at 1258 ("{A}s Commerce stated, 'the record of this proceeding contains no information relating to why the reference to veneer core platforms was removed from the scope

and certain veneered panels was added.' Thus, Commerce's explanation has no basis in the record and the Petition's references to veneer core platforms are of little, if any, value.") (internal citations omitted)).

Commerce is also not permitted to expand the scope beyond the plain language. The Federal Circuit has held that Commerce may not rely on language in the petition to <u>expand</u> the scope when that language is not included in the express terms of the final scope. "{R}eview of the petition and the investigation may provide valuable guidance as to the interpretation of the final order. But they cannot substitute for language in the order itself." <u>Duferco</u>, 296 F.3d at 1097. In the scope ruling under review in <u>Duferco</u>, Commerce relied on language in the petition that included the products at issue to support its scope ruling, even though this language ultimately was not included in the final scope. Commerce concluded that it was reasonable to rely on language in the petition to include the product at issue when there was no language in the orders specifically excluding the products. See <u>id.</u>, 296 F.3d at 1095. The Federal Circuit disagreed, explaining:

> The critical question is not whether the petition covered the merchandise or whether it was at some point within the scope of the investigation. The purpose of the petition is to propose an investigation. *See generally* 19 U.S.C. §§ 1671a(b)(1), 1673a(b)(1) (2000). A purpose of the investigation is to determine what merchandise should be included in the final order. Commerce's final determination reflects the decision that has been made as to which merchandise is within the final scope of the investigation and is subject to the order.

<u>Id.</u> at 1096. Finally, the Federal Circuit noted that although "review of the petition and the investigation may provide valuable guidance as to the interpretation of the final order" these sources could not "substitute for language in the order itself." <u>Id.</u> at 1097-98. Applying the holding in <u>Duferco</u> to the instant case, Commerce may not lawfully rely on an initial definition of "wood mouldings and millwork products" from the Petition given that Petitioner ultimately removed that language from the scope. Adding that language back in would unlawfully expand

the definition "of wood mouldings and millwork products" to include essentially all woodwork products, a conclusion belied by the (k)(1) sources as discussed below.

Commerce agreed with arguments made by Hardware Resources in its comments on the draft remand that "parties rely on the scope language to understand what products are and are not covered by the scope."  Remand Results at 21.  Commerce noted, however, that when the scope language is not dispositive, it must draw on the (k)(1) sources to clarify the definition of the scope. Id.  Commerce claimed that is precisely what it did here – the language used to interpret "wood mouldings and millwork products" is from the "technical characteristics and use" section of the Petition.  Id. (citing Petition at 6) (excerpts attached to Scope Ruling Application at Ex. 7 (P.R. 2)).  Commerce concluded that this definition is consistent with the "descriptions and applications" section of the ITC Report, which describe millwork as "a general term referring to woodwork that is produced in a mill."  Id. at 21 (citing Wood Mouldings and Millwork Products from China, Inv. Nos. 701-TA-636 and 731-TA-1470 (Final), USITC Pub. 5157 at I-12 (Feb. 2021) ("ITC Report") (attached to Scope Ruling Application at Ex. 5 (P.R. 2)).

Commerce's Remand Results impermissibly cherry-picked language from the Petition and ITC Report in support of Commerce's pre-determined conclusion that Hardware Resources' edge-glued boards are in scope while simultaneously ignoring substantial record evidence that demonstrates that the term "wood mouldings and millwork products that" refers only to a specific subset of all "woodwork or building materials that are produced in a mill or otherwise undergo remanufacturing" that is inherently defined by end use.  Commerce is required to consider evidence on the record that may detract from its position and may not simply ignore such evidence. See Universal Camera, 340 U.S. at 488; see also Star Pipe I, __ CIT at __, 365 F. Supp. 3d at 1286 (issuing a remand when Commerce failed to consider the petition and "its analysis of the ITC

Report was so selective and cursory as to ignore a substantial amount of information relevant to the scope question presented in this case"). Commerce's Remand Results disregarded numerous examples from the Petition describing the product subject to the scope based on a narrow end use. For instance, the Petition states that

> in-scope {wood moulding and millwork products} share the same general physical characteristics, including shape and materials. All {wood moulding and millwork products} are constructed from similar wood inputs and <u>are intended to be used as a covering for floors, walls, doors, and other areas, primarily in residential and non-residential construction</u>.

Petition at 14 (emphasis added) (excerpts attached to Scope Ruling Application at Ex. 7 (P.R. 2)). This definition does not suggest a scope so broad as to also cover <u>any</u> woodwork produced in a mill or that "otherwise undergo{es} remanufacturing." There are numerous examples from the Petition describing the product subject to the scope based on end use. There would be no reason to have a list of narrow end uses if the scope covered "all woodwork" produced in a mill or that was further remanufactured.[2] For example, the Petition indicates the uses of in-scope wood moulding and millwork products as follows:

- "These <u>uses</u> include as crown mouldings, which are <u>used</u> where wall and ceiling meet to cover large angles, and cove mouldings, which have a concave profile and are <u>used</u> at corners, including as a ceiling cornice." Petition at 6 (excerpts attached to Scope Ruling Application at Ex. 7 (P.R. 2)) (emphasis added).

- "Wood mouldings and millwork products are also <u>used</u> as interior and exterior door frames or jambs, and as astragals, which are attached to one of a pair of doors to keep the other from swinging through the opening and also can serve a decorative purpose." <u>Id.</u> at 6-7 (emphasis added).

- "Additional <u>uses</u>, among others, include as base shoes, which are applied where base moulding meets the floor to protect the base from damage and/or to conceal uneven lines or cracks where the base meets the floor." <u>Id.</u> at 7 (emphasis added).

---

[2] Notably Commerce did not define or otherwise point to record sources that define what it means by a "mill" or "remanufacturing." Therefore, even the new definition is ambiguous.

- Petitioner also discusses blanks as "{b}oards fabricated by joining smaller pieces of wood together, which are later machined or moulded into a final profile" - a reference to post importation uses. Letter on Behalf of the Coalition of American Millwork Producers to Dep't of Commerce and Int'l Trade Comm'n re: Resp. to First Supp. Questions on General Issues Vol. I of the Petition at Ex. I-Supp-5 (Jan. 15, 2020) ("Pet'r First Supp. Questionnaire Resp.") (attached to Scope Ruling Application at Ex. 9) (P.R. 3)).

Reading Petitioner's statements, it is evident that the scope was limited to a specific category of merchandise, that is, wood for use in functional and decorative applications in residential and non-residential construction and blanks that were later machined or moulded into a final profile. Again, Petitioner elected to take language out of the scope that appears to have extended as far as <u>any</u> woodwork produced in a mill or that "otherwise undergo{es} remanufacturing." The removal of that language was a deliberate choice and – regardless of why it was removed (a fact that is not on the record) – one Commerce may not lawfully undo by selectively reading the record to ignore the abundant evidence that contradicts its new interpretation of the scope language.

In its Remand Results, Commerce largely ignored Hardware Resources' arguments that it should have considered record evidence relating to end use. <u>See</u> Draft Remand Cmts. at 14-15 (Rem. P.R. 2); Remand Results at 21-22. Commerce initially dismissed these arguments because "the language Hardware Resources cites to is the section of the petition titled 'Technical Characteristics and Uses,'" and "{t}hese end-use descriptions are examples of purposes for which the products within the scope could be used, and is a requirement. . . for all petition filings." Remand Results at 22. Notably, the language that Commerce now relies on as a definition for "wood mouldings and millwork products" is also found in the "Technical Characteristics and Uses" section of the Petition. <u>See id.</u> at 21. Commerce failed to justify why it is appropriate for it to select one sentence from the same section, while ignoring the rest of that section. Commerce seems to conclude that it is permitted to ignore evidence of end use simply because this section "is

14

required in every filed petition." Id. at 22.  Commerce's argument is illogical.  If the information requested in this section was unnecessary and could be ignored, why is it a required component of "every" filed petition?

Citing King Supply Co., LLC v. United States, Commerce noted that end-use restrictions are "disfavored," and that "when an end-use requirement applies to a scope, Commerce must use express end-use terms in the language of the scope and the exclusionary language must leave no reasonable doubt that the products were intended to be out of scope."  Remand Results at 22 (citing King Supply Co., LLC v. United States, 674 F.3d 1343, 1348 (Fed. Cir. 2012)).  As discussed in Hardware Resources' Rule 56.2 and Reply Briefs, the Court's decision in King Supply is distinguishable and does not govern this case.[3]  In King Supply, the party requesting the scope ruling acknowledged that its pipe fittings were "physically identical to those subject to the AD Order" but argued there was an end-use restriction written into the scope and thus its products were not properly considered subject merchandise.  King Supply, 674 F.3d at 1347 (emphasis omitted).  By contrast, Hardware Resources disputes that its edge-glued boards are physically identical to in-scope mouldings or millwork products and does not contend merely that they should be excluded solely because they are used as drawer sides.  Rather, Hardware Resources' boards are excluded from the scope because they have key physical differences.  See Pl.'s Br. in Support of R. 56.2 Mot. for J. on the Agency Record at 18 (Jan. 26, 2024) (Public Version), ECF No. 47

_____

[3] In its opinion, the Court noted that it did not reach "at this stage of the litigation" of Hardware Resources' claims relating to an inherent end-use limitation to the term "wood mouldings and millwork products."  Hardware Res., __ CIT at __, 744 F. Supp. 3d at 1366.  The issue of end use is relevant at this stage because Commerce has ignored language in the Petition relating to end use while cherry picking other language from the same section of the Petition in support of its position. Hardware Resources incorporates by reference its arguments relating to end use from its direct and response briefs.  See Hardware Res. R. 56.2 Br. at 22-23; Hardware Res. Reply Br. at 5-9.

15

("Hardware Res. R. 56.2 Br."); Pl.'s Reply Br. in Support of R. 56.2 Mot. for J. on the Agency

Record at 5-8 (June 24, 2024), ECF No. 37 ("Hardware Res. Reply Br.").  Furthermore, although

King Supply held that "end-use restrictions do not apply to AD orders unless the AD order at issue

includes clear exclusionary language," King Supply, 674 F.3d at 1349, that case did not address

the scenario at issue in this case – i.e., how to interpret an AD/CVD order that has an implicit,

inherent end use incorporated into the scope language.  The Court has recognized in multiple

instances that King Supply is applicable only where, unlike the instant case, there is no dispute as

to whether the product at issue is physically identical to in-scope merchandise.  See, e.g., Trade

Assoc. Grp. v. United States, 38 CIT 131, 146, 961 F. Supp. 2d 1306, 1318 (2014) (holding that

King Supply was not relevant because end use is the sole basis of distinction between the product

at issue and in-scope products); Stein Indus. Inc. v. United States, 43 CIT __, __, 365 F. Supp. 3d

1364, 1372 (2019) (holding that Commerce failed to address the plaintiff's arguments relating to

a product's physical characteristics and incorrectly relied on King Supply).

 Ultimately, Commerce's conclusion in its Remand Results that Hardware Resources'

products are in the scope because the "steps of {the} manufacturing process as described by

Hardware Resources in the Scope Ruling Application are demonstrative of a remanufacturing

process of scrap wood to a completed woodwork or building material: an edge-glued board,"

Remand Results at 12, skips over the key step of properly defining "wood moulding and millwork

products that," contrary to the Court's opinion.  Commerce arrives at its definition by unlawfully

expanding the scope, relying on language that was specifically removed from the scope during

Commerce's investigation while ignoring multiple examples of how end use is an inherent and

integral part of the definition for "wood moulding and millwork products."  If any piece of wood

shaped along its length or that is finger-jointed or edge-glued falls under the scope of the Orders,

as Commerce found again in the Remand Results, then the terms "wood mouldings and millwork products that" in the opening words of the first sentence of the scope language have no meaning and any wood product that is continuously shaped or finger-jointed or edge-glued would be covered, regardless of whether it was or was not a moulding or millwork product. Commerce's new definition is unreasonable because it overreaches and redefines the scope language and is unsupported by substantial evidence.

## II. COMMERCE IGNORED EVIDENCE FROM THE ITC DETERMINATION THAT UNDERCUTS ITS RESULT

In its Remand Results, Commerce continued to ignore substantial record evidence from the original ITC proceeding – a source Commerce itself includes as a primary interpretive source in 19 C.F.R. § 351.225(k)(1) – demonstrating that in-scope "wood mouldings and millwork products" are an entirely different class or kind of product than Hardware Resources' edge-glued wood boards used for drawer sides. Commerce may not selectively adopt certain language that supports its position, while ignoring the substantial evidence that contradicts it. See Star Pipe I, __ CIT at __, 365 F. Supp. 3d at 1284, 1286.

During its investigation, the ITC explained that "{wood moulding and millwork products} are lengths of wood molded into various shapes, or profiles, for use in a wide variety of functional and decorative applications in residential and non-residential construction." ITC Report at 8 (attached to Scope Ruling Application at Ex. 5 (P.R. 2)). The ITC elaborated that

> {wood moulding and millwork products} are wood-constructed products used mainly in residential and non-residential buildings and can be used for both interior and exterior applications. These products have both functional (e.g. door jamb) and decorative (e.g. mouldings) uses but are not structural (e.g. framing). Millwork is a general term referring to woodwork that is produced in a mill; the universe of millwork products is extensive and diverse. This broad category of products includes items like window and door frames, mouldings, and other dimension stock (worked wood products that are cut or shaped). Millwork products typically are installed with screws, nails, or adhesives."

17

Id. at I-12 (emphases added).

The ITC also provided definitions for wood mouldings and for millwork products, making clear that there was a specific end-use component to those definitions.  For example, the ITC defined wood moulding as

> a <u>decorative element that is characterized by its placement</u>, the material that it is made from, and its profile and level of ornamentation.  They are <u>strips of materials used to cover transitions between surfaces (e.g. at the corners between walls and ceilings or at floor intersections), around openings (e.g. windows and doors) or for decoration in the middle of walls</u> (e.g. chair rails).

Id. at I-13 (emphases added).  The industry witnesses before the ITC also drew a distinction between "the moulding and millwork business" and other types of industries such as the "cabinet manufacturers {and} furniture manufacturers."  Wood Mouldings and Millwork Products from Brazil and China, Conf. Tr. at 149 (P. Burke) (Jan. 29, 2020) (Prelim.) ("Conf. Tr.") (attached to Letter on Behalf of Hardware Resources to Dep't of Commerce re: Rebuttal Cmts. at Ex. 1 (May 31, 2023) (Public Version) (P.R. 21)).  Another industry witness also confirmed that "{t}he moulding and millwork that we sell is used for decorative purposes."  Id. at 118 (L. Ammons).  This record evidence further demonstrates that the term "wood moulding or millwork products" was inherently defined based on end use as products used mainly in residential and non-residential buildings used for both interior and exterior applications and not edge-glued boards produced into drawer sides after importation.

