UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE: THE HONORABLE JOSEPH A. LAROSKI, JR., JUDGE

| | |
|---|---|
| HARDWARE RESOURCES, INC., | ) ) ) |
| Plaintiff, | ) ) |
| v. | ) ) ) |
| UNITED STATES, | ) ) ) Ct. No. 23-00150 |
| Defendant, | ) ) |
| and | ) ) ) |
| COALITION OF AMERICAN MILLWORK PRODUCERS, | ) ) ) ) |
| Defendant-Intervenor. | ) ) |

**NOTICE OF SUPPLEMENTAL AUTHORITY**

Plaintiff Hardware Resources, Inc. ("Hardware Resources"), respectfully submits this Notice of Supplemental Authority to advise the Court of the final scope ruling issued by the U.S. Department of Commerce ("Commerce") on the scope ruling application filed by Blinds to Go (US), Inc. See Mem. From Maureen Shaheen to Erin Begnal re: Final Scope Ruling on Blinds to Go (US), Inc. Request on Feedstocks (Dec. 22, 2025) ("Blinds to Go Final Scope Ruling") (attached hereto). Hardware Resources discussed Commerce's preliminary Blinds to Go scope ruling on page 24 of its Remand Comments and at the oral argument held by the Court on August 27, 2025. See Pl.'s Cmts. in Opposition to the Final Results of Redeterm. at 24 n. 4 (Apr. 30, 2025), ECF No. 59.

In the Blinds to Go Final Scope Ruling, Commerce continued to find that the products at issue in that matter, feedstock for window blinds, are not subject to the scope of the antidumping

and countervailing duty orders on wood moulding and millwork products ("WMMP") from the People's Republic of China. Through that ruling, Commerce has now acknowledged that the scope "as a whole emphasizes form and intended function," Blinds to Go Final Scope Ruling at 9, a conclusion that is directly contrary to the Defendant's claim in the instant litigation that "Commerce correctly determined that the phrase 'wood moulding and millwork products' did not carry any end-use restriction." Def.'s Resp. to Pl.'s Cmts on Remand at 10 (May 30, 2025), ECF No. 61. Commerce's decision in its Remand Results that Hardware Resources' edge-glued boards are subject to the WMMP scope is wholly at odds with this recent ruling with respect to Blinds to Go's feedstock where Commerce agreed that it must consider the "product's ultimate nature and purpose" when examining whether a product is subject to the scope, Blinds to Go Final Scope Ruling at 10, factors Commerce did not properly recognize in the Remand Results at issue here. See Final Results of Redetermination Pursuant to Ct. Remand (Mar. 17, 2025) (Public Document), ECF No. 53-1 ("Remand Results").

      We respectfully request that the Court consider this supplemental authority in its forthcoming opinion on whether the Remand Results are supported by substantial evidence and are otherwise in accordance with law.

                                    Respectfully submitted,

Dated: December 23, 2025         /s/ Jill A. Cramer
                                            Jill A. Cramer
                                            Jeffrey S. Grimson
                                            Mowry & Grimson, PLLC
                                            5335 Wisconsin Avenue, NW, Suite 810
                                            Washington, D.C. 20015
                                            202-688-3610
                                            trade@mowrygrimson.com
                                            *Counsel to Hardware Resources, Inc.*

Barcode:4857491-01 A-570-117 SCO - Scope Inquiry - Blinds To Go Feedstock



A-570-117, C-570-118
Scope Inquiry: Blinds To Go
**Public Document**
E&C/OPN: TT

December 22, 2025

| | |
|---|---|
| **MEMORANDUM TO:** | Erin Begnal<br>Acting Deputy Assistant Secretary<br>  for Antidumping and Countervailing Duty Operations |
| **FROM:** | Maureen Shaheen<br>Office of Policy<br>Enforcement and Compliance |
| **SUBJECT:** | Antidumping and Countervailing Duty Order on Wood Mouldings and Millwork Products from the People's Republic of China: Final Scope Ruling on Blinds to Go (US), Inc. Request on Feedstocks |

## I. SUMMARY

In accordance with 19 CFR 351.225(d) and 351.225(k)(1), we recommend that the U.S. Department of Commerce (Commerce) determine that the feedstock for wooden slats for window blinds; feedstock for wooden bottom rails for window blinds; and feedstock for wooden valances for window blinds (collectively, feedstocks) imported by Blinds to Go (US), Inc. ("BTG"), which are the subject of BTG's scope ruling application, are outside the scope of the antidumping (AD) and countervailing duty (CVD) orders on Wood Mouldings and Millwork Products (millwork products) from the People's Republic of China (China).[1]

## II. BACKGROUND

On April 11, 2025, Commerce issued the Preliminary Scope Determination and invited interested parties to comment.[2] In the Preliminary Scope Determination, Commerce determined that BTG's blind feedstock components were outside the scope of the *Orders*.[3] Commerce found that BTG's feedstocks lack the defining physical characteristics of wood mouldings and millwork products, mainly because they were not architectural accessories or building components.[4] On April 25, 2025, we received comments from the Coalition of American Millwork Producers (CAMP) urging

---

[1] *See Wood Mouldings and Millwork Products from the People's Republic of China: Amended Final Antidumping Duty Determination and Antidumping Duty Order*, 86 FR 9486 (February 16, 2021) (*AD Order*); and *Wood Mouldings and Millwork Products from the People's Republic of China: Countervailing Duty Order*, 86 FR 9484 (February 16, 2021) (*CVD Order*) (collectively, *Orders*).
[2] *See* Memorandum, "Preliminary Scope Determination on the Antidumping and Countervailing Duty Orders on Wood Mouldings and Millwork Products from the People's Republic of China on Feedstock for Wooden Slats for Window Blinds; Feedstock for Wooden Bottom Rails for Window Blinds; Feedstock for Wooden Valances for Window Blinds Imported By Blinds to Go (US)," dated April 11, 2025 (Preliminary Scope Determination).
[3] *Id.*
[4] *Id.*

Commerce to reverse its preliminary finding.[5]  On May 1, 2025, we received comments from BTG supporting Commerce's Preliminary Scope Determination.[6]

### III.  DESCRIPTION OF THE PRODUCTS SUBJECT TO THE INQUIRY[7]

(1) Feedstock for wooden slats for window blinds, hereinafter "slat stock;"

(2) Feedstock wooden bottom rails for window blinds, hereinafter "bottom rail stock;" and

(3) Feedstock for wooden valences for window blinds, hereinafter "valance stock."