Commerce did not provide a meaningful rebuttal to the abundant evidence indicating that the ITC never considered products such as Hardware Resources' edge-glued boards as part of its injury investigation.  Commerce noted as an initial matter that "{t}he role of the ITC is to make a determination as to material injury or threat of material injury to the domestic industry" and that "the ITC uses Commerce's scope as the basis for the product description to define the domestic

like product for its injury analysis." Remand Results at 24. To the contrary, the courts have repeatedly held that how the ITC defines the domestic like product (and the domestic industry) during an investigation carries weight in Commerce's "class or kind" scope determination because Commerce may not include products in the scope of an order if the ITC did not cover the product as part of its injury determination. See, e.g., A.L. Patterson, Inc. v. United States, 585 Fed. App'x 778, 785-86 (Fed. Cir. 2014) ("Commerce came forward with no evidence to support the conclusion that coil rod is in the domestic industry investigated by the Commission. In sum, there is insufficient evidence to conclude that Patterson's coil rod, a distinctly different product than steel threaded rod, was part of the Commission's material injury investigation. As such, Commerce may not impose antidumping duties on coil rod under § 1673."); Trendium, __ CIT at __, 399 F. Supp. 3d at 1345 ("Commerce's decision was also not in accordance with law because Trendium's products were never considered as part of the ITC's injury analysis despite the requirement of an injury determination prior to the imposition of antidumping duties."). In the instant case, Commerce has not cited to any record evidence that the ITC considered products like Hardware Resources' edge-glued boards within the universe of products it investigated as "wood mouldings and millwork products." Furthermore, the two statements that Commerce points to in support of its position may not be read in isolation and without considering the ITC Report as a whole.

Commerce cursorily summarized statements in the ITC Report that support Hardware Resources' position but then simply dismissed these multiple examples to focus on language in the ITC Report that the exemplars provided by the ITC "'provide{d} a broad outline of the possible products classified as a millwork and mouldings,' noting that it is not 'feasible to discuss them all.'" Remand Results at 24 (citing ITC Report at I-12 n. 20 (P.R. 2)). Commerce also referenced a sentence in the ITC Report that "{m}illwork is a general term referring to woodwork that is

produced in a mill; the universe of millwork products is extensive and diverse." Remand Results at 25. These sentences must be read in context. While it is true that the examples of in-scope products provided in the ITC Report are not exhaustive, they do constitute record evidence of what types of products are encompassed by the terms "wood mouldings and millwork products" and were considered as being part of the industry subject to the ITC's injury analysis.

Finally, Commerce found that Hardware Resources' description of its product as boards that will be further processed into cabinet parts is consistent with the physical description provided in the ITC Report that wood mouldings and millwork products are "wood-constructed products used mainly in residential and non-residential buildings . . . for both interior and exterior applications." Id. at 26. Commerce's conclusion that Hardware Resources' edge-glued boards meet the product description in the ITC Report lacks merit. None of the definitions or exemplars of "wood mouldings and millwork products" in the Petition, Petition Supplements or the ITC Report include raw materials for making cabinet parts after importation. In its Scope Ruling Application, Hardware Resources explained:

> Hardware Resources' edge-glued boards <u>are raw materials that are later produced into cabinet parts following processing after import into the United States</u>. They are not used to produce downstream mouldings or millwork products. Applying these sources from the original investigation, it is clear that Hardware Resources' edge-glued boards are not mouldings and millwork products subject to the orders because at the time of importation <u>they are not for functional and decorative applications in residential and non-residential construction, but rather, they are used for an entirely distinct purpose as raw materials requiring further processing into cabinet parts or other applications</u>. The edge-glued boards are also not standard wood mouldings because they are not worked to a pattern having the same profile in cross section throughout their length. <u>The edge-glued boards are not strips of materials that are used to cover transitions between surfaces, around openings, or for decoration in the middle of walls. Instead, at the time of import, the edge-glued boards are wood boards that will be used by Hardware Resources to manufacture cabinet parts in the United States</u>.
>
> …

20

{T}he edge-glued boards are not edge-glued moulding or millwork blanks.  The petitioner describes "finger jointed or edge glued moulding or millwork blanks" as "boards fabricated by joining smaller pieces of wood together, which are later machined or moulded into a final profile." . . .  <u>Hardware Resources' boards are not later machined or moulded into a final profile</u>.

Scope Ruling Application at 14, 16 (P.R. 1).  As these excerpts make clear, Hardware Resources' edge-glued boards are raw materials for cabinet parts and not for the types of applications described by the ITC.  <u>See</u> ITC Report at I-12 (emphasis added) (attached to Scope Ruling Application at Ex. 5 (P.R. 2)).

For these reasons, the Court should find Commerce's conclusion that the ITC Report supports its new, expanded definition of "wood mouldings and millwork products" is unsupported by substantial evidence.

### III.    COMMERCE IGNORED THE LOVEDAY SCOPE RULING IN EXPANDING THE SCOPE

Commerce's new interpretation of the scope language is wholly at odds with its own determination in the Loveday Scope Ruling.  The Court recognized that the Loveday Scope Ruling addressed the threshold issue of whether a product was or was not a millwork product in assessing whether it was covered by the scope.  <u>See</u> <u>Hardware Res.</u>, __ CIT at __, 744 F. Supp. 3d at 1365-66 ("in Commerce's scope determination regarding Loveday Lumber's lengthwise sawn ('LWS') scarf-jointed wood reveal strips and wood squares, Commerce draws a clear conclusion with regard to this question: 'Loveday's LWS wood products . . . are also not <u>millwork products</u> made of wood that are continuously shape, finger-jointed, or edge-glued'") (emphasis in original).   In the Loveday Scope Ruling, Commerce found a product to be out of scope where it was "<u>not intended to be later manufactured</u> into a moulding or piece of millwork." Mem. from Max Goldman to James Maeder re: Req. by Loveday Lumber Company, Inc. at 9 (May 16, 2022) (Public Document) ("Loveday Scope Ruling") (attached to Scope Ruling Application at Ex. 10) (emphasis added) (P.R. 3)).  The Loveday Scope Ruling unequivocally affirms that the intended

use of the product governs whether that product is subject to the wood mouldings and millwork products Orders.  Namely, in the Loveday Scope Ruling, Commerce noted as "an initial matter" that "Loveday Lumber's LWS wood products are not 'moulding or millwork blanks'" because "record evidence demonstrates that Loveday Lumber's LWS wood products <u>are not intended to be later manufactured into a moulding or piece of millwork</u>." <u>Id.</u> (emphasis added).

Commerce's rationale for ignoring the Loveday Scope Ruling in its Remand Results is unpersuasive.  Commerce concluded first that the Loveday Scope Ruling is not applicable because "we have determined that Hardware Resources' edge-glued boards fall within scope because they are wood moulding and millwork products {that} are made of wood, finger-jointed, edge-glued and continuously shaped."  Remand Results at 27.  The Court should reject this conclusory statement.  As noted, in the Loveday Scope Ruling, Commerce started with the threshold question of whether Loveday Lumber's wood products were "moulding or millwork blanks" and determined that they were not based on their end use.   Loveday Scope Ruling at 9 (attached to Scope Ruling Application at Ex. 10) (P.R. 3)).  In dismissing its own finding in the Loveday Scope Ruling in the Remand Results filed here, Commerce cited additional evidence on the record in that earlier proceeding such as a glossary definition that defined "'moulding or millwork blanks'" as "{b}oards fabricated by joining smaller pieces of wood together, which are later machined into profile.'"  Remand Results at 27 (citing Loveday Scope Ruling at 9 (attached to Scope Ruling Application at Ex. 10) (P.R. 3)).  Commerce also noted in the Remand Results that Loveday Lumber included a dictionary definition defining a blank as "'a piece of material prepared to be made into something (such as a key) by further operation.'"  <u>Id.</u> at 28.  Commerce stated that its review of the (k)(1) factors "did not indicate that the scope phrase carries an express end-use restriction."  <u>Id.</u>  This conclusion is belied by the actual text of its decision in the Loveday Scope

Ruling, which defined millwork blanks based on its intended use. See Loveday Scope Ruling at 9 (attached to Scope Ruling Application at Ex. 10) (P.R. 3)) ("record evidence demonstrates that Loveday Lumber's LWS wood products <u>are not intended to be later manufactured into a moulding or piece of millwork</u>"). In addition, the glossary and dictionary definitions Commerce relied on in the Loveday Scope Ruling both focus on the intended use of the millwork blanks. The Loveday Scope Ruling was placed on the administrative record of this proceeding and therefore constitutes record evidence in the instant case as well.

In its Remand Results, Commerce also determined that, although Hardware Resources' edge-glued boards are formed using a straight saw, similar to the one used in the Loveday Scope Ruling, unlike Loveday Lumber's product, Hardware Resources' edge-glued board "is scored with a straight saw to create a fine detail along the length of the board." Remand Results at 28. Regardless of the finish on the board, however, Hardware Resources edge-glued boards are, like Loveday Lumber's products, "<u>not intended to be later manufactured into a moulding or piece of millwork</u>" and are manufactured using a straight saw. Loveday Scope Ruling at 9 (attached to Scope Ruling Application at Ex. 10) (P.R. 3) (emphasis added)); Scope Ruling Application at 7, 9, 18 (P.R. 1). Further, as discussed below, the "scoring" referenced by Commerce does not constitute the type of "continuous shaping" covered by the scope.

Finally, Commerce concluded that Hardware Resources' "edge-glued boards are finger-jointed, edge-glued, planed, trimmed, sanded to smooth the corners, and have a UV coating applied, resulting in them not being 'rough and unfinished.'" Remand Results at 28. As explained in Hardware Resources' briefs, however, contrary to Commerce's conclusion, Hardware Resources' edge-glued boards are distinguishable from in-scope merchandise precisely because they have a UV coating. See Hardware Resources R. 56.2 Br. at 25. Unlike other merchandise coated with

23

materials that are included within the scope, Hardware Resource's edge-glued boards cannot be

used in decorative or functional applications listed in the Petition and other sources gathered during

the investigation because they have a UV coating that prevents them from being further painted or

stained in the same way as in-scope wood mouldings and millwork.  See Hardware Resources R.

56.2 Br. at 25 (citing Scope Ruling Application at 18 (P.R. 1)).

The Loveday Scope Ruling unequivocally confirms that the intended use of the product

governs whether that product is subject to the scope of the Orders on wood moulding and millwork

products.  Commerce's failure to properly consider its own earlier determination rendered its

Remand Results further unsupported by substantial evidence and not in accordance with law.  The

Court should therefore issue another remand to Commerce, requiring it to consider the intended

use of Hardware Resources' edge-glued boards in its scope analysis just as it did in the Loveday

Scope Ruling. [4]

---

[4]  Hardware Resources also brings to the Court's attention Commerce's recent Blinds to Go
Preliminary Scope Determination assessing whether feedstock manufactured into components of
blinds and related items are subject to the scope of the Orders. See Mem. From Constance Handley
to Scot Fullerton re: Prelim. Scope Determination on Feedstock for Wooden Slats for Window
Blinds; Feedstock for Wooden Bottom Rails for Window Blinds; Feedstock for Wooden Valances
for Window Blinds Imported By Blinds to Go (US), Inc. (Apr. 11, 2025) ("Blinds to Go Prelim.
Scope Ruling") (included at Attachment I hereto).  There, as in the Loveday Scope Ruling,
Commerce itself cites to several end-use provisions to support its preliminary scope ruling that
feedstocks imported by Blinds to Go are excluded from the scope of the Orders.  For example, in
finding Blinds to Go's feedstock to be out of scope, Commerce noted that "subject {wood
mouldings and millwork products} are described as being 'intended to be used as a covering for
floors, walls, doors, and other areas….' According to BTG, feedstocks are intended to be
manufactured into components of wooden window blinds and are not intended to cover floors,
walls, doors, or other areas." Id. at 10 (emphases added). Commerce further notes, "{t}he ITC
Report describes mouldings—such as casing, crown, wall base (baseboard), and wall trim—as
items designed to be permanently affixed to a structure, serving specific roles like covering gaps,
framing openings, and protecting walls."  Id. (citations omitted).  The Blinds to Go Preliminary
Scope Ruling confirms that Commerce itself relies on an end-use based definition of "wood
mouldings and millwork products."  The Court may take into consideration administrative
authorities issued subsequent to litigation.  See, e.g., Star Pipe Prods. v. United States, __ CIT __,
__, 463 F. Supp. 3d 1366, 1377-79 (2020) ("In its December 3, 2019 Notice of Supplemental

IV.   **COMMERCE IGNORED RECORD EVIDENCE IN DETERMINING THAT HARDWARE RESOURCES' BOARDS ARE CONTINUOUSLY SHAPED**

In its Remand Results, Commerce concluded that Hardware Resources' edge-glued boards are also covered by the scope because they are continuously shaped.  Remand Results at 12-13.  Commerce acknowledged that "{t}he scope does not include a definition of 'continuously shaped wood.'"  Id. at 12.  Commerce stated that "the fact that Hardware Resources' product has a '1 mm mark ('score')'" does not "render the product out of scope."  Id.  In looking for sources to support its conclusion, Commerce noted that a description on the record from the U.S. Harmonized Tariff Schedule of the United States (HTSUS) that describes

> continuously shaped wood as wood that is "tongued, grooved, rebated, chamfered, V-jointed, beaded, molded, rounded or the like along any of its edges, ends or faces, whether or not planed, sanded, or end jointed". . . .  we find that "continuously shaped" includes "grooved" and nothing supports that the score on Hardware Resources' product differs in any material way from a groove, which, as explained above, is a type of continuous shaping.

Id. at 12-13.  Commerce's conclusion is not supported by a complete reading of the record.

Hardware Resources has repeatedly explained how the temporary mark on its edge-glued boards is different than a "groove" that is indicative of continuous shaping.  Commerce recognized that "{a}s described by Hardware Resources, the '1 mm mark ('score')' is made 'using a straight saw along the length of one side of the board,' to act 'as a guide' in further processing" but failed to address why that distinction is important.  Id. at 12.  Hardware Resources has repeatedly raised two practical reasons that explain how the mark is different than a groove: First, the mark is added as a temporary guide for where the groove is to be added after importation.  See Scope Ruling

---

Authority, Star Pipe directs the court's attention to a scope ruling . . . issued during the course of this litigation, after briefing was completed. . . .  In the redetermination it submits in response to this Opinion and Order, Commerce may take the opportunity to address the issue plaintiff raises in its Notice of Supplemental Authority."); Habas Sinai Ve Tibbi Gazlar Istihsal Endustrisi A.S. v. United States, 33 CIT 695, 720, 625 F. Supp. 2d 1339, 1360 (2009) (holding that, on remand, Commerce may consider its own administrative decisions issued subsequent to litigation).

Application at 15 (P.R. 1).  Second, Hardware Resources explained how its edge-glued boards differed from products it previously imported and described the further processing of the boards into drawer parts in the United States after importation.  See id. at 10 (Business Proprietary Version) (C.R. 1); Hardware Resources R. 56.2 Br. at 5 (Confidential Version), ECF No. 46.  These two reasons establish why the mark is different than a groove and is not otherwise continuous shaping.  Commerce entirely failed to address these arguments in its Remand Results or in response to comments filed by Hardware Resources on the Draft Remand Results.  Remand Results at 29-30.  A photograph of the mark that Commerce characterizes as a "groove" was provided by Hardware Resources:



Scope Ruling Application at Ex. 1 (P.R. 2).

In its Remand Results, Commerce noted that the phrase "continuously shaped," can be defined based on an excerpt from the HTSUS included in the Petition that defines continuously shaped wood as wood that is "tongued, grooved, rebated, chamfered V-jointed beaded, molded, rounded or the like along any of its edges, ends or faces, whether or not planed, sanded, or end jointed."  Remand Results at 29 (citing Petition at Ex. I-10 (excerpts attached to Scope Ruling

Application at Ex. 7) (P.R. 2)).  Hardware Resources' edge-glued boards are finger-jointed and edge-glued, but they are not continuously shaped because the boards do not undergo the types of processing described in the HTSUS that would render the boards as continuously shaped.  <u>See</u> Scope Ruling Application at 15 (P.R. 1).  Commerce concluded that the 1 mm mark is the same as a grove and noted that  "the petitioner described a groove as a 'cut with, or parallel to the grain." Remand Results at 13 (citing Pet'r First Supp. Questionnaire Resp. at 5 (attached to Scope Ruling Application at Ex. 9) (P.R. 2)).  Commerce reads Petitioner's statement out of context.  In context, the statement from Petitioner reads as follows:

> <u>Please provide a detailed narrative description of the term "endwork/dado."</u>
>
> Endwork/dado refers to a slot or trench cut into the surface of a piece of machinable material, usually wood, as shown in the illustration below.  When viewed in cross-section, some dados have three sides, while most dados for frames and jambs only have two sides, unless the flat jamb has a lug.  A dado is cut across, or perpendicular to, the grain and <u>is thus differentiated from a groove which is cut with, or parallel to the grain</u>.
>
> Photographs of endwork/dado examples are attached at Ex. I-Supp-6.