Slat stock is made from basswood (Tilia americana).  At the time of importation, slat stock is cut to specific widths (nominally 1 inch or 2 inches, with actual widths being within tolerances) and specific thicknesses (nominally 0.110 inches, with actual widths being within tolerances).  The slat stock is shipped in lengths between 20 inches and 96 inches.  The slat stock also has stated bow and camber allowances to ensure the shape of the stock can be used to make wood slats.  Finally, the slat stock is covered with a UV protected finish on all surfaces except the ends. This finish can be in a variety of colors but always provides UV protection.  The slat stock is not finger-jointed.

Bottom rail stock is made from basswood (Tilia americana). At the time of importation, bottom rail stock is cut to specific widths (nominally 1 inch or 2 inches, with actual widths being within tolerances) and specific thicknesses (nominally 0.590 inches, with actual widths being within tolerances). The bottom rail stock is shipped in lengths between 20 inches and 96 inches. The bottom rail stock also has stated bow and camber allowances to ensure the shape of the stock can be used to make bottom rails. Finally, the bottom rail stock is covered with a UV protected finish on all surfaces except the ends. This finish can be in a variety of colors but always provides UV protection.  The bottom rail stock is not finger-jointed.

Valance stock is made from basswood (Tilia americana).  At the time of importation, valance stock is cut to specific widths (nominally 2.5 inches or 3.25 inches, with actual widths being within tolerances) and specific thicknesses (nominally 0.315 inches or 0.590 inches, with actual thicknesses being within tolerances).  The valance stock is also sent through a cutter that creates a decorative element on the face of the valance stock.  The valance stock is shipped in various lengths between 20 inches and 96 inches.  The valance stock also has stated bow and camber allowances to ensure the shape of the stock can be used to make valances.  Finally, the valance stock is covered with a UV protected finish on all surfaces except the ends.  This finish can be in a variety of colors but always provides UV protection.  The valance stock is not finger-jointed.

As a matter of clarity and brevity these three products are sometimes referred to as "feedstock" in this request.  In all cases "feedstock" refers to each of the products named above.

Wooden blinds are, by their nature, convenient, lower cost window coverings.  Because of their convenience and lower-cost, blinds are periodically replaced by homeowners, renters or other

---

[5] *See* CAMP's Letter, "Comments on Preliminary Scope Determination," April 25, 2025 (CAMP's Comments).
[6] *See* BTG's Letter, "Preliminary Scope Rebuttal Comments," May 1, 2025 (BTG's Comments).
[7] *See* BTG's Letter, "Scope Ruling Application," dated November 15, 2024 (Scope Ruling Application) at 3-4.

2

occupants of spaces with blinds. Wooden blinds are also easily installed and removed and are not considered to be a fixture when advertising or conveying property. With respect to the slat stock, bottom rail stock, and valence stock it is necessary that the stock be of minimal thickness and made from a relatively light-weight material. This is true because slat stock and bottom rail stock will only be used in the production of finished blinds and blinds will not function if the slats are too thick or heavy. The valances produced from valance stock must be of an appropriate size and weight to be attached to finished blinds without requiring reinforced framing for the blinds. Therefore, the critical design features of these stocks all relate to the proper operation of window blinds.

## IV.      SCOPE OF THE *ORDERS*

The merchandise subject to the *Orders* consists of wood mouldings and millwork products that are made of wood (regardless of wood species), bamboo, laminated veneer lumber (LVL), or of wood and composite materials (where the composite materials make up less than 50 percent of the total merchandise), and which are continuously shaped wood or finger-jointed or edge-glued moulding or millwork blanks (whether or not resawn). The merchandise subject to the Orders can be continuously shaped along any of its edges, ends, or faces.

The percentage of composite materials contained in a wood moulding or millwork product is measured by length, except when the composite material is a coating or cladding. Wood mouldings and millwork products that are coated or clad, even along their entire length, with a composite material, but that are otherwise comprised of wood, LVL, or wood and composite materials (where the non-coating composite materials make up 50 percent or less of the total merchandise) are covered by the scope.

The merchandise subject to the *Orders* consists of wood, LVL, bamboo, or a combination of wood and composite materials that is continuously shaped throughout its length (with the exception of any endwork/dados), profiled wood having a repetitive design in relief, similar milled wood architectural accessories, such as rosettes and plinth blocks, and finger-jointed or edge-glued moulding or millwork blanks (whether or not resawn). The scope includes continuously shaped wood in the forms of dowels, building components such as interior paneling and jamb parts, and door components such as rails, stiles, interior and exterior door frames or jambs (including split, flat, stop applied, single- or double-rabbeted), frame or jamb kits, and packaged door frame trim or casing sets, whether or not the door components are imported as part of a door kit or set. The covered products may be solid wood, laminated, finger-jointed, edge-glued, face-glued, or otherwise joined in the production or remanufacturing process and are covered by the scope whether imported raw, coated (*e.g.*, gesso, polymer, or plastic), primed, painted, stained, wrapped (paper or vinyl overlay), any combination of the aforementioned surface coatings, treated, or which incorporate rot-resistant elements (whether wood or composite).

The covered products are covered by the scope whether or not any surface coating(s) or covers obscure the grain, textures, or markings of the wood, whether or not they are ready for use or

require final machining (*e.g.*, endwork/dado, hinge/strike machining, weatherstrip or application thereof, mitre) or packaging.

All wood mouldings and millwork products are included within the scope even if they are trimmed; cut-to-size; notched; punched; drilled; or have undergone other forms of minor processing.

Subject merchandise also includes wood mouldings and millwork products that have been further processed in a third country, including but not limited to trimming, cutting, notching, punching, drilling, coating, or any other processing that would not otherwise remove the merchandise from the scope of the *Orders* if performed in the country of manufacture of the in-scope product. Excluded from the scope of the *Orders* are countertop/butcherblocks imported as a full countertop/butcherblock panel, exterior fencing, exterior decking and exterior siding products (including solid wood siding, non-wood siding (*e.g.*, composite or cement), and shingles) that are not LVL or finger jointed; finished and unfinished doors; flooring; parts of stair steps (including newel posts, balusters, easing, gooseneck, risers, treads, rail fittings and stair stringers); picture frame components three feet and under in individual lengths; and lumber whether solid, finger jointed, or edge-glued.  To be excluded from the scope, finger-jointed or edge-glued lumber must have a nominal thickness of 1.5 inches or greater and a certification stamp from an American Lumber Standard Committee-certified grading agency.  The exclusion for lumber whether solid, finger-jointed, or edge-glued does not apply to screen "surfaced on 4 sides" (S4S) and/or "surface 1 side, 2 edges" (S1S2E) stock (also called boards) that are finger-jointed and/or edge-glued, or to finger-jointed and/or edge-glued moulding or millwork blanks (whether or not resawn). Accordingly, S4S and S1S2E stock/boards that are not finger-jointed or edge glued are excluded from the scope of the *Orders.*