Pet'r First Supp. Questionnaire Resp. at 5 (attached to Scope Ruling Application at Ex. 9) (emphasis added) (P.R. 2)).  This entire discussion, therefore, involved the issue of what is meant by "dado" and does not constitute a comprehensive definition of a "groove."  In its response to Hardware Resources' Draft Remand Comments, Commerce acknowledged that its analysis of "groove" is derived from a discussion of endwork / dados, and "is not a technical specification for 'groove.'" Remand Results at 30.  Commerce stated, however, that "the description of 'groove,' whether or not under the category of a specific product, would not change depending on the context." <u>Id.</u>  Commerce's justification for relying on this description of "groove" is unpersuasive. In the discussion about what is meant by "dado," Petitioner is simply indicating the direction of a

groove, not what defines a groove.  Further, the photographs provided by Petitioner of the dado do

not have the same appearance as the mark shown in Hardware Resources' scope ruling application.

<u>Photographs from Petitioner's First Supplemental Questionnaire Response at Ex. I-Supp-6</u>
<u>(P.R. 3):</u>

Endwork & Dado's








Commerce then cites to what it claimed is "a classification ruling from . . . U.S. Customer

{sic} and Border Protection (CBP) {describing} Hardware Resources' edge-glued boards" as "'cut

with a continuous groove along their length,'" that is "'continuously shaped throughout its length.'"

Remand Results at 30 (citing Scope Ruling Application at Ex. 3a (P.R. 2)).    Commerce

mischaracterizes the record evidence. The classification ruling Commerce cites <u>did not involve</u>

<u>Hardware Resources' edge glued boards</u>.  In fact, Hardware Resources included this classification

ruling to explain why Hardware Resources' boards were not considered continuously shaped.  <u>See</u>

Scope Ruling Application at 5-6, Ex. 3a (P.R. 1-2).

Finally, Commerce concluded that even if the 1 mm mark does not constitute a groove, "Hardware Resources edge-glued boards still constitute continuously shaped wood" because the boards are planed and sanded, and these are "characteristics" that "constitute 'continuously shaping.'" Remand Results at 30-31. Commerce provides no record evidence for its finding that boards that are "planed and sanded" are necessarily also "continuously shaped." The specific language that Commerce relies on for its "definition" of "continuously shaped," states: "continuously shaped (tongued, grooved, rebated, chamfered, V-jointed, beaded, molded, rounded or the like) along any of its edges, ends or faces, whether or not planed, sanded or end-jointed." Petition at I-10 (excerpts attached to Scope Ruling Application at Ex. 7) (P.R. 2)). A plain reading of this definition shows that the terms that are in the parenthetical are the defining characteristics of being "continuously shaped" – i.e., "(tongued, grooved, rebated, chamfered, V-jointed, beaded, molded, rounded or the like)." Id. The descriptions outside the parenthetical – i.e., "along any of its edges, ends or faces, whether or not planed, sanded or end-jointed" (emphasis added) are not defining characteristics of "continuously shaped." Whether a product is "planed or sanded," therefore, does not determine whether it is "continuously shaped," contrary to Commerce's conclusion and Petitioner's argument. Cf. Remand Results at 13, 30. Because not all planed or sanded wood products are also "continuously shaped," there is no reasonable basis for Commerce's finding that Hardware Resources' edge-glued boards are "continuously shaped," simply because they are planed and sanded. Commerce's alternative determination that Hardware Resources' boards are continuously shaped because they are planed or sanded is not, therefore, supported by substantial evidence.

Commerce must consider the entire record. The only reasonable reading of all the record evidence is that the 1 mm scoring is not the same as a groove and does not constitute "continuous

shaping" and that Hardware Resources' boards are not mouldings or millwork blanks. Commerce's finding that Hardware Resources edge-glued boards are continuously shaped is unsupported by substantial evidence and not in accordance with law.

**CONCLUSION**

Commerce failed to implement this Court's remand order, unreasonably read the scope language and neglected to consider the totality of the (k)(1) evidence in reaching its conclusion that Hardware Resources' edge-glued boards are covered by the scope of the Orders because they are "wood moulding or millwork products."[5]  Commerce may not lawfully ignore the abundant record evidence that undermines its broad, new definition of "wood moulding and millwork products."

---

[5] If the Court determines that these sources are not dispositive, the Court should issue a remand requiring Commerce to consider the (k)(2) factors.  See Vandewater Int'l Inc. v. United States, 130 F.4th 981 (Fed. Cir. 2025) ("When the (k)(1) factors are not 'dispositive,' Commerce must, in issuing its scope ruling, 'further consider' the (k)(2) criteria set forth in section 351.225(k)(2)."); see also Draft Remand Cmts. at 23 n. 9 (Rem. P.R. 2).  In its Remand Results, Commerce declined to consider the (k)(2) sources on the grounds that the (k)(1) sources were dispositive. Remand Results at 10.  Hardware Resources incorporates by reference its arguments on the (k)(2) factors in its Rule 56.2 and Reply Briefs.  The Court held in its decision remanding this case to Commerce that Commerce "ignored the threshold question of whether the product at issue is a wood moulding or millwork product" and issued its remand to Commerce on that basis.  Hardware Res., __ CIT at __, 744 F. Supp. 3d at 1366.  It did not, therefore, reach the other arguments raised on appeal. Hardware Resources' has therefore limited its comments to those responding to the Department's Remand Results.

For the foregoing reasons, the Court should find the Remand Results failed to implement the Court's remand order and were unsupported by substantial evidence and not in accordance with law.

Respectfully submitted,

/s/ Jill A. Cramer
Jeffrey S. Grimson
Jill A. Cramer
Kavita Mohan
Mowry & Grimson, PLLC
5335 Wisconsin Ave., NW, Suite 810
Washington, DC 20015
202.688.3610 (ph)
jac@mowrygrimson.com
*Counsel to Hardware Resources, Inc.*

## CERTIFICATE OF COMPLIANCE

As required by Paragraph 2 of the Standard Chambers Procedures of the Court of International Trade, I, Jill A. Cramer, hereby certify that this brief complies with the word limitations set forth in Paragraph 2(B) of the Standard Chamber Procedures. Excluding the table of contents, table of authorities, signature block and any certificates of counsel, the word count for this brief is 9,919 words, which is less than the 10,000-word limit set by the Standard Chambers Procedures.

/s/ Jill A. Cramer
Jill A. Cramer
Mowry & Grimson, PLLC
5335 Wisconsin Avenue, NW, Suite 810
Washington, DC 20015
202-688-3610 (ph)
202-595-8968 (fax)
*Counsel to Hardware Resources, Inc.*

Dated: April 30, 2025

# ATTACHMENT I

UNITED STATES DEPARTMENT OF COMMERCE
International Trade Administration
Washington, D.C. 20230

A-570-117, C-570-118
Scope Inquiry: Blinds To Go
**Public Document**
E&C/OPN: TT

April 11, 2025

| | |
|---|---|
| **MEMORANDUM TO:** | Scot Fullerton<br>Acting Deputy Assistant Secretary<br> for Antidumping and Countervailing Duty Operations |
| **FROM:** | Constance Handley<br>Acting Executive Director<br>Office of Policy and Negotiations |
| **SUBJECT:** | Antidumping and Countervailing Duty Order on Wood Mouldings and Millwork Products from the People's Republic of China  - Preliminary Scope Determination on Feedstock for Wooden Slats for Window Blinds; Feedstock for Wooden Bottom Rails for Window Blinds; Feedstock for Wooden Valances for Window Blinds Imported By Blinds to Go (US), Inc. |

## I.    SUMMARY

In accordance with 19 CFR 351.225(d) and 351.225(k)(1), we preliminarily recommend that the Department of Commerce (Commerce) determine that the feedstock for wooden slats for window blinds; feedstock for wooden bottom rails for window blinds; and feedstock for wooden valances for window blinds (collectively, feedstocks) imported by Blinds to Go (US), Inc. ("BTG"), which is the subject of BTG's scope ruling request, is outside the scope of the antidumping (AD) and countervailing duty (CVD) orders on Wood Mouldings and Millwork Products (millwork products) from the People's Republic of China (China).[1]

## II.    BACKGROUND

On February 16, 2021, Commerce published the *Orders* in the *Federal Register*.  On November 15, 2024, BTG, a U.S. importer of inquiry merchandise, submitted a scope ruling application (Scope Ruling Application) regarding feedstocks pursuant to 19 CFR 351.225 and requested that Commerce find that BTG's feedstocks, made in China, are not subject to  the scope of the *Orders*.[2]  On December 16, 2024, we accepted BTG's Scope Ruling Application, initiated the scope inquiry, and invited interested parties to submit comments and factual information to rebut,

---

[1] *See Wood Mouldings and Millwork Products from the People's Republic of China: Amended Final Antidumping Duty Determination and Antidumping Duty Order*, 86 FR 9486 (February 16, 2021) (*AD Order*); and *Wood Mouldings and Millwork Products from the People's Republic of China:  Countervailing Duty Order*, 86 FR 9484 (February 16, 2021) (*CVD Order*) (collectively, *Orders*).

[2] *See* BTG's Letter, "Scope Ruling Application," dated November 15, 2024 (Scope Ruling Application).



clarify, or correct factual information contained in the SRA.[3]  On January 15, 2025, we received comments from the Coalition of American Millwork Producers (CAMP) arguing that BTG's scope request falls within the scope of the *Orders* .[4]  On January 28, 2025, we received rebuttal comments from BTG arguing that feedstocks were outside of the scope of the *Orders*.[5]

## III.    DESCRIPTION OF THE PRODUCTS SUBJECT TO THE INQUIRY[6]

(1) Feedstock for wooden slats for window blinds, hereinafter "slat stock;"

(2) Feedstock wooden bottom rails for window blinds, hereinafter "bottom rail stock;" and

(3) Feedstock for wooden valences for window blinds, hereinafter "valance stock."

Slat stock is made from basswood (Tilia americana).  At the time of importation, slat stock is cut to specific widths (nominally 1 inch or 2 inches, with actual widths being within tolerances) and specific thicknesses (nominally 0.110 inches, with actual widths being within tolerances).  The slat stock is shipped in lengths between 20 inches and 96 inches.  The slat stock also has stated bow and camber allowances to ensure the shape of the stock can be used to make wood slats. Finally, the slat stock is covered with a UV protected finish on all surfaces except the ends. This finish can be in a variety of colors but always provides UV protection.  The slat stock is not finger-jointed.

Bottom rail stock is made from basswood (Tilia americana). At the time of importation, bottom rail stock is cut to specific widths (nominally 1 inch or 2 inches, with actual widths being within tolerances) and specific thicknesses (nominally 0.590 inches, with actual widths being within tolerances). The bottom rail stock is shipped in lengths between 20 inches and 96 inches. The bottom rail stock also has stated bow and camber allowances to ensure the shape of the stock can be used to make bottom rails. Finally, the bottom rail stock is covered with a UV protected finish on all surfaces except the ends. This finish can be in a variety of colors but always provides UV protection.  The bottom rail stock is not finger-jointed.

Valance stock is made from basswood (Tilia americana).  At the time of importation, valance stock is cut to specific widths (nominally 2.5 inches or 3.25 inches, with actual widths being within tolerances) and specific thicknesses (nominally 0.315 inches or 0.590 inches, with actual thicknesses being within tolerances).  The valance stock is also sent through a cutter that creates a decorative element on the face of the valance stock.  The valance stock is shipped in various lengths between 20 inches and 96 inches.  The valance stock also has stated bow and camber allowances to ensure the shape of the stock can be used to make valances.  Finally, the valance

---

[3] *See* Memorandum, "Initiation of Scope Inquiry," dated December 16, 2024.
[4] *See* CAMP's Letter, "Comments on Blinds to Go's Scope Ruling Application," January 15, 2025 (CAMP's Comments).
[5] *See* BTG's Letter at 2-3, "Comments on Blinds to Go's Scope Ruling Application," January 28, 2025 (BTG's Rebuttal Comments).
[6] See Scope Ruling Application at 3-4.

stock is covered with a UV protected finish on all surfaces except the ends. This finish can be in a variety of colors but always provides UV protection. The valance stock is not finger-jointed.

As a matter of clarity and brevity these three products are sometimes referred to as "feedstock" in this request. In all cases "feedstock" refers to each of the products named above.

Wooden blinds are, by their nature, convenient, lower cost window coverings. Because of their convenience and lower-cost, blinds are periodically replaced by homeowners, renters or other occupants of spaces with blinds. Wooden blinds are also easily installed and removed and are not considered to be a fixture when advertising or conveying property. With respect to the slat stock, bottom rail stock, and valence stock it is necessary that the stock be of minimal thickness and made from a relatively light-weight material. This is true because slat stock and bottom rail stock will only be used in the production of finished blinds and blinds will not function if the slats are too thick or heavy. The valances produced from valance stock must be of an appropriate size and weight to be attached to finished blinds without requiring reinforced framing for the blinds. Therefore, the critical design features of these stocks all relate to the proper operation of window blinds.

## IV.    SCOPE OF THE *ORDERS*[7]

The merchandise subject to the *Orders* consists of wood mouldings and millwork products that are made of wood (regardless of wood species), bamboo, laminated veneer lumber (LVL), or of wood and composite materials (where the composite materials make up less than 50 percent of the total merchandise), and which are continuously shaped wood or finger-jointed or edge-glued moulding or millwork blanks (whether or not resawn). The merchandise subject to the Orders can be continuously shaped along any of its edges, ends, or faces.

The percentage of composite materials contained in a wood moulding or millwork product is measured by length, except when the composite material is a coating or cladding. Wood mouldings and millwork products that are coated or clad, even along their entire length, with a composite material, but that are otherwise comprised of wood, LVL, or wood and composite materials (where the non-coating composite materials make up 50 percent or less of the total merchandise) are covered by the scope.

The merchandise subject to the *Orders* consists of wood, LVL, bamboo, or a combination of wood and composite materials that is continuously shaped throughout its length (with the exception of any endwork/dados), profiled wood having a repetitive design in relief, similar milled wood architectural accessories, such as rosettes and plinth blocks, and finger-jointed or edge-glued moulding or millwork blanks (whether or not resawn). The scope includes continuously shaped wood in the forms of dowels, building components such as interior paneling and jamb parts, and door components such as rails, stiles, interior and exterior door frames or jambs (including split, flat, stop applied, single- or double-rabbeted), frame or jamb kits, and packaged door frame trim or casing sets, whether or not the door components are imported as part of a door kit or set. The covered products may be solid wood, laminated, finger-jointed, edge-glued, face-glued, or

---

[7] *See Wood Mouldings and Millwork Products from the People's Republic of China: Amended Final Antidumping Duty Determination and Antidumping Duty Order*, 86 FR 9486 (February 16, 2021).

3

otherwise joined in the production or remanufacturing process and are covered by the scope whether imported raw, coated (e.g., gesso, polymer, or plastic), primed, painted, stained, wrapped (paper or vinyl overlay), any combination of the aforementioned surface coatings, treated, or which incorporate rot-resistant elements (whether wood or composite).