Also excluded from the *AD Order* are all products covered by the scopes of the antidumping duty orders on:  (1) hardwood plywood from the People's Republic of China,[8] (2) multilayered wood flooring from the People's Republic of China,[9] (3) wooden cabinets and vanities from the People's Republic of China,[10] and (4) wooden bedroom furniture from the People's Republic of China.[11]

Also excluded from the *CVD Order* are all products covered by the scopes of the countervailing duty orders on:  (1) hardwood plywood from the People's Republic of China,[12] (2) multilayered wood flooring from the People's Republic of China,[13] and (3) wooden cabinets and vanities from

---

[8] *See Certain Hardwood Plywood Products from the People's Republic of China:  Amended Final Determination of Sales at Less Than Fair Value, and Antidumping Duty Order*, 83 FR 504 (January 4, 2018).
[9] *See Multilayered Wood Flooring from the People's Republic of China:  Amended Final Determination of Sales at Less Than Fair Value and Antidumping Duty Order*, 76 FR 76690 (December 8, 2011).
[10] *See Wooden Cabinets and Vanities and Components Thereof from the People's Republic of China:  Antidumping Duty Order*, 85 FR 22126 (April 21, 2020).
[11] *See Notice of Amended Final Determination of Sales at Less Than Fair Value and Antidumping Duty Order: Wooden Bedroom Furniture from the People's Republic of China*, 70 FR 329 (January 4, 2005).
[12] *See Certain Hardwood Plywood Products from the People's Republic of China:  Countervailing Duty Order*, 83 FR 513 (January 4, 2018).
[13] *See Multilayered Wood Flooring from the People's Republic of China: Countervailing Duty Order*, 76 FR 76693 (December 8, 2011).

the People's Republic of China.[14] Imports of wood mouldings and millwork products are primarily entered under the following Harmonized Tariff Schedule of the United States (HTSUS) numbers: 4409.10.0500, 4409.10.1020, 4409.10.1040, 4409.10.1060, 4409.10.1080, 4409.10.4010, 4409.10.4090, 4409.10.4500, 4409.10.5000, 4409.10.9020, 4409.10.9040, 4409.22.0590, 4409.22.1000, 4409.22.4000, 4409.22.5000, 4409.22.5020, 4409.22.5040, 4409.22.5060, 4409.22.5090, 4409.22.9000, 4409.22.9020, 4409.22.9030, 4409.22.9045, 4409.22.9060, 4409.22.9090, 4409.29.0665, 4409.29.1100, 4409.29.4100, 4409.29.5100, 4409.29.9100, 4412.99.5115, 4412.99.9500, 4418.91.9095, and 4421.91.9780. Imports of wood mouldings and millwork products may also enter under HTSUS numbers: 4409.10.6000, 4409.10.6500, 4409.22.6000, 4409.22.6500, 4409.29.6100, 4409.29.6600, 4412.41.0000, 4412.42.0000, 4412.49.0000, 4412.91.5115, 4412.92.5215, 4412.99.9700, 4418.20.4000, 4418.20.8030, 4418.20.8060, 4418.91.9195, 4418.99.9095, 4418.99.9195, 4421.91.9880, 4421.99.9780, and 4421.99.9880.

While the HTSUS subheadings are provided for convenience and customs purposes, the written description of the scope of the *Orders* is dispositive.

### V.    LEGAL FRAMEWORK

Pursuant to Commerce's regulations, Commerce may base its determination regarding whether a product is covered by the scope of an order on the scope language alone, including the descriptions of merchandise expressly excluded from the scope, where such language is dispositive.[15] Thus, when a scope ruling application is filed with Commerce, as a starting point, Commerce examines the language of the scope of the order and the description of the product contained in the application.[16]

Commerce may also take into account primary interpretive sources in making a scope ruling, including: the descriptions of the merchandise in the petition and the initial investigation; previous or concurrent determinations by Commerce, including prior scope rulings, memoranda, or clarifications pertaining to both the order at issue, as well as other orders with same or similar scope language as that of the order at issue; and determinations of the U.S. International Trade Commission (ITC) pertaining to the order at issue, including reports issued pursuant to the {ITC's} initial investigation.[17] Additionally, Commerce may consider secondary interpretive sources in making a scope ruling, such as any other determinations of Commerce or the ITC, U.S. Customs and Border Protection (CBP) rulings or determinations, industry usage, dictionaries, and any other relevant record evidence.[18] However, to the extent that these secondary interpretive sources conflict with primary interpretive sources under 19 CFR 351.225(k)(1)(i), the primary interpretive sources will normally govern.[19] If Commerce determines that the primary and/or

---

[14] *See Wooden Cabinets and Vanities and Components Thereof from the People's Republic of China: Countervailing Duty Order*, 85 FR 22134 (April 21, 2020).
[15] *See* 19 CFR 351.225(k)(1).
[16] *See Walgreen Co. v. United States*, 620 F.3d 1350, 1357 (Fed. Cir. 2010) (*Walgreen*).
[17] *See* 19 CFR 351.225(k)(1)(i).
[18] *See* 19 CFR 351.225(k)(1)(ii).
[19] *Id*.

5

secondary sources are determinative, it will issue a final scope ruling as to whether the merchandise is subject to the scope of the order at issue.[20]

Where Commerce determines that the sources described in 19 CFR 351.225(k)(1) are not dispositive, it will consider five additional factors provided in 19 CFR 351.225(k)(2)(i). These factors are: (A) the physical characteristics of the product; (B) the expectations of the ultimate users; (C) the ultimate use of the product; (D) the channels of trade in which the product is sold; and (E) the manner in which the product is advertised and displayed. In the event of a conflict between these factors, the physical characteristics of the product will normally be allotted greater weight than other factors in 19 CFR 351.225(k)(2)(i).[21]

The determination as to which analytical framework is most appropriate in a given scope inquiry is made on a case-by-case basis, and may be applied on a producer-specific, exporter-specific, or importer-specific basis, or some combination thereof, or to all products from the same country with the same relevant physical characteristics as the product at issue, on a country-wide basis, regardless of the producer, exporter, or importer of the products.[22]