The covered products are covered by the scope whether or not any surface coating(s) or covers obscure the grain, textures, or markings of the wood, whether or not they are ready for use or require final machining (e.g., endwork/dado, hinge/strike machining, weatherstrip or application thereof, mitre) or packaging.

All wood mouldings and millwork products are included within the scope even if they are trimmed; cut-to-size; notched; punched; drilled; or have undergone other forms of minor processing.

Subject merchandise also includes wood mouldings and millwork products that have been further processed in a third country, including but not limited to trimming, cutting, notching, punching, drilling, coating, or any other processing that would not otherwise remove the merchandise from the scope of the *Orders* if performed in the country of manufacture of the in-scope product. Excluded from the scope of the *Orders* are countertop/butcherblocks imported as a full countertop/butcherblock panel, exterior fencing, exterior decking and exterior siding products (including solid wood siding, non-wood siding (e.g., composite or cement), and shingles) that are not LVL or finger jointed; finished and unfinished doors; flooring; parts of stair steps (including newel posts, balusters, easing, gooseneck, risers, treads, rail fittings and stair stringers); picture frame components three feet and under in individual lengths; and lumber whether solid, finger jointed, or edge-glued. To be excluded from the scope, finger-jointed or edge-glued lumber must have a nominal thickness of 1.5 inches or greater and a certification stamp from an American Lumber Standard Committee-certified grading agency. The exclusion for lumber whether solid, finger-jointed, or edge-glued does not apply to screen "surfaced on 4 sides" (S4S) and/or "surface 1 side, 2 edges" (SlS2E) stock (also called boards) that are finger-jointed and/or edge-glued, or to finger-jointed and/or edge-glued moulding or millwork blanks (whether or not resawn). Accordingly, S4S and S1S2E stock/boards that are not finger-jointed or edge glued are excluded from the scope of the *Orders*.

Also excluded from the *AD Order* are all products covered by the scopes of the antidumping duty orders on: (1) hardwood plywood from the People's Republic of China,[8] (2) multilayered wood flooring from the People's Republic of China,[9] (3) wooden cabinets and vanities from the

---

[8] *See Certain Hardwood Plywood Products from the People's Republic of China: Amended Final Determination of Sales at Less Than Fair Value, and Antidumping Duty Order*, 83 FR 504 (January 4, 2018).
[9] *See Multilayered Wood Flooring from the People's Republic of China: Amended Final Determination of Sales at Less Than Fair Value and Antidumping Duty Order*, 76 FR 76690 (December 8, 2011).

4

People's Republic of China,[10] and (4) wooden bedroom furniture from the People's Republic of China.[11]

Also excluded from the *CVD Order* are all products covered by the scopes of the countervailing duty orders on:  (1) hardwood plywood from the People's Republic of China,[12] (2) multilayered wood flooring from the People's Republic of China,[13] and (3) wooden cabinets and vanities from the People's Republic of China.[14]Imports of wood mouldings and millwork products are primarily entered under the following Harmonized Tariff Schedule of the United States (HTSUS) numbers:  4409.10.0500, 4409.10.1020, 4409.10.1040, 4409.10.1060, 4409.10.1080, 4409.10.4010, 4409.10.4090, 4409.10.4500, 4409.10.5000, 4409.10.9020, 4409.10.9040, 4409.22.0590, 4409.22.1000, 4409.22.4000, 4409.22.5000, 4409.22.5020, 4409.22.5040, 4409.22.5060, 4409.22.5090, 4409.22.9000, 4409.22.9020, 4409.22.9030, 4409.22.9045, 4409.22.9060, 4409.22.9090, 4409.29.0665, 4409.29.1100, 4409.29.4100, 4409.29.5100, 4409.29.9100, 4412.99.5115, 4412.99.9500, 4418.91.9095, and 4421.91.9780.  Imports of wood mouldings and millwork products may also enter under HTSUS numbers:  4409.10.6000, 4409.10.6500, 4409.22.6000, 4409.22.6500, 4409.29.6100, 4409.29.6600, 4412.41.0000, 4412.42.0000, 4412.49.0000, 4412.91.5115, 4412.92.5215, 4412.99.9700, 4418.20.4000, 4418.20.8030, 4418.20.8060, 4418.91.9195, 4418.99.9095, 4418.99.9195, 4421.91.9880, 4421.99.9780, and 4421.99.9880.

While the HTSUS subheadings are provided for convenience and customs purposes, the written description of the scope of the *Orders* is dispositive.

## V.    LEGAL FRAMEWORK

Pursuant to Commerce's regulations, Commerce may base its determination regarding whether a product is covered by the scope of an order, on the scope language alone, including the descriptions of merchandise expressly excluded from the scope, where such language is dispositive.[15]  Thus, when a scope ruling application is filed with Commerce, as a starting point, Commerce examines the language of the scope of the order and the description of the product contained in the application.[16]

Commerce may also take into account primary interpretive sources in making a scope ruling, including:  the descriptions of the merchandise in the petition and the initial investigation; previous or concurrent determinations by Commerce, including prior scope rulings, memoranda, or clarifications pertaining to both the order at issue, as well as other orders with same or similar

---

[10] *See Wooden Cabinets and Vanities and Components Thereof from the People's Republic of China: Antidumping Duty Order*, 85 FR 22126 (April 21, 2020).
[11] *See Notice of Amended Final Determination of Sales at Less Than Fair Value and Antidumping Duty Order: Wooden Bedroom Furniture from the People's Republic of China*, 70 FR 329 (January 4, 2005).
[12] *See Certain Hardwood Plywood Products from the People's Republic of China:  Countervailing Duty Order*, 83 FR 513 (January 4, 2018).
[13] *See Multilayered Wood Flooring from the People's Republic of China:  Countervailing Duty Order*, 76 FR 76693 (December 8, 2011).
[14] *See Wooden Cabinets and Vanities and Components Thereof from the People's Republic of China: Countervailing Duty Order*, 85 FR 22134 (April 21, 2020).
[15] *See* 19 CFR 351.225(k)(1).
[16] *See Walgreen Co. v. United States*, 620 F.3d 1350, 1357 (Fed. Cir. 2010) (*Walgreen*).

5

language as that of the order at issue; and determinations of the U.S. International Trade Commission (ITC) pertaining to the order at issue, including reports issued pursuant to the {ITC's} initial investigation.[17]   Additionally, Commerce may consider secondary interpretive sources in making a scope ruling, such as any other determinations of Commerce or the ITC, U.S. Customs and Border Protection (CBP) rulings or determinations, industry usage, dictionaries, and any other relevant record evidence.[18]   However, to the extent that these secondary interpretive sources conflict with primary interpretive sources under 19 CFR 351.225(k)(1)(i), the primary interpretive sources will normally govern.[19]   If Commerce determines that the primary and/or secondary sources are determinative, it will issue a final scope ruling as to whether the merchandise is subject to the scope of the order at issue.[20]

Where Commerce determines that the sources described in 19 CFR 351.225(k)(1) are not dispositive, it will consider five additional factors provided in 19 CFR 351.225(k)(2)(i).  These factors are:  (A) the physical characteristics of the product; (B) the expectations of the ultimate users; (C) the ultimate use of the product; (D) the channels of trade in which the product is sold; and (E) the manner in which the product is advertised and displayed.  In the event of a conflict between these factors, the physical characteristics of the product will normally be allotted greater weight than other factors in 19 CFR 351.225(k)(2)(i).[21]

The determination as to which analytical framework is most appropriate in a given scope inquiry is made on a case-by-case basis, and may be applied on a producer-specific, exporter-specific, or importer-specific basis, or some combination thereof, or to all products from the same country with the same relevant physical characteristics as the product at issue, on a country-wide basis, regardless of the producer, exporter, or importer of the products.[22]

## VI.    COMMENTS

*BTG's Scope Ruling Application*
- Commerce should find feedstocks for wooden blinds to be outside the scope of the *Orders* because the language of the petition covers construction-oriented products such as architectural accessories or building components that are permanently affixed within a structure.[23]   The feedstock components are sold exclusively to window blind manufacturers rather than construction channels.[24]
- During the investigation, CAMP initially grouped "window blinds" with "shutters" when describing components, but Commerce's analysis and subsequent findings clarify that only shutter components were discussed and found in scope.[25]   Consistent with Commerce's scope determinations, plantation shutters, which are heavy, permanently affixed architectural

---

[17] *See* 19 CFR 351.225(k)(1)(i).
[18] *See* 19 CFR 351.225(k)(1)(ii).
[19] *Id.*
[20] *See* 19 CFR 351.225(h); *see also* 19 CFR 351.225(k)(2)(i).
[21] *See* 19 CFR 351.225(k)(2)(ii).
[22] *See* 19 CFR 351.225(m)(1).
[23] *See* Scope Ruling Application at 13-14.
[24] *Id.* at 14.
[25] *Id.* at 15.

merchandise, remain covered, whereas blinds' lightweight, easily removable feedstock lacks those permanent, architectural characteristics and is therefore excluded.[26]

- Analysis of the "(k)(2)" factors confirms that the feedstock components are not covered by the scope of the *Orders*.[27]  Specifically, the feedstock components do not share the same physical characteristics, expectations of the ultimate users, the ultimate use of the product, channels of trade, or the manner in which the products are advertised and displayed as in scope wood mouldings.[28]

*CAMP'S Comments*

- CAMP noted that there is no dimensional limitation excluding feedstock components, and these items readily fit the scope's overarching definition of continuously shaped or profiled wood products. [29]
- Blind feedstock shares comparable dimensions (thin wood strips), undergoes a parallel shaping and coating process, and ultimately serves a window-covering function.[30]  Because blinds and shutters both consist of continuously shaped wood used in window treatments there is no meaningful distinction between the two.[31]  Commerce previously confirmed that plantation shutters and their components fall within the scope.[32]
- The *Orders* do not specify that covered items must be permanently affixed to a building.[33]  Thus, Blinds to Go's emphasis on blinds being more easily removed than shutters is irrelevant for scope coverage.[34]

*BTG's Rebuttal Comments*

- According to *Walgreen*, Commerce must interpret the plain meaning of the term "wood mouldings and millwork products," not just rely on a product's superficial similarity or shape.[35]
- The U.S. Court of International Trade (CIT) recently confirmed in *Hardware Resources*, that Commerce must first determine whether an item is actually "wood moulding or millwork" before examining other scope details.[36]  In that case, Commerce's initial scope inclusion rested on physical similarity alone, but the CIT remanded the decision because Commerce had not asked whether the items were truly "moulding or millwork" under the scope's plain text.[37]
- CAMP emphasizes "physical description" (continuously shaped wood, coated surfaces) without addressing whether feedstock meets the functional definition of wood mouldings or millwork.[38]

---

[26] *Id.*
[27] *Id.* at 16-17.
[28] *Id.*
[29] *See* CAMP's Comments at 4.
[30] *Id.* at 4-5.
[31] *Id.* at 5.
[32] *Id.*
[33] *Id.* at 7.
[34] *Id.* at 6.
[35] *See* BTG's Rebuttal Comments at 2-3.
[36] *Id.* at 3 (citing *Hardware Resources v. United States,* Slip op. 24-140 (CIT December 16, 2024) (*Hardware*)).
[37] *Id.*
[38] *Id.*

7

- In January 2025, the Friedland Scope Ruling excluded wooden window shade slats from these same *Orders*.[39]  The feedstock components are the same class of products as they were also not used in construction, unsuited for architectural/structural applications and used for window covering.[40]
  - In the Loveday Ruling, Commerce found that "{lengthwise sawn} (LWS) wood products, like their feedstock components, are not 'moulding or millwork blanks'…LWS wood products are not intended to be later manufactured into a moulding piece or millwork."[41]

## VII.    PREVIOUS SCOPE RULINGS

Ralph Friedland & Brother, Inc. Scope Ruling
- Ralph Friedland & Brother, Inc. (RFB) submitted a scope ruling request to determine if its wooden window shade slats fall within the scope of the *Orders*.[42]
- RFB argued that the slats are not meant for construction applications and are essentially scrap material, used solely as a component of window shade assemblies.[43]  The slats were not intended to be covered by the scope according to the CAMP's description in the original petition for the *Orders*.[44]
- Commerce determined that RFB's wooden window shade slats are indeed outside the scope of the *Orders*.[45]

Loveday Lumber Company, Inc. Scope Ruling
- Loveday Lumber Company, Inc. (Loveday Lumber) submitted a scope ruling request to determine if its LWS scarf-jointed wood reveal strips (triangular or trapezoidal) and LWS wood squares fall within the scope of the *Orders*.[46]
- Loveday Lumber argued that these rough-sawn items are not continuously shaped, finger-jointed, or edge-glued mouldings and therefore do not meet the definition of millwork products.[47]  It pointed out that the products are saw-cut without additional planing or shaping and serve only as temporary components in concrete form systems, after which they are discarded.[48]  It also noted that similar products had been excluded in the underlying investigations.[49]

---

[39] *Id*. at 4-5 (*see* Attachment I of this memorandum containing Memorandum, "Antidumping and Countervailing Duty Orders on Wood Mouldings and Millwork Products from the People's Republic of China on Wooden Window Shade Slats," dated January 14, 2025 (RFB Scope Ruling)).
[40] *Id*. at 4.
[41] *Id*. at 5 (*see* Attachment II of this memorandum containing Memorandum, "Antidumping and Countervailing Duty Orders on Wood Mouldings and Millwork Products from the People's Republic of China: Request by Loveday Lumber Company," Inc., dated May 16, 2022 (Loveday Lumber Scope Ruling), at 9).
[42] *See* Attachment I of this memorandum (containing RFB Scope Ruling at 1).
[43] *Id*. (containing RFB Scope Ruling at 6).
[44] *Id*. (containing RFB Scope Ruling at 7).
[45] *Id*. (containing RFB Scope Ruling at 8).
[46] *See* Attachment II of this memorandum (containing Loveday Lumber Scope Ruling at 9).
[47] *Id*. (containing Loveday Lumber Scope Ruling at 5).
[48] *Id*. (containing Loveday Lumber Scope Ruling at 5).
[49] *Id*. (containing Loveday Lumber Scope Ruling at 5).

- Commerce determined that Loveday Lumber's LWS scarf-jointed wood reveal strips and squares are outside the scope of the *Orders*.[50]

## VIII.  ANALYSIS

In this scope inquiry, we preliminarily find that the sources provided in 19 CFR 351.225(k)(1), *i.e.*, the plain language of the scope, along with the product descriptions provided in the Scope Ruling Application, previous scope ruling decisions, the ITC determination and parties comments are dispositive in determining whether BTG's feedstock for wooden slats for window blinds; feedstock for wooden bottom rails for window blinds; and feedstock for wooden valances for window blinds are within the scope of the *Orders*.  Therefore, Commerce did not analyze the additional factors provided in 19 CFR 351.225(k)(2).