## VI. COMMENTS

*CAMP'S Comments*
- Commerce should find that Blinds to Go's feedstock falls within the scope of the AD/CVD orders on wood mouldings and millwork products from China.[23]
- The products are made from basswood and cut to specific dimensions, with a UV finish applied to all surfaces except the ends.[24] However, the scope language has no size restrictions and covers products regardless of finish.[25] The scope language also explicitly includes "continuously shaped" wood mouldings, which matches the description of the feedstock components.[26]
- Feedstock components are planed, shaped, cut into feedstock, optionally decorated, and coated with UV protection, similar to the production process of other in-scope wood products.[27]
- Commerce previously declined to initiate a changed circumstances review for wood shutter components, affirming their inclusion in the scope.[28] CAMP made clear its intent to cover window components such as shutter slats, and Commerce affirmed this by including shutter components in scope.[29]
- The production process for wood shutter and blind components is virtually identical, making it difficult to distinguish blind components from other in-scope products.[30]

---

[20] *See* 19 CFR 351.225(h); *see also* 19 CFR 351.225(k)(2)(i).
[21] *See* 19 CFR 351.225(k)(2)(ii).
[22] *See* 19 CFR 351.225(m)(1).
[23] *See* CAMP's Comments at 1-2.
[24] *Id.* at 2.
[25] *Id.*
[26] *Id.*
[27] *Id.* at 3.
[28] *Id.* at 3 (citing CAMP's Scope Application Comments, at 5, Exhibit 1).
[29] *Id.* at 3-4 (citing Blinds to Go Scope Ruling Request at 14-15).
[30] *Id.*

- Therefore, Commerce should not draw artificial distinctions between shutter and blind components simply due to minor differences in dimension or use.[31]
- CAMP refutes Commerce's preliminary comparison to the Ralph Friedland & Brother, Inc. Scope Ruling (Friedland), arguing that the unfinished wood pieces in that case were "rough," "not decorative," "of poor quality," and akin to scrap.[32] Commerce's reference to the Loveday Lumber Company, Inc. Scope Ruling (Loveday) is also inappropriate, as the products in that case were roughly sawn, unfinished wood strips used temporarily in construction before being discarded.[33] BTG's feedstock, by contrast, is fully shaped, planed, and coated, making it a finished product.[34]
- It is consistent with both of Commerce's prior scope rulings and CAMP's original intent to treat unfinished materials as out-of-scope while keeping finished mouldings in scope.[35]
- Terms like "architectural accessory" or "building component" are broad and undefined and thus should not serve as scope-limiting criteria.[36] CAMP urges Commerce to reverse its preliminary finding, stating that analogies to past rulings involving out-of-scope merchandise are misplaced and should be reconsidered.[37]

*BTG's Rebuttal Comments*
- Commerce correctly found that the requested feedstock is outside the scope of the AD/CVD Orders on Wood Mouldings and Millwork Products from China.[38]
- CAMP repeats arguments from its initial submission and fails to engage meaningfully with the scope language or the record.[39] CAMP emphasizes physical similarity between BTG's feedstock and in-scope mouldings,[40] but does not define what constitutes wood moulding or millwork, which BTG identifies as the threshold issue.[41]
- *Hardware* requires Commerce to ground its scope analysis in the plain language of the order, not just physical characteristics.[42] CAMP ignores terms actually used in the scope, such as "architectural accessories" and "building components," even as they argue those terms are irrelevant.[43] CAMP's reasoning attempts to divorce scope interpretation from the actual regulatory text, in violation of long-standing legal precedent such as *Walgreen*.[44]
- BTG rebuts CAMP's argument against drawing a fine line between shutters and blinds by pointing out that CAMP itself previously distinguished shutters as permanent architectural

---

[31] *Id.*
[32] *Id.* at 5 (citing Preliminary Scope Determination at 8, Attachment I (containing Memorandum, "Antidumping and Countervailing Duty Orders on Wood Mouldings and Millwork Products from the People's Republic of China on Wooden Window Shade Slats," dated January 14, 2025 (RFB Scope Ruling)).).
[33] *Id.* (citing Preliminary Scope Determination at 8, Attachment II (containing Memorandum, "Antidumping and Countervailing Duty Orders on Wood Mouldings and Millwork Products from the People's Republic of China: Request by Loveday Lumber Company," Inc., dated May 16, 2022 (Loveday Lumber Scope Ruling)).).
[34] *Id.*
[35] *Id.* at 6.
[36] *Id.* at 7.
[37] *Id.*
[38] *See* BTG's Comments at 2 (citing Preliminary Scope Determination).
[39] *Id.* at 2.
[40] *See* CAMP's Comments at 2-3, 6.
[41] *See* BTG's Comments at 2.
[42] *Id.* (citing *Hardware Resources v. United States,* Slip op. 24-140 (CIT December 16, 2024) (*Hardware*)).
[43] *Id.* at 2-3 (citing Preliminary Scope Determination at 6).
[44] *Id.* at 3 (citing *Walgreen Co. v. United States*, 620 F.3d 1350, 1357 (Fed. Cir. 2010) (*Walgreen*)).

- elements and blinds as temporary, lightweight items.[45] BTG supports Commerce's preliminary scope determination, emphasizing that the distinction is well-established and based on consistent differences in design, installation, and functionality across the record.[46]
- BTG rejects CAMP's attempt to distinguish between "unfinished/semifinished" and "finished" products, arguing this framework is unsupported by the scope language, which expressly includes unfinished items requiring final machining.[47] BTG asserts that prior rulings like Friedland[48] and Loveday[49] excluded items not based on finish status, but because they were not considered wood mouldings or millwork at all, and contends that the feedstock here is similarly outside the scope based on its physical and functional characteristics.[50]

## VII.    PREVIOUS SCOPE RULINGS

Ralph Friedland & Brother, Inc. Scope Ruling
- Ralph Friedland & Brother, Inc. (RFB) submitted a scope ruling request to determine if its wooden window shade slats fall within the scope of the *Orders*.[51]
- RFB argued that the slats are not meant for construction applications and are essentially scrap material, used solely as a component of window shade assemblies.[52] The slats were not intended to be covered by the scope according to the CAMP's description in the original petition for the *Orders*.[53]
- Commerce determined that RFB's wooden window shade slats are indeed outside the scope of the *Orders*.[54]

Loveday Lumber Company, Inc. Scope Ruling
- Loveday Lumber Company, Inc. (Loveday Lumber) submitted a scope ruling request to determine if its LWS scarf-jointed wood reveal strips (triangular or trapezoidal) and LWS wood squares fall within the scope of the *Orders*.[55]
- Loveday Lumber argued that these rough-sawn items are not continuously shaped, finger-jointed, or edge-glued mouldings and therefore do not meet the definition of millwork products.[56] It pointed out that the products are saw-cut without additional planing or shaping and serve only as temporary components in concrete form systems, after which they are