The language of the scope states that:

> {t}he merchandise subject to the *Orders* consists of wood mouldings and millwork products that are made of wood (regardless of wood species), bamboo, laminated veneer lumber (LVL), or of wood and composite materials (where the composite materials make up less than 50 percent of the total merchandise), and which are continuously shaped wood or finger-jointed or edge-glued moulding or millwork blanks (whether or not resawn).  The merchandise subject to the *Orders* can be continuously shaped along any of its edges, ends, or faces.[51]

The scope of the *Orders* specifically provides for:

> {W}ood, LVL, bamboo, or a combination of wood and composite materials that is continuously shaped throughout its length (with the exception of any endwork/dados), profiled wood having a repetitive design in relief, similar milled wood <u>architectural accessories,</u> such as rosettes and plinth blocks, and finger-jointed or edge-glued moulding or millwork blanks (whether or not resawn). The scope includes continuously shaped wood in the forms of dowels, <u>building components</u> such as interior paneling and jamb parts, and door components such as rails, stiles, interior and exterior door frames or jambs (including split, flat, stop applied, single- or double-rabbeted), frame or jamb kits, and packaged door frame trim or casing sets, whether or not the door components are imported as part of a door kit or set, *emphasis added*.[52]

The examples of "architectural accessories" and "building components" referenced in the scope language suggests products that are permanently affixed[53] to or in buildings. BTG argues that the

---

[50] *Id.* (*see* Attachment II of this memorandum containing Loveday Lumber Scope Ruling at 11).
[51] *See Orders*.
[52] *Id.* (emphasis added).
[53] BTG uses "permanent" here in the sense that articles require substantial effort to remove and would be considered fixtures that would be expected to convey with a property. This is in distinction to the few screws necessary for wooden blinds to be removed. Naturally no built environment is truly "permanent."

9

feedstocks are designed very thin and lightweight and are not suitable for any use or sold in any market other than the production of wooden window blinds.[54]

Attachment 1 contains a photograph of the feedstocks imported by BTG.[55] As BTG noted, each slat is made from made from a relatively light-weight material basswood (Tilia americana), which is cut with minimal thickness because slat stock and bottom rail stock will only be used in the production of finished blinds, and the blinds will not function if the slats are too thick or heavy.[56] Attachment 3 reflects the production process of the feedstocks.[57] As is evident in Attachment 3, all three feedstocks are simple and physically insubstantial, which allow wooden window blinds to be sufficiently lightweight to be installed on simple brackets by a non-professional as well as open, close, and be able to block or admit light, as desired.[58] Attachments 1 and 3 demonstrate that the BTG products subject to this scope inquiry are used for the sole purpose of window blind production.

The *Orders* state that subject merchandise includes articles used in construction, often with a decorative and/or structural use such as "crown mouldings; cove mouldings; door frames and jambs; astragals; base caps; corner guards; base shoes; brickmoulds; drip caps; and battens."[59] According to BTG, the feedstocks are not substantial articles of wood and cannot serve supportive functions to be affixed on or in buildings permanently.[60] Additionally, subject WMMP are described as being "intended to be used as a covering for floors, walls, doors, and other areas…."[61] According to BTG, feedstocks are intended to be manufactured into components of wooden window blinds and are not intended to cover floors, walls, doors, or other areas.

CAMP's 2020 comments[62] and Commerce's preliminary scope memorandum from the underlying investigations[63] indicate that while plantation shutters and their components were found to be in scope, that determination was based on their permanent, architectural nature—much like crown mouldings—rather than any resemblance to removable wooden blinds.[64] BTG emphasizes the significant physical and functional differences between shutters and blinds (e.g., shutters' heavier, thicker louvers with pivot pins versus thin, lightweight blind slats), arguing that feedstock for blinds is not inherently architectural or permanently affixed.[65] RFB noted that CAMP's statements after the petition was filed indicated that RFB's slats are not covered by the scope. Specifically, in response to questions from Commerce regarding window blind components in the

---

[54] *See* Scope Ruling Application at 11.
[55] *Id.* at Attachment 1.
[56] *Id.* at 3-4.
[57] *Id.* at Attachment 3.
[58] *Id.* at 5.
[59] *Id.* at 13 and *Orders*.
[60] *Id.* at 14.
[61] *Id.*
[62] *Id.* at Attachment 2.3 (containing CAMP's Letter, "Wood Mouldings and Millwork Products from Brazil and the People's Republic of China: Rebuttal Scope Comments," dated March 13, 2020, at 13-15).
[63] *Id.* at Attachment 2.4 (containing Memorandum, "Mouldings and Millwork Products from Brazil and the People's Republic of China: Preliminary Scope Decision Memorandum," dated August 5, 2020, at 36-37).
[64] *See* Scope Ruling Application at 14-15.
[65] *Id.* at 14-16.

10

Petition Supplement, CAMP stated that it, "…does not intend to cover window blind components such as slats, valences, bottom rails or shutter slats within the scope.[66]

Under *Walgreen*, Commerce must begin by examining the plain language of the order.[67]  The *Orders* specify that covered merchandise consists of "wood mouldings and millwork products…."[68]  CAMP and BTG agree on this threshold requirement.[69]  Accordingly, if the feedstock components do not qualify as wood mouldings or millwork products, they cannot fall within the scope.[70]  BTG underscores that some of the scope's illustrative examples—rosettes, plinth blocks, dowels—are architectural or building components, reflecting products permanently affixed to or part of a structure.[71]  BTG's feedstock lacks these characteristics; it is neither decorative trim nor a fixture to, or in, a structure or building.[72]  Instead, it serves as material for removable window blinds, differing from the in-scope exemplars.[73]

In the previous scope ruling on wooden window shade slats, we determined a similar product to be out of scope merchandise.  In the Friedland Scope Ruling, wooden window shade slats made of wood in various lengths were found to be outside the scope based on the plain language of the Orders.[74]  We preliminarily find arguments regarding the applicability of the Friedland Scope Ruling to the present feedstock components to be convincing, because the physical characteristics of BTG's feedstock (*i.e.*, thin, lightweight, non-construction-oriented strips) match those of the wooden window shade slats in the Friedland Scope Ruling , and both types of products are intended exclusively for window coverings rather than for structural or building uses.[75]  In the Friedland Scope Ruling, Commerce noted that "window shade slats are not suitable for covering floors, doors, or other areas and the petition did not intend to cover window blind components such as slats, valances, or bottom rails," thereby confirming that such products should be excluded from the scope.[76]  Because the record shows that BTG's feedstock has similarly limited uses— being exclusively destined to become slats, bottom rails, and valances for wooden window blinds—we preliminarily find the Friedland Scope Ruling directly relevant to our consideration under 19 CFR 351.225(k)(1)(i)(C).

Additionally, under the Loveday Scope Ruling which was discussed at length in *Hardware Resources*, Commerce began its analysis by finding that:

> Loveday Lumber's LWS wood products are not moulding or millwork blanks[77]…In this regard, the record evidence demonstrates that Loveday Lumber's LWS wood products are not intended to be later manufactured into a moulding piece or

---

[66] *See* RFB Scope Ruling at 7.
[67] *See Walgreen,* 620 F.3d at 1357.
[68] *See* BTG's Rebuttal Comments at 2.
[69] *Id*.
[70] *Id*.
[71] *Id.* at 3.
[72] *Id.*
[73] *Id.* at 3-6.
[74] *See* RFB Scope Ruling at 5.
[75] *See* BTG's Rebuttal Comments at 5.
[76] *Id.* at 4 and RFB Scope Ruling at 6.
[77] *See* BTG's Rebuttal Comments at 5; *see also* Attachment II of this memorandum (containing Loveday Lumber Scope Ruling at 9).

11

millwork[78]…The requested feedstock components, like the LWS wood products, are neither moulding nor millwork blanks and will not be later manufactured into moulding or millwork pieces.[79]

Accordingly, the analysis in the Loveday Scope Ruling supports finding the requested feedstock components to be outside the scope of the *Orders*.

Finally, in the ITC Report of the underlying investigation, the description of domestic like product supports our preliminary finding here.[80]  The ITC Report describes mouldings—such as casing, crown, wall base (baseboard), and wall trim[81]—as items designed to be permanently affixed to a structure, serving specific roles like covering gaps,[82] framing openings,[83] and protecting walls.[84] With respect to windows, the ITC Report notes that WMMP includes products like window frames, window casings, or mouldings around windows.[85]  In contrast, feedstocks are lightweight and easily removable, therefore exclusively used in the manufacturing of window blinds.[86]  The ITC Report does not mention window blinds and therefore supports the conclusion that blind feedstock components fall outside the scope of the orders.

## IX.    COMMENTS ON THE PRELIMINARY RULING

Pursuant to 19 CFR 351.225, interested parties may submit comments on Commerce's preliminary scope ruling.  We will not accept new factual information.  Interested parties may submit comments no later than 14 days after the issuance date of this preliminary scope ruling. Parties may submit rebuttal comments within seven days of the date of the filing of affirmative comments.  We will not accept surrebuttal comments.  Comments and rebuttals should be submitted via Enforcement and Compliance's Antidumping and Countervailing Duty Centralized Electronic Service System (ACCESS).  An electronically filed document must be received successfully in its entirety via ACCESS by 5:00 p.m. Eastern Time on the day it is due.

---

[78] *Id.*
[79] *See* BTG's Rebuttal Comments at 5.
[80] *See* Wood Mouldings and Millwork Products from China Investigation, Nos. 701-TA-636 and 731-TA-1470 (Final), dated February 2021 (ITC Report), available at:  https://www.usitc.gov/publications/701_731/pub5157.pdf.
[81] *Id.* at I-14.
[82] *Id.* at I-14-15.
[83] *Id.* at I-14.
[84] *Id.* at I-16.
[85] *Id.* at I-12-13.
[86] *See* Scope Ruling Application at 11.

## X.    RECOMMENDATION

We recommend preliminarily finding, based on 19 CFR 351.225(k)(1) and the description of the product contained in the Scope Ruling Application, that feedstocks are not within the scope of the *Orders*.

☒                        ☐
_____          _____
Agree                    Disagree

                         4/11/2025

X   *Scot T. Fullerton*
_____

Signed by: SCOT FULLERTON

Scot Fullerton
Acting Deputy Assistant Secretary
 for Antidumping and Countervailing Duty Operations

13

Attachment I

14

Barcode:4769386510-01-A-070117SCO Scope Inquiry - Filed to Scope Research

UNITED STATES DEPARTMENT OF COMMERCE
International Trade Administration
Washington, D.C. 20230

A-570-117
C-570-118
Scope Inquiry:  Window Shade Slats
**Public Document**
E&C/OP:  JS

January 14, 2025

| | |
|---|---|
| **MEMORANDUM TO:** | Scot Fullerton<br>Acting Deputy Assistant Secretary<br> for Antidumping and Countervailing Duty Operations |
| **THROUGH:** | Constance Handley<br>Director<br>Office of Policy |
| **FROM:** | Joanna Schlesinger<br>Senior Policy Analyst<br>Office of Policy |
| **SUBJECT:** | Antidumping and Countervailing Duty Orders on Wood Mouldings and Millwork Products from People's Republic of China - Scope Ruling on Wooden Window Shade Slats |

## I.    SUMMARY

In accordance with 19 CFR 351.225(h) and 351.225(k)(1), we recommend that the U.S. Department of Commerce (Commerce) determine that the wooden window shade slats imported by Ralph Friedland & Brother, Inc (RFB) described below are outside the scope of the antidumping and countervailing duty orders on wood mouldings and millwork products (WMMP) from the People's Republic of China (China).[1]

## II.    BACKGROUND

On February 16, 2021, Commerce published the *Orders* in the *Federal Register*.  On September 11, 2024, RFB, a U.S. importer of the inquiry merchandise, submitted a scope ruling request for Commerce to determine whether its wooden window shade slats, made in China are outside the scope of the *Orders*.[2]  On October 15, 2024, we accepted RFB's Scope Ruling Request, deemed the scope inquiry as initiated, and invited interested parties to submit comments and factual

---

[1] *See Wood Mouldings and Millwork Products from the People's Republic of China:  Amended Final Antidumping Duty Determination and Antidumping Duty Order*, 86 FR 9486 (February 16, 2021) (*AD Order*); and *Wood Mouldings and Millwork Products from the People's Republic of China: Countervailing Duty Order*, 86 FR 9484 (February 16, 2021) (*CVD Order*) (collectively, *Orders*).

[2] *See* RFB's Letter, "Scope Ruling Request," dated September 11, 2024 (Scope Ruling Request).



Barred 474623656110A-A7670171SC8C0  Scopep Enq Inquiry-  -Bl Windo ToShad Ma  essl ate ck

information to rebut, clarify, or correct factual information contained in the Scope Ruling Request.[3]  No parties filed comments.

## III.    DESCRIPTION OF THE PRODUCTS UNDER CONSIDERATION

The products subject to this scope ruling request are wooden window shade slats exported from China.  After importation, the slats are assembled with other components of the window shade assembly into the finished product. Each slat is cut from a kiln dried wood picket made of Paulownia Tomentosa, which is a rough piece of wood, not decorative, of poor quality, and more akin to scrap.  The chart below illustrates the various items numbers and corresponding sizes.

| Item Number | Size - LxWxT |
| --- | --- |
| WS35-3/4 | 35" x 7/8" x ¼" |
| WS44-3/4 | 44" x 7/8" x ¼" |
| WS53-3/4 | 53" x 7/8" x ¼" |
| WS71-3/4-1-1/4 | 71" x 1-¼" x ¼" |
| WS76-3/4-1-1/4 | 76" x 1-¼" x ¼" |
| WS83-3/4-1-1/4 | 83" x 1-¼" x ¼" |
| WS95-3/4-1-1/4 | 95" x 1-¼" x ¼" |
| WS107-3/4-1-1/4 | 107" x 1-¼" x ¼" |
| WS119-3/4-1-1/4 | 119" x 1-¼" x ¼" |

## IV.    SCOPE OF THE *ORDERS*

The merchandise subject to the *Orders* consists of wood mouldings and millwork products that are made of wood (regardless of wood species), bamboo, laminated veneer lumber (LVL), or of wood and composite materials (where the composite materials make up less than 50 percent of the total merchandise), and which are continuously shaped wood or finger-jointed or edge-glued moulding or millwork blanks (whether or not resawn). The merchandise subject to the *Orders* can be continuously shaped along any of its edges, ends, or faces.

The percentage of composite materials contained in a wood moulding or millwork product is measured by length, except when the composite material is a coating or cladding. Wood mouldings and millwork products that are coated or clad, even along their entire length, with a composite material, but that are otherwise comprised of wood, LVL, or wood and composite materials (where the non-coating composite materials make up 50 percent or less of the total merchandise) are covered by the scope.

The merchandise subject to the *Orders* consists of wood, LVL, bamboo, or a combination of wood and composite materials that is continuously shaped throughout its length (with the exception of any endwork/dados), profiled wood having a repetitive design in relief, similar milled wood architectural accessories, such as rosettes and plinth blocks, and finger-jointed or edge-glued moulding or millwork blanks (whether or not resawn). The scope includes continuously shaped

---

[3] *See* Memorandum, "Initiation of Scope Inquiry," dated October 15,2024.

2

Barcode:4746236810-01 A-570-117 SCO  Scope Inquiry - Window Stool Stock

wood in the forms of dowels, building components such as interior paneling and jamb parts, and door components such as rails, stiles, interior and exterior door frames or jambs (including split, flat, stop applied, single- or double-rabbeted), frame or jamb kits, and packaged door frame trim or casing sets, whether or not the door components are imported as part of a door kit or set. The covered products may be solid wood, laminated, finger-jointed, edge-glued, face-glued, or otherwise joined in the production or remanufacturing process and are covered by the scope whether imported raw, coated (e.g., gesso, polymer, or plastic), primed, painted, stained, wrapped (paper or vinyl overlay), any combination of the aforementioned surface coatings, treated, or which incorporate rot-resistant elements (whether wood or composite).

The covered products are covered by the scope whether or not any surface coating(s) or covers obscure the grain, textures, or markings of the wood, whether or not they are ready for use or require final machining (e.g., endwork/dado, hinge/strike machining, weatherstrip or application thereof, mitre) or packaging.

All wood mouldings and millwork products are included within the scope even if they are trimmed; cut-to-size; notched; punched; drilled; or have undergone other forms of minor processing.