---

[45] *Id.* (citing Preliminary Scope Determination at 10-11).
[46] *Id.*
[47] *Id.* at 3-4 (citing *AD Order*).
[48] *See* Preliminary Scope Determination at Attachment I (containing Memorandum, "Antidumping and Countervailing Duty Orders on Wood Mouldings and Millwork Products from the People's Republic of China on Wooden Window Shade Slats," dated January 14, 2025 (RFB Scope Ruling)).
[49] *See* Preliminary Scope Determination at Attachment II of (containing Memorandum, "Antidumping and Countervailing Duty Orders on Wood Mouldings and Millwork Products from the People's Republic of China: Request by Loveday Lumber Company," Inc., dated May 16, 2022 (Loveday Lumber Scope Ruling)).
[50] *See* BTG's Comments at 4.
[51] *See* Preliminary Scope Determination at Attachment I (containing RFB Scope Ruling at 1).
[52] *Id*. (containing RFB Scope Ruling at 6).
[53] *Id.* (containing RFB Scope Ruling at 7).
[54] *Id.* (containing RFB Scope Ruling at 8).
[55] *Id.* (containing Loveday Lumber Scope Ruling at 9).
[56] *Id.* (containing Loveday Lumber Scope Ruling at 5).

discarded.[57] It also noted that similar products had been excluded in the underlying investigations.[58]
- Commerce determined that Loveday Lumber's LWS scarf-jointed wood reveal strips and squares are outside the scope of the *Orders*.[59]

## VIII. ANALYSIS

In this scope inquiry, we find that the sources provided in 19 CFR 351.225(k)(1), *i.e.*, the plain language of the scope, along with the product descriptions provided in the Scope Ruling Application, previous scope ruling decisions, the ITC determination and parties comments are dispositive in determining whether BTG's feedstock for wooden slats for window blinds, feedstock for wooden bottom rails for window blinds, and feedstock for wooden valances for window blinds are within the scope of the *Orders*. Therefore, Commerce did not analyze the additional factors provided in 19 CFR 351.225(k)(2).

The scope of the *Orders* specifically covers:

> {W}ood, LVL, bamboo, or a combination of wood and composite materials that is continuously shaped throughout its length (with the exception of any endwork/dados), profiled wood having a repetitive design in relief, similar milled wood, architectural accessories (emphasis added), such as rosettes and plinth blocks, and finger-jointed or edge-glued moulding or millwork blanks (whether or not resawn). The scope includes continuously shaped wood in the forms of dowels, building components (emphasis added) such as interior paneling and jamb parts, and door components such as rails, stiles, interior and exterior door frames or jambs (including split, flat, stop applied, single or double-rabbeted), frame or jamb kits, and packaged door frame trim or casing sets, whether or not the door components are imported as part of a door kit or set. The covered products may be solid wood, laminated, finger-jointed, edge-glued, face-glued, or otherwise joined in the production or remanufacturing process and are covered by the scope whether imported raw, coated (*e.g.*, gesso, polymer, or plastic), primed, painted, stained, or wrapped.

CAMP's arguments primarily focus on claims of physical similarity, noting that BTG's feedstock are "plainly covered by the physical description of the scope" because they are "made from basswood," "cut to specific widths and thicknesses," and "continuously shaped to a pattern along their length."[60] However, this line of reasoning ignores the fact that the scope language as a whole emphasizes form and intended function. The critical characteristics involve the product being a moulding or millwork blank and being continuously shaped for a structural or architectural purpose, as the scope identifies the types of products covered as "architectural accessories, such as rosettes and plinth blocks, and finger-jointed or edge-glued moulding or millwork blanks..." and "building components such as interior paneling and jamb parts, and door components such as rails, stiles, interior and exterior door frames or jambs...whether or not the

---

[57] *Id.*
[58] *Id.*
[59] *Id.* (containing Loveday Lumber Scope Ruling at 11).
[60] *See* CAMP's Comments at 2.

9

Case 1:23-cv-00150-JAL    Document 68    Filed 12/23/25    Page 12 of 19

Barcode:4857491-01 A-570-117 SCO - Scope Inquiry  -  Blinds To Go Feedstock

door components are imported as part of a door kit or set."[61]  These examples all point toward permanent or semi-permanent installation in buildings, whereas BTG's feedstock is used in removable, lightweight consumer goods.  CAMP's focus on physical features ignores the product's ultimate nature and purpose, which is inconsistent with the architectural or building components described in the scope.[62]  BTG states that this undermines the definitional inquiry required by *Hardware*, where the Court emphasized the need to first determine whether the article is a moulding or millwork product as a threshold matter.[63]

CAMP's claim that the *Orders* do not require in-scope merchandise to be permanently installed takes the scope language out of context.[64]  While it is true that the *Orders* do not contain the phrase "permanently installed," the scope consistently references items that are architectural or structural in nature.[65]  When BTG states that "in-scope articles are the types of articles that are permanently affixed to or in buildings in construction"[66] BTG "uses "permanent" in the sense that articles require substantial effort to remove and would be considered fixtures that are expected to convey with a property".[67]  This is in contrast to the "few screws necessary for blinds to be removed",[68] which is important because blind feedstock components are designed for convenience and marketed as removable products that do not alter or convey with the structure.[69]  CAMP further argues that imposing a permanent installation requirement or threshold would open the door to circumvention.[70]  However, Commerce has not imposed a new threshold beyond the scope; instead, it interprets the existing language by reference to the examples and context provided in the *Orders*.  The k(1) sources says the, "Secretary will consider the language of the scope and may make its determination on this basis alone if the language of the scope, including the descriptions of merchandise expressly excluded from the scope, is dispositive."[71]  Commerce relies heavily on these product examples listed in the scope language to serve as the interpretive framework for describing covered merchandise.  Interpreting the scope to include lightweight, removable consumer items, such as blind feedstock, would sweep in products never intended to be covered, and is contrary to the scope language, the ITC descriptions, and Friedland.  Furthermore, CAMP also argues that the terms "architectural accessory" and "building component" are broad and undefined, but this argument overlooks the interpretive function of examples.[72]

CAMP argues that BTG's feedstock components fall within the scope because they are cut to specific dimensions, coated with a UV finish, and continuously shaped along their length, which CAMP claims meet the physical characteristics of the scope and are plainly wood mouldings and millwork products.[73]  However, this interpretation isolates individual terms without considering the broader architectural context in which those terms are used.  The slat stock and bottom rail

---

[61] *See Orders*.
[62] *See* CAMP'S Comments at 2.
[63] *See* BTG's Comments at 2-3 (citing *Hardware*).
[64] *See* CAMP's Comments at 6.
[65] *See Orders*.
[66] *See* Scope Ruling Application at 10.
[67] *Id*.
[68] *Id*.
[69] *Id*. at 3-4.
[70] *See* CAMP's Comments at 6.
[71] *See* 19 CFR 351.225(k)(1)(i).
[72] *Id*.
[73] *See* CAMP's Comments at 2.