Subject merchandise also includes wood mouldings and millwork products that have been further processed in a third country, including but not limited to trimming, cutting, notching, punching, drilling, coating, or any other processing that would not otherwise remove the merchandise from the scope of the *Orders* if performed in the country of manufacture of the in-scope product. Excluded from the scope of the *Orders* are countertop/butcherblocks imported as a full countertop/butcherblock panel, exterior fencing, exterior decking and exterior siding products (including solid wood siding, non-wood siding (e.g., composite or cement), and shingles) that are not LVL or finger jointed; finished and unfinished doors; flooring; parts of stair steps (including newel posts, balusters, easing, gooseneck, risers, treads, rail fittings and stair stringers); picture frame components three feet and under in individual lengths; and lumber whether solid, finger jointed, or edge-glued. To be excluded from the scope, finger-jointed or edge-glued lumber must have a nominal thickness of 1.5 inches or greater and a certification stamp from an American Lumber Standard Committee-certified grading agency. The exclusion for lumber whether solid, finger-jointed, or edge-glued does not apply to screen "surfaced on 4 sides" (S4S) and/or "surface 1 side, 2 edges" (SlS2E) stock (also called boards) that are finger-jointed and/or edge-glued, or to finger-jointed and/or edge-glued moulding or millwork blanks (whether or not resawn). Accordingly, S4S and S1S2E stock/boards that are not finger-jointed or edge glued are excluded from the scope of the *Orders*.

Also excluded from the *AD Order* are all products covered by the scopes of the antidumping duty orders on: (1) hardwood plywood from the People's Republic of China,[4] (2) multilayered wood flooring from the People's Republic of China,[5] (3) wooden cabinets and vanities from the

---

[4] *See Certain Hardwood Plywood Products from the People's Republic of China: Amended Final Determination of Sales at Less Than Fair Value, and Antidumping Duty Order*, 83 FR 504 (January 4, 2018).
[5] *See Multilayered Wood Flooring from the People's Republic of China: Amended Final Determination of Sales at Less Than Fair Value and Antidumping Duty Order*, 76 FR 76690 (December 8, 2011).

Filed By: Joanna Dahlgren, Filed Date: 4/11/25 3:46 AM, Submission Status: Approved

Barcode:4746238610-01 A-570-117 SCO  Scope Inquiry- - Window and Bedrock

People's Republic of China,[6] and (4) wooden bedroom furniture from the People's Republic of China.[7]

Also excluded from the *CVD Order* are all products covered by the scopes of the countervailing duty orders on:  (1) hardwood plywood from the People's Republic of China,[8] (2) multilayered wood flooring from the People's Republic of China,[9] and (3) wooden cabinets and vanities from the People's Republic of China.[10]

Imports of wood mouldings and millwork products are primarily entered under the following Harmonized Tariff Schedule of the United States (HTSUS) numbers: 4409.10.0500, 4409.10.1020, 4409.10.1040, 4409.10.1060, 4409.10.1080, 4409.10.4010, 4409.10.4090, 4409.10.4500, 4409.10.5000, 4409.10.9020, 4409.10.9040, 4409.22.0590, 4409.22.1000, 4409.22.4000, 4409.22.5000, 4409.22.5020, 4409.22.5040, 4409.22.5060, 4409.22.5090, 4409.22.9000, 4409.22.9020, 4409.22.9030, 4409.22.9045, 4409.22.9060, 4409.22.9090, 4409.29.0665, 4409.29.1100, 4409.29.4100, 4409.29.5100, 4409.29.9100, 4412.99.5115, 4412.99.9500, and 4418.91.9095, and 4421.91.9780. Imports of wood mouldings and millwork products may also enter under HTSUS numbers: 4409.10.6000, 4409.10.6500, 4409.22.6000, 4409.22.6500, 4409.29.6100, 4409.29.6600, 4412.41.0000, 4412.42.0000, 4412.49.0000, 4412.91.5115, 4412.92.5215, 4412.99.9700, 4418.20.4000, 4418.20.8030, 4418.20.8060, 4418.91.9195, 4418.99.9095, 4418.99.9195, 4421.91.9880, 4421.99.9780, and 4421.99.9880. While the HTSUS subheadings are provided for convenience and customs purposes, the written description of the scope of the *Orders* is dispositive.

## V.    LEGAL FRAMEWORK

Pursuant to Commerce's regulations, Commerce may consider the language of the scope and may make its determination on this basis alone if the language of the scope, including descriptions of merchandise expressly excluded from the scope, is dispositive.[11]  Thus, when a scope ruling application is filed with Commerce, as a starting point, Commerce examines the language of the scope of the order and the description of the product contained in the application.[12]

Commerce may also take into account primary interpretive sources in making a scope ruling, including:  the descriptions of the merchandise in the petition and the investigation; previous or concurrent determinations by Commerce, including prior scope rulings, memoranda, or clarifications pertaining to the order at issue or other orders with same or similar language; and

---

[6] *See Wooden Cabinets and Vanities and Components Thereof from the People's Republic of China:  Antidumping Duty Order*, 85 FR 22126 (April 21, 2020).
[7] *See Notice of Amended Final Determination of Sales at Less Than Fair Value and Antidumping Duty Order: Wooden Bedroom Furniture from the People's Republic of China*, 70 FR 329 (January 4, 2005).
[8] *See Certain Hardwood Plywood Products from the People's Republic of China: Countervailing Duty Order*, 83 FR 513 (January 4, 2018).
[9] *See Multilayered Wood Flooring from the People's Republic of China:  Countervailing Duty Order*, 76 FR 76693 (December 8, 2011).
[10] *See Wooden Cabinets and Vanities and Components Thereof from the People's Republic of China: Countervailing Duty Order*, 85 FR 22134 (April 21, 2020).
[11] *See* 19 CFR 351.225(k)(1).
[12] *See Walgreen Co. v. United States*, 620 F.3d 1350, 1357 (Fed. Cir. 2010).

4

Barcode:4746236510A-4787171 SC0   Scope Inquiry-  Window Shade Slat

determinations of the U.S. International Trade Commission (ITC) pertaining to the order at issue.[13]  Additionally, Commerce may consider secondary interpretive sources in making a scope ruling, such as any other determinations of Commerce or the ITC, U.S. Customs and Border Protection (CBP) rulings or determinations, industry usage, dictionaries, and any other relevant record evidence.[14]  However, to the extent that these secondary interpretive sources conflict with primary interpretive sources under 19 CFR 351.225(k)(1)(i), the primary interpretive sources will normally govern.[15]  If Commerce determines that the primary and/or secondary sources are determinative, it will issue a final scope ruling as to whether the merchandise is subject to the scope of the order at issue.[16]

Where Commerce determines that the sources described in 19 CFR 351.225(k)(1) are not dispositive, it will consider five additional factors provided in 19 CFR 351.225(k)(2)(i).  These factors are:  (A) the physical characteristics of the product; (B) the expectations of the ultimate users; (C) the ultimate use of the product; (D) the channels of trade in which the product is sold; and (E) the manner in which the product is advertised and displayed.  In the event of a conflict between these factors, the physical characteristics of the product will normally be allotted greater weight than other factors.[17]

The determination as to which analytical framework is most appropriate in a given scope inquiry is made on a case-by-case basis, and may be applied on a producer-specific, exporter-specific, or importer-specific basis, or some combination thereof, or to all products from the same country with the same relevant physical characteristics as the product at issue, on a country-wide basis, regardless of the producer, exporter, or importer of the products.[18]

## VI.    INTERESTED PARTY COMMENTS

*RFB's Comments*

- From a plain language reading of the scope, RFB's wooden window shade slats are not expressly provided for within the scope.  Also, as demonstrated by the exemplars in the scope itself, the scope is clearly meant to include WMMP that are designed and used for construction applications.[19]
- The factors listed under 19 CFR  351.225(k)(1) (the "(k)(1)" factors) further support a finding that RFB's wooden window shade slats are not within the scope of the WMMP *Orders*.[20]
- From the description of the merchandise in the petition and the petitioner's[21] response to Commerce's second supplemental questionnaire regarding the petition, it is evident that wooden window shade slats were not meant to be included within the scope of the *Orders*.

---

[13] *See* 19 CFR 351.225(k)(1)(i).
[14] *See* 19 CFR 351.225(k)(1)(ii).
[15] *Id*.
[16] *See* 19 CFR 351.225(h).
[17] *See* 19 CFR 351.225(k)(2)(ii).
[18] *See* 19 CFR 351.225(m)(1).
[19] *See* Scope Ruling Request  at 9.
[20] *Id.* at 9-10.
[21] The petitioner is the Coalition of American Mill Work Producers ("petitioner" or "Coalition").

5

The wood mouldings and millwork products in the petition are described as having "a variety of exterior and interior uses, primarily in residential and non-residential construction."[22] Additionally, the WMMP are described as being "intended to be used as a covering for floors, walls, doors, and other areas…" [23]

- RFB's wooden slats do not have any construction applications and do not and cannot serve as a covering for floors, walls, doors, or other areas. The wooden slats resemble scrap and have no commercial purpose other than serving as a weight for a window shade that facilitates the shade's pulling mechanism. The product has no additional uses or applications, and the petitioner did not intend for wooden slats of this type to be within the scope of the *Orders*.[24]

- In response to Commerce's questions about window blind components in the second supplemental questionnaire on the petition, the petitioner stated that, "{the p}etitioner does not intend to cover window blind components such as slats, valences, bottom rails or shutter slats within the scope."[25]

- RFB's Wooden Window Shade Slats do not undergo any further processing in the United States and are used "as is" when entered. Additionally, given the scrap-like nature of these products, there are no additional end-uses for the Wooden Window Shade Slats other than as a component of RFB's window shade assemblies. Accordingly, RFB's Wooden Window Shade Slats are distinguishable from products that Commerce previously found to be within the scope of the *Orders*.[26]

- The factors listed under 19 CFR 351.225(k)(2) (the "(k)(2)" factors) further support a finding that RFB's Wooden Window Shade Slats are not within the scope of the WMMP *Orders*.[27]

No other interested party submitted comments.

## VII.  ANALYSIS

In this scope ruling, we find that the sources provided in 19 CFR 351.225(k)(1), *i.e.,* information from the petition,[28] along with the product descriptions provided in RFB's scope ruling application, are dispositive in determining whether RFB's window shade slats are within the scope of the WMMP *Orders*. Therefore, Commerce did not analyze the additional factors provided in 19 CFR 351.225(k)(2).

The language of the scope states that "{t}he merchandise subject to the *Orders* consists of wood mouldings and millwork products that are made of wood (regardless of wood species), bamboo, laminated veneer lumber (LVL), or of wood and composite materials (where the composite materials make up less than 50 percent of the total merchandise), and which are continuously shaped wood or finger-jointed or edge-glued moulding or millwork blanks (whether or not

---

[22] *Id.* at 11.
[23] *Id.* at 14.
[24] *Id.* at 11.
[25] *Id.*
[26] *Id.* at 17.
[27] *Id.* at 13.
[28] *See* Scope Ruling Request at Exhibit 3 (citing Petitioner's Letter, "Responses to Second Supplemental Questions on General Issues Volume I of Petition," dated January 22, 2020 (Petition Supplement)).

6

resawn). The merchandise subject to the *Orders* can be continuously shaped along any of its edges, ends, or faces."[29]

The scope of the *Orders* specifically provides for:

> continuously shaped wood in the forms of dowels, building components such as interior paneling and jamb parts, and door components such as rails, stiles, interior and exterior door frames or jambs (including split, flat, stop applied, single- or double-rabbeted), frame or jamb kits, and packaged door frame trim or casing sets, whether or not the door components are imported as part of a door kit or set.

The exemplars referenced in the scope language cover products commonly used in construction. RFB argues that the wooden window shade slats imported by RFB are neither designed nor used for such construction applications.[30] Moreover, RFB states that the wooden slats are of poor quality, which resemble scrap, such that the slats have no commercial purpose outside of their function as a component of a window shade.[31]

Exhibit 1 contains a photograph of the wooden window shade slats imported by RFB.[32] As RFB noted, each slat is cut from a kiln dried wood picket made of *Paulownia Tomentosa*, which is a rough piece of wood, not decorative, of poor quality, and more akin to scrap.[33] Exhibit 1 demonstrates that RFB's product subject to this scope inquiry is indeed of poor quality and resembles scrap.

Commerce next looked at the description of the merchandise contained in the petition and the petitioner's response to Commerce's second supplemental questionnaire during the investigation.[34] The WMMP in the petition are described as having "a variety of exterior and interior uses, primarily in residential and non-residential construction."[35]

Additionally, the WMMP are described as being "intended to be used as a covering for floors, walls, doors, and other areas…."[36] According to RFB, the wooden window slats do not have any construction applications and do not and cannot serve as a covering for floors, walls, doors, or other areas.[37]

RFB noted that the petitioner's statements after the petition was filed indicated that RFB's slats are not covered by the scope. Specifically, in response to questions from Commerce regarding window blind components in the Petition Supplement, the petitioner stated that it, "…does not intend to cover window blind components such as slats, valences, bottom rails or shutter slats within the scope."[38] Thus, the petitioner acknowledged that window blind components were not intended to be covered by the scope of the *Orders* which supports RFB's statement.

---

[29] *See Orders.*
[30] *See* Scope Ruling Request at 9.
[31] *Id.*
[32] *See* Scope Ruling Request at Exhibit 1.
[33] *Id.* and at 2-3.
[34] *Id.* at 11 and Exhibit 3 and Petition Supplement.
[35] *Id.* at 11.
[36] *Id.*
[37] *Id.*
[38] *Id.* and Exhibit 3.

Barcode:4746256610-01 A-570-117 SCO Scope Inquiry - Window Shade Stock

In summary, we find that the description of the product contained in RFB's scope ruling request is dispositive when considering the sources identified in 19 CFR 351.225(k)(1). Therefore, it is not necessary to consider the additional factors specified in 19 CFR 351.225(k)(2).

## VIII.  RECOMMENDATION

For the reasons stated above, we recommend finding that window shade slats are not covered by the scope of the *Orders*. If this recommendation is accepted, we will notify CBP of this determination. Specifically, in accordance with 19 CFR 351.225(l)(4), because entries of the products under consideration are not otherwise subject to suspension of liquidation as a result of another segment of the proceeding, we intend to instruct CBP: (1) that window shade slats imported by RFB noted above are subject to the *Orders*; and (2) to terminate the suspension of liquidation and refund any cash deposits for entries covered by this determination. Further, we will convey a copy of this final scope ruling to all parties to this proceeding, consistent with section 516A(a)(2)(A)(ii) of the Tariff Act of 1930, as amended, and as directed by 19 CFR 351.225(h).

☒                              ☐
_____        _____
Agree                          Disagree

                    1/14/2025

X _Scot T. Fullerton_____

Signed by: SCOT FULLERTON

Scot Fullerton
Acting Deputy Assistant Secretary
 for Antidumping and Countervailing Duty Operations

Filed By: Joe Huynh, Filed Date: 4/11/25 4:46 AM, Submission Status: Approved

Barcode:4746236-01 A-570-117 SCO - Scope Inquiry  -  Blinds To Go Feedstock

Attachment II

Filed By: Thuydan Tran, Filed Date: 4/11/25 11:46 AM, Submission Status: Approved

Case 1:23-cv-00150-JAL     Document 59     Filed 04/30/25     Page 61 of 72

Barcode:4462083-03 A-570-117 SCO - Scope Inquiry:Wood Reveal Str...