10

stock undergo basic sawing and planing to achieve light, thin dimensions necessary for use in window blinds.[74] Although a finish color and UV protection have been added, these components lack decorative profiling or architectural styling.[75] The valance stock, while shaped with optional customer-specified design elements, does not exhibit the type of milled profile or repetitive design in relief that characterizes in-scope mouldings.[76] There is no indication in the record that any of these products is intended to serve decorative or structural purposes within a building.[77] When the scope language is read as a whole, it becomes clear that "continuously shaped" refers to wood products that are shaped for architectural or building applications.[78] The shaping described in the scope is linked to structural or architectural products, such as rails, jambs, and rosettes, which are either decorative or functional fixtures used in construction.[79] As affirmed in *Walgreen*, "the language of the order itself … remains the 'cornerstone' in any scope determination."[80] This means Commerce need not rely solely on isolated descriptors, such as "continuously shaped," to define scope coverage.[81] The analysis must account for the full scope language, including key qualifying terms such as "architectural accessory" and "building component."[82]

Furthermore, the mere presence of a UV coating or basic dimensional cutting does not transform a non-architectural item into a building component, particularly when the shaping is minimal and the product lacks any functional or decorative role in construction. BTG states that, "while all parties say they agree Commerce must begin its analysis with the language of the scope of the *Orders*, Petitioners have again argued for a scope wholly divorced from the words in the scope."[83] We agree with BTG that this is contrary to longstanding law in *Walgreen*.[84] However, even if we were to base the analysis on physical similarity, the feedstock components do not resemble the mouldings illustrated in the U.S. International Trade Commission (ITC) Report.[85] As shown in Figure I-1 of the ITC Report, mouldings are thick, contoured wood products intended to be permanently affixed to structures.[86] By contrast, Attachment 1 of BTG's Scope Ruling Application states that the feedstocks are thin, flat, and lightweight, designed solely for use in the production of wooden window blinds and unsuitable for any other architectural or structural application. Thus, the dimensional characteristics of mouldings underscore the architectural function absent from BTG's feedstock.

CAMP then claims that the production process for Blinds to Go's products also matches the manufacturing process for other in-scope wood mouldings and millwork products.[87] CAMP notes that the feedstock is sawn, planed, shaped, cut to length, and coated, which it argues is analogous

---

[74] *See* Scope Ruling Application at 5.
[75] *Id.*
[76] *Id.*
[77] *Id.*
[78] *See Orders.*
[79] *Id.*
[80] *See Walgreen*, 620 F.3d at 1357.
[81] *Id.*
[82] *See Orders.*
[83] *See* BTG's Comments at 3 (citing *Walgreen*, 620 F.3d at 1357).
[84] *Id.*
[85] *See* Wood Mouldings and Millwork Products from China Investigation, Nos. 701-TA-636 and 731-TA-1470 (Final), dated February 2021 (ITC Report), available at: https://www.usitc.gov/publications/701_731/pub5157.pdf.
[86] *Id.* at I-14.
[87] *See* CAMP's Comments at 3.

11

to the processes used to produce in-scope products.[88]  BTG's feedstock, though sawn, planed, and coated, results in thin, flat strips designed exclusively for blinds, which do not match the profiled, contoured shapes (*e.g.*, mouldings, rosettes, plinth blocks) or structurally substantial forms of mouldings, blanks, or door and jamb components described in the scope.  Furthermore, in CAMP's 2020 rebuttal comments[89] regarding the scope of the investigations, CAMP explained that the production process of shutters "starts with lumber that is cut, finger-jointed to the appropriate length and bonded together, sent through a moulding machine for formation into the appropriate shape, primed, and painted."[90]  However, BTG noted in its scope ruling application that none of its feedstock components were finger-jointed.[91]  The production process of feedstocks did not involve bonding and was not sent through a molding machine; instead, the lumber was sawed, planed, and shaped to maximize the amount of feedstocks.[92]  The production process of shutters would result in a product that is intended as a permanent fixture, while all three feedstocks are simple and physically insubstantial. [93]

CAMP argues that "while there may be minor differences in the physical parameters of these products or how they are installed, that does not change the fact that they ultimately serve the same purpose (*i.e.*, window covering) and are physically comparable products."[94]  The finished wooden window blinds shown in Attachment 1, Figure 1.6 of BTG's Scope Ruling Application consist of thin slats hung loosely from a window opening.[95]  They can be easily removed without professional installation and, even when closed, allow light and air to pass through the free-swinging edges.[96]  By contrast, as shown in Attachment 4, shutters are permanent fixtures installed within a frame that resembles casing or trim. [97]  Their wider louvers not only block sun glare more effectively but also reinforce their architectural character as in-scope millwork products.[98]  Feedstocks are not as thick and heavy as shutters, and do not possess the louver design that allows the insertion of pivot point pins on the ends of the louvers necessary for the louvers to open and close.  Therefore, technically, they do not serve the same purpose. "If you want a temporary treatment for your standard windows, you can use a window blind. But an interior shutter gives you a permanent solution that offers light management, energy efficiency, and increased home value."[99]  CAMP argues that Commerce overstated the significance of the physical and functional differences between shutters and blinds.[100]  However, shutters are intended to be permanently affixed to a window frame, similar to the way crown moulding is affixed to the angle where a ceiling meets a wall, which makes shutters essentially architectural

---

[88] *Id.*
[89] *See* Scope Ruling Application at Attachment 2.3 (containing CAMP's Letter, "Wood Mouldings and Millwork Products from Brazil and the People's Republic of China:  Rebuttal Scope Comments," dated March 13, 2020, at 13-15).
[90] *Id.* at Attachment 2.3 (containing CAMP's Letter, "Wood Mouldings and Millwork Products from Brazil and the People's Republic of China:  Rebuttal Scope Comments," dated March 13, 2020 (CAMP's 2020 Comments), at 14).
[91] *Id.* at 3.
[92] *Id.* at 5 and Attachment 3.
[93] *Id.*
[94] *See* CAMP's Comments at 4.
[95] *See* Scope Ruling Application at Attachment 1, Figure 1.6.
[96] *Id*. at Attachment 1 and 4.
[97] *Id*. at Attachment 4.
[98] *Id*.
[99] *Id*.
[100] *See* CAMP's Comments at 4.

accessories.[101] This distinction is significant, and it is not an overstatement, because its permanence and design elements are what make the shutter an architectural accessory included in the scope language.[102] Shutters, by design, become part of the structure and serve an architectural role, whereas blinds remain removable furnishings that do not alter or integrate with the structure.[103]

Furthermore, CAMP argues that window blinds and wooden shutters should both be found in scope because they serve the same purpose (*i.e.*, window covering) and are physically comparable products.[104] However, in *Friedland*,[105] wooden slats, also designed for window coverings, were excluded despite sharing that purpose and because, like blinds, they lack any construction applications.