**UNITED STATES DEPARTMENT OF COMMERCE**
International Trade Administration
Washington, D.C. 20230

A-570-117
C-570-118
Scope Inquiry
Loveday Lumber
**Public Document**
E&C/OVIII:  MG/BCS

May 16, 2022

**MEMORANDUM TO:**  James Maeder
        Deputy Assistant Secretary
         for Antidumping and Countervailing Duty Operations

**THROUGH:**    Irene Darzenta Tzafolias
        Director, Office VIII
        Antidumping and Countervailing Duty Operations

**FROM:**      Max Goldman
        International Trade Compliance Analyst, Office VIII
        Antidumping and Countervailing Duty Operations

**SUBJECT:**     Final Scope Ruling on the Antidumping and Countervailing Duty
        Orders on Wood Mouldings and Millwork Products from the
        People's Republic of China:  Request by Loveday Lumber
        Company, Inc.

---

## I. SUMMARY

In accordance with 19 CFR 351.225(h) and 351.225(k)(1), we recommend that the Department of Commerce (Commerce) determine that the lengthwise sawn (LWS) scarf-jointed wood reveal strips[1] and LWS scarf-jointed wood squares (collectively, LWS wood products) imported by Loveday Lumber Company, Inc. (Loveday Lumber), which are the subject of Loveday Lumber's scope ruling request, are outside the scope of the antidumping (AD) and countervailing duty (CVD) orders on wood mouldings and millwork products (WMMPs) from the People's Republic of China (China).[2]

---

[1] These wood reveal strips can have either triangular or trapezoidal forms.

[2] *See Wood Mouldings and Millwork Products from the People's Republic of China:  Amended Final Antidumping Duty Determination and Antidumping Duty Order*, 86 FR 9486 (February 16, 2021) (*AD Order*); and *Wood Mouldings and Millwork Products from the People's Republic of China: Countervailing Duty Order*, 86 FR 9484 (February 16, 2021) (*CVD Order*) (collectively, the *WMMP Orders*).


INTERNATIONAL
T R A D E
ADMINISTRATION

Barcode:4462262-03 A-570-117 SCO Scope Inquiry Blinne Woods Lumberstock

## II.      BACKGROUND

On December 15, 2021, Commerce received a scope ruling application from Loveday Lumber, a U.S. importer of LWS wood products from China.[3]  In its submission, Loveday Lumber requests that Commerce determine whether the LWS wood products described therein are outside the scope of the *WMMP Orders*.  On January 14, 2022, Commerce deemed the scope inquiry initiated.[4]  On January 20, 2022, the Coalition of American Millwork Producers (the petitioner) submitted comments and factual information concerning Loveday Lumber's scope ruling request.[5]  On February 18, 2022, Loveday Lumber submitted comments and factual information rebutting the petitioner's submission.[6]  On March 8, 2022, Commerce issued a supplemental questionnaire to Loveday Lumber,[7] to which Loveday Lumber responded on March 15, 2022.[8]

## III.     SCOPE OF THE *WMMP ORDERS*

The merchandise subject to the *WMMP Orders* consists of wood mouldings and millwork products that are made of wood (regardless of wood species), bamboo, laminated veneer lumber (LVL), or of wood and composite materials (where the composite materials make up less than 50 percent of the total merchandise), and which are continuously shaped wood or finger-jointed or edge-glued moulding or millwork blanks (whether or not resawn).  The merchandise subject to the *WMMP Orders* can be continuously shaped along any of its edges, ends, or faces.

The percentage of composite materials contained in a wood moulding or millwork product is measured by length, except when the composite material is a coating or cladding.  Wood mouldings and millwork products that are coated or clad, even along their entire length, with a composite material, but that are otherwise comprised of wood, LVL, or wood and composite materials (where the non-coating composite materials make up 50 percent or less of the total merchandise) are covered by the scope.

The merchandise subject to the *WMMP Orders* consists of wood, LVL, bamboo, or a combination of wood and composite materials that is continuously shaped throughout its length (with the exception of any endwork/dados), profiled wood having a repetitive design in relief, similar milled wood architectural accessories, such as rosettes and plinth blocks, and finger-jointed or edge-glued moulding or millwork blanks (whether or not resawn).  The scope includes continuously shaped wood in the forms of dowels, building components such as interior paneling and jamb parts, and door components such as rails, stiles, interior and exterior door frames or jambs (including split, flat, stop applied, single- or double-rabbeted), frame or jamb kits, and packaged door frame trim or casing sets, whether or not the door components are imported as

---

[3] *See* Loveday Lumber's Letter, "Scope Ruling Application," dated December 15, 2021 (Scope Ruling Application).
[4] *See* Memorandum, "Deemed Initiation of Scope Inquiry," dated January 14, 2022.
[5] *See* Petitioner's Letter, "Comments on Loveday's Scope Ruling Application," dated January 20, 2022 (Petitioner's Comments).
[6] *See* Loveday Lumber's Letter, "Loveday Lumber Company, Inc.'s Rebuttal to Coalition of American Millwork Producers' Comments," dated February 18, 2022 (Rebuttal Comments).
[7] *See* Commerce's Letter, "Scope Inquiry Application Supplemental Questionnaire," dated March 8, 2022.
[8] *See* Loveday Lumber's Letter, "Loveday Lumber Company, Inc.'s Response to Commerce's Scope Inquiry Application Supplemental Questionnaire," dated March 15, 2022 (Supplemental Questionnaire Response).

Filed By: Tracy Goldman, Filed Date: 5/17/2025 12:36 PM, Submission Status: Approved

part of a door kit or set.

The covered products may be solid wood, laminated, finger-jointed, edge-glued, face-glued, or otherwise joined in the production or remanufacturing process and are covered by the scope whether imported raw, coated (*e.g.*, gesso, polymer, or plastic), primed, painted, stained, wrapped (paper or vinyl overlay), any combination of the aforementioned surface coatings, treated, or which incorporate rot-resistant elements (whether wood or composite).  The covered products are covered by the scope whether or not any surface coating(s) or covers obscure the grain, textures, or markings of the wood, whether or not they are ready for use or require final machining (*e.g.*, endwork/dado, hinge/strike machining, weatherstrip or application thereof, mitre) or packaging.

All wood mouldings and millwork products are included within the scope even if they are trimmed; cut-to-size; notched; punched; drilled; or have undergone other forms of minor processing.

Subject merchandise also includes wood mouldings and millwork products that have been further processed in a third country, including but not limited to trimming, cutting, notching, punching, drilling, coating, or any other processing that would not otherwise remove the merchandise from the scope of the WMMP *Orders* if performed in the country of manufacture of the in-scope product.

Excluded from the scope of the *WMMP Orders* are countertop/butcherblocks imported as a full countertop/butcherblock panel, exterior fencing, exterior decking and exterior siding products (including solid wood siding, non-wood siding (*e.g.*, composite or cement), and shingles) that are not LVL or finger jointed; finished and unfinished doors; flooring; parts of stair steps (including newel posts, balusters, easing, gooseneck, risers, treads, rail fittings and stair stringers); picture frame components three feet and under in individual lengths; and lumber whether solid, finger-jointed, or edge-glued.  To be excluded from the scope, finger-jointed or edge-glued lumber must have a nominal thickness of 1.5 inches or greater and a certification stamp from an American Lumber Standard Committee-certified grading agency.  The exclusion for lumber whether solid, finger-jointed, or edge-glued does not apply to screen/"surfaced on 4 sides" (S4S) and/or "surface 1 side, 2 edges" (SlS2E) stock (also called boards) that are finger-jointed and/or edge-glued, or to finger-jointed and/or edge-glued moulding or millwork blanks (whether or not resawn).  Accordingly, S4S and S1S2E stock/boards that are not finger-jointed or edge glued are excluded from the scope of the *WMMP Orders*.

Also excluded from the *AD Order* are all products covered by the scopes of the antidumping duty orders on:  1) *Hardwood Plywood from the People's Republic of China*,[9] 2) *Multilayered Wood Flooring from the People's Republic of China*,[10] 3) *Wooden Cabinets and Vanities from*

---

[9] *See Certain Hardwood Plywood Products from the People's Republic of China:  Amended Final Determination of Sales at Less Than Fair Value, and Antidumping Duty Order*, 83 FR 504 (January 4, 2018).
[10] *See Multilayered Wood Flooring from the People's Republic of China:  Amended Final Determination of Sales at Less Than Fair Value and Antidumping Duty Order*, 76 FR 76690 (December 8, 2011).

Barcode:4462262-03A057A-570-SCO SCO Scope Inquiry Blind Loveday Lumberstock

*the People's Republic of China,*[11] and 4) *Wooden Bedroom Furniture from the People's Republic of China.*[12]

Also excluded from the *CVD Order* are all products covered by the scopes of the countervailing duty orders on: 1) *Hardwood Plywood from the People's Republic of China,*[13] 2) *Multilayered Wood Flooring from the People's Republic of China,*[14] and 3) *Wooden Cabinets and Vanities from the People's Republic of China.*[15]

Imports of wood mouldings and millwork products are primarily entered under the following Harmonized Tariff Schedule of the United States (HTSUS) numbers: 4409.10.0500, 4409.10.1020, 4409.10.1040, 4409.10.1060, 4409.10.1080, 4409.10.4010, 4409.10.4090, 4409.10.4500, 4409.10.5000, 4409.10.9020, 4409.10.9040, 4409.22.0590, 4409.22.1000, 4409.22.4000, 4409.22.5000, 4409.22.5020, 4409.22.5040, 4409.22.5060, 4409.22.5090, 4409.22.9000, 4409.22.9020, 4409.22.9030, 4409.22.9045, 4409.22.9060, 4409.22.9090, 4409.29.0665, 4409.29.1100, 4409.29.4100, 4409.29.5100, 4409.29.9100, 4412.99.5115, 4412.99.9500, 4418.91.9095, and 4421.91.9780. Imports of wood mouldings and millwork products may also enter under HTSUS numbers: 4409.10.6000, 4409.10.6500, 4409.22.6000, 4409.22.6500, 4409.29.6100, 4409.29.6600, 4412.41.0000, 4412.42.0000, 4412.49.0000, 4412.91.5115, 4412.92.5215, 4412.99.9700, 4418.20.4000, 4418.20.8030, 4418.20.8060, 4418.91.9195, 4418.99.9095, 4418.99.9195, 4421.91.9880, 4421.99.9780, and 4421.99.9880. While the HTSUS subheadings are provided for convenience and customs purposes, the written description of the scope of the *WMMP Orders* is dispositive.

## IV. PRODUCT DESCRIPTION

The products subject to Loveday Lumber's request are LWS scarf-jointed wood reveal strips and LWS scarf-jointed wood squares. Loveday Lumber explains that LWS scarf-jointed products are made by "…sawing wood logs into sheets, joining the smaller sheets by scarf joints to form larger sheets, {and} sawing the larger sheets into wood strips with various dimensions."[16]

Loveday Lumber described the scarf joint in its LWS products as an end joint formed by applying adhesive to the ends of two pieces that have been tapered or beveled, usually to a featheredge with the angle of the end cut identical in each piece.[17] Loveday Lumber states that its LWS products are not finger-jointed, edge-glued, or continuously shaped.

---

[11] *See Wooden Cabinets and Vanities and Components Thereof from the People's Republic of China: Antidumping Duty Order,* 85 FR 22126 (April 21, 2020).
[12] *See Notice of Amended Final Determination of Sales at Less Than Fair Value and Antidumping Duty Order: Wooden Bedroom Furniture from the People's Republic of China,* 70 FR 329 (January 4, 2005).
[13] *See Certain Hardwood Plywood Products from the People's Republic of China: Countervailing Duty Order,* 83 FR 513 (January 4, 2018).
[14] *See Multilayered Wood Flooring from the People's Republic of China: Countervailing Duty Order,* 76 FR 76693 (December 8, 2011).
[15] *See Wooden Cabinets and Vanities and Components Thereof from the People's Republic of China: Countervailing Duty Order,* 85 FR 22134 (April 21, 2020).
[16] *See* Scope Ruling Application at 6.
[17] *Id.* at 4.

Barcode:4462620-83 A-570-SCO SCO Scope Inquiry Binder - Loveday Lumber bstock

The wood used to make these LWS wood products is of the Paulownia species. Moreover, the LWS wood reveal strips have either triangular or trapezoid forms.

## V.    INTERESTED PARTY COMMENTS

Scope Ruling Application

- Loveday Lumber requests that Commerce find its LWS scarf-joined wood reveal strips and LWS scarf-joined wood squares to be outside the scope of the *WMMP Orders* because these products are not (i) continuously shaped wood (ii) finger-jointed mouldings; (iii) edge-glued mouldings; or (iv) millwork blanks.[18]
- The trapezoidal wood reveal strips are used as components in steel and wooden concrete form systems for the creation of concrete structures.  The wood reveal strip is placed in the form, then rebar and other materials are added for strength, and the concrete is poured into the form.  They are typically discarded as soon as the construction project is complete.  The triangular wood reveals (also known as chamfers or cant strips) ease the removal of the formwork of a concrete structure. The chamfers prevent the concrete edges from breaking upon removal.[19]
- The wood squares are used in concrete pathways as expansion joints.  Expansion joints are used when a concrete pathway such as a sidewalk or driveway is poured to allow the concrete to expand without cracking the concrete.  The wood squares form a frame and the concrete is poured inside.  Once the concrete has dried, the outside squares are removed and discarded, but the inside square remains as an expansion joint.[20]
- Loveday Lumber's LWS products are "substantively equivalent" to Sylvan Products, LLC's (Sylvan) LWS products, which Commerce determined were outside the scope of the investigations.[21]
- During the investigations, Sylvan filed comments requesting that Commerce clarify whether their LWS wood bracing, blocking, and temporary structural forming products, that are similar to Loveday Lumber's LWS products, are excluded from the scope of the investigations.[22]
- Sylvan described its LWS products as:

    "{W}ood bracing, blocking, and temporary structural concrete forming products, such as rectangular, square, triangular cant strips and exterior skewback with or without chamfered edges, and trapezoidal reveal and rustification [sic], used as components in the steel and wooden concrete form systems for the creation of concrete structures. Additionally, LWS wood products are generally of low

---

[18] *Id.* at 11.
[19] *Id.* at 5.
[20] *Id.*
[21] *Id.* at 16.
[22] *Id.* at 10-11 and Exhibit 5 (which includes Memorandum, "Wood Mouldings and Millwork Products from Brazil and the People's Republic of China:  Preliminary Scope Decision Memorandum," dated August 5, 2020 (Preliminary Scope Memorandum), at 13-18).