CAMP disregards the foundational distinction drawn by both Commerce and the ITC concerning permanent architectural use.[106] The ITC Report from the original investigation describes mouldings as items designed to be permanently affixed to a structure, serving specific roles like covering gaps,[107] framing openings,[108] and protecting walls.[109] This includes mouldings such as casing, crown, wall base, wall trim, and window-related architectural components like window frames and casings.[110] Similarly, the shutters shown in Attachment 4 are permanent fixtures installed within a frame that resembles casing or trim, further underscoring the architectural and structural nature of in-scope products.[111] These are fundamentally distinct from blind feedstock components, which are lightweight and easily removable and are exclusively used in the manufacturing of window blinds.[112] Moreover, the ITC Report makes no reference to window blinds or blind components in its product description, which confirms that blinds were not considered part of the domestic-like product during the investigation and were never contemplated as within the intended scope.[113]

In Friedland and Loveday, Commerce excluded wooden shade slats and LWS wood products because wooden shade slats lacked a construction application,[114] and LWS wood products were used in a temporary application.[115] CAMP argued that the BTG feedstock components should not be excluded from the scope because, unlike the products excluded in Friedland and Loveday, BTG's feedstock components are not rough, unfinished, or scrap-like, but rather are shaped, planed, and coated.[116] However, Commerce's determination in Friedland and Loveday was not

---

[101] *See* Scope Ruling Application at 12, Attachment 4.
[102] *See Orders*.
[103] *See* Scope Ruling Application at Attachment 4.
[104] *See* CAMP's Comments at 4.
[105] *Id*. at 4-5.
[106] *See* Preliminary Scope Determination at 12 (citing ITC Report).
[107] *Id.* (citing ITC Report at I-14-15).
[108] *Id.* (citing ITC Report at I-14).
[109] *Id.* (citing ITC Report at I-16).
[110] *Id.* (citing ITC Report at I-14).
[111] *See* Scope Ruling Application at Attachment 4.
[112] *Id.*
[113] *See* Preliminary Scope Determination at 12 (citing ITC Report).
[114] *Id.* at Attachment I of (containing RFB Scope Ruling at 7.)
[115] *Id.* at Attachment II of (containing Loveday Lumber Scope Ruling at 10).
[116] *See* CAMP's Comments at 4-5.

13

only driven by their finished status, but also by their intended purpose and function.[117] According to Friedland and the Petition, "the wooden window slats do not have any construction applications and do not, and cannot, serve as a covering for floors, walls, doors, or other areas"[118] Feedstock components are only intended for use in the manufacture of wooden window blinds.[119] In Loveday, Commerce stated that "Loveday Lumber's LWS wood products are not intended to be later manufactured into a moulding or piece of millwork."[120] Specifically, "Loveday Lumber describes its LWS wood products as temporary structural concrete forming products in the form of LWS wood reveal strips and squares."[121]

BTG argues that a distinction between "unfinished vs. finished" components is not rooted in the scope language and directly contradicts Friedland and Loveday, where exclusion was based on product type, not finish.[122] The scope explicitly covers products "whether imported raw, coated, primed, painted, stained, wrapped, or treated,"[123] meaning both unfinished and finished items are in scope if they meet the definition of mouldings or millwork. Therefore, CAMP's argument that BTG feedstock is "shaped, planed, and coated,"[124] implying "finished" status, is not a defining criterion in the scope language.[125] BTG states that the requested feedstocks are dissimilar to in-scope mouldings shown on pages 3 and 9 of the Preliminary Scope Determination, but similar in use and physical properties to the goods in Friedland and Loveday, which are shown on pages 10 and 11 of the Preliminary Scope Determination.[126] While BTG did not cite the specific quotes referenced in their comments, we reviewed the Preliminary Scope Determination to identify and provide the relevant language that appears to be referenced. On page 3, the physical description of the product is, "Wooden blinds are also easily installed and removed and are not considered to be a fixture when advertising or conveying property…Therefore, the critical design features of these stocks all relate to the proper operation of window blinds.[127] On Page 9 of the Preliminary Scope Determination, Commerce states, "the examples of 'architectural accessories' and 'building components' referenced in the scope language suggest products that are permanently affixed to or in buildings."[128] As such, these components fall outside the intended coverage of the *Orders*. Furthermore, on page 10 of the Preliminary Scope Determination, Commerce refers to how, "in Attachment 3, all three feedstocks are simple and physically insubstantial, which allows wooden window blinds to be sufficiently lightweight… BTG products… are used for the sole purpose of window blind production."[129] This supports that feedstocks are functionally aligned with the

---

[117] *See* Preliminary Scope Determination at Attachment I (containing RFB Scope Ruling at 7, 8) and Attachment II (containing Loveday Lumber Scope Ruling at 9).
[118] *Id*. at Attachment I (containing RFB Scope Ruling at 7); *see also* Scope Ruling Application at Attachment 2.2 of (containing CAMP'S Letter, "Wood Mouldings and Millwork Products from Brazil and the People's Republic of China: Petitions for the Imposition of Antidumping and Countervailing Duties," dated January 8, 2020 (Petition), at 14).
[119] *See* Scope Ruling Application at 14.
[120] *Id*.; *see also* Preliminary Scope Determination at Attachment II (containing Loveday Lumber Scope Ruling at 9).
[121] *Id*. at 10.
[122] *See* BTG's Comments at 3-4.
[123] *See* Orders.
[124] *See* CAMP's Comments at 5.
[125] *See* Orders.
[126] *See* BTG's Comments at 4 (citing Preliminary Scope Determination).
[127] *See* Preliminary Scope Determination at 3.
[128] *Id*. at 9.
[129] *Id*. at 10 (citing Scope Ruling Application at Attachment 3).