5

quality and are typically discarded as soon as the construction project is completed."[23]

- Commerce found that based on the intent of the petitioner, Sylvan's products were not subject to the scope of the investigations and that language to exclude these products from the scope was unnecessary.[24]
- In its scope comments submitted in the investigations, the petitioner clarified that LWS wood products were not intended to be included in the scope unless they underwent additional manufacturing.
- Loveday Lumber states its products are "substantially equivalent" to Sylvan's products and likewise do not undergo additional manufacturing.[25]

Petitioner's Comments

- Loveday Lumber's LWS wood reveal strip and LWS wood square products are covered by the scope of the *WMMP Orders* because they are continuously shaped and their scarf joint is similar to a finger joint.[26]
- Loveday Lumber's products differ from Sylvan's LWS products because Loveday Lumber's wood products include complex shapes, radius edges with fine details, and smooth shaping. The smooth edges indicate that the products likely undergo planing or other moulding-like manufacturing processes.[27]
- The scope of the *WMMP Orders* also covers scarf-jointed wood products, which are similar to finger-jointed wood products, in that scarf joints should be considered joints that are "…otherwise joined in the production or remanufacturing process."[28]
- Loveday Lumber's products were imported under HTSUS subheading number 4409.29.9100, which is a subheading assigned for continuously shaped wood products.[29]
- While amended during the investigations to be broad and descriptive, the scope language was always intended to cover the products produced by Loveday Lumber.[30]

Loveday Lumber's Rebuttal Comments

- Loveday Lumber's LWS products are not millwork products, according to the following dictionary definition of millwork, "a wood strip having a curved or projecting surface, used for decorative purposes."[31] Loveday's products do not have decorative recessed or relieved surfaces. Additionally, they do not have any decorative planes or curved strips.[32]
- The products at issue may be used to create aesthetic details in concrete but are removed from the structure after use and are not decorative themselves.[33]

---

[23] *Id.*
[24] *Id.*
[25] *Id.* at 12.
[26] *See* Petitioner's Comments at 3 and 4.
[27] *Id.* at 6.
[28] *Id.* at 4.
[29] *Id.*
[30] *Id.*
[31] *See* Rebuttal Comments at 7.
[32] *Id.*
[33] *Id.*

- The United States Department of Agriculture defines the term "millwork" as:

  "planed and patterned lumber for finish work in buildings, including items such as sash, doors, cornices, panelwork, and other items of interior or exterior trim. Does not include flooring, ceiling, or siding."[34]

- Because its LWS products do not fall under the definition of millwork products, the HTSUS subheading number that Loveday Lumber's LWS products have been classified under is immaterial.[35]
- Commerce previously agreed that Sylvan's LWS products are out of the scope whether they have or do not have chamfered edges.[36]
- The petitioner mischaracterized Loveday Lumber's LWS products as having complex shapes, including radius edges with fine details.[37]
- Loveday Lumber's LWS products are identical to Sylvan's LWS products, which both companies purchase from the same factory.[38]
- The only tools used to produce Loveday Lumber's LWS products are rip or table saws, which are unable to perform planing or moulding-type processes on the LWS products.[39]

## VI.    LEGAL FRAMEWORK

When a request for a scope ruling is filed, Commerce examines the scope language of the order{s} at issue and the description of the product contained in the scope ruling application.[40] Pursuant to Commerce's regulations, in determining whether a product is covered by the scope of an order, Commerce may make its determination on the basis of the scope language alone where such language is dispositive.[41]

Commerce may also take into account primary interpretive sources in determining a scope ruling, including the descriptions of the merchandise contained in the petition and investigation; previous or concurrent determinations by Commerce, including prior scope rulings, memoranda, or clarifications pertaining to the order at issue or other orders with same or similar language; and determinations of the International Trade Commission (ITC) pertaining to the order at issue.[42]  Additionally, Commerce may consider secondary interpretive sources, such as any other determinations of Commerce or the ITC, Customs rulings or determinations, industry usage, dictionaries, and any other relevant record evidence, in determining a scope ruling. However, to the extent that these secondary interpretive sources conflict with primarily interpretive sources under 19 CFR 351.225(k)(1)(i), the primary interpretive sources will normally control.[43] If Commerce determines that these sources are determinative of the matter, it will issue a final

---

[34] *Id.* at 8.
[35] *Id.* at 9.
[36] *Id.* at 12.
[37] *Id.* at 13.
[38] *Id.* at 17.
[39] *Id.* at 18.
[40] *See Walgreen Co. v. United States*, 620 F.3d 1350, 1357 (Fed. Cir. 2010).
[41] *See* 19 CFR 351.225(k)(1).
[42] *See* 19 CFR 351.225(k)(1)(i).
[43] *See* 19 CFR 351.225(k)(1)(ii).

scope ruling as to whether the merchandise is covered by the order or orders.[44]

Where the descriptions of the merchandise in the sources described in 19 CFR 351.225(k)(1) are not dispositive, Commerce will consider the five additional factors set forth at 19 CFR 351.225(k)(2)(i). These factors are: (A) the physical characteristics of the merchandise; (B) the expectations of the ultimate purchasers; (C) the ultimate use of the product; (D) the channels of trade in which the product is sold; and (E) the manner in which the product is advertised and displayed. In the event of a conflict between these factors, the physical characteristics of the merchandise will normally be allotted greater weight than other factors.[45]

Commerce's scope rulings are made on a case-by-case basis, and may be applied on a producer-specific, exporter-specific, or importer-specific basis, or some combination thereof, or to all products from the same country with the same relevant physical characteristics as the product at issue, on a country-wide basis, regardless of the producer, exporter, or importer of the products.[46]

## VII.    ANALYSIS

In this scope ruling, we find that the sources provided in 19 CFR 351.225(k)(1), *i.e.*, the plain language of the scope, information from the Petition,[47] and the preliminary scope memorandum issued in the underlying investigations, along with the product descriptions provided in Loveday Lumber's scope ruling application and supplemental questionnaire responses, are dispositive in determining whether Loveday Lumber's LWS scarf-jointed wood reveal strips and LWS scarf-jointed wood squares are within the scope of the *WMMP Orders*. Therefore, Commerce did not analyze the additional factors provided in 19 CFR 351.225(k)(2).

The language of the *WMMP Orders* states that subject merchandise "consists of {WMMPs} that are made of wood (regardless of wood species) . . . and which are continuously shaped wood or finger-jointed or edge-glued moulding or millwork blanks (whether or not resawn)." Additionally, subject merchandise can be "continuously shaped along any of its edges, ends, or faces."[48]  The scope language does not address whether LWS wood products constitute "continuously shaped wood" or "finger-jointed or edge-glued moulding or millwork blanks." Therefore, we consulted the other interpretive sources set forth in 19 CFR 351.225(k)(1).

Regarding the phrase "continuously shaped," the Petition includes an excerpt from the HTSUS defining continuously shaped wood as wood that is "tongued, grooved, rebated, chamfered, V-jointed, beaded, molded, rounded or the like along any of its edges, ends or faces, whether or not planed, sanded, or end jointed."[49]  Additionally, in scope comments submitted during the

---

[44] *See* 19 CFR 351.225(h).
[45] *See* 19 CFR 351.225(k)(2)(ii).
[46] *See* 19 CFR 351.225(m)(1).
[47] *See* Petitioner's Letter, "Wood Mouldings and Millwork Products from Brazil and the People's Republic of China: Petitions for the Imposition of Antidumping and Countervailing Duties," dated January 8, 2020 (Petition).
[48] *See WMMP Orders*.
[49] *See* Petition at Exhibit I-10, which is included in Memorandum, "Additional Information Placed on the Record," dated concurrently with this memorandum (Investigation Information Memorandum).  As the scope language indicates, tariff codes are not dispositive or limiting with regard to what is covered by the scope.  Nonetheless, the

Barcode:4462262-03 A-570-SCO SCO Scope Inquiry Blinds - Loveday Lumberstock

underlying investigations, the petitioner stated that a product was continuously shaped where it was "smoothed/surfaced" and agreed that another product was not continuously shaped where it was "rough sawn."[50]  As noted in the Preliminary Scope Memorandum, the petitioner also provided examples and descriptions of in-scope products along with glossaries of wood mouldings and millwork products in the Petition and Petition supplements.

Regarding the phrase "finger-jointed or edge-glued moulding or millwork blanks," the petitioner provided a glossary in a supplement to the Petition defining moulding or millwork blanks as "{b}oards fabricated by joining smaller pieces of wood together, which are later machined or moulded into a final profile."[51]  The glossary further defines finger-jointing as a "method of joining wood pieces milled in the shape of fingers . . . " and edge-glued as "{b}oards fabricated by gluing two or more smaller pieces of wood together along their thinner edges."[52]  Separately, in the Scope Ruling Application, Loveday Lumber placed a dictionary definition on the record defining a blank as "a piece of material prepared to be made into something (such as a key) by further operation."[53]

As an initial matter, we find that Loveday Lumber's LWS wood products are not "moulding or millwork blanks."  In this regard, record evidence demonstrates that Loveday Lumber's LWS wood products are not intended to be later manufactured into a moulding or piece of millwork.,[54] nor are Loveday Lumber's LWS wood products "finger-jointed or edge-glued" as defined above.

We also find that Loveday Lumber's LWS wood products are not continuously shaped mouldings or millwork products.  Loveday Lumber provided evidence that its LWS wood products are produced using a straight saw, rather than a moulder or radial saw (*i.e.*, equipment used to shape the wood).[55]  This evidence demonstrates that the products at issue are straight cut, and do not have radius edges with fine details as alleged by the petitioner.[56]  Regarding the petitioner's contention that the complexity of the cuts in certain Loveday Lumber products indicate that they likely go through planing or other moulding-type manufacturing processes,[57] record evidence demonstrates otherwise.  Specifically, Loveday Lumber provided videos showing the machinery used to cut the wood and the manner in which the wood is cut.[58]  We find that these videos demonstrate that the saws used in the manufacturing process to produce Loveday Lumber's products do not make the complex cuts that the petitioner describes.

---

definition from the tariff schedule provides some evidence of what might be considered "continuously shaped" wood.

[50] *See* Investigation Information Memorandum, which includes Petitioner's Letter, "Wood Mouldings and Millwork Products from Brazil and the People's Republic of China:  Additional Rebuttal Scope Comments," dated April 10, 2020, at 3, 14.

[51] *See* Investigation Information Memorandum, which includes Petitioner's Letter, "Responses to First Supplemental Questions on General Issues Volume I of the Petition," dated January 15, 2020, at Exhibit I-supp-5.

[52] *Id.*

[53] *See* Rebuttal Comments at 8.

[54] *See* Supplemental Questionnaire Response at Exhibit 6, video exhibit, video exhibit 2, and video exhibit 3.

[55] *Id.* at 4, video exhibit, video exhibit 2, and video exhibit 3.

[56] *See* Petitioner's Comments at 6.

[57] *Id.*

[58] *See* Supplemental Questionnaire Response at video exhibit, video exhibit 2, and video exhibit 3.

Filed By: Max Goldman, Filed Date: 5/17/225 12:36 PM, Submission Status: Approved

Barcode:4462620-01 A-570-SCO SCO Scope Inquiry Binding Loveday Lumberstock

Additionally, Loveday Lumber confirms that its LWS wood products "do not undergo any planing, priming, coating, or finishing" and are "raw and unfinished."[59]

Regarding the petitioner's claim that chamfer strips (which are one of the products covered by Loveday Lumber's request) were described in the Petition as subject merchandise, we note as an initial matter that Loveday Lumber's chamfer strips (*i.e.*, triangular reveal strips) do not have chamfered edges but rather are used to create chamfered edges in concrete forms.[60] We recognize that in the Petition, the petitioner stated that chamfer strips were intended to be included in the scope and the initially proposed scope language identified chamfer strips as covered by the scope. Nonetheless, the petitioner later indicated during the underlying investigations that chamfer strips (referred to as cant strips) and LWS wood squares manufactured by Sylvan were not covered by the scope. In particular, the petitioner stated "assuming that, as described, the LWS Wood Products are not finger-jointed, edge-glued or continuously shaped and that they are produced not through moulding and millwork shaping equipment but are instead rough sawn, Petitioner agrees that the products appear to fall outside of the scope of these investigations."[61] In the Preliminary Scope Memorandum, Commerce confirmed that Sylvan's LWS products (which also included chamfer/cant strips) were not covered by the scope so long as they are not millwork products made of wood that are continuously shaped, finger-jointed, or edge-glued.[62]

We find that Loveday Lumber's LWS wood products are similar to Sylvan's LWS wood products addressed during the investigations in that Loveday Lumber's LWS wood products, like Sylvan's LWS wood products, are also not millwork products made of wood that are continuously shaped, finger-jointed, or edge-glued.[63] Additionally, based on the photos provided by Loveday Lumber comparing its products to Sylvan's products found to be out-of-scope during the investigations, we find that, contrary to the petitioner's claim, Loveday Lumber's LWS wood products are similar in terms of shape and cut to Sylvan's LWS wood products that Commerce found to be not covered by the scope of the AD and CVD investigations.[64] Like Sylvan's products, Loveday Lumber describes its LWS wood products as temporary structural concrete forming products in the form of LWS wood reveal strips and squares.

---

[59] *Id.* at 3.

[60] *See* Supplemental Questionnaire Response at 3.

[61] *See* Investigation Information Memorandum, which includes Petitioner's Letter, "Wood Mouldings and Millwork Products from Brazil and the People's Republic of China: Additional Rebuttal Scope Comments," dated April 10, 2020, at 14.

[62] *See* Investigation Information Memorandum, which includes the Preliminary Determination Scope Decision Memorandum at 16. The preliminary scope ruling with respect to Sylvan's LWS products was unchanged in the final determinations of the underlying investigations.

[63] *See* Investigation Information Memorandum which includes Sylvan's Letter, Wood Mouldings and Millwork Products from Brazil and the People's Republic of China: Scope Comments," dated March 18, 2020.

[64] *See* Preliminary Determination Scope Decision Memorandum at 13-14; *see also* Loveday Lumber's Rebuttal Comments at Exhibit 27.

Filed By: Tracy Goldman, Filed Date: 5/1/2025 11:46 AM, Submission Status: Approved

Barcode:4642623-01 A-570-SCO Scope Inquiry Bin Gov Loveday Lumberstock

Regarding the HTSUS subheading under which Loveday Lumber's LWS wood products may have entered the United States, we note that HTSUS classifications are not dispositive and our practice is not to make scope determinations based on the product's HTSUS classification.[65]

In summary, we find that the description of the product contained in Loveday Lumber's scope ruling application and supplemental questionnaires is dispositive when considered in light of the sources identified in 19 CFR 351.225(k)(1) (in particular, the scope language of the *WMMP Orders* and other interpretive sources described above). Therefore, it is not necessary to consider the additional factors specified in 19 CFR 351.225(k)(2). Further, we find that Loveday Lumber's LWS wood reveal strips and LWS wood squares are not covered by the scope of the *WMMP Orders* because they are not continuously shaped wood or finger-jointed or edge-glued mouldings or millwork blanks (whether or not resawn).

## VIII.  RECOMMENDATION

For the reasons discussed above, and in accordance with 19 CFR 351.225(h) and 19 CFR 351.225(k)(1), we recommend finding that the products subject to this scope ruling request, LWS wood reveal strips and LWS wood squares imported by Loveday Lumber, are outside of the scope of the *WMMP Orders*.

If you agree, we will notify U.S. Customs and Border Protection (CBP) of our determination. Specifically, in accordance with 19 CFR 351.225(m)(1) and (l)(4), because entries of LWS wood products are not otherwise subject to suspension of liquidation as a result of another segment of the proceeding, we intend to instruct CBP that LWS wood products imported by Loveday Lumber, as described in the Scope Ruling Application, are not covered by the scope of the *WMMP Orders* and to terminate the suspension of liquidation and refund any cash deposits for entries covered by this determination.

---

[65] *See Wirth Ltd. v. United States*, 5 F. Supp. 2d 968, 973 (CIT 1998) (noting that although Commerce "may consider the decisions of Customs, it is not obligated to follow, nor is it bound by, the classification determinations of Custom{, }" and "Commerce, not Customs, has authority to clarify the scope of AD/CVD orders and findings.").

Filed By: Max Goldman, Filed Date: 5/17/225 12:36 PM, Submission Status: Approved

BarcBdec43462362083A057A570SCTO  SC8cop8c3pequInquiry  Blindev8da9oLEmbstock

If the recommendation in this memorandum is accepted, we will send a copy of this final scope ruling to all parties to the proceeding, as directed by section 516A(a)(2)(A)(ii) of the Tariff Act of 1930, as amended, and 19 CFR 351.225(h).

☒                          ☐
_____        _____
Agree                      Disagree
                           5/16/2022

X  *James Maeder*
_____

Signed by: JAMES MAEDER

James Maeder
Deputy Assistant Secretary
  for Antidumping and Countervailing Duty Operations