14

window slats in Friedland.[130] It also mirrors Loveday, where the Loveday products were temporary in nature and used for concrete forming, which were not for architectural or decorative purposes, making them fall outside the scope.[131] On page 11, the Preliminary Scope Determination states, "in the Friedland Scope Ruling…window shade slats made of wood… were found to be outside the scope… because they were not suitable for covering floors, doors, or other areas and the Petition did not intend to cover window blind components."[132] This section affirms how the Friedland Scope Ruling aligned in function with the feedstock components, which solidifies Commerce's reliance on prior rulings to exclude BTG's feedstock from the scope.

As part of its second supplemental response during the original investigation, CAMP explicitly stated that "Petitioner does not intend to cover window blind components, such as slats, valences, bottom rails, or shutter slats, within the scope."[133] This clarification was critical to Commerce's prior analysis in the Friedland Scope Ruling, where it was determined that similar wooden window shade slats were outside the scope of the *Orders*.[134] Accordingly, the current attempt by CAMP to now assert that feedstock components are in-scope merchandise stands in direct contradiction to its own prior representations, which Commerce considered in issuing prior determinations.

Furthermore, during the investigation CAMP made a distinction between shutters and window blinds by stating that, "while Petitioner acknowledges that it initially did not intend to cover window blind components such as shutter slats within the scope…components of shutter slats are indeed a wood moulding and millwork product."[135] In the investigation, CAMP did not draw any similarities between window blinds and millwork products; therefore, CAMP did not originally include blinds in the petition. CAMP highlights it would be difficult to distinguish wood shutter and blind components from other in-scope merchandise.[136] However, the record evidence does not demonstrate that BTG's feedstock components could be used for other wood mouldings and millwork products applications because of their lack of permanence. On the language of the petition, CAMP included in scope examples of architectural accessories and building components, such as "crown mouldings; cove mouldings; door frames and jambs; astragals; base caps; corner guards; base shoes; brickmoulds; drip caps; and battens" that are affixed to walls, floors, ceilings, or exterior openings.[137] Each serves an architectural or finishing function within a building, such as covering large angles and corners, framing or sealing door and window openings, protecting walls and exposed edges, concealing seams or uneven lines where building materials meet, and directing water away from structural surfaces.[138] None of these uses corresponds to movable or non-architectural items such as window blinds, confirming that the *Orders* target products used in construction and architectural applications.

---

[130] *Id*. at 10 and Attachment I (containing RFB Scope Ruling at 7, 8).
[131] *Id*. at 10 and Attachment II (containing Loveday Lumber Scope Ruling at 10-11).
[132] *Id*. at 11 and Attachment I (containing RFB Scope Ruling at 7, 8).
[133] *See* RFB Scope Ruling at 7; *see also* Scope Ruling Application at Attachment 2.3 (containing CAMP's 2020 Comments at 13 (citing CAMP's Letter, "Responses to Second Supplemental Questions on General Issues Volume I of Petition," dated January 22, 2020)).
[134] *See* RFB Scope Ruling at 7-8.
[135] *See* Scope Ruling Application at Attachment 2.3 (containing CAMP's 2020 Comments at 13-14).
[136] *See* Camp Comments at 5.
[137] *Id.* at 13, Attachment 2.2 (containing Petition at 6-7).
[138] *Id*. at Attachment 2.2 (containing Petition at 6-7).

CAMP argues that because Commerce declined to initiate a changed circumstances review (CCR) and found that shutter components should remain within the scope, the same rationale should be applied to the feedstock components.[139] The Preliminary Scope Determination notes how BTG emphasizes the significant physical and functional differences between shutters and blinds (*e.g.*, shutters' heavier, thicker louvers with pivot pins versus thin, lightweight blind slats), arguing that feedstock for blinds is not inherently architectural or permanently affixed."[140] The CCR denial was a procedural determination that did not substantively affirm or reexamine the scope status of shutter components, let alone blind feedstock components. The CCR denial stated that the Houston Shutter CCR request did not meet the criteria to initiate, "given that CAMP has expressly objected to the initiation of the scope exclusion CCR, indicating that its members produce the merchandise in question and are interested in such products remaining covered by the scope of the *Orders*, Houston Shutters has not demonstrated that changed circumstances exist to warrant a review…"[141] This language makes clear that the sole basis for denial was the lack of sufficient changed circumstances, specifically because CAMP expressed continued interest in covering the product.

In summary, we find that the description of the product contained in BTG's Scope Ruling Application is dispositive when considering the sources identified in 19 CFR 351.225(k)(1). Therefore, it is not necessary to consider the additional factors specified in 19 CFR 351.225(k)(2).

## X.    RECOMMENDATION

We recommend finding, based on 19 CFR 351.225(k)(1) and the description of the product contained in the Scope Ruling Application, that feedstock components are not within the scope of the *Orders*. If this recommendation is accepted, we will notify CBP of this determination. Specifically, in accordance with 19 CFR 351.225(l)(4), because entries of the products under consideration are not otherwise subject to suspension of liquidation as a result of another segment of the proceeding, we intend to instruct CBP:  (1) that feedstock components imported by BTG noted above are not subject to the Orders; and (2) to terminate the suspension of liquidation and refund any cash deposits for entries covered by this determination.  Further, we will convey a

---

[139] *See* CAMP'S Comments at 3 (citing CAMP's Letter, "Comments on Blinds to Go's Scope Ruling Application," January 15, 2025, at 5, Exhibit 1 (CAMP's Scope Application Comments) (containing Letter, "Wood Mouldings and Millwork Products from the People's Republic of China Changed Circumstances Review for Wood Shutter Components Scope Exclusion:  Determination Not to Initiate a Changed Circumstances Review," dated August 15, 2024 (CCR)).
[140] *Id.* at 10 (citing Scope Ruling Application at 14-16.)
[141] *See* CAMP'S Comments at 3 (citing CAMP's Scope Application Comments at 5, Exhibit 1 (containing CCR at 2).

copy of this final scope ruling to all parties to this proceeding, consistent with section 516A(a)(2)(A)(ii) of the Tariff Act of 1930, as amended, and as directed by 19 CFR 351.225(h).

☒   ☐
_____   _____
Agree   Disagree

12/22/2025

X  *Erin Begnal*
_____

Signed by: ERIN BEGNAL

Erin Begnal
Acting Deputy Assistant Secretary
 for Antidumping and Countervailing Duty Operations

